Sealed

FILED by _____ S D.C.

OCT 2 9 2018

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

FEDERAL TRADE COMMISSION,

  Plaintiff,

   v.

SIMPLE HEALTH PLANS LLC *et al.*,

  Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No.** **18-62593-CV-GAYLES**

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR AN *EX
PARTE* TEMPORARY RESTRAINING
ORDER**

**TABLE OF CONTENTS**

I.      Introduction...................................................................................................1

II.     Defendants' Deceptive Business Practices....................................................2

        A.      Defendants' Deceptive Lead Generation Websites .............................4

        B.      Defendants' Deceptive Telemarketing Sales Pitch............................12

        C.      Defendants Enroll Consumers in Limited Benefit Plans and Medical
                Discount Memberships, Not Comprehensive Health Insurance.........16

        D.      Defendants' Limited Benefit Plans and Discount Memberships Do
                Not Pay for Medical Services Typically Covered by Comprehensive
                Health Insurance................................................................................19

        E.      Defendants' Sham "Verification" Process..........................................22

        F.      Defendants' Deceptive Cancellation and Refund Policies .................23

        G.      Consumer Injury................................................................................25

        H.      Other Law Enforcement Actions........................................................25

                1.      Cease and Desist Orders ..........................................................26

                2.      Florida Department of Financial Services Investigations.........26

                3.      Pennsylvania Investigation ......................................................27

                4.      Nebraska Attorney General Warning ........................................28

                5.      Montana Action........................................................................28

III.    Defendants .................................................................................................28

        A.      Corporate Defendants........................................................................29

B.     Individual Defendant ............................................................................30

C.     Common Enterprise ...........................................................................31

IV.    Argument ...................................................................................................32

A.     This Court Has the Authority to Grant the Requested Relief .............32

B.     The FTC Meets the Standard for Issuance of a Temporary Restraining Order .........................................................................................................33

      1.      The FTC is Likely to Succeed on the Merits .............................33

           a.      Defendants Are Violating the FTC Act ..........................34

           b.      Defendants Are Violating the TSR .................................36

           c.      Steven Dorfman Is Individually Liable ..........................37

      2.      The Balance of Equities Strongly Favors Injunctive Relief .....38

C.     The Temporary Restraining Order Should Include an Asset Freeze, Appointment of a Receiver, and Other Ancillary Relief ....................39

      1.      An Asset Freeze Is Necessary to Preserve the Possibility of Providing Restitution to Defendants' Victims ..........................39

      2.      A Temporary Receiver Is Necessary to Preserve the Status Quo. ................................................................................40

      3.      Immediate Access and Expedited Discovery Are Necessary to Preserve Evidence ..................................................................41

D.     The Temporary Restraining Order Should Be Issued *Ex Parte* ..........42

V.    Conclusion .................................................................................................43

## TABLE OF AUTHORITIES

### Cases

*AT&T Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309, 1319-20 (11th Cir. 2004) ............... 42

*Del. Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964) ............................................................ 31

*FTC and Florida v. Marcus*, No. 0:17-cv-60907-FAM (S.D. Fla. May 9, 2017) ........................ 33

*FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1234 (9th Cir. 1999) ......................................... 37

*FTC v. All Us Mktg. LLC et al.*, No. 6:15-cv-1016-ORL-28GJK (M.D. Fla. June 22, 2015) ...... 33

*FTC v. Am. Student Loan Consolidators, LLC*,
No. 17-61862-DPG (S.D. Fla. Sept. 26, 2017) ............................................................................. 33

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573-74 (7th Cir. 1989)) ........................................ 37

*FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 636 (7th Cir. 2005) ...................................... 37

*FTC v. Bishop*, 425 F. App'x 796 (11th Cir. 2011) ..................................................................... 33

*FTC v. D&S Mktg. Sols. LLC, et al.*,
No. 8:16-cv-01435-MSS-AAS (M.D. Fla. June 8, 2016) .............................................................. 33

*FTC v. DOTAuthority.com, Inc.*, 0:16-cv-62186-WJZ (S.D. Fla. Sept. 19, 2016) ...................... 33

*FTC v. FTN Promo., Inc.*, No. 8:07-CV-1279,
2008 WL 821937, *2 (M.D. Fla. March 26, 2008) ........................................................................ 37

*FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996) ................................. 32, 37, 39, 40

*FTC v. IAB Mktg. Assoc., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014) ........... 33, 35, 37, 38, 39, 40

*FTC v. Jordan Ashley*, No. 93-2257, 1994 WL 200775, *3 (S.D. Fla. Apr. 5, 1994) ................. 37

*FTC v. Lanier Law, LLC*, 715 F. App'x 970, 979 (11th Cir. 2017) ............................................. 31

*FTC v. Mail Tree, Inc.*, No. 0:15-cv-61034-JIC (S.D. Fla. May 19, 2015) .................................. 33

*FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994) ................................................. 34

*FTC v. Partners in Health Care Assoc., Inc.*,
No. 1:14-cv-23109-RNS (S.D. Fla. Aug. 25, 2014) ...................................................................... 33

*FTC v. Partners in Health Care Ass'n, Inc.*,
189 F. Supp. 3d 1356, 1367-68 (S.D. Fla. 2016) ........................................................ 38

*FTC v. People Credit First, LLC*, 244 F. App'x 942, 944 (11th Cir. 2007) .................................. 34

*FTC v. Pointbreak Media, LLC*, No. 0:18-cv-61017-CMA (S.D. Fla. May 7, 2018) ................. 32

*FTC v. Primary Grp, Inc.*, 2015 WL 12976115, at *4 (N.D. Ga. June 8, 2015) ......................... 33

*FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1329 (M.D. Fla. 2010) ................... 34, 35

*FTC v. SlimAmerica, Inc.*, 77 F. Supp.2d 1263, 1272 (S.D. Fla. 1999) ...................................... 35

*FTC v. Strategic Student Sols. LLC*, No. 9:17-cv-80619-WPD (S.D. Fla. May 15, 2017) .......... 33

*FTC v. Student Debt Doctor, LLC*, No. 17-cv-61937-WPD (S.D. Fla. Oct. 3, 2017) ................. 32

*FTC. v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1267 (S.D. Fla. 2007) .................. 34, 35

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217 (11th Cir. 1991) .............................................. 33

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir. 1984) .............................. 32, 39, 40

*FTC v. USA Fin., LLC*, 415 F. App'x 970, 976 (11th Cir. 2011) ........................................... 32, 37

*FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012) ......................... 31, 33, 36

*FTC v. Wash. Data Res.*, 2009 WL 4885033 at *11 (M.D. Fla. Dec. 14, 2009) ......................... 33

*FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005) .............................................. 37

*FTC v. World Patent Mktg., Inc. et al.*,
No. 1:17-cv-20848-DPG (S.D. Fla. Mar. 8, 2017) ............................................................... 33, 40

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988) ................... 39

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) .................................. 33, 39

*Levi Strauss & Co. v. Sunrise Int'l Trading*, 51 F.3d 982, 985 (11th Cir. 1995) ....................... 33

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989) ........................................ 36

*Resort Car Rental Sys., Inc v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) ..................................... 36

*SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 438 (5th Cir. 1981) .............................................. 41

## STATUTES

Federal Trade Commission Act, 15 U.S.C. § 45(a) ........................................................ 34

15 U.S.C. § 53(b) ........................................................................................................... 32

## RULES

Telemarketing Sales Rule, 16 C.F.R. § 310.3(a)(4) ...................................................... 36

16 C.F.R. § 310.2(dd) .................................................................................................... 36

16 C.F.R. § 310.2(ff) ..................................................................................................... 36

16 C.F.R. § 310.2(gg) .................................................................................................... 36

16 C.F.R. § 310.3(a)(2)(iii) ........................................................................................... 36

16 C.F.R. § 310.3(a)(2)(vii) .......................................................................................... 36

Fed. R. Civ. P. 65(b) ..................................................................................................... 42

## I.    INTRODUCTION

The Federal Trade Commission ("FTC") asks this Court to halt a massive deceptive telemarketing scheme based in southern Florida that falsely claims to be selling comprehensive health insurance plans to consumers across the country.  Doing business as Simple Health Plans, Defendants prey on consumers seeking affordable health insurance, many of whom are uninsured and have preexisting medical conditions.  Defendants gain consumers' trust by falsely claiming to be affiliated with reputable organizations, such as the Blue Cross Blue Shield Association and AARP, and by falsely claiming to be experts on, and providers of, government-sponsored health insurance policies, such as those offered pursuant to the Affordable Care Act. Defendants then deceive consumers into paying hundreds of dollars per month for what they are led to believe is comprehensive health insurance.  Instead, Defendants enroll consumers in products that provide few, if any, of the fundamental benefits of comprehensive health insurance. These alternative products consist of discount memberships and indemnity policies that offer negligible reimbursements on only a subset of medical services regardless of their actual cost. Deceived consumers are effectively left uninsured and subjected to nearly unlimited financial exposure.  Many of Defendants' victims only learn that they are still uninsured after incurring tens of thousands of dollars in medical expenses.  In stark contrast, the architect of this scam, defendant Steven Dorfman, has siphoned millions of dollars of proceeds from defrauded consumers to pay for private jet travel, gambling sprees in Las Vegas, the rent for his oceanfront condominium, luxury automobiles, over $1 million in jewelry, and even the nearly $300,000 cost of his recent wedding at the St. Regis Hotel in Miami.

The FTC brings this motion *ex parte* to immediately halt Defendants' ongoing unlawful conduct, which has caused well over $150 million in consumer injury.  Without swift action,

significant consumer injury is imminent because November 1 begins Open Enrollment for the Affordable Care Act, a period during which Defendants have historically increased their sales by as much as 350%. The temporary restraining order ("TRO") sought by the FTC would enjoin Defendants' deceptive sales practices, freeze their assets, appoint a temporary receiver, and provide access to Defendants' business premises and records. The requested relief is supported by overwhelming evidence of Defendants' fraud. This evidence includes multiple declarations from consumers victimized by Defendants as well as a transcript of a sales call between a consumer and one of Defendants' telemarketers; declarations from two of Defendants' former employees describing the extent to which Defendants' business practices are permeated by fraud; transcripts of three undercover purchases conducted by FTC staff; copies of a management-approved sales script that is deceptive on its face; an expert witness's analysis of the products Defendants offer; and declarations from representatives of the Blue Cross Blue Shield Association, AARP, and the Better Business Bureau. The relief requested in this motion is necessary to prevent continued consumer injury, dissipation of assets, and destruction of evidence, thereby preserving this Court's ability to provide effective final relief to the victims of Defendants' scheme.

## II.    DEFENDANTS' DECEPTIVE BUSINESS PRACTICES

Defendants' business model is a classic bait-and-switch scheme designed to trick consumers into paying hundreds of dollars for substandard products under the pretense that they are actually receiving comprehensive health insurance. This "insurance," Defendants claim, will supposedly cover nearly every aspect of health care, including, but not limited to, doctor visits, specialists, hospital stays, laboratory services, emergency room visits, and prescription medication. Defendants also blatantly mislead many consumers into believing that they will

receive government-sponsored health insurance, including insurance plans that comply with the guidelines set by the Affordable Care Act ("ACA").

The advantages of a health insurance policy that complies with the standards set by the ACA are substantial. For example, those enrolled in ACA-qualified plans are not required to pay a fee imposed on individuals who can afford insurance but choose not to purchase it.[1] Other advantages of ACA-qualified insurance include coverage of preexisting conditions as well as "essential health benefits," including emergency medical care, hospitalization, prescription medication, preventive care, maternity care, and pediatric care.[2]

In reality, Defendants enroll consumers in limited benefit indemnity plans and discount memberships that provide virtually none of the promised benefits. Unlike comprehensive health insurance, which shifts significant financial risk from the consumer to the insurance company, Defendants' products do not pay any portion of consumers' healthcare costs. At most, they may provide nominal reimbursements and potential savings for certain expenses. The "benefits" afforded by these products are generally deficient on their face (such as a $50 annual limit for hospital emergency room care), highly suspect (such as a purported $634 in savings on "life extension naturopaths"), or completely unrelated to medical care (such as pet medication, magazine subscriptions, car rental, and cell phone service). The financial consequences for many consumers are devastating, often saddling them with tens of thousands of dollars in

---

[1] Many consumers specifically inform Defendants that they want an ACA plan to avoid paying this fee. Plaintiff's Exhibit ("PX") 10, Declaration of Dawn Hall ("Hall Dec.") ¶¶ 3 & 5 (consumer "made it clear [she] wanted to avoid the tax penalty"); PX 13, Declaration of April Macary ("Macary Dec.") ¶ 4 (consumer told telemarketer she wanted "to avoid incurring a tax penalty"); PX 21, Declaration of Catherine Touchet ("Touchet Dec.") ¶ 4 (consumer wanted to "be sure that [she] would not incur a tax penalty"); PX 22, Declaration of Shannon Van Deusen ("Van Deusen Dec.") ¶ 3 (consumer "told the agent" she did not want to be obligated to "pay the penalty for failing to obtain insurance").
[2] PX 23, Declaration of Expert Witness Dr. Brian Miller ("Miller Dec.") p. 15.

healthcare bills that they thought would be covered by the "insurance" they had purchased from
Defendants.

### A.   Defendants' Deceptive Lead Generation Websites

Defendants advertise their products primarily through a network of deceptive lead
generation websites that make a variety of false claims, including that Defendants: (1) specialize
in providing affordable, comprehensive health insurance from an array of reputable carriers; (2)
are affiliated with the Blue Cross Blue Shield Association and AARP; and (3) are experts on, and
providers of, government-sponsored health insurance, including plans offered pursuant to the
ACA and Medicare.[3]  Consumers typically find their way to these websites after searching
online for health insurance.[4]

---

[3] Defendants own some of these lead generation websites themselves, and also pay third parties
for leads.  *See* PX 1, Declaration of Roberto C. Menjivar ("Menjivar Dec.") ¶¶ 27 & 81-86; PX
5, Declaration of Emil George ("George Dec.") ¶ 38.  Defendants register all of their lead
generation websites using a privacy protection service that shields their identity.  PX 1, Menjivar
Dec. ¶¶ 14-25 & ¶¶ 28-39.  Similarly, the mailing address displayed on most of these sites is not
publicly associated with Defendants, but is instead a UPS Store maildrop.  *Id.* ¶¶ 12 & 28.

[4] PX 6, Declaration of Dawn Banski ("Banski Dec.") ¶ 32; PX 9, Declaration of Jane Hackethal
("Hackethal Dec.") ¶ 2; PX 10, Hall Dec. ¶ 4; PX 11, Declaration of Ryan Hess ("Hess Dec.") ¶
2; PX 12, Declaration of David Llamas ("Llamas Dec.") ¶ 3; PX 13, Macary Dec. ¶ 2; PX 14,
Declaration of Holly Mandarich ("Mandarich Dec.") ¶ 2; PX 15, Declaration of Roger Prescher
("Prescher Dec.") ¶ 3; PX 16, Declaration of Amanda Scott ("Scott Dec.") ¶ 2; PX 17,
Declaration of Vicki Skordilis ("Skordilis Dec.") ¶ 2; PX 18, Declaration of Gertrude Slawson
("Slawson Dec.") ¶ 2; PX 20, Declaration of Michelle Thompson ("Thompson Dec.") ¶ 2; PX
21, Touchet Dec. ¶ 2 PX 22, Van Deusen Dec. ¶ 2.  In some instances, consumers follow links
received in email or text messages that Defendants pay affiliate marketers to disseminate.  *See,
e.g.,* PX 1, Menjivar Dec. ¶ 18 (premiumhealthquotes.com registered to Defendants), ¶ 37
(capture of premiumhealthquotes.com), ¶ 84 (affiliate marketing campaigns for Premium Health
Quotes), & ¶ 86 and p. 659 (unsolicited email promoting Premium Health Quotes).  *See also id.* ¶
80 and pp. 636-43 (class action text spam lawsuit filed against Defendants); PX 7, Declaration of
Curtis Conner ("Conner Dec.") ¶ 2 and p. 4 (email received by consumer with telephone number
linked to Defendants that stated: "Find Out About TrumpCare Today . . . Open Enrollment Is
Here.").

Defendants' lead generation websites deceptively claim that consumers who submit their contact information[5] will receive multiple quotes for comprehensive health insurance from "the Nation's Leading Carriers" and that these policies will include benefits such as prescription drug coverage, access to doctors and specialists as well as hospital and emergency care – all for "low co-pays" and "affordable premiums."[6]  Defendants falsely assert that they "work closely with most insurers to provide an unbiased comparison of plan benefits, premium cost, and eligibility."[7]  On one of their sites, healthinsurane4me.com, Defendants misleadingly claim that they have "assisted hundreds of thousands of consumers with their enrollment in major medical insurance."[8]  The site includes a mock breaking-news video announcing that Defendants offer "top quality health insurance for as much as 66% less than Obamacare."[9]  The fake newscaster in this video, displayed below, claims that Defendants' policies include "low co-pays and cover items like doctor visits, access to specialists, prescription benefits, coverage for hospitalization and emergency room visits."[10]

---

[5] To receive a call from Defendants, consumers must submit a form with their contact information as well as information regarding any preexisting medical conditions, such as HIV, diabetes, cancer, and mental illness.  PX 1, Menjivar Dec. ¶¶ 35, 38 & 39 and pp. 227, 273 & 289.

[6] PX 1, Menjivar Dec. ¶¶ 30, 33, 35, 36, 37, 40 & 41 and pp. 153, 186, 218, 235, 244, 294 & 305.

[7] *Id.* ¶¶ 39 & 40 and pp. 257 & 277.

[8] *Id.* ¶ 39 and pp. 276-277.

[9] *Id.* ¶¶ 40 & 41 and pp. 294, 302 & 303.

[10] *Id.* ¶¶ 40 & 41 and pp. 294 & 305.



The announcer closes with this flagrantly deceptive guarantee: "This is not a discount health card; it's real insurance."[11]

Many of Defendants' lead generation websites also display the Blue Cross Blue Shield or AARP logos.[12]  One site, www.trumpcarequotes.com, shown below, prominently features the Anthem BlueCross logo. [13]



---

[11] *Id.* ¶ 40 and p. 294.
[12] PX 1, Menjivar Dec.  ¶¶ 29 (usamedsupp.org), 33 (trumpcarequotes.com) & 42 (hbcquotes.direct and myobamacareapplication.com) and pp. 138, 186, 310 & 314.
[13] *Id.* ¶ 33 and p. 186.

These sites also identify "Anthem BCBS" and the "Blue Cross/Blue Shield Association Companies" as "carriers and partners" of Defendants.[14]  In fact, Defendants are not affiliated with the Blue Cross Blue Shield Association or AARP and are not authorized to use the trademarks of these organizations.[15]

Defendants aggressively exploit widespread uncertainty and confusion regarding the ACA by pretending on their lead generation websites to be experts on, or providers of, government-sponsored insurance.[16]  These sites often refer to the ACA and terms associated with it, such as "Obamacare."  For example, one site operated by a lead generator affiliated with

---

[14] *Id.* ¶ 29 and p. 148 (usamedsupp.org), ¶ 30 and p. 161 (usahealthinsure.net), ¶ 32 and p. 181 (americanhealthinsure.com), ¶ 33 and p. 203 (trumpcarequotes.com), ¶ 34 and p. 213 (medigapquote.com), ¶ 35 and p. 230 (freedomcarequotes.com), ¶ 37 and p. 251 (premiumhealthquotes.com), ¶ 38 and p. 266 (supremehealthplans.com) & ¶ 39 (healthinsurance4me.com) and p. 284.

[15] PX 27, Declaration of Leslie Nettleford ¶ 4 (AARP); PX 29, Declaration of Jeffrey Hinshaw ¶¶ 5-9 (Blue Cross Blue Shield Association).

[16] Defendants make similar claims regarding their ability to advise consumers about the ACA in press releases and media interviews.  Specifically, Defendants have claimed that their employees provide better guidance to consumers about the ACA in particular, and health insurance options in general, than ACA-certified advisors (called "navigators").  In a newspaper interview, for example, Defendants' chief compliance officer asserted that, compared to navigators, her employees "have the freedom to help the consumer figure out what's in their best interest." PX 1, Menjivar Dec. ¶ 50 and p. 384.  Similarly, in a press release, Defendant Steven Dorfman claimed that his employees have a "deeper, surer feel of the policies, companies, and networks, and how they compare." *See* Health Benefits Center press release (Jan. 20, 2015), https://www.marketwatch.com/press-release/theres-still-time-for-aca-obamacare-open-enrollment-here-are-some-questions-answers-and-maybe-surprises-2015-01-20.  An ACA navigator is an individual or organization trained to help consumers look for health coverage options available through the ACA.  Navigators are required to be unbiased, and their services are free to consumers.  Defendants' telemarketers, by contrast, are compensated solely based on commissions.  PX 30, Declaration of Terena Baker ("Baker Dec.") ¶ 8 (former salesperson).  Moreover, as explained below, they follow deceptive scripts designed to sell inferior limited benefit plans and discount memberships, not comprehensive health insurance, much less ACA-qualified plans.  *Id.* ¶¶ 11- 13; PX 31, Declaration of Lovely Seraphin ("Seraphin Dec.") ¶ 31 (former manager) ("As everyone at Simple Health knows, however, the company's limited benefit plans are significantly inferior to traditional health insurance.").

Defendants, displayed below, prominently refers to the "Obamacare Marketplace" and features the Blue Cross Blue Shield logo:[17]



Even this site's address, <u>obamacare-plans.com</u>, is misleading.

On their lead generation websites, Defendants falsely claim that they have helped "hundreds of thousands of consumers" enroll in "Obamacare."[18] These sites assert that Defendants either will provide consumers with quotes for ACA insurance plans or help consumers who are shopping for such plans.[19] The sites refer to both the ACA and Medicare,

---

[17] PX 1, Menjivar Dec. ¶ 27 and pp. 129-130. One consumer was first contacted by Defendants after submitting her telephone number to the obamacare-plans.com lead generation site. PX 14, Mandarich Dec. ¶ 2. Similarly, another consumer reported being called by Defendants after submitting his contact information to a different deceptive lead generation website, official-plans.com. PX 1, Menjivar 1, ¶ 27 and p. 132-136; PX 19, Declaration of Michael Stanley ("Stanley Dec.") ¶ 2.

[18] PX 1, Menjivar Dec. ¶¶ 38 & 39 and pp. 257 & 276-77.

[19] Some of Defendants' lead generation websites deceptively advise consumers that they will receive "health insurance quotes" that "may include a combination of state exchange plans, federal exchange plans, and private health insurance." Id. ¶ 33 and p. 186 (trumpcarequotes.com), ¶ 36 and p. 236 (americashealthcareadvisors.com). Other sites promise that Defendants can "help" consumers "interested in shopping on a state or federal exchange." Id. ¶ 32 and p.173 (americanhealthinsure.com), ¶ 30 and p. 153 (usahealthinsure.net), ¶ 31 and p.

using terms associated with these programs.[20]  One site registered to Defendants at the URL

healthinsurancedeadline2018.com,[21] displayed below, warns that uninsured consumers "will pay

an average Obamacare penalty of almost $1000," cautions that this amount "is likely to increase

in the coming year," and urges consumers to "beat the deadline" and "[a]void these penalties by

getting insured today."[22]

---

165 (healthinsurancedeadline2018.com).  "Exchange" is a reference to the health insurance marketplace established pursuant to the ACA, which assists consumers in shopping for and enrolling in ACA-qualified health insurance.

[20] Defendants also use the ACA as an employee recruitment tool, promising that prospective employees "WILL HAVE MONEY THROWN AT YOU" during "open enrollment."  One of Defendants' job postings features a cigar-smoking man throwing money in the air next to the statement:  "If you are not making money hand over first [*sic*] this open enrollment you are not making the most of your time left on this earth.  Well guess what . . . here is your golden opportunity to MAKE THAT MONEY!"  *Id.* ¶ 48 and p. 370.  Under the ACA, "open enrollment" is a period during which individuals or employees may add or drop their health insurance, or make changes to their coverage.  There is no such period for Defendants' limited benefit plans and medical discount memberships.

[21] *Id.* ¶ 31 and p. 165.

[22] Defendants also operate sites that promote "Medicare Health Plans for Your Needs and Budget," invite consumers to "Learn about Medicare and Choose a Plan with Confidence" and "Compare Medicare Quotes," and feature the AARP logo.  *Id.* ¶ 29 and p. 138 (usamedsupp.org) & ¶ 42 and p. 318 (simplemedicareplans.com).



In fact, Defendants do not sell government-sponsored healthcare plans or provide advice regarding such plans.  Indeed, they do the opposite, actively misleading consumers about the availability and affordability of their options under the ACA by steering consumers into markedly inferior products even after consumers have explicitly stated that they want an ACA-

qualified health insurance plan.[23]  During 2015, while publicly boasting about their superior

ability to advise consumers about options under the ACA,[24] Defendants admitted to state

regulators that out of the 103,000 policies they sold that year, only 30 were ACA-qualified (that

is, less than 0.029% of their total sales volume).[25]  Defendants then completely exited the ACA

marketplace in 2016.[26]  Despite this, their websites continue *to this date* to promote their non-

existent expertise regarding government-sponsored health insurance.[27]

    This lack of scruples has paid off.  During the first month of open enrollment in 2017,

Defendants experienced a 350% increase in revenue.[28]  According to a former employee,

Defendants' telemarketers can easily double their sales during this period.[29]

---

[23] *See, e.g.*, PX 14, Mandarich Dec. ¶ 3 ("I specifically asked him to confirm that the plan was
ACA-compliant and he assured me that it was."); PX 13, Macary Dec. ¶ 4 (same); PX 21,
Touchet ¶ 3 (same).  Tellingly, the monthly "premiums" that Defendants quoted during the
FTC's three undercover transactions were roughly comparable to what the undercover persona
would pay for a "bronze" ACA-qualified health insurance policy with comprehensive coverage.
PX 23, Miller Dec. pp. 13 (Fig. 3), 29 (Fig. 8) & 32 (Fig. 10).  Nevertheless, Defendants'
telemarketers offered the same indemnity plan to each caller, which lacks most of the ACA's
essential health benefits and exposes consumers to greater financial risk.  PX 23, Miller Dec. pp.
12-13 (Fig. 2), p. 27 (Fig. 7) & p. 30 (Fig. 9).

[24] *See supra* note 16.

[25] PX 1, Menjivar Dec. ¶ 75 and p. 560.

[26] In a letter to the Florida Department of Financial Services dated February 4, 2016, Defendants
stated they chose "not to participate in the Federal Insurance Marketplace this year."  *Id.* at p.
558.  *See also* PX 30, Baker Dec. ¶ 10 (former salesperson) ("As far as I knew, Simple Health
did not offer ACA-qualified plans").

[27] On their primary, consumer-facing website, Defendants claim that their "one objective" is to
"help consumers through the complexities of the Affordable Care Act."  PX 1, Menjivar Dec. ¶
43 and pp. 321 & 333.  Another section claims that defendant Steven Dorfman "positioned
Simple Health to capitalize on the rollout of the Affordable Care Act, aka Obamacare."  *See*
www.simplehealthplans.com/steve-dorfman.php.  Defendants also operate a lead generation
website at the URL myobamacareapplication.com.  PX 1, Menjivar Dec. ¶¶ 25 & 42 and pp.
309-312.

[28] *Id.* ¶ 64 and p 413.  This spike in sales also led to an increase in chargebacks, which itself led
to the eventual termination of Defendants' existing merchant account for "excessive risk."  *Id.* ¶
61 and p. 411.

**B.      Defendants' Deceptive Telemarketing Sales Pitch**

Many consumers who submit their contact information to the deceptive lead generation

websites described above receive a call from one of Defendants' telemarketers,[30] who typically

identify themselves as an insurance agent licensed in the consumer's state.[31]   In many instances,

these telemarketers are not, in fact, properly licensed insurance agents.[32]

In calls with consumers, Defendants' telemarketers purport to offer comprehensive health

insurance for a one-time enrollment fee of up to $175 as well as an ongoing monthly "premium"

of up to $700 or more.[33]   When making this pitch, telemarketers follow a management-approved

script that is deceptive on its face.[34]   Defendants' script repeatedly and misleadingly

---

[29] PX 30, Baker Dec. ¶ 8.  The same former employee observed a corresponding surge in "lies and deception" by Defendants' telemarketers and noted that management rarely, if ever, disciplined anyone for this conduct.  *Id.* ¶ 14.

[30] *See, e.g.,* PX 9, Hackethal Dec. ¶ 2; PX 12, Hess Dec. ¶ 2; PX 13, Scott Dec. ¶ 2; PX 14, Mandarich Dec. ¶ 2; PX 19, Stanley Dec. ¶ 2.  Some consumers contact Defendants directly by calling one of the telephone numbers displayed on Defendants' lead generation websites.  PX 6, Banski Dec. ¶ 2; PX 13, Macary Dec. ¶ 3

[31] *See, e.g.,* PX 1, Menjivar ¶ 67 and pp. 417 & 422.

[32] PX 31, Seraphin Dec. ¶¶ 19 & 43 (former customer service manager describing Defendants' practice of attributing sales to her license without her knowledge or consent); PX 30, Baker Dec. ¶¶ 20-21 (similar testimony from former salesperson).

[33] *See, e.g.,* PX 6, Banski Dec. ¶ 5 ($119 enrollment fee, $312 monthly "premium" for "PPO" health insurance plan); PX 9, Hackethal Dec. ¶ 6 ($145 enrollment fee, $514 monthly "premium" for "PPO health insurance policy"); PX 10, Hall Dec. ¶ 5 ($155 enrollment fee, $283 monthly "premium" for "PPO health insurance plan"); PX 13, Macary Dec. ¶ 5 ($360 monthly "premium" for ACA-compliant health insurance policy); PX 14, Mandarich Dec. ¶ 4 ($120 enrollment fee, $88 monthly "premium" for ACA-compliant health insurance policy); PX 15, Prescher Dec. ¶ 5 ($150 enrollment fee, $720 monthly "premium" for "PPO" health insurance policy); PX 17, Skordilis Dec. ¶¶ 3-6 ($125 application fee, $312 monthly fee for major medical "PPO" health insurance plan); PX 20, Thompson Dec. ¶ 3 ($125 enrollment fee, $265 monthly "premium" for major medical health insurance policy); PX 21, Touchet Dec. ¶ 3 ($125 enrollment fee, $79 monthly fee for major medical coverage that complied with "Obamacare" requirements); PX 22, Van Deusen Dec. ¶¶ 3-4 ($80 enrollment fee, $277 monthly "premium" for ACA-compliant major medical health insurance).

[34] PX 24, Declaration of Michael Fissel ("Fissel Dec.) ¶ 11 and pp. 4-8; PX 30, Baker Dec. ¶ 9 and pp. 7-10 (former salesperson); PX 31, Seraphin Dec. ¶¶ 18 & 31 (former manager) (scripts

characterizes the limited benefit plans and discount memberships sold to consumers as "PPOs."[35]

It also deceptively uses other insurance terms of art, such as "premium," "copay" and

"deductible" that simply do not apply to Defendants' products.[36]

Building on these facially deceptive scripts, telemarketers often falsely claim that

Defendants' "PPO" "insurance" plans cover preexisting medical conditions[37] and prescription

medications.[38]  Many telemarketers go even further, leading consumers to believe they are

receiving ACA-qualified health plans.[39]

---

"were deliberately designed to give consumers the impression that the coverage provided by
Simple Health's limited benefit plans was equal to, if not better than, major medical insurance").
[35] As explained by the FTC's expert witness, these products are not PPOs.  By definition, a PPO
contracts with a broad range of healthcare providers, including physicians and hospitals,
designated as the "preferred" network.  Plan members who use these so-called preferred
providers are charged a favorable copay that counts toward their annual deductible.  Defendants'
limited benefit plans and discount memberships, by contrast, have no preferred network with
favorable contracting terms and therefore cannot be considered a PPO.  PX 23, Miller Dec. p. 9.
Nevertheless, in accordance with Defendants' script, telemarketers consistently describe them as
a type of "PPO" "insurance."  *See, e.g.,* PX 1, Menjivar Dec. 1, ¶ 67 and p. 418 ("So this is an A-
rated carrier and a PPO"); PX 2, Declaration of Kenneth Hawkins ("Hawkins Dec.") ¶ 8 and p. 9
("We got you approved as a PPO [sic] with an A-plus rated carrier"); PX 3, Declaration of
Nathaniel Al-Najjar ("Al-Najjar Dec.") ¶ 9 and p. 14 ("A-rated carrier and a PPO"); PX 7,
Conner Dec. ¶ 5; PX 18, Slawson Dec. ¶ 3 and p. 18 ("You got a good PPO insurance").
[36] PX 7, Conner Dec. ¶ 5; PX 23, Miller Dec. pp. 9-10; PX 30, Baker ¶ 12 (former salesperson).
[37] PX 1, Menjivar Dec. ¶ 67 and p. 418 ("They don't discriminate against any of your preexisting
conditions"); PX 2, Hawkins Dec. ¶ 8 and p. 10; PX 3, Al-Najjar Dec. ¶ 9 and p. 15 ("It will
cover the preexisting condition of your daughter"); PX 9, Hackethal Dec. ¶ 4; PX 11, Hess Dec.
¶ 5; PX 12, Llamas Dec. ¶ 4; PX 15, Prescher Dec. ¶ 4 ("I specified that the policy needed to
cover certain preexisting medical conditions that my wife and I had been diagnosed with and
identified these conditions to the agent"); PX 19, Stanley Dec. ¶ 4.
[38] PX 1, Menjivar Dec. ¶ 67 and pp. 419, 421; PX 2, Hawkins Dec. ¶ 8 and p. 9 ("You get a plan
that has . . . prescriptions coverage") and p. 10 ("So, remember, it covers your prescriptions");
PX 9, Hackethal Dec. ¶ 9; PX 15, Prescher Dec. ¶ 4; PX 17, Skordilis Dec. ¶ 5 ($3-6 for generic
prescriptions, $15-40 for name brand prescriptions); PX 19, Stanley Dec. ¶ 4 ($4 to $12 for
generic prescriptions, $5 to $20 for name brand prescriptions); PX 20, Thompson Dec. ¶ 3 ($14
for generic prescriptions, $35 for name brand prescriptions).
[39] PX 9, Hackethal Dec. ¶ 6; PX 10, Hall Dec. ¶¶ 3 & 5; PX 13, Macary Dec. ¶¶ 4-5; PX 14,
Mandarich Dec. ¶ 3; PX 21, Touchet Dec. ¶¶ 3-4; PX 22, Van Deusen Dec. ¶ 3. *See also* PX 24,
Fissel Dec. ¶ 13, Att. B (interview with former salesperson, who stated that script was "sketchy"
and that employees "would dance around the question if asked if the plan was ACA compliant");

At the end of Defendants' sales pitch, consumers expect that they will receive a comprehensive health insurance policy that covers prescription medication, laboratory services, primary and specialty doctor visits, and hospital care.[40]  Defendants even guarantee some consumers that specific doctors or medications will be covered by their plan with only minimal copays.[41]

---

PX 30, Baker Dec. ¶¶ 14-15 (former salesperson) (employees lied regularly to consumers, bragged to one another about it, and were rarely, if ever, disciplined by management, who only cared about sales and seemed to deliberately exploit confusion regarding the ACA).

[40] *See, e.g.,* PX 1, Menjivar Dec. ¶ 67 and p. 418 ("You're going to have doctor office visits, diagnostic testing for blood and lab, three options on your medications, medical, surgical and hospital coverage with no deductible"); PX 2, Hawkins Dec. ¶ 8 and p. 9 ("what you receive with the policy is going to be doctor visits, diagnostic testing, so blood and lab work … [m]edications will be covered, surgical, and hospital coverage"); PX 8, Declaration of Jules Fernandez ("Fernandez Dec.") ¶ 5 (plan benefits "included no out-of-pocket expenses for major health healthcare services; acceptance at every hospital and urgent care center; low deductible; and, depending on the doctor, I may or may not have a co-pay"); PX 9, Hackethal Dec. ¶ 4 ("The agent assured me that he would find a plan that enabled me to see any doctor I wanted and would also cover all of my pre-existing conditions and current medications"); PX 16, Scott Dec. ¶ 4 (telemarketer repeatedly assured consumer that she would receive major medical insurance, which the consumer understood meant a plan that would cover "hospital and doctor visits, medical tests, and prescription drugs"); PX 18, Slawson Dec. ¶ 4 ("Nellie told me that the policy she offered would cover doctor's visits, lab work, and surgical costs, that it required no deductible, no claim forms, and that it had no limits."); PX 19, Stanley Dec. ¶ 4 (telemarketer "indicated that the insurance plan would cover doctor visits, diagnostic testing, medical and surgical procedures, hospitalization").

[41] *See, e.g.,* PX 1 Menjivar Dec. ¶ 67 and pp. 420, 421 ($25 copay for unlimited doctor visits, and $4-$12 copay for prescription medications); PX 14, Mandarich Dec. ¶ 3 (plan included doctors in consumers' area); PX 15, Prescher Dec. ¶ 4 ($35 copay for doctor visits); PX 17, Skordilis Dec. ¶ 5 (telemarketer claimed that plan had no deductible for hospitalization, maximum out-of-pocket expense of $1,250 per person per year, $35 copay for urgent care visits, and a $50 copay for emergency room visits); PX 18, Slawson Dec. ¶ 12 and p. 14 ("You will never pay more than $50 to see a doctor, okay?"); PX 19, Stanley Dec. ¶ 6 (telemarketer assured consumer that doctor was within plan's network); PX 20, Thompson Dec. ¶ 3 (telemarketer claimed "plan had no deductibles, that the copay for doctor visits was $10 for primary care physicians and $30 for specialists . . . and [consumer] would pay under $35 for name brand prescriptions and under $14 for generic prescriptions"); PX 21, Touchet Dec. ¶ 3 (consumer was promised that plan would include doctor visits, clinic visits, and prescription all with a $20 copay).

In three undercover calls conducted by the FTC, telemarketers made misrepresentations consistent with – and often more egregious than – Defendants' facially deceptive sales script.  In one undercover transaction, Defendants' telemarketer claimed to find a "PPO" "health insurance" policy that would cover preexisting conditions, including diabetes treatment needed by the caller's daughter.[42]  The telemarketer not only guaranteed the plan would "cover the preexisting condition of your daughter," but claimed that Defendants' "system" specifically selected the plan "because it does cover preexisting conditions."[43]  Notwithstanding these unequivocal assurances, Defendants actually sold the caller a limited benefit "hospital indemnity" policy and a discount membership, among other products, not comprehensive health insurance.[44]  What's more, plan documents plainly show that the child's diabetes and all related treatments are excluded for 12 months from even the exceedingly narrow benefits conferred by the "indemnity" policy because diabetes would be classified as a preexisting condition.[45]

Even Defendants' managers personally engage in this deception.  During one of the FTC's undercover calls, a manager who identified himself as "Kirsch" intervened and assured the caller that his medical needs would be "covered 100 percent" by Defendants' "health insurance plan." [46]  "Kirsch" also promised the caller that he did not "have to worry about being

---

[42] PX 3, Al-Najjar Dec. ¶ 9 and p. 15.

[43] *Id.*

[44] *Id.* ¶ 11 and pp. 37, 59 ("THIS PROGRAM IS NOT INSURANCE.  IT IS A DISCOUNT PROGRAM.") & ¶ 12 and pp. 79-80 ("Accident & Sickness Hospital Indemnity Plan").

[45] *Id.* at p. 47 ("There is no coverage for a pre-existing condition for a continuous period of 12 months following the effective date of a Covered Person's coverage under the Policy.").  The coverage limitations defined in these documents are, in many respects, ludicrous on their face. "Emergency Room Benefit," for example, is limited to $50 per day with a maximum of one day of coverage per year.  PX 3, Al-Najjar Dec. ¶ 11 and p. 39.  The maximum annual coverage is limited to just $3200.  PX 23, Miller Dec. p. 22.

[46] PX 1, Menjivar Dec. ¶ 67 and p. 433.  "Kirsch" is likely Kirschner Alteme, the agent in charge of defendant Health Benefits One.  *Id.* at ¶ 7 and p. 124.

penalized" under the ACA.[47]  The plan documents provided after the purchase belie these

representations, however, showing that the limited benefit and discount membership, as

discussed below in section II.D, would have covered only a fraction of his medical expenses.[48]

The same documents also acknowledge that enrollment in the policies alone may result in

additional tax payments, a reference to the ACA penalty the consumer would have incurred

despite enrolling in Defendants' program.[49]

### C.    Defendants Enroll Consumers in Limited Benefit Plans and Medical Discount Memberships, Not Comprehensive Health Insurance

The vast majority of consumers who contact Defendants do so in search of

comprehensive health insurance, including ACA-qualified health plans.[50]  Contrary to promises

on their lead generation websites and in telemarketing calls, Defendants do not sell

comprehensive health insurance policies to these consumers, much less policies from "the

nation's leading" carriers, such as Anthem Blue Cross.  Instead, Defendants typically enroll

---

[47] *Id.* at ¶ 67 and p. 433.

[48] Consumers do not have an opportunity to see these documents prior to completing the sale.  If consumers ask for written documentation about the plans before agreeing to purchase them, telemarketers refuse and state that they are not capable of providing documentation. *See* PX 21, Touchet Dec. ¶ 4; PX 9, Hackethal Dec. ¶ 9; PX 19, Stanley Dec. ¶¶ 10-11.

[49] PX 1, Menjivar Dec. ¶ 33 and p. 448 ("accident & sickness hospital indemnity plan is not major medical. . . . Lack of major medical coverage (or other minimum essential coverage) may result in an additional payment with your taxes").

[50] PX 30, Baker Dec. ¶¶ 10-11 (former salesperson); PX 31, Seraphin Dec. ¶ 31 (former manager). *See also* PX 6, Banski Dec. ¶ 4 (consumer specifically asked for "a traditional individual health insurance plan that would provide comprehensive coverage"); PX 9, Hackethal Dec. ¶ 4 (consumer asked for "major medical insurance with low deductibles and copays"); PX 13, Macary Dec. ¶ 3 (consumer asked for "full medical coverage"); PX 15, Prescher Dec. ¶ 4 (consumer explained that he wanted "full medical health insurance similar to my current policy with Aetna"); PX 17, Skordilis Dec. ¶¶ 3 & 4 (consumer, a retired nurse, asked for "major medical health insurance" and asked specific questions about coverage she required); PX 20, Thompson Dec. ¶ 4 ("I reiterated that I wanted a nation-wide full coverage major medical insurance plan"); PX 21, Touchet Dec. ¶ 3 (consumer asked for "affordable preferred provider organization plan with full medical coverage"); PX 22, Van Deusen Dec. ¶ 3 (consumer informed telemarketer that she needed "major medical insurance that met all the requirements of the Affordable Care Act").

consumers in at least two inferior products: a limited benefit plan (also known as an indemnity plan or hospital indemnity plan) and a medical discount membership.[51]  These products offer virtually none of the benefits of traditional health insurance and subject consumers to nearly unlimited financial exposure for medical expenses.[52]

Defendants' limited benefit plans claim to partially reimburse consumers for three narrow categories of medical expenses, but the purported reimbursements are grossly inadequate in relation to real healthcare costs and are far less than what an actual comprehensive insurance policy would cover.  For example, Defendants' typical limited benefit plan restricts total yearly coverage to:  $100 per day for hospital care with a maximum of 30 days per year; $50 per doctors' office visit with a maximum of three visits per year; and $50 per day for emergency room care with a single day of coverage per year.[53]  In other words, the *maximum* annual reimbursement allowable under Defendants' plan is just $3200.[54]  Moreover, an individual could only realize this benefit *after* being hospitalized for at least 30 days and incurring the associated financial burden, which the plan would not begin to cover,[55] assuming the claims were even paid

---

[51] Defendants frequently bundle accidental death and dismemberment plans with the other products sold to consumers.  These "AD&D" plans are limited benefit life insurance policies with a separate monthly premium.  *See* PX 6, Banski Dec. ¶ 9 and pp. 15-17, 24-25; PX 11, Hess Dec. ¶ 11 and pp. 14 & 20; PX 12, Llamas Dec. ¶ 7 and p. 15; PX 16, Scott Dec. ¶ 11 and pp. 28-31, 36-39; PX 22, Van Deusen Dec. ¶ 6 and pp. 12-24.

[52] Unlike traditional health insurance, these products do not shift risk from the consumer to an insurer.  PX 23, Miller Dec. pp. 10 ("In major medical plans . . . the health plan bears the supermajority of both the financial and clinical risk. . . . In contrast, in Simple Health's plans, the consumer bears those risks both because of the product design . . . and because the Simple Health plans offer extremely limited scope of covered services.") & 20 (medical discount plans are not risk bearing).

[53] *See, e.g.*, PX 1, Menjivar Dec. ¶ 70 and p. 459; PX 2, Hawkins Dec. ¶ 12 and p. 62; PX 3, Al-Najjar Dec. ¶ 11 and p. 39.

[54] *See* PX 23, Miller Dec. p. 22.

[55] For 2015, the average adjusted cost for inpatient care in U.S. hospitals was $2,271 per day. *See* Henry J. Kaiser Family Foundation, "Hospital Adjusted Expenses per Inpatient Day," https://www.kff.org/health-costs/state-indicator/expenses-per-inpatient-day/.  In fact,

out.[56]  Aside from their negligible financial coverage, Defendants' plans also contain numerous,

gaping exclusions and omissions.  In particular, despite explicit promises to the contrary by

Defendants' telemarketers[57] and their lead generation websites,[58] the plans exclude coverage of

preexisting medical conditions for the first year and provide no coverage for prescription

medications.[59]

Defendants' discount memberships, meanwhile, merely purport to provide consumers

with access to various pre-negotiated savings from third parties, only some of which relate to

healthcare.  In addition to trivial prescription drug discounts,[60] for example, these discounts

supposedly also apply to identity theft protection, cell phone service, flowers, vitamins, travel,

car rental and purchase, diet and exercise programs, magazine subscriptions, pet insurance and

medications, dining, and movie tickets.[61]  Other membership programs purport to offer

thousands of dollars' worth of benefits consisting of access to "wellness specialists," "life

---

Defendants' own lead generation website scares consumers into purchasing their plans by
claiming that a three-day hospital stay could cost "around $30,000."  PX 1, Menjivar Dec. ¶ 31
and p. 165.  *See also* PX 23, Miller Dec. pp. 17-18 (discussing "conservative" estimates of
inpatient hospital costs based on Medicare statistics).

[56] PX 17, Skordilis ¶ 9 (all of consumer's claims denied).

[57] *See, e.g.,* PX 1, Menjivar Dec. ¶ 67 and p. 418; PX 3, Al-Najjar Dec. ¶9 and pp. 14-15; PX 9,
Hackethal Dec. ¶ 4; PX 11, Hess Dec. ¶ 5; PX 12, Llamas Dec. ¶ 4; PX 15, Prescher Dec. ¶ 4 ("I
specified that the policy needed to cover certain preexisting medical conditions . . . and identified
these conditions to the agent"); PX 19, Stanley Dec. ¶ 4.

[58] *See, e.g.,* PX 1, Menjivar ¶ 39 and pp. 294, 305.

[59] *Id.* ¶ 69 and p. 448 ("This insurance does not pay any benefits for Sickness caused by or
resulting from a Covered Person's Pre-existing Condition if the Sickness occurs during the first
12 months that a Covered Person is insured under this policy"); PX 2, Hawkins Dec. ¶ 11 and p.
39 (same); PX 3, Al-Najjar Dec. ¶ 11 and p. 47 ("There is no coverage for a pre-existing
condition for a continuous period of 12 months following the effective date of a Covered
Person's coverage under the Policy").  Defendants' plans also do not cover nurse practitioners,
physician assistants, rehabilitation hospitals, or psychiatric hospitals.  PX 23, Miller Dec. p. 19.

[60] PX 10, Hall Dec. ¶ 10 (attempted to purchase prescription with a $70 retail price and was told
that Defendants' plan would provide a discount of three dollars).

[61] PX 1, Menjivar Dec. ¶ 70 and pp. 473-90 (NCE Lifestyle Saving Program) & 513-17 (Med-
Sense Guaranteed Association); PX 2, Hawkins Dec. ¶ 12 and pp. 76-78 & pp. 108-09.

extension naturopaths," and "comprehensive education lifestyle coaching."[62]  Whatever their

benefits, however, these memberships do not provide consumers with the comprehensive health

insurance they thought they were purchasing.[63]

**D.      Defendants' Limited Benefit Plans and Discount Memberships Do Not Pay for Medical Services Typically Covered by Comprehensive Health Insurance**

Consumers are unable to use Defendants' limited benefits plans and discount

memberships to pay for medical expenses or receive meaningful discounts or savings for such

expenses.  For example, one consumer agreed to pay $283 per month as well as a $155

enrollment fee for what Defendants' telemarketer led her to believe would be an ACA-qualified

health insurance plan.[64]  The consumer brought her "insurance" card to the pharmacy to fill

prescriptions only to discover that it was a prescription discount plan, not insurance, and that it

entitled her to a savings of just three dollars.[65]  Defendants advised another consumer to schedule

medical appointments through a so-called "concierge" service available as a part of what the

telemarketer assured the consumer was an ACA-qualified plan with no deductibles purchased for

$277 per month with an $80 enrollment fee.[66]  When the consumer attempted to make an

appointment with her doctor, she learned that Defendants' plan would not cover any of the costs

of such a visit.[67]

---

[62] PX 16, Scott Dec. ¶ 12 and p. 51 ($634 in purported savings on "life extension vitamins and supplements" and $125 in purported savings on "pet care"); PX 22, Van Deusen Dec. ¶ 11 and p. 38.

[63] PX 23, Miller Dec. p. 20 ("Discount memberships do not guarantee coverage of medical services or pharmaceutical products, rather they serve as a 'buyer's club' akin to a grocery store savers card. . . . I am unaware in all my years of practicing medicine, regulation, and health insurance of discount memberships like the ones sold by Simple Health playing any significant role in the provision of healthcare.").

[64] PX 10, Hall Dec. ¶ 5.

[65] *Id.* ¶ 10.

[66] PX 22, Van Deusen Dec. ¶ 3, 4, 10.

[67] *Id.* ¶ 14.

One of the FTC's undercover transactions illustrates the gulf between what Defendants promise in their sales pitch and the meager benefits available to consumers under Defendants' plans. During this call, an FTC investigator asked about coverage for two particular specialists at the Emory Clinic in Atlanta as well as multiple preexisting conditions.[68]  Defendants' telemarketer claimed that the investigator qualified for a comprehensive "PPO" health insurance plan with a $263 monthly "premium."[69]  According to the telemarketer, (1) the two Emory specialists identified by the investigator were in the plan's preferred provider network;[70] (2) the investigator would be able to schedule unlimited appointments with these physicians and pay no more than $25 per visit;[71] and (3) the plan would allow the investigator to obtain the diabetes drug Victoza for $4 to $12 per prescription.[72]  All of these claims are patently false.  Defendants enrolled the investigator in a "hospital indemnity" plan, not comprehensive health insurance.[73] This plan has no contractual relationship with the Emory Clinic – thus, a patient attempting to use this plan with the physicians identified by the investigator would be treated as uninsured and, for a routine office visit, billed at a rate of $232 to $458, not $25 as promised by Defendants' telemarketer.[74]  The telemarketer's assurances regarding prescription drug costs proved equally misleading.  Defendants enrolled the FTC's investigator in a prescription discount program that

---

[68] PX 1, Menjivar Dec. ¶ 67 and pp. 417, 420.

[69] *Id.* at p. 418 ("So this is an A-rated carrier and a PPO.  So like I said, a PPO means like you choose your own doctors and hospitals and you don't need a referral to see a specialist") and p. 419 ("And you also you have your prescription medications . . . you have medical, surgical, and hospital coverage with no deductible").

[70] *Id.* at pp. 420-21.

[71] *Id.* at p. 421.

[72] *Id.*

[73] *Id.* ¶ 70 at p. 455-71.

[74] PX 26, Declaration of Andrew Rowles ¶¶ 3 & 4 (Director, Patient Accounts at Emory Healthcare).

would require a consumer in the Atlanta area to pay $850-$900 to fill a Victoza prescription, hundreds of dollars more than promised by the telemarketer.[75]

The financial consequences of Defendants' misrepresentations have been ruinous for consumers, many of whom do not realize that they are uninsured until after incurring substantial medical expenses.[76] According to Defendants' former customer service manager, consumers often complained about receiving thousands or even tens of thousands of dollars in unreimbursed medical bills, especially for emergency room visits and surgical procedures.[77] One consumer purchased what Defendants led her to believe was a PPO health insurance policy that covered doctor visits, lab work, and surgical costs.[78] Consistent with their script, Defendants' telemarketer also assured the consumer there would be no deductible for hospital visits, which the consumer reasonably understood to mean that any expenses related to hospital care would be covered by the plan.[79] Shortly after purchasing what she believed was comprehensive health insurance, the consumer and her husband each required emergency medical care and incurred

---

[75] PX 1, Menjivar Dec. ¶ 71.

[76] *See, e.g.,* PX 17, Skordilis Dec. ¶ 9 (consumer incurred thousands of dollars in expenses related to treatment for herself and son, none of which was reimbursed by Defendants' plan); PX 15, Prescher Dec. ¶ 17 (consumer incurred over $25,000 in medical expenses, none of which were covered by plan that Defendants represented to be major medical health insurance).

[77] PX 31, Seraphin Dec. ¶ 18.

[78] PX 18, Slawson Dec. ¶ 4.

[79] In the course of its investigation, the FTC obtained an audio recording of this consumer's sales call that reveals the full extent to which Defendants misled her. A transcript of this recording is attached to the consumer's declaration. Among other claims, Defendant's telemarketer stated: "Let's suppose you need to go to the hospital. I told you that this plan have no deductible. When a plan have deductible, what that means is that you have to pay thousands of dollars from your pocket before start receiving benefits from the insurance. In this case, those don't work in that way. This is for – called first dollar coverage plan, which means that the plan cover you from the moment you enter in the hospital. The PPO network take care of the entire bill. They reprice that and then they send you what they call the cash benefit to cover the rest. At the end, what you pay is less than if you have a very high deductible. You never pay anything – . . ." [sic]." *Id.* ¶ 12 and p. 14.

over $60,000 in hospital bills.[80]  Contrary to the telemarketer's representations, Defendants actually enrolled the consumer in a limited benefit plan that covered none of these expenses, leaving her tens of thousands of dollars in debt.[81]

### E.   Defendants' Sham "Verification" Process

After obtaining consumers' payment information, Defendants steer consumers through a sham "verification" process.  Prior to the start of this process, Defendants' telemarketers often instruct consumers to disregard any verification statements indicating that consumers will not receive comprehensive health insurance that covers their preexisting medical conditions.[82]

During verification, consumers are asked to confirm a series of densely worded statements that are either read by a separate employee or transmitted electronically by email or text message.  On mobile devices, these electronic disclosures are rendered in pages of small, barely legible text.[83]  Consumers who choose to have these statements read aloud are cautioned not to ask any questions or they will be transferred back to their sales representative.[84]  The length and complexity of these statements make it virtually impossible for consumers to

---

[80] *Id.* ¶¶ 15-21.

[81] *Id.* ¶ 21; PX 30, Baker ¶ 20.

[82] PX 3, Al-Najjar Dec. ¶ 9 and p. 19 ("some of the information will say they will apply to you and some of which will not apply to you. . . . they read their script to everyone.").  A telemarketer told one consumer to disregard any inconsistencies between the benefits she had been promised and what would be described during verification, explaining that "certain things are going to apply for you guys" and that the verification call is "a script" that must be read to everyone.  PX 18, Slawson Dec. ¶¶ 9 & 12 and p. 19.

[83] PX 2 Hawkins Dec. ¶¶ 8 & 10 and pp. 16-33 (during three-minute electronic verification of undercover purchase, investigator signed 11 times on a 13-page document, all viewed on a smartphone screen).

[84] PX 1, Menjivar Dec. ¶ 67 and pp. 426; PX 8, Fernandez Dec. ¶ 6; PX 9, Hackethal Dec. ¶ 9 ("I felt pressure to agree to everything because the verification employee warned that if I asked any questions, he would need to transfer me back to the sales agent where the process would start all over again."); PX 22, Van Deusen Dec. ¶ 5 (consumer felt pressured to agree with verification employee, who "not only refused to answer any questions, but warned that I would be transferred back to the sales agent if I tried asking a question, where the process would start all over again").

comprehend them.[85]  Regardless, the record created by this charade does not reflect consumers'

understanding of what they agreed to purchase.[86]

### F.    Defendants' Deceptive Cancellation and Refund Policies

Consumers often do not discover that that they have been misled until they have paid

Defendants, and in some cases, continued to pay for the products for many months.[87]  Those who

call to cancel their policies and obtain refunds frequently are unable to reach a customer service

representative, are prevented from canceling, are refused refunds, or are further misled that

Defendants' products are comprehensive health insurance policies.[88]  One former manager

---

[85] PX 13, Macary Dec. ¶ 8 (telemarketer "rushed" consumer through electronic verification, did
not explain any of the information, consumer did not feel she had the time to closely review
documents); PX 21, Touchet Dec. ¶ 6 (same); PX 14, Mandarich Dec. ¶ 6 (telemarketer "quickly
read through a series of long statements and periodically asked me whether I understood or
agreed with these statements.  It was difficult, if not impossible, to follow everything this person
said."); PX 9, Hackethal Dec. ¶ 7 (same); PX 10, Hall Dec. ¶ 6 (same); PX 22, Van Deusen Dec.
¶ 5 (same).

[86] PX 31, Seraphin Dec. ¶ 17 (former customer service manager describing thousands of
complaints received each day by Defendants from misled consumers).  *See also* PX 24, Fissel
Dec. ¶ 3 (Pennsylvania Insurance Department investigation prompted by high volume of
complaints); PX 25, Declaration of Guy Miller ("G. Miller Dec.") ¶ 15 (BBB alert regarding
pattern of consumer complaints filed against Defendants).

[87] *See, e.g.,* PX 15, Prescher Dec.; PX 17, Skordilis Dec.; PX 18, Slawson Dec.

[88] PX 6, Banski Dec. ¶ 10 (unable to reach anyone by calling customer service number provided
by Defendants' telemarketer); PX 9, Hackethal Dec. ¶ 10 (representative effectively refused
consumer's cancellation request, justifying refusal by saying that she had 30 day trial period);
PX 13, Macary Dec. ¶ 12 (after multiple calls, customer service employee promised that
consumer would be contacted within 48 hours by someone from Defendants' "escalation
department," but no one ever contacted her); PX 16, Scott Dec. ¶ 15 (consumer called seven
times and spoke to multiple employees, none of whom could satisfactorily explain why she had
not received promised insurance) and ¶ 16 (employee attempted to talk consumer out of
canceling by claiming that Defendants' policies are cheaper than actual health insurance); PX 17,
Skordilis ¶ 10 (Defendants' employees would hang up on consumer when she called); PX 19,
Stanley Dec. ¶¶ 15-16 (refused to cancel policy without speaking to consumer's daughter); PX
20, Thompson Dec. ¶ 10 ("rude and dismissive" supervisor who told consumer that she had a
"bad attitude"); PX 21, Touchet Dec. ¶ 10 (consumer hung up on at least three times while
waiting on hold for supervisor); PX 22, Van Deusen Dec. ¶¶ 10 &13 (manager claimed that
consumer had purchased "excellent medical coverage" and would not be subject to the ACA
penalty, and encouraged consumer to schedule doctor appointment with her "concierge").

estimates that approximately 95% of the two to three thousand customer service calls received by Defendants each day consisted of "complaints from consumers who had been misled about the benefits they would receive, typically people who were under the impression that they had purchased major medical insurance."[89]  Defendants use specially trained "saves team" employees and misleading, scripted "rebuttals" to talk consumers out of canceling.[90]

When, for example, an FTC investigator attempted to cancel the limited benefit plan and discount membership sold to him by Defendants, the investigator unambiguously told the customer service agent that he had been deceived:

> I clearly told [the agent] that I needed full coverage insurance, and I told him that I needed that to cover my annual physicals and doctor's visit and lab work. . . . Once I received the documents and I started reviewing them, I realized that the insurance cards actually indicate that it's more like a discount plan . . . and that it's not intended to replace health insurance.[91]

Instead of granting the investigator's cancellation request, the customer service agent argued with the investigator for several minutes, claiming deceptively that he had purchased a "good policy" with no "copayments, no co-insurance, and [no] deductibles."[92]  Even after the agent finally seemed prepared to comply with the investigator's cancellation request, she first offered

---

[89] PX 31, Seraphin Dec. ¶ 17.

[90] *Id*. at ¶¶ 22-23.

[91] PX 2, Hawkins Dec. ¶ 13 and p. 121.

[92] *Id*. ("So, for real, it is a very good policy, sir.").  The customer service agent who handled one of the FTC's other cancellation requests described the limited benefit plan sold to the FTC in similarly deceptive terms:  "But normal checkup visits, you're covered.  If you got to an emergency room, you're covered, or to a hospital, you're covered.  You have no deductible and no copays when you go to the doctors that are in your network."  PX 1, Menjivar Dec. ¶ 72 and p. 550.

only to cancel the "health portion" of his policy and continue charging him for "accidental death" insurance that Defendants had included in the various products sold to him.[93]

### G.   Consumer Injury

Defendants' bank and telephone records show both the scale of their operations as well as the considerable harm it has caused to consumers. These records indicate that between January 2016 and April 2018, Defendants' boiler rooms handled over 62 million calls with consumers.[94] During this same period, bank records show that Defendants' scheme generated well over $150 million in revenue.[95]

### H.   Other Law Enforcement Actions

As detailed below, Defendants have been the target of numerous law enforcement actions related to both the deceptive marketing of their products as well as other illegal conduct. Nevertheless, Defendants continue to actively mislead both consumers and law enforcement. For example, although Defendants record and save all of their sales calls,[96] they tell regulatory authorities that such recordings do not exist.[97]

---

[93] *Id.* at p. 551. These products, according to an email received by the investigator, consist of a bewildering array of confusingly-named plans and services, including: 1) Health Choice + American Financial Security Life Insurance at $99.64 per month; 2) Teladoc 24/7 doctor visits by telephone at $29.99 per month; 3) Association Dues at $12.50 per month; 4) Rx Helpline at $10.00 per month; 5) Health Education Program (PEP) Online health education & fitness training at $125 per month; and 6) Freedom Spirit Plus Cost inclusive of monthly Med-Sense Dues & Plan Cost Federal Insurance Company at $161.50 per month. PX 2, Hawkins Dec. ¶ 11 and p. 43.

[94] PX 1, Menjivar Dec. ¶ 54.

[95] PX 5, George Dec. ¶ 9.

[96] PX 31, Seraphin Dec., ¶¶ 28-31 (former manager); PX 30, Baker Dec. ¶ 19 (former salesperson). *See also, e.g.,* PX 18, Slawson Dec. pp. 9-20 (transcript of sales call between consumer and Defendants).

[97] PX 24, Fissel Dec. ¶ 7 (interview with state insurance investigators in which Defendants' chief compliance officer falsely claimed that Defendants only record the verification portion of sales calls). Moreover, Defendants remove misleading statements from the recordings and provide sanitized versions to their business partner. PX 31, Seraphin Dec. ¶ 36 (former manager).

### 1.     Cease and Desist Orders

In July 2011, the Indiana Commissioner of Insurance issued an emergency cease and
desist order against defendant Steven Dorfman after finding that he had engaged in the
unlicensed sale of insurance to Indiana consumers.[98]  Six months later, in January 2012, the
Nebraska Department of Insurance issued a similar order, finding cause to believe that Dorfman
had sold insurance without a license in violation of a Nebraska statute.[99]

### 2.     Florida Department of Financial Services Investigations

The Florida Department of Financial Services ("DFS") has conducted at least four
separate investigations that revealed a pattern of deceptive practices similar to those alleged in
the FTC's complaint.  Each of these investigations has resulted in the issuance by DFS of a letter
of guidance to Defendants.  DFS issued its first letter of guidance in April 2015 after finding that
Defendants had improperly displayed a Better Business Bureau logo on multiple websites
without authorization.[100]

DFS conducted a more extensive investigation of defendant Health Benefits One starting
in July 2014.[101]  In a letter of guidance issued on June 17, 2016, DFS concluded that Defendants'
"websites and press releases over multiple years contained deceptive advertising that implied the
agency primarily sold ACA 'Obamacare' eligible products; however, the agency product
portfolio consisted primarily of indemnity products and discount plans that did not provide

---

[98] PX 1, Menjivar Dec. ¶ 77 and pp. 605-11.
[99] *Id.* ¶ 78 and pp. 613-19.
[100] PX 1, Menjivar Dec. ¶ 75; PX 25, G. Miller Dec. ¶¶ 21-24 (Vice President of Southeast
Florida BBB).
[101] PX 1, Menjivar Dec. ¶ 75 and p. 555.  In response to an initial set of inquiries from DFS,
Defendants categorized Dorfman as simply a "manager."  In a letter of guidance issued on June
17, 2016, DFS noted that Dorfman was omitted from the agency license application despite
being identified publicly as the company's founder and CEO.

Minimum Essential Coverage."[102]  The letter also found that Defendants employed no agents certified to sell ACA health insurance policies for the 2014 and 2016 enrollment periods, and only sold 30 ACA-qualified policies in 2015.[103]

DFS issued a third letter of guidance on January 17, 2018, finding that Health Benefits One allowed its employees "to engage in deceptive and misleading practices by misrepresenting the terms of policies placed by the agency" for three consumers.[104]

A fourth letter of guidance issued by DFS on August 10, 2018 alleged that Health Benefits One allowed two of its agents "to engage in deceptive and misleading practices by misrepresenting the terms of health policies" sold to two consumers.  Although these consumers "wanted to purchase major medical policies," Defendants "placed health policies with limited benefits without these consumers' knowledge and consent."[105]

### 3.   Pennsylvania Investigation

In June 2017, the Pennsylvania Insurance Department began investigating a high volume of complaints filed by consumers who had purchased what they had been led to believe were ACA-compliant health insurance policies, but which actually turned out to be medical discount memberships, indemnity policies, and similar products.[106]  After identifying Defendants as one of the telemarketers responsible for selling these products, Pennsylvania investigators conducted two separate inspections of Defendants' call center in Hollywood, Florida.[107]  During one of

---

[102] *Id.* at pp. 562-66.
[103] *Id.* at p. 562.
[104] *Id.* at pp. 568-69.
[105] *Id.* at pp. 573-75.  The letter also notes that Defendants failed to report the location of their former Boca Raton branch to DFS as required by Florida statute.
[106] PX 24, Fissel Dec. ¶ 3.
[107] *Id.* at ¶ 6.

these inspections, investigators interviewed Defendants' chief compliance officer, who falsely claimed that Defendants did not record the sales portion of calls with consumers.[108]

### 4. Nebraska Attorney General Warning

In a press release dated July 10, 2017, the Nebraska Attorney General alerted consumers that "scam artists . . . posing as Blue Cross and Blue Shield of Nebraska . . . are using fake Google and Manta listings bearing Blue Cross's logo and web address, along with bogus physical addresses in Omaha."[109]  The release cautions that "scam artists," referring to Defendants, "offer insurance plans well below market value . . . but never provide[] insurance cards or proof of coverage."  Blue Cross Blue Shield of Nebraska contacted Defendants directly informing them of the deceptive internet listings.[110]  In response, Defendants blamed the listings on an affiliate marketer located in Gujarat, India.[111]

### 5. Montana Action

In May 2016, the Montana Commissioner of Securities and Insurance filed a notice of proposed agency action naming defendant Health Benefits One.[112]  The complaint alleged that Health Benefits One and other respondents had "routinely sold through misinformation and deception" short-term medical insurance "by individuals not properly licensed or appointed in Montana to conduct this insurance business."[113]

## III.   DEFENDANTS

Defendants are Steven J. Dorfman and the six Florida companies through which he operates this scheme:  Simple Health Plans LLC, Health Benefits One LLC, Health Center

---

[108] *Id.* at ¶ 7.
[109] PX 1, Menjivar Dec. ¶ 79 and pp. 621.
[110] PX 28, Declaration of John Clabaugh ¶ 11.
[111] *Id.*
[112] PX 1, Menjivar Dec. ¶ 76 and pp. 566-603.
[113] *Id.* at pp. 579-80.

Management LLC, Innovative Customer Care LLC, Simple Insurance Leads LLC, and Senior Benefits One LLC.  In the United States, Defendants maintain two call centers in south Florida and one in Dallas, Texas.  Defendants also operate two offshore business locations in Panama and the Dominican Republic.[114]

### A.    Corporate Defendants

**Simple Health Plans LLC** functions primarily as a shell company that Defendants use to do business under the name "Simple Health."[115]  Defendants use **Health Benefits One LLC**, formed in 2012, to transact most of the scheme's business.  Bank, merchant processing, and telecommunications accounts associated with Defendants' operations, as well as their primary Florida insurance agency license, are all in the name of Health Benefits One.[116]  Similarly, many of Defendants' deceptive lead generation websites are registered to Health Benefits One.[117]  Its bank accounts have received tens of millions of dollars in commission payments for the deceptive sale of limited benefit plans and medical discount memberships by Defendants to consumers.[118]  Defendants use these funds to finance the day-to-day operating expenses of their call centers and funnel millions more to **Simple Insurance Leads LLC** to buy consumer leads from third parties.[119]

---

[114] PX 1, Menjivar Dec. ¶ 75 and p. 558-59; PX 30, Baker Dec. ¶ 3; PX 31, Seraphin Dec. ¶ 7.
[115] PX 1, Menjivar Dec. ¶¶ 9 ("Simple Health" on nameplate at Doral location) & 10 ("Simple Health" sign above Hollywood location); PX 4, Declaration of Kelle Slaughter ¶ 3 ("Simple Health" on a sign outside Dallas location).  In addition to being a limited liability company, Simple Health Plans is also a fictitious business name registered in Florida to defendant Health Benefits One.  *See* PX 1, Menjivar Dec. ¶ 6 and p. 117.
[116] PX 1, Menjivar Dec. ¶¶ 7 (insurance license), 53 (telephone), 56 (bank), 58 (credit cards) & 61 (merchant processing).
[117] *Id.* at ¶ 14-25 (website domain registrations).
[118] PX 5, George Dec. ¶ 9.
[119] PX 5, George Dec. ¶ 10 (From January 2015 through April 2018, Health Benefits One paid $73,240,237.45 to Simple Insurance Leads).  Many of Defendants' lead generation websites refer

**Innovative Customer Care LLC** and **Senior Benefits One LLC** also each receive significant transfers from Health Benefits One.[120]  Defendants formed Innovative Customer Care in 2017 to manage their customer service operations.  Most funds transferred into Innovative Customer Care's bank accounts are paid to Defendants' customer service employees.  Senior Benefits One holds a Florida insurance agency license and is licensed to sell insurance in multiple other states.  **Health Center Management LLC** is a managing member of Senior Benefits One and Simple Health Plans.

**B.      Individual Defendant**

**Steven J. Dorfman** is a resident of this district.[121]  He controls and actively manages the corporate defendants.[122]  He is identified on Defendants' main website as Simple Health's "founder and CEO," and has been quoted extensively in press releases and other media about Defendants' business.[123]  Dorfman is a signatory on many of the corporate bank accounts that receive proceeds of Defendants' scheme and are used to pay its operating expenses.[124]

Dorfman's extravagant lifestyle is bankrolled by the corporate defendants.  He has charged millions of dollars for personal expenses to credit cards maintained by these entities that

---

to a fictitious business name registered to Simple Insurance Leads, Health Insurance Services, in the sites' privacy policies.  PX 1, Menjivar Dec. ¶¶ 6 and 28-39.

[120] PX 5, George Dec. ¶ 10 (From January 2017 through April 2018, Health Benefits One paid Innovative Customer Care $1,096.871.17 and from March 2015 through March 2018 paid Senior Benefits One $971,500).

[121] PX 1, Menjivar Dec. ¶ 89.

[122] *See, e.g.,* PX 31, Seraphin Dec. ¶ 8 & 24 (former manager) (Dorfman has a large office at Defendants' headquarters and receives a daily email with sales and cancellation statistics).

[123] PX 1, Menjivar Dec. ¶ 43 and pp. 333, 387.  *See also* Marcia Heroux Pounds, *ObamaCare, year two: Insurance firms hiring agents to help consumers choose wisely,* Sun Sentinel (Oct. 24, 2014), https://www.sun-sentinel.com/business/careers/fl-health-benefits-jobs-20141027-story.html.

[124] *Id.* ¶ 57.

are then settled with funds from Defendants' corporate accounts.[125]  Dorfman also spends lavishly on himself using funds directly from the corporate bank accounts.  A partial catalog of personal expenses that Dorfman has financed with corporate funds, which are proceeds from Defendants' scam, includes: over $1 million in jewelry;[126] luxury vehicles, including a Rolls-Royce Wraith and a Lamborghini Aventador;[127] $368,000 in cash transfers to the Cosmopolitan Hotel and Casino in Las Vegas;[128] $341,000 at nightclubs, including a $57,000 tab incurred at one club in a single evening;[129] the rent on his $1.4 million oceanfront condominium;[130] and his recent wedding at the St. Regis Bal Harbor Resort in Miami for which Dorfman spent $133,000 on flowers alone.[131]

### C.    Common Enterprise

The corporate defendants operate as a common enterprise and are therefore jointly and severally liable for each other's illegal conduct.  To determine if a common enterprise exists, courts consider various factors, including: (1) maintaining officers and employees in common; (2) operating under common control; (3) sharing of office space; (4) operating the business through a maze of interrelated companies; (5) commingling of funds; and (6) sharing of advertising and marketing.  *See FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012) (citing *Del. Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964)); *see also FTC v. Lanier Law, LLC*, 715 F. App'x 970, 979 (11th Cir. 2017) (per curiam) ("[A] corporate entity can be held liable for the conduct of other entities where the structure, organization, and pattern of a

---

[125] PX 5, George Dec. ¶¶ 14-25.
[126] *Id.* ¶¶ 22 & 30.
[127] *Id.* ¶ 33 & 34; PX 1, Menjivar Dec. ¶ 87.
[128] PX 5, George Dec. ¶ 31
[129] *Id.* ¶ 20 and p. 54.
[130] *Id.* ¶ 31 and p. 77; PX 1, Menjivar Dec. ¶ 89.
[131] PX 5, George Dec. ¶¶ 28 & 29 and pp. 67-75; PX 1, Menjivar Dec. ¶ 52 and pp. 391-405.

business venture reveal a common enterprise or a maze of integrated business entities." (internal quotation marks omitted)).

The corporate defendants form a classic common enterprise. The six corporate defendants engage in the same health insurance scam; share ownership, management, office locations, employees, fictitious business names, insurance licenses, leads and lead generation websites; and commingle funds.

## IV.   ARGUMENT

The FTC seeks *ex parte* entry of a temporary restraining order, including an asset freeze, appointment of a temporary receiver, and immediate access to Defendants' business premises, to prevent Defendants from dissipating assets and destroying evidence. As set forth below, the evidence overwhelmingly supports entry of the proposed TRO.

### A.      This Court Has the Authority to Grant the Requested Relief

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to seek, and this Court to grant, preliminary and permanent relief enjoining violations of the FTC Act. *See FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996) ("[A] district court may order preliminary relief, including an asset freeze, that may be needed to make permanent relief possible."). With that authority comes the power to grant "ancillary relief, including freezing assets and appointing a Receiver." *FTC v. USA Fin., LLC*, 415 F. App'x 970, 976 (11th Cir. 2011) (per curiam) (quoting *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir. 1984) (per curiam)). Courts in this District have frequently granted the same ancillary relief that the FTC seeks here.[132]

---

[132] *See, e.g., FTC v. Pointbreak Media, LLC*, No. 0:18-cv-61017-CMA (S.D. Fla. May 7, 2018) (entering *ex parte* TRO granting asset freeze, immediate access, expedited discovery, and appointment of receiver); *FTC v. Student Debt Doctor, LLC*, No. 17-cv-61937-WPD (S.D. Fla.

**B.      The FTC Meets the Standard for Issuance of a Temporary Restraining Order**

To grant preliminary injunctive relief in an FTC Act case, district courts consider:  (1) the likelihood that the Commission will ultimately succeed on the merits, and (2) the balance of the equities.  *See FTC v. IAB Mktg. Assoc., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014); *see also FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217 (11th Cir. 1991).  The FTC, unlike private plaintiffs, need not establish irreparable harm.  *See IAB Mktg*, 746 F.3d at 1232.  As demonstrated below, the FTC's evidence satisfies the two-part test and warrants issuance of a temporary restraining order against Defendants.

**1.      The FTC Is Likely to Succeed on the Merits**

To show that it is likely to succeed on the merits, the FTC need only present evidence that it "likely will prevail," rather than evidence that would justify a "final determination."  *Univ. Health*, 938 F.2d at 1218.  The FTC satisfies the standard by establishing "some chance of probable success on the merits."  *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989); *FTC v. Wash. Data Res.*, 2009 WL 4885033 at *11 (M.D. Fla. Dec. 14, 2009), *aff'd in part, vac'd in part on other grounds by FTC v. Bishop*, 425 F. App'x 796 (11th Cir. 2011).[133]

---

Oct. 3, 2017) (same); *FTC v. Am. Student Loan Consolidators, LLC*, No. 17-61862-DPG (S.D. Fla. Sept. 26, 2017) (same); *FTC v. Strategic Student Sols. LLC*, No. 9:17-cv-80619-WPD (S.D. Fla. May 15, 2017) (same); *FTC and Florida v. Marcus*, No. 0:17-cv-60907-FAM (S.D. Fla. May 9, 2017) (same); *FTC v. World Patent Mktg., Inc. et al.*, No. 1:17-cv-20848-DPG (S.D. Fla. Mar. 8, 2017) (same); *FTC v. DOTAuthority.com, Inc.*, 0:16-cv-62186-WJZ (S.D. Fla. Sept. 19, 2016) (same); *FTC v. D&S Mktg. Sols. LLC, et al.*, No. 8:16-cv-01435-MSS-AAS (M.D. Fla. June 8, 2016) (same); *FTC v. All Us Mktg. LLC et al.*, No. 6:15-cv-1016-ORL-28GJK (M.D. Fla. June 22, 2015) (same); *FTC v. Mail Tree, Inc.*, No. 0:15-cv-61034-JIC (S.D. Fla. May 19, 2015) (same); *FTC v. Partners in Health Care Assoc., Inc.*, No. 1:14-cv-23109-RNS (S.D. Fla. Aug. 25, 2014) (same).

[133] The evidence used to support such a showing can include "affidavits and hearsay materials." *Levi Strauss & Co. v. Sunrise Int'l Trading*, 51 F.3d 982, 985 (11th Cir. 1995); *see also FTC v. Primary Grp, Inc.*, 2015 WL 12976115, at *4 (N.D. Ga. June 8, 2015).

Here, the evidence establishes that the FTC is likely to prevail on its claim that Defendants violated the FTC Act and the Telemarketing Sales Rule through their deceptive sale of limited benefit plans and medical discount memberships.  The evidence also shows that the corporate defendants are jointly and severally liable because they operated as a common enterprise and that individual defendant Steven Dorfman is liable for these practices. Accordingly, the FTC is likely to succeed on the merits of its claims.

### a.      Defendants Are Violating the FTC Act

Defendants are violating the FTC Act, which prohibits "deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a).  An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.  *See FTC v. People Credit First, LLC*, 244 F. App'x 942, 944 (11th Cir. 2007) (per curiam) (following *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003)).  "Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material."  *FTC. v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1267 (S.D. Fla. 2007); *see also FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994). In determining whether a solicitation is likely to mislead consumers, courts consider the overall "net impression" it creates.  *See FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1329 (M.D. Fla. 2010) (citing *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009)).  "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."  *RCA Credit Servs.*, 727 F. Supp. at 1329 (quoting *FTC v. Cyberspace.Com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)).  Finally, the FTC need not prove that consumers actually relied on the claims.  *See Transnet Wireless Corp.*, 506 F. Supp. 2d at 1266-67

Defendants make at least four materially misleading claims: (1) that Defendants' limited benefit plans and medical discount memberships are comprehensive health insurance or the equivalent of such insurance; (2) that these products are qualified health insurance plans under the Affordable Care Act; (3) that Defendants are experts on, or providers of, government-sponsored health insurance policies; and (4) that Defendants are affiliated with AARP or the Blue Cross Blue Shield Association.

All of these claims are false. They are also presumed to be material as they are "used to induce the purchase of a particular product or service." *RCA Credit Servs.*, F. Supp. 2d at 1329 (quoting *Transnet Wireless Corp.*, 506 F. Supp. 2d at 1267); *see also FTC v. SlimAmerica, Inc.*, 77 F. Supp.2d 1263, 1272 (S.D. Fla. 1999). Each of Defendants' claims is likely to affect a reasonable consumer's decision about whether to purchase Defendants' products. Indeed, as reflected by the attached declarations from Defendants' victims and former employees, these misrepresentations have induced consumers to pay hundreds of dollars a month for what they believed would be comprehensive health insurance or its equivalent.[134]

These misrepresentations are not cured by the farcical "verification" process that consumers are subjected to at the end of the sales call, after they submit their payment information. *See IAB Mktg*, 746 F.3d at 1233 (operators of medical discount scheme cannot shift blame to consumers by faulting them for not reading post-sale disclosures, which do not cure

---

[134] The consumers whose declarations are submitted herewith in support of the FTC's motion are only a fraction of the consumers who have been injured by Defendants' conduct. *See, e.g.*, PX 3, Al-Najjar Dec. ¶¶ 14-16 (145 consumer complaints against Defendants in the Consumer Sentinel Database); PX 31, Seraphin Dec. ¶ 31 (former manager) (thousands of calls received daily by Defendants from deceived consumers).

misrepresentations made during initial sales pitch) (citing *Tashman*, 318 F.3d at 1277 (*caveat emptor* is not a valid defense to liability arising from misrepresentations)).[135]

### b.    Defendants Are Violating the TSR

The Telemarketing Sales Rule ("TSR") prohibits deceptive and abusive telemarketing practices, including misrepresenting any material aspect of the nature or central characteristics of goods or services, 16 C.F.R. § 310.3(a)(2)(iii), or making a false or misleading statement to induce any person to pay for goods or services, 16 C.F.R. § 310.3(a)(4).[136]  As explained above, Defendants are violating these two provisions of the TSR by falsely leading consumers to believe that they will receive comprehensive health insurance, the equivalent of such insurance, or an ACA-qualified health insurance policy.  Defendants also violate these provisions by falsely claiming to be experts on, and providers of, government-sponsored health insurance policies. Defendants also violate a third provision of the TSR, which prohibits misrepresenting an affiliation with, or endorsement or sponsorship by, any person or government entity.  16 C.F.R. § 310.3(a)(2)(vii).  Despite claims to the contrary on their lead generation websites, Defendants are not affiliated with either AARP or the Blue Cross Blue Shield Association.

---

[135] *See also Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989) ("Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression.  Anything less is only likely to cause confusion by creating contradictory double meanings."); *Wash. Data Res.*, 856 F. Supp. 2d at 1275 (FTC Act is violated if the seller "induces the first contact through deception" despite buyer later obtaining more information (quoting *Resort Car Rental Sys., Inc v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) (per curiam)).

[136] Defendants are "sellers: or "telemarketers" as defined by the TSR because they arrange for the sale of goods or services.  16 C.F.R. § 310.2(dd), (ff), & (gg).

### c.   Steven Dorfman Is Individually Liable for Injunctive and Monetary Relief

Defendant Steven Dorfman is responsible for the illegal activity of the corporations that he controls.[137]  An individual may be held liable for injunctive relief under the FTC Act if the individual participated directly in or had authority to control the practices, and may be held liable for monetary relief if the individual had actual or constructive knowledge of the unlawful acts. *See IAB Mktg.*, 746 F.3d at 1233; *Gem Merch. Corp.*, 87 F.3d at 470; *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 636 (7th Cir. 2005); *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005).  Authority to control may be evidenced by active involvement in the corporation's business affairs, including assuming the duties of an officer, particularly when the corporate defendant is a small, closely held entity.  *See IAB Mktg.*, 746 F.3d at 1233; *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573-74 (7th Cir. 1989)).  The FTC does not need to show intent to defraud.  *See IAB Mktg.*, 746 F.3d at 1233; *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1234 (9th Cir. 1999).  Instead, the FTC need only show that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such representations, or an awareness of a high probability of deception, coupled with intentional avoidance of the truth.  *See USA Fin., LLC*, 415 Fed. Appx. at 974; *see also FTC v. FTN Promo., Inc.*, No. 8:07-CV-1279, 2008 WL 821937, *2 (M.D. Fla. March 26, 2008); *FTC v. Jordan Ashley*, No. 93-2257, 1994 WL 200775, *3 (S.D. Fla. Apr. 5, 1994).  Participation in corporate affairs is probative of knowledge.  *See IAB Mktg.*, 746 F.3d at 1233.

---

[137] As noted above in Section III.C, *supra*, the corporate defendants do not function as independent legal entities, but as an interrelated network to facilitate Defendants' scam.  They are therefore jointly and severally liable for Defendants' conduct because they have operated as a common enterprise.

Dorfman is the sole officer of four of the six closely held corporate defendants, including the entity that serves as the sole manager of the remaining two corporations. He unquestionably controls and participates in their practices. He maintains an office at Defendants' headquarters in Hollywood, Florida, is a signatory on corporate bank accounts, and has converted millions of dollars in corporate assets for his personal use. Dorfman is fully aware of Defendants' unlawful practices, having been interviewed at least once in connection with Florida's regulatory investigations of Defendants.[138] He also receives a daily email summarizing both the number of cancellations and reasons why consumers decide to cancel Defendants' products.[139] The most common cancellation reason identified in these emails, by far, is deception – specifically, complaints from consumers who were misled into believing that they would receive major medical health insurance.[140] Courts routinely find individuals liable for injunctive and monetary relief in such circumstances. *See IAB Mktg*, 746 F.3d at 1233 (individual defendants named in FTC action against medical discount scheme liable for actions of corporate defendants based on their active involvement in business affairs and evidence showing some knowledge of deceptive practices); *FTC v. Partners in Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1367-68 (S.D. Fla. 2016) (individual defendant named in action brought against deceptive seller of medical discount card liable for actions of corporate defendants because individual had authority to control seller's day-to-day activities and was aware of underlying deceptive practices).

### 2. The Balance of Equities Strongly Favors Injunctive Relief

Once the FTC has shown a likelihood of success on the merits, the Court must balance the equities, giving greater weight to the public interest than to any of Defendants' private

---

[138] Florida and Pennsylvania regulators interviewed Dorfman in connection with a 2017 investigation of Defendants. PX 1, Menjivar Dec. ¶ 75 and p. 570.
[139] PX 31, Seraphin Dec. ¶ 24.
[140] *Id.*

concerns. *See World Wide Factors, Ltd.*, 882 F.2d at 347; *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988). There is a strong public interest in halting Defendants' fraudulent conduct and preserving assets for restitution. Defendants, by contrast, have no legitimate interest in continuing their scam. *See World Wide Factors, Ltd.*, 882 F.2d at 347 ("no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment"); *see also IAB Mktg.*, 746 F.3d at 1233 (FTC met burden of showing that injunction would serve the public interest). The evidence demonstrates that Plaintiff is likely to succeed on the merits and that an injunction is necessary to ensure that Defendants do not continue their scheme while the case is pending. The requested TRO is therefore warranted.

### C.   The Temporary Restraining Order Should Include an Asset Freeze, Appointment of a Receiver, and Other Ancillary Relief

The evidence shows that the FTC is likely to succeed in showing that Defendants violated the law, and the balance of the equities is in the FTC's favor. The FTC therefore requests that the Court issue a TRO that prohibits future law violations,[141] preserves assets, and imposes a temporary receivership to ensure that the Court can grant effective final relief, including restitution, in this case.[142] As noted above, such an order is well within the Court's authority.

### 1.   An Asset Freeze Is Necessary to Preserve the Possibility of Providing Restitution to Defendants' Victims

The Eleventh Circuit has repeatedly upheld the authority of district courts under Section 13(b) of the FTC Act to impose an asset freeze to preserve the possibility of consumer redress. *See, e.g., IAB Mktg*, 746 F.3d at 1234; *Gem Merch. Corp.*, 87 F.3d at 469; *U.S. Oil & Gas Corp.*,

---

[141] Specifically, the requested conduct prohibitions in the proposed TRO require only that Defendants comply with the FTC Act and the TSR.
[142] A proposed TRO has been filed concurrently with the FTC's TRO application.

748 F.2d at 1433-34. Moreover, the Eleventh Circuit has recognized that the "FTC's burden of proof in the asset-freeze context is relatively light." *IAB Mktg*, 746 F.3d at 1234.[143] As a result, courts in this District have frozen the assets of defendants in numerous FTC enforcement actions. *See* cases cited *supra* note 132.

An asset freeze is necessary to ensure that funds are available for consumer redress. The need is especially pressing here given the magnitude of financial injury caused by Defendants' scheme, which is responsible for over \$150 million in consumer harm in the past three years alone. A freeze is also justified by the threat of asset concealment or dissipation. Defendants maintain bank accounts in Panama and the Dominican Republic to which they could easily transfer funds in the absence of an asset freeze.[144] Moreover, as shown above, individual defendant Dorfman has spent millions of dollars in corporate funds to pay for his personal expenses, including over a million dollars in jewelry, hundreds of thousands of dollars on his wedding, and \$368,000 at a Las Vegas casino. As the FTC is likely to succeed in showing that Dorfman is personally liable for restitution, the asset freeze should extend to his assets as well. *See Gem Merch. Corp.*, 87 F.3d at 470 (upholding use of individual defendants' assets for restitution).

### 2.   A Temporary Receiver Is Necessary to Preserve the Status Quo

The FTC Act authorizes a district court to appoint a receiver to oversee a business. *See U.S. Oil & Gas Corp.*, 748 F.2d at 1432; see also cases cited *supra* note 132. When a corporate defendant has used deception to obtain money from consumers, "it is likely that, in the absence

---

[143] The FTC is not required to present evidence that assets will be dissipated, "only show a concern that the Defendants' assets will disappear." *FTC v. World Patent Mktg., Inc.*, 2017 WL 3508639, at *17 (S.D. Fla. Aug. 16, 2017) (citing *IAB Mktg. Assocs., LP*, 972 F. Supp. 2d at 1313 n.3).

[144] PX 5, George Dec. ¶ 37 (over \$20 million in offshore transfers between March 2015 and April 2018).

of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste" to the detriment of victims. *SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 438 (5th Cir. 1981).

Appointment of a receiver is particularly appropriate when, as here, pervasive fraud presents a strong likelihood of continued misconduct. A temporary receiver would prevent the destruction of documents and dissipation of assets as well as secure the sensitive consumer data that Defendants have collected. The risk of document destruction is especially high given Defendants' history of lying to regulators about the existence of sales recordings as well as their practice of altering these recordings. A receiver could also assist the Court in assessing the extent of Defendants' fraud, trace the proceeds of that fraud, and make an independent report of Defendants' current and past activities to the Court.

### 3. Immediate Access and Expedited Discovery Are Necessary to Preserve Evidence

The proposed TRO would grant the temporary receiver and the FTC immediate access to the corporate defendants' physical business premises to locate and to secure Defendants' assets and documents pertaining to their business practices. Immediate access is critical to protecting evidence against destruction and ensuring that the Court can ultimately determine: (1) the full scope of Defendants' law violations; (2) the identities of injured consumers; (3) the total amount of consumer injury; and (4) the nature, extent, and location of Defendants' assets. The proposed TRO would also allow limited expedited discovery to aid in locating documents or assets and to assess Defendants' compliance with the proposed TRO. Courts in this district have frequently granted this relief in similar cases. *See* cases cited *supra* note 132.

From the inception of their scheme, Defendants have shown a willingness to mislead regulators and law enforcement in order to hide their illegal conduct. Defendants have, for

example, repeatedly lied to investigators about the existence of sales recordings and withheld information that they are legally obligated to disclose to state licensing authorities.  Although Defendants are obligated to report all locations from which they operate to the Florida Department of Financial Services, they have disclosed only one of these three locations.  In light of this and similar conduct, Defendants are unlikely to be forthcoming in discovery or take seriously their obligation to preserve records relevant to this case.

**D.      The Temporary Restraining Order Should Be Issued *Ex Parte***

To prevent Defendants from dissipating or concealing their assets, the requested TRO should be issued *ex parte*.  An *ex parte* TRO is warranted when the facts show that immediate and irreparable injury, loss, or damage will occur before the defendants can be heard in opposition.  *See* Fed. R. Civ. P. 65(b).  As noted above, there is a serious risk that assets and evidence stemming from Defendants' illegal activity will disappear if they receive prior notice. The blatantly deceptive nature of Defendants' scheme presents a serious risk that Defendants will destroy documents and dissipate assets if given advance notice of Plaintiff's motion.[145] Indeed, such behavior is likely in this case given the entirely fraudulent nature of Defendants' business practices, their practice of regularly funneling large sums of cash overseas, and the steps they have taken to conceal their illegal conduct from law enforcement and regulators.

---

[145] Plaintiff's *Rule 65(b) Declaration of Counsel*, filed contemporaneously herewith, describes the need for *ex parte* relief and cites cases in which defendants who learned of impending FTC actions withdrew funds, destroyed vital documents and fled the jurisdiction.  Declarations of counsel provide an appropriate basis for granting *ex parte* relief.  *AT&T Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309, 1319-20 (11th Cir. 2004).

## V.    CONCLUSION

For the above reasons, the FTC respectfully requests that this Court issue the attached proposed TRO with asset freeze, appointment of a receiver, immediate access, and other equitable relief, and require Defendants to show cause why a preliminary injunction should not issue.

Dated:  October 29, 2018            Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

ELIZABETH C. SCOTT, Special Bar No. A5501502
escott@ftc.gov; (312) 960-5609
JAMES H. DAVIS, Special Bar No. A5502004
jdavis@ftc.gov; (312) 960-5611
JOANNIE WEI, Special Bar No. A5502492
jwei@ftc.gov; (312) 960- 5607

Federal Trade Commission
230 S. Dearborn Street, Suite 3030
Chicago, Illinois  60604
Telephone:  (312) 960-5634
Facsimile: (312) 960-5600

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION