## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**FEDERAL TRADE COMMISSION,**

           Plaintiff,

    v.

**SIMPLE HEALTH PLANS LLC, et al.,**

        Defendants.

**Case No.: 18-cv-62593-DPG**

## DEFENDANT STEVEN DORFMAN'S MEMORANDUM
## <u>IN OPPOSITION TO A PRELININARY INJUNCTION</u>

Respectfully submitted by:

Ryan D. O'Quinn
Elan A. Gershoni
**DLA PIPER LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Telephone:  305.423.8554
Facsimile:   305.675.7885

*Counsel for Defendant*
*Steven Dorfman*

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

MEMORANDUM OF LAW .................................................................................................9

   I.   The Defendants Are Not a "Common Enterprise" ....................................................9

   II.  The Proposed Preliminary Injunction is Improper.................................................10

       A.  Legal Standard. ................................................................................................10

       B.  The FTC Did Not Meet its Burden of Establishing that it Will Succeed on the Merits. ............................................................................................................10

       C.  The FTC's Case is Based on the Complaints of a Select Few Disgruntled Customers Out of Tens of Thousands Customers.........................................18

       D.  Steven Dorfman Is Not Individually Liable for any of the Corporate Defendants' Conduct. ...................................................................................19

   III. The Proposed Blanket Asset Freeze is Improper....................................................21

   IV. The Court Should Remove the Temporary Receivership or, at Most, Convert it to a Corporate Monitorship. .....................................................................................24

    CONCLUSION.......................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CFTC v. Combest Trading Corp.*,
   481 F. Supp. 438 (D. Mass. 1979) .................................................................24, 25

*CFTC v. Lake Shore Asset Management Ltd.*,
   2007 WL 2915647 (N.D.Ill. 2007) ..................................................................25

*CFTC v. Mad Fin., Inc.*,
   2002 WL 1972063 (S.D. Fla. 2002) ................................................................23

*CFTC v. Sterling Trading Group, Inc.*,
   605 F.Supp.2d 1245 (S.D. Fla. 2009) .............................................................22

*Coro, Inc. v. FTC*,
   338 F.2d 149 (1st Cir. 1964) ...........................................................................19

*FTC v. Direct Marketing Concepts, Inc.*,
   2006 WL 149039 (D. Mass. Jan. 19, 2006) ...................................................24

*FTC v. IAB Mktg. Assocs., LP*,
   746 F.3d 1228 (11th Cir. 2014) ......................................................................10

*FTC v. John Beck Amazing Profits, LLC*,
   2009 WL 7844076 (C.D. Cal. Nov. 17, 2009) ...............................................22

*FTC v. Millennium Telecard, Inc.*,
   2011 WL 2745963 (D.N.J. Jul. 12, 2011) ......................................................22

*FTC v. Alcoholism Cure Corp.*,
   2011 WL 13137951 (M.D. Fla. 2011) ............................................................17

*FTC v. Capital Choice Consumer Credit*,
   2003 WL 25429612 (S.D.Fla. 2003) ..............................................................17

*FTC v. Consumer Collection Advocates Corp.*,
   2015 WL 12533013 (S.D. Fla. Sept. 9, 2015) ...............................................17

*FTC. v. The Crescent Publishing Group, Inc.*,
   129 F. Supp. 311 (S.D.N.Y. 2001) .................................................................24

*FTC v. Debt Solutions, Inc.*,
   2006 WL 1041996 (W.D. Wash. Apr. 3, 2006).............................................23

*FTC v. Direct Mktg. Concepts, Inc.*,
   624 F.3d 1 (1st Cir. 2010)...........................................................................17, 18

ii

## TABLE OF AUTHORITIES

**Page(s)**

*FTC v. Great Lakes Chem. Corp.*,
 528 F. Supp. 84 (N.D. Ill. 1981) ....................................................................................10

*FTC v. NPB Advert., Inc.*,
 2016 WL 6493923 (M.D. Fla. Nov. 2, 2016) .................................................................17

*FTC v. SlimAmerica, Inc.*,
 77 F. Supp. 2d 1263 (S.D. Fla. 1999) ............................................................................17

*FTC v. Tashman*,
 318 F.3d 1273 (11th Cir. 2003) .....................................................................................11

*FTC v. Wolf*,
 1996 WL 81240 (S.D.Fla. Jan. 31, 2016) ........................................................................9

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No.
 70 of Alameda Cty.*,
 415 U.S. 423 (1974) ..........................................................................................................1

*SEC v. ABS Manager, LLC*,
 2013 WL 1164413 (S.D. Cal. Mar. 20, 2013) ...............................................................22

*SEC v. Schooler*,
 902 F. Supp. 2d 1341 (S.D. Cal. 2012)..........................................................................22

*SEC v. Compania Internacional Financiera S.A.*,
 2011 WL 3251813 (S.D.N.Y. July 29, 2011) ...........................................................10, 24

**Statutes**

15 U.S.C. § 53(b) ......................................................................................................................10

**Other Authorities**

16 C.F.R. §§ 310.3(a)(2)(iii), (a)(2)(vii), & (a)(4).....................................................................11

Pursuant to the Court's Ex Parte Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief, and Order to Show Cause why a Preliminary Injunction Should not Issue (the "**Show Cause Order**") [DE 15] and scheduling order [DE 76], Defendant Steven Dorfman ("**Dorfman**") submits this response and memorandum in opposition to the imposition of a preliminary injunction and other relief sought by Plaintiff the Federal Trade Commission (the "**FTC**") at the preliminary injunction hearing scheduled for April 16, 2019 (the "**Preliminary Injunction Hearing**").

For the sake of brevity, Mr. Dorfman respectfully refers the Court to his *Motion to Strike Temporary Restraining Order* [DE 79] as to why the FTC is not authorized to obtain the remedies sought in this proceeding, including disgorgement and restitution, or injunctive relief to restrain the Defendants' assets for the benefit of those remedies, which he fully incorporates herein.

## **INTRODUCTION**

The FTC, as a federal regulatory agency, has been endowed by Congress with specific, *limited* enforcement powers.  Because of that, like the federal government's mandate in criminal actions, the FTC should maintain the highest standards of integrity in enforcement litigation in federal district courts.  That is especially the case where, as here, the FTC submits an *ex parte* request to a district court seeking extraordinary relief including a blanket asset freeze over untraced corporate and personal assets as well as the immediate takeover of a company by a court-appointed receiver without any notice to the interested parties.  *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty*., 415 U.S. 423, 439 (1974) ("the availability of *ex parte* temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute").  However, in this action, the FTC's *ex parte* motion for a temporary

restraining order ("**TRO Motion**") [DE 3] and memorandum in support thereof (the "**TRO Memorandum**")[1] [DE 12] exceeds and constitutes an abuse of the FTC's regulatory authority, the Court's *ex parte* procedures, and the litigants' obligations to accurately disclose all relevant facts, especially when seeking extraordinary relief.

The FTC relied on assumptions, misattributed statements, and out-of-context facts to make a flawed showing that the Defendants deceived their customers into thinking that HBO: (i) sold "comprehensive" health insurance; (ii) sold qualified health plans under the Affordable Care Act; (iii) was an expert on and sold government-sponsored health insurance policies; and (iv) was affiliated with AARP and the Blue Cross Blue Shield Association.

The FTC's errors and misrepresentations to the Court appear to stem from a failure to understand the health insurance industry it seeks to regulate, blurring important distinctions between the various players in the industry and their respective roles, and the process by which consumers search for, identify, and buy health insurance and other healthcare products.  Individuals that seek to purchase a health plan or product often start by conducting generic internet searches using search terms such as "health insurance."  *See* Paragraphs 37-38; 54-63 of the Declaration of Steven Dorfman attached as **Exhibit "A."**  This internet search leads individuals to a variety of independently-owned and operated websites for so-called "lead generation" companies that specialize in connecting consumers to agencies that sell health insurance plans issued by health insurance companies.  *Id.*  To be connected with health insurance agencies, consumers often input basic biographical information on the lead generation website.  *Id.*  The lead generation website then immediately sends these "leads" to multiple different agencies that sell health insurance plans and products created and maintained by third party health insurers and administrators.  *Id.*  Each agency sells a unique array

---

[1] All citations herein to "PX" are to exhibits to the FTC's TRO Memorandum.

of health insurance plans and products from a different set of health insurers and providers. *Id.* Upon receiving the "lead," the agencies' respective salespeople rush to contact the "lead." *Id.* Salespeople then compete to sell the consumer a health insurance plan or other product marketed and sold by the agency. *Id.* Ignoring the different roles that health insurers, third-party administrators, lead generation companies, and agencies play in the industry, the FTC oversimplifies the industry by lumping all of these independent businesses together and clumsily misattributing the various industry players' representations to unrelated entities. The flow of information and relationship between the players in the process is summarized in the illustration below:



In addition to confusing the fundamental process by which health insurance is marketed and sold, the FTC apparently also fails to appreciate that the numerous corporate Defendants are distinct business entities – further eroding the reliability of the FTC's *ex parte* presentation to the Court. Indeed, throughout its Complaint, TRO Motion, and TRO Memorandum, the FTC repeatedly refers to all of the Defendants as if they are a single entity with identical business models, employees, and

operations.  In fact, the Defendants are distinct business entities that were in different lines of business.  The only operating Defendants are:  Health Benefits One, LLC ("**HBO**"), Senior Benefits One, LLC ("**SBO**"), Innovative Customer Care, LLC ("**ICC**"), and Simple Insurance Leads, LLC ("**SIL**").  Although each of the Defendants is involved in the insurance industry, each has a separate identity and defined businesses:  (i) HBO is a health insurance agency focused on brokering limited benefit health insurance plans, short term medical plans, and wellness plans (and which previously sold Affordable Care Act-compliant plans), Dorfman Decl., ¶¶ 48-53; (ii) SBO is a Medicare insurance agency focused on brokering Medicare Advantage plans, Dorfman Decl., ¶¶ 79-84; (iii) ICC is a customer support company that provided customer support for non-affiliated health insurance agencies, Dorfman Decl., ¶¶ 100-102; and (iv) SIL is a lead generation company that gathered applications from individuals interested in purchasing health insurance and distributed those leads to HBO, SBO, and dozens of other unrelated health insurance brokerages, Dorfman Decl., ¶¶ 94-99.  Defendant Simple Health Plans, LLC ("**SHP**") never operated and Defendant Health Center Management, LLC ("**HCM**") is merely a holding company that wholly-owned the other corporate Defendants as subsidiaries.  Dorfman Decl., ¶¶ 41, 103-107.

The FTC maintains that all of the Defendants acted deceptively by misrepresenting to customers the type of health insurance plan they were purchasing.  The FTC is wrong.  Putting aside the fact that Defendants ICC, SIL, SHP, and HCM were never in the business of marketing or selling health insurance plans and that there are no allegations with any specificity relating to SBO's conduct, the record reflects that HBO's representations to consumers and contracts were not misleading. In fact, they were replete with express statements advising the customers of the health insurance plans and products that they purchased and that the Defendants did not deceive anyone. Indeed, while finalizing each customer's purchase of a health insurance plan, the customer was either

read or text messaged all of the terms and conditions of the specific plan they were purchasing, setting forth all of the benefits they were entitled to.  Dorfman Decl., ¶¶ 64-76.  At the end of this disclosure, each customer verified that she understood the terms and conditions of the plan she purchased.  *Id; see also,* verification annexed to FTC's consumer-witnesses' declarations (PX6-22).

Despite all of this, it appears that the FTC had a pre-determined view of the corporate Defendants and Mr. Dorfman, and has investigated and litigated this case to vindicate its pre-conceived beliefs – regardless of actual facts.   As a result, the FTC's strategy in its *ex parte* submission to the Court was to obtain an uncontested temporary restraining order imposing onerous conditions obstructing the Defendants' ability to contest this action by denying Mr. Dorfman the ability to fund his legal defense and putting the corporate Defendants out of business before they even had an opportunity to respond to the FTC's claims and correct the record.  To secure the *ex parte* TRO, the FTC improperly caused the Court to rely on an *ex parte* submission loaded with material falsehoods, half-truths, innuendo, assumptions and omissions.  It was a transparent effort to inflame the Court through a one-sided, incomplete version of the material facts bearing on the extraordinary remedies sought.  Below are a few examples of the outright falsehoods and omissions in the FTC's *ex parte* papers:

- The FTC asserts that HBO used deceptive third party lead generation websites to market health plans sold by HBO.  Specifically, the FTC takes issue with the fact that these websites reflect that they (i) specialize in providing comprehensive health insurance, (ii) are affiliated with Blue Cross Blue Shield Association and AARP, and (iii) are experts on government-sponsored health insurance.  *See* TRO Memorandum, 4-11.  In reality, HBO had an arms-length business relationship with the lead generation companies, had no way that it could have monitored their independent business activities, and was not responsible

for the content listed on those websites. Dorfman Decl., ¶¶ 54-57. Regardless, the representations that the FTC complains of are *true*. HBO was only one of scores of health insurance agencies that the lead generation websites sent leads to and many of the other health insurance agencies in fact: (i) specialize in providing comprehensive health insurance; (ii) are affiliated with Blue Cross Blue Shield Association and AARP; and (iii) are experts on government-sponsored health insurance. Dorfman Decl., ¶ 58.

- The FTC asserts that HBO deceived its customers into purchasing health insurance products that did not meet their expectations TRO Memorandum, 12-23. In reality, before consummating each transaction, HBO's representatives read or emailed to the customer the complete terms and conditions of the product that the consumer purchased and each consumer verified his or her assent to those terms. Dorfman Decl., ¶¶ 60-63. HBO cannot be held liable for a handful of customers misunderstanding the terms of their coverage despite having those terms clearly explained to them orally and in writing.

What makes the FTC's misrepresentations all the more egregious is that, if the FTC had done even an iota of untainted due diligence, the FTC would have an actual understanding of the Defendants' respective operations and would have avoided destroying multiple profitable businesses, leaving hundreds of individuals unemployed and hundreds of thousands of individuals without access to customer support for the healthcare products that they purchased. Instead, the FTC chose to shoot first and ask questions later based on the hearsay self-drafted declarations by a select few disgruntled customers, out of tens of thousands of satisfied customers, and declarations from two vindictive former low-level employees. Worse yet, ***recordings of the sales calls between HBO and the customer-witnesses*** that the FTC coerced into submitting declarations on behalf of this action ***directly contradict statements in the customers' declarations*** submitted in support of

the TRO.  Those recordings, which Mr. Dorfman will present to the Court at the Preliminary Injunction Hearing, highlight that during sales process, HBO representatives advised the consumer-witnesses: (i) that the plans they were purchasing were not (a) ACA-complaint or (b) comprehensive health insurance; and (ii) the benefits they were entitled to and their health insurance plans' terms and conditions.  The recordings also highlight that HBO never told customers they were purchasing health insurance issued by the Blue Cross Blue Shield Association or AARP.

Once the TRO was entered, the Receiver took control of the Defendants' assets, and Mr. Dorfman's personal funds were frozen and inaccessible to him.  As a result, Mr. Dorfman, who is married has been severely restricted in his ability to use his own money to pay for basic living expenses and for his legal defense.  Notably, the FTC has rebuffed Mr. Dorfman's request that the asset freeze be modified so that he can access funds to pay for his family's expenses and for his legal defense.  The FTC would prefer that Mr. Dorfman not be able to fund a legal defense and challenge the quality and sufficiency of the investigation in this case.

The Court should not condone the FTC's improvident *ex parte* submission by entering the requested preliminary injunction.  More important, as shown below, the factual record and applicable law does not support a preliminary injunction.  *First*, the FTC failed to show that there is a likelihood it will prevail on the merits.  In its papers, the FTC ignored key facts that contravene its allegations, *i.e.*, that the Defendants did not deceive anyone or engage in unfair trade practices.

*Second*, the FTC completely fails to support the onerous blanket asset freeze over the corporate Defendants' and Mr. Dorfman's personal assets.  The FTC failed to satisfy the threshold inquiry for such an asset freeze: that there is a risk of dissipation of assets.  The FTC's argument in support of the risk of dissipation is comprised of false assumptions, misstatements, and innuendo—and nothing more.  In attempting to obtain the asset freeze, it seems that the FTC's strategy was to

publish inflammatory allegations and references to "suspicious" transfers to offshore accounts.  In reality, the transfers were contractual payments to companies that provided HBO with call center support from Panama and the Dominican Republic – not shells to which Mr. Dorfman sought to secrete assets.  Simply put, there is no showing here of a danger of dissipation.

*Third*, the FTC has not provided support for the extreme remedy of implementing a receiver.  In addition to not showing a risk of dissipation of assets, which is an important aspect of the receivership analysis, the FTC cannot justify the severe hardship imposed by the receivership on Mr. Dorfman, and more importantly, on the corporate Defendants' employees and customers who rely on their continued operation.  To the extent that the Court determines that oversight of the corporate Defendants is appropriate, a corporate monitorship would clearly suffice.

In sum, the Court should not condone the FTC's thoughtless approach to this case.  Granting the proposed preliminary injunction will essentially give the FTC license to continue submitting incomplete and misleading *ex parte* assertions to district courts in order to obtain extreme injunctive relief that exceeds the FTC's statutory authority.  Further, granting a preliminary injunction is simply not legally appropriate given the heavy legal burden and the facts of this case.  The TRO, entered based on the FTC's improper and misleading *ex parte* submission, has destroyed Mr. Dorfman's reputation and his businesses, resulting in the loss of jobs and damaging the corporate Defendants' customers relying on their ongoing services, and destroyed Mr. Dorfman's finances, as he cannot access most of his personal funds.  ***Effectively, the FTC's actions flip the American judicial system on its head by treating defendants as guilty until they prove their own innocence while subject to an asset freeze***.  The Court should deny the FTC's motion for a preliminary injunction and proceed with this historical case with the parties on equal footing.  This is what due process and fairness require.

## MEMORANDUM OF LAW

### I.   The Defendants Are Not a "Common Enterprise"

The FTC erroneously seeks to have all of the Defendants held jointly and severally liable for their conduct because the FTC alleges that they are a "common enterprise."   TRO Memorandum, 31-32.  To establish that the Defendants constitute a common enterprise the FTC bears the burden of establishing that the Defendants: (i) have common control; (ii) share office space and officers; (iii) transact business through a maze of interrelated companies; (iv) commingle corporate funds and fail to maintain separation of companies; (v) have unified advertising; and (vi) are not distinguishable.  *FTC v. Wolf*, 1996 WL 81240, at *7 (S.D.Fla. Jan. 31, 2016) (collecting cases).   In support of its contention that the Defendants form a "common enterprise" the FTC nakedly asserts that the Defendants "engage in the same health insurance scam; share ownership, management, office locations, employees, fictitious business names, insurance licenses, leads and lead generation websites; and commingle funds."  TRO Memorandum, p. 32.  The FTC failed to provide *any* substantiating evidence for these allegations.   In reality, apart from the corporate Defendants sharing common ownership by HCM, for which they undertook efforts to maintain corporate formalities, the corporate Defendants do not share any of the other hallmarks of a common enterprise: (i) apart from a couple of members of senior management and HBO's account department, they do not maintain common employees; (ii) they have distinct and separate office space; (iii) they have independent operations; (iv) they maintain separate accounts and books and records; and (v) they have independent marketing and advertising efforts and strategies.  *See* Dorfman Decl., ¶¶ 42-46.  Furthermore, ***HBO is the only Defendant against whom the FTC made any specific allegations against.***  Accordingly, the FTC failed to meet its burden of establishing that the Defendants are engaged in a common enterprise and that they should held jointly and severally liable.

Seemingly, the FTC's overzealous efforts to characterize the Defendants as a "common enterprise" stem from its fundamental misapprehension of the different business activities of each Defendant described above and in the Dorfman Declaration.  As highlighted below, properly attributing the alleged misrepresentations at issue to the appropriate Defendant, as opposed to clumsily attempting to collapse all of the Defendants into a single entity, provides a more contextual analysis of why the Defendants did not make any actionable representations to consumers.  Accordingly, the Court should deny the FTC's request that the Defendants be treated as a "common enterprise" and be held jointly and severally liable for their individual conduct.

## II.  <u>The Proposed Preliminary Injunction is Improper.</u>

### A.  Legal Standard.

For the FTC to obtain injunctive relief it bears the burden of showing that (1) it is likely to ultimately succeed on the merits of the case and (2) that a balancing of the equities supports the injunctive relief sought.  *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014); *see also* 15 U.S.C. § 53(b).  "In light of the severe adverse consequences of a preliminary injunction, the FTC has a substantial burden under Section 13(b)."  *See FTC v. Great Lakes Chem. Corp*., 528 F. Supp. 84, 86 (N.D. Ill. 1981).  Where, as here, the FTC seeks extraordinary injunctive remedies beyond merely enjoining allegedly violative conduct, it is required to satisfy an even higher burden of proof.  *See SEC v. Compania Internacional Financiera S.A.*, 2011 WL 3251813, at *7 (S.D.N.Y. July 29, 2011) ("Like any litigant, the Commission [is] obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks.").

### B.  The FTC Did Not Meet its Burden of Establishing that it Will Succeed on the Merits.

The FTC alleges that the Defendants engaged in deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and deceptive telemarketing acts or practices that

violate the Telemarketing Sales Rule, 16 C.F.R. §§ 310.3(a)(2)(iii), (a)(2)(vii), & (a)(4).  *See* Complaint at 23-26.  Specifically, the FTC claims HBO engaged in deceptive conduct by misleadingly claiming to customers that:  (i) HBO's limited benefits plans and medical discount memberships are comprehensive health insurance or the equivalent; (ii) that these products are qualified health insurance plans under the Affordable Care Act; (iii) that HBO is an experts on, or provider of, government-sponsored health-insurance policies; and (iv) HBO is affiliated with AARP or the Blue Cross Blue Shield Association.  *See* TRO Memorandum, 35-36.  The FTC is wrong.  HBO did not engage in intentionally deceptive conduct.

To establish deceptive acts or practices, the FTC bears the burden of showing that (1) the defendant made a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances; and (3) the representation was material.  *See FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003).  As shown below, the FTC will not prevail on the merits of its claims against the Defendants for alleged deceptive practices for a number of independent reasons: (i) third parties, not the Defendants, made the alleged misrepresentations; (ii) the representations at issue were true and not actually misrepresentations; and (iii) even if the representations were misleading, they were immaterial because the Defendants adequately disclosed the terms and conditions of the health insurance products that consumers purchased.

1.  **The FTC Failed to Meet its Burden to Establish that the Defendants Made Any Misrepresentations.**

   a.  **HBO Did Not Represent that Consumers Were Purchasing Comprehensive Health Insurance.**

The FTC alleges that HBO represented to consumers that it sold comprehensive health insurance by citing to:

- Declarations from a handpicked sample of customers who claim that HBO's representatives told them that the health insurance policy they were purchasing was a

preferred provider organization (i.e., a "PPO") health insurance policy.   TRO Memorandum, 12-13.

- Declarations from FTC investigators and former customers indicating that they claim that HBO's representatives told them that the plan they purchased covered: (i) doctor office visits, (ii) hospital visits, (iii) diagnostic testing, (iii) medications, and (iv) surgical procedures.  *Id.*, 14-16.

In other words, the FTC claims the fact that HBO's representatives told customers that the plans they purchased were PPOs and provided the covered benefits is equivalent to the Defendants' representation that the subject plans were comprehensive health insurance.  However, neither of these representations, even if proved, supports the allegation that HBO mislead consumers into believing they were purchasing comprehensive health insurance plans.

*First,* the fact that a health insurance plan or product gives customers access to a Preferred Provider Organization or  "PPO" does not mean that the plan or product is comprehensive health insurance.   A PPO is merely a network of healthcare providers, such as doctors, urgent cares, hospitals, or labs.  Dorfman Decl., ¶¶ 21-24.  The fact that a health insurance plan is a "limited benefit plan" does not mean that it cannot simultaneously include a PPO network.  Dorfman Decl., ¶ 22.  Critically, none of the customer-witnesses' declarations reflect that that HBO representatives told the consumers that they were purchasing comprehensive health insurance.[2]  Indeed, the audio recordings of the HBO's representatives' conversations with the FTC's consumer-witnesses, which will be played during the Preliminary Injunction Hearing, confirm as much and even go

---

[2] *See* TRO Memorandum Footnote 33 *citing* PX 6, Banksi Dec. ¶ 5 (no allegation that HBO's representative told her she was purchasing "comprehensive health insurance" or an ACA-compliant plan); PX9, Hackethal Dec. ¶ 6 (same); PX 10, Hall Dec. ¶ 5 (same); PX 13, Macary Dec. ¶ 5 (same); PX 14, Mandarich Dec. ¶ 4 (same); PX 15, Prescher Dec. ¶ 5 (same); PX 17, Skordilis Dec. ¶¶ 3-6 (same); PX 20, Thompson Dec. ¶ 3 (same); PX 21, Touchet Dec. ¶ 3 (same); PX 22, Van Deusen Dec. ¶¶ 3-4 (same).

further to show that many of these witnesses (i) specifically said they did not want comprehensive health insurance (because they could not afford it) and (ii) were affirmatively told that they were not purchasing comprehensive health insurance. Accordingly, the FTC's allegation that HBO misrepresented to consumers that they were purchasing comprehensive health insurance is wrong. Additionally, transcripts of HBO's representatives calls with the FTC's undercover investigators also highlight that HBO informed the FTC's undercover agents that the plans they were "purchasing" were not comprehensive health insurance. *See, e.g.* PX 3, Al-Najjar Dec., page 23 (Where HBO representative advises Mr. Al Najjar that the plan he is purchasing is not comprehensive health insurance, major medical health insurance, or ACA-Complaint).

*Second*, healthcare benefits such as doctor visits, hospital visits, diagnostic testing, prescriptions, and surgical procedures are not exclusively afforded by comprehensive health insurance, but also provided by other plans such as limited benefit insurance plans. Dorfman Decl., ¶ 8. Further, the health insurance plans that the witnesses purchased in fact provided benefits for doctor visits, hospital visits, diagnostic testing, medications, and surgical procedures.[3]

In sum, the FTC failed to meet its burden of establishing that HBO's representations misrepresented the type of benefits their plans afforded consumers.

---

[3] *See* PX 1, Menjivar Dec., p. 451-452 (providing coverage for physician are, prescriptions, and lab testing), 459 (providing schedule of benefits for hospitals, doctors visits, and emergency room visits), 482 (prescription coverage), 485 (imaging and laboratory testing coverage), 486 (medical supplies and equipment coverage); PX 2, Hawkins Dec., p. 62 (providing schedule of benefits for hospitals, doctors visits, and emergency room visits), 79, 86, 105 (prescription coverage), 89 (imaging and laboratory testing coverage), 90 (medical supplies and equipment coverage); PX 8, Declaration of Jules Fernandez (failing to attach any documents evidencing that he did not receive any of the benefits he alleged that the Defendants promised he would receive); PX 9, Hackethal Dec. (failing to attach any documents evidencing that he did not receive any of the benefits he alleged that the Defendants promised he would receive); PX 16, Scott Dec., (failing to attach any documents evidencing that he did not receive any of the benefits he alleged that the Defendants promised he would receive); PX 18, Slawson Dec., ¶ 4 (Defendant's representative advised customer that she was purchasing a "limited plan.") (failing to attach any documents evidencing that he did not receive any of the benefits he alleged that the Defendants promised he would receive); PX 19, Stanley Dec. (failing to attach any documents evidencing that he did not receive any of the benefits he alleged that the Defendants promised he would receive)

### b. HBO Did Not Represent to Consumers that they Were Purchasing Affordable Care Act-Compliant Plans.

The second category of alleged misrepresentations that the FTC claims HBO made and are actionable is that HBO told consumers that the plans they purchased qualified under the Affordable Care Act. TRO Memorandum, 7-11. Again, the facts do not support the FTC's claim. Tellingly, none of the consumer-witnesses claimed that HBO representatives told them that HBO's plans are qualified Affordable Care Act plans or government-sponsored health insurance.[4] *See also,* PX 3, Al-Najjar Dec., page 23 (Where HBO representative advises Mr. Al Najjar that the plan he is purchasing is not comprehensive health insurance, major medical health insurance, or ACA-Complaint). To the contrary, as will be highlighted during playback of the consumer-witnesses recorded calls during the Preliminary Injunction Hearing, HBO explicitly advised the consumer-witnesses that the plans they were purchasing from HBO ***were not*** Affordable Care Act plans. Accordingly, the FTC failed to meet its burden of establishing that HBO misrepresented to the consumer-witnesses that they were purchasing ACA-compliant plans.

To the extent that any of the lead generation companies that HBO purchased leads from represented that they were affiliated with other insurance agencies that sold ACA-compliant plans, HBO is not liable for those representations because those representations (i) were made by a third party and/or (ii) are true. Dorfman Decl. ¶¶ 30-36; 58. Indeed, the FTC failed to submit any evidence (through declarations or otherwise) that the lead generation companies that represented that they were affiliated with agencies that sold ACA-compliant or comprehensive health insurance plans did not in fact send leads to agencies that sold those types of health insurance

---

[4] *See* TRO Memorandum footnote 39; PX 9, Hackenthal Dec. ¶ 6 (reflecting that HBO's representative did not state that she was purchasing an ACA-complaint plan); PX 10, Hall Dec. ¶¶ 3 & 5 (same); PX 13, Macaray Dec. ¶¶ 4-5 (same); PX 14, Mandarich Dec. ¶ 3 (same); PX 21, Touchet Dec. ¶¶ 3-4 (same); and PX 22, Van Deusen Dec. ¶ 3 (same).

plans.  To the contrary, the lead generation companies that HBO purchased leads from did in fact sell leads to other insurance agencies that sold ACA-complaint and comprehensive health insurance plans.  *See* Dorfman Decl. ¶¶ 58, 98.  Accordingly, the FTC failed to meet ***its burden*** of establishing that the Defendants actionably represented that they sold ACA-complaint or comprehensive health insurance plans.

### c.  HBO Did Not Represent to Consumers that they Were Purchasing Plans Issued by the Blue Cross Blue Shield Association or AARP.

The FTC also seeks to hold HBO liable for SIL's and other lead generation's representations on their websites that they were affiliated with the Blue Cross Blue Shield Association ("**BCBS**") or AARP.  TRO Memorandum, 6-7.  As a preliminary matter, there are no allegations or substantiating evidence that HBO represented to consumers that they were purchasing BCBS or AARP Plans.  Accordingly, the Court should disregard any insinuation that HBO made such a representation.  Additionally, similar to its failure to meet its burden of establishing that the lead generation companies sold leads to insurance agencies that sold ACA-compliant or comprehensive health insurance plans, the FTC failed to present any evidence that the lead agencies that HBO purchased leads from did not sell leads to agencies that sold plans issued by BCBS or AARP.[5]  In truth, those lead agencies did in fact sell leads to agencies that sold health insurance plans issued by BCBS or AARP.  *See* Dorfman Decl., ¶¶ 58, 98.    In sum, the FTC failed to meet its burden of showing that (i) ***HBO*** made any representation that it sold AARP or BCBS health insurance plans and (ii) that those lead generation companies did not in fact send

---

[5] Tellingly, while HBO does not claim to sell policies issued by AARP and Blue Cross Blue Shield Association, neither the declaration issued by AARP's representative (PX 27) nor the declaration issued by Blue Cross Blue Shield Association's representative (PX 29) reflect that their health insurance policies are not sold by any of HBO's competitor insurance agencies that also procure leads from the same lead generation companies as HBO.

leads to insurance brokerages that sold plans issued by BCBS or AARP.  Accordingly, these representations are not actionable.

### d.   HBO Was Qualified to Advise Consumers on the Affordable Care Act.

The FTC also claims that HBO misrepresented to consumers that it was an expert on the Affordable Care Act.  However, to the extent that HBO "boast[ed] about their superior ability to advise consumers about options under the ACA," that statement is not a misrepresentation since, as the FTC explicitly acknowledges, HBO sold numerous ACA-qualified policies – giving them adequate experience to "advise consumers about options under the ACA." *See* TRO Memorandum, 11.

### 2.   Even if the Representations were False, they were Immaterial and it was Unreasonable for Consumers to Rely on Them.

Even if (i) HBO's sales representatives misrepresented to consumers that the plans they purchased were (a) ACA-complaint or (b) comprehensive health insurance or (ii) the lead generation companies that HBO purchased leads from misrepresented that they had business relationships with insurance brokerages that sold plans issued by BCBS or AARP, the FTC failed to meet its burden of establishing that those statements were material and that it was reasonable for consumers to rely on them when purchasing their policies from HBO.  This is so because, even as the FTC's witnesses acknowledged in their declarations, HBO's representatives disclosed the plans' benefits, terms, and conditions with consumers when they purchased the plans and the consumers received documentation setting forth those details as well. Dorfman Decl., ¶¶ 60-62, 72-76, 91-93; *see also¸* Footnote 3 above.

"When assessing whether a representation is misleading, courts look to the representation's overall, net impression rather than the literal truth or falsity."  *See FTC v. Consumer Collection Advocates Corp.*, 2015 WL 12533013, at *4 (S.D. Fla. Sept. 9, 2015).  A representation or

omission is material if it is of the kind usually relied on by a reasonably prudent person.  *See FTC v. SlimAmerica, Inc*., 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999).  Mere puffery is not considered deceptive.  "Where a claim is merely exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely, it may be un-actionable puffery." *FTC v. Direct Mktg. Concepts, Inc*., 624 F.3d 1, 11 (1st Cir. 2010) (citations and quotes omitted); *see also FTC v. NPB Advert., Inc*., No. 8:14-CV-1155-T-23TGW, 2016 WL 6493923, at *7 (M.D. Fla. Nov. 2, 2016) ("An advertiser may lawfully engage in puffery,' i.e., state an opinion about a product") (citation omitted).

Disclaimers and disclosure to consumers may shield defendants in FTC cases from liability if they are communicated to consumers.  In a frequently cited case regarding the avoidance of liability through disclaimers, the First Circuit stated:

> Disclaimers or qualifications are not adequate to avoid liability **unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression**. Anything less is only likely to cause confusion by creating contradictory double meanings.

*FTC v. Direct Mktg. Concepts, Inc*., 624 F.3d 1, 12 (emphasis added); *see also, FTC v. Capital Choice Consumer Credit*, 2003 WL 25429612, at *5 (S.D.Fla. 2003) (citing above passage from *Direct Mktg.*); *FTC v. Alcoholism Cure Corp*., 2011 WL 13137951, at *44 (M.D. Fla. 2011) (same).

Here, the FTC's own exhibits evidence that the consumer-witnesses purchased limited benefit and discount membership plans from HBO and were never told that they were purchasing anything other than those products.   All of HBO's customers were required to review and consider the terms and conditions of the health insurance plans they were purchasing prior to consummating their purchase.  Dorfman Decl., ¶¶ 60-63; *see also*, Footnote 3.  As evidenced by the plan documents submitted by the FTC and attached to the FTC's consumer-witnesses declarations, this disclosure

set forth with painstaking detail the benefits, coverage, limits, terms, and other conditions of the plans that consumers were purchasing from HBO. Further, as will be evidenced by playbacks of recordings of the conversations that the consumer-witnesses had with HBO's representatives, HBO's representatives also disclosed the nature of the benefits, terms, and conditions of the plans that consumers purchased. In sum, the terms of the health insurance plans that the customers were purchasing were "prominent and unambiguous" and certainly left customers with an accurate depiction of the product they were purchasing. *See Direct Mktg.*, 624 F.3d at 12.

Therefore, even if any of the representations identified by the FTC were (i) misleading and (ii) attributable to HBO, the FTC failed to meet ***its burden*** of establishing that those misrepresentations were material or that it was reasonable for consumers to rely on them in the face of prominent, clear disclosures that the plans they were purchasing were not comprehensive health insurance or ACA-complaint.

**C. The FTC's Case is Based on the Complaints of a Select Few Disgruntled Customers Out of Tens of Thousands Customers.**

Finally, taking the above into consideration, it is also important to note the inadequate sample size of customer complaints offered by the FTC and the obvious selection bias at hand. HBO sold over five hundred thousand (500,000) insurance plans and other products and supplements to customers since 2013. Dorfman Decl., ¶ 52. Meanwhile, the FTC brings its allegations of widespread deceptive practices by the Corporate Defendants based on *only* 16 customer complaints, which represents less than 0.0035% of the Corporate Defendants' customers. *See* PX Decl. 6-22, in support of Motion for TRO. The few declarations of disgruntled customers are not representative of a fair sample of Corporate Defendants' customers.

**D. Steven Dorfman Is Not Individually Liable for any of the Corporate Defendants' Conduct.**

As the FTC highlights, for an individual to be held liable for corporate misdeeds, the FTC has the burden of showing that the individual has knowledge of the misrepresentations made by his company or should be aware of those misrepresentations.  *See, generally,* TRO Memorandum, 37.  The FTC claims that Mr. Dorfman is liable for any of the corporate Defendants' misdeeds because he is their sole officer, controls their practices, and is aware that customers have cancelled health insurance plans that they purchased from the corporate Defendants because they were unhappy with the coverage that it provided them.  TRO Memorandum, 38.  However, this alone does not impute liability for any wrongful conduct to Mr. Dorfman.  In *Coro, Inc. v. FTC,* 338 F.2d 149 (1st Cir. 1964), the court found that FTC could not meet its burden of establishing that an individual should be personally liable for his company's bad acts just because he was the company's largest shareholder, president, and chairman and was responsible for the company's acts and practices.  *Coro,* 338 F.2d at 154.

The FTC's effort to impute individual liability on Mr. Dorfman fails for the same reason as it did in *Coro*.  Simply put, although Mr. Dorfman was ultimately in charge of the corporate Defendants' operations, he did not have and could not reasonably have been expected to have knowledge that one or a few of his thousands of employees may have been making material misrepresentations to customers.  Indeed it would be an impossible task for any executive of any large organization to know exactly what his employees were doing.  For this reason, Mr. Dorfman built-in safeguards at his companies, requiring all of his employees to follow a script (the "**Script**") when marketing and selling health plans to customers and to comply with the Policies.  Dorfman Decl. at ¶¶ 64-76.  The Script explicitly required the Defendants' employees to advise customers that the health plans they were purchasing provided discounts and included an indemnity

component that did not cover the entire cost of services, that the "plan does not meet the definition of minimal essential coverage, therefore, you could be subject to a tax penalty," and that the Defendants' agent would confirm the details of the insurance portion and discount part of the health plan. *See* PX 30, Baker Decl., ¶ 9 ("All agents were required to follow a sales script."), 13 ("The script explain[ed] the differences between limited benefit plans and major medical insurance. It also noted that limited plans did not meet the ACA's minimum essential coverage requirements."), p. 8-10. Despite requiring employees to follow the Script, apparently a few of them may have allegedly "skipped these disclosures." *Id.*, ¶ 13. Mr. Dorfman also created a quality assurance team to monitor the HBO's sales representatives sales pitches to consumers to make sure that they completely explained and disclosed the terms and conditions of the plans and policies that consumers purchased. *See*, PX 31, Seraphin Decl., ¶ 29. Employees that failed to adequately explain the terms and conditions of policies that they were selling to consumers were reprimanded. *Id.*; *see also*, PX 30, Baker Decl., ¶ 15. The FTC's own witness testified that the Defendants never told their employees to lie to consumers. PX 31, Seraphin Decl., ¶ 26.

Additional grounds for not imputing the corporate Defendants' conduct to Mr. Dorfman exist because the corporate Defendants were audited by HII, the third party administrator that compiled the health insurance policies and products that HBO sold, regularly audited HBO's employee training and sales and verification processes. A copy of documents produced by HII is annexed hereto as **Exhibit "B."** In each instance, HII after onsite visits and interviews with HBO employees, confirmed that HBO's business practices complied with all statutory and regulatory requirements. HII most recently audited HBO on September 13, 2018. *See* HII_000130-142. The purpose of the audit, as all that preceded it, was to:

- Assess the extent of HBO's compliance with regulatory and insurance requirements, as well as HII's own policies;

- To assess whether HBO's procedures are effective and ensure integrity; and

- To verify that HBO and HII have sufficient controls over HBO's processes and employees.

*See* HII_000133.  To that end, HII reviewed HBO's sales process, verification processes, and consumer complaints and interviewed HBO employees.   *See* HII_000134-35.   HII's audit confirmed that two HBO employees, Kirschner Alteme (with 15 years of experience) and David Caldes (with 10 years of experience) conducted sales and verification training for HBO employees. *See* HII_000136.  HBO invested a week of sales training in its employees with both a classroom and floor monitoring component and two weeks of sales verification training.  *Id*.  Additionally, HII's audit verified that HBO trains its employees using materials provided by HII and insurers. HII_000137.  After conducting its extensive audit, HII concluded that apart from updating a few questionnaire responses, HBO did not have any deficiencies in its sales and verification processes. *See* HII_000142 (2017-2018 audit).  HII reached the same conclusion, that HBO's processes were sufficient, in its other recent audits as well.   *See* HII_000109 – 121 (June 11, 2018 audit); HII_000147-150 (February 24, 2016 audit); HII_000151-158 (March 26, 2015 audit).   In sum, based on HII's own review of HBO's policies and practices it "found Simple Health's practices to be in adherence with HII Compliance guidelines."  *See* HII_000111.

**III. The Proposed Blanket Asset Freeze is Improper.**

An asset freeze is an extremely severe remedy, justifiable only in extraordinary circumstances and which must be very carefully circumscribed.  The FTC claims that an asset freeze is necessary because Mr. Dorfman is wrongly siphoning assets to offshore bank accounts.  TRO Memorandum, 39-40.  However, the FTC has not submitted any evidence of risk of dissipation of the Defendants'

assets.  Instead, the FTC relied on half-truths and speculation cloaked as facts when representing that Mr. Dorfman was funneling the Defendants' assets to offshore accounts.  Accordingly, the FTC failed to meet **its burden** of establishing that the blanket asset freeze is warranted.  In reality, the identified transfers were periodic payments to companies that provided customer and call center support for HBO.  Dorfman Decl., ¶¶ 108-13.

Even if the Court determines that the FTC has the common law-created remedies of disgorgement and restitution at its disposal, the FTC is not entitled to an asset freeze because it failed to meet its burden of showing that there is a substantial risk that the Defendants will dissipate, conceal, or transfer away assets before a final judgment is rendered. *See CFTC v. Sterling Trading Group, Inc.*, 605 F.Supp.2d 1245, 1304 (S.D. Fla. 2009) (denying asset freeze in part because the CFTC did not make "showing of dissipation or hiding of assets"); *see also, SEC v. ABS Manager, LLC*, No. 13cv319-GPC (JMA), 2013 WL 1164413, at *6 (S.D. Cal. Mar. 20, 2013) (denying asset freeze because, "[i]n support of its motion to freeze assets, the SEC . . . offered no evidence that [the] Defendant . . . will likely dissipate his own personal assets or the corporate assets."); *SEC v. Schooler*, 902 F. Supp. 2d 1341, 1360 (S.D. Cal. 2012) (modifying asset freeze in part because "SEC . . . offered no evidence that Defendants are sheltering or hiding money, or shuffling it around nefariously"); *FTC v. Millennium Telecard, Inc.*, 2011 WL 2745963, at *12-13 (D.N.J. Jul. 12, 2011) (refusing to continue asset freeze because incidents of financial impropriety – including the principal's history of writing checks to cash on corporate accounts, of writing bad checks and of co-mingling personal and corporate funds – failed to demonstrate a likelihood that the defendants would dissipate any assets); *FTC v. John Beck Amazing Profits, LLC*, No. 2:09-cv-4719-FMC-FFMx, 2009 WL 7844076, at *15 (C.D. Cal. Nov. 17, 2009) (denying asset freeze of defendants' personal assets:  "[T]here is no evidence that Defendants have ever previously attempted to intentionally dissipate, hide or otherwise

shelter corporate or personal assets from an effort to collect a debt or judgment against Defendants."). This is the principal inquiry on this issue because the purpose of an asset freeze is to ensure that defendants will not dissipate, conceal, or divert assets before a final judgment, "thereby defeating the possibility of effective final relief in the form of equitable monetary relief." *See CFTC v. Mad Fin., Inc.*, 2002 WL 1972063, at *7 (S.D. Fla. 2002). Thus, without a substantial showing of a likelihood of dissipation, there is no need for an asset freeze through the duration of this proceeding. Further, to establish the possibility of dissipation, the FTC "cannot rely on conjecture, instead, [it] must offer evidence specific to the Defendant that reveals a possibility that the Defendant will dissipate assets." *FTC v. Debt Solutions, Inc.,* No. C06-298JLR, 2006 WL 1041996, at *7 (W.D. Wash. Apr. 3, 2006). In *Debt Solutions, Inc.*, the Court froze the corporate defendants' assets upon proof that the corporate assets had been secreted to Canada, but declined to freeze the assets of the individual defendants. *Id.* The court recognized that the individuals were "accused of violations that could subject them to substantial liability," but concluded that, if "this were sufficient to stablish a 'possibility' of dissipation, then every defendant subject to an injunction under the FTCA would automatically be subject to an asset freeze." *Id.*

The FTC has failed to make any showing whatsoever that the Defendants and Mr. Dorfman are likely to dissipate or conceal assets. The FTC's efforts to demonstrate a likelihood of dissipation are premised on innuendo, speculation, and falsehoods. To create the false appearance of questionable offshore transfers, the FTC **blatantly misrepresented** to the Court that Mr. Dorfman was "funneling large sums of cash overseas." *See* TRO Memorandum, 48. This is a total falsehood. Simply put: none of the Defendants have or have ever had offshore bank or financial accounts. Dorfman Decl., ¶ 113. Rather, the international wire transfers identified by the FTC's forensic accountant relate to payments from the Defendants to offshore call centers used by the Defendants

to conduct their business.  Dorfman Decl., ¶¶ 108-12, PX 5, ¶ 37.  Furthermore, Mr. Dorfman's actions in this case have evidenced that he is not attempting to conceal assets and has gone above and beyond to identify and voluntarily turnover assets to the receiver.  Indeed, the FTC and Receiver can attest to, Mr. Dorfman voluntarily walked-over assets worth in excess of $1 million to the Receiver on the same day that he was served with the TRO.

In sum, the FTC has not submitted any competent evidence that Mr. Dorfman or the corporate Defendants present any risk of dissipation of assets.  Clearly the FTC failed to meet the extraordinary burden imposed when seeking such a severe remedy.  *See SEC v. Compania Internacional*, 2011 WL 3251813, at *7 ("Like any litigant, the Commission [is] obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks.").

## IV. The Court Should Remove the Temporary Receivership or, at Most, Convert it to a Corporate Monitorship.

Section 13(b) of the FTC Act grants courts broad equitable powers, including the power to appoint a receiver incident to a preliminary injunction.  But the appointment of a receiver "is, like an injunction, an extraordinary remedy and ought never to be made except in cases of necessity upon a clear showing that . . . emergency exists, in order to protect the interests of the plaintiff in the property."  *CFTC v. Combest Trading Corp.*, 481 F. Supp. 438, 441 (D. Mass. 1979).  *See also FTC v. Direct Marketing Concepts, Inc.*, 2006 WL 149039, at *4 (D. Mass. Jan. 19, 2006) (describing the appointment of a receiver as an extreme, "draconian" remedy); *FTC. v. The Crescent Publishing Group, Inc.*, 129 F. Supp. 311, 326 (S.D.N.Y. 2001) (declining to appoint receiver, which, the Court noted, is "an extraordinary remedy to be employed cautiously and usually when no lesser relief would be effective.").

24

There are a number of factors a court should consider in determining whether to appoint a receiver, among them: (i) the nature of the alleged fraud; (ii) the extent to which the property at issue is in imminent danger of being lost, concealed, squandered or otherwise diminished in value; (iii) the adequacy of available legal remedies; (iv) whether any harm to the plaintiff would be greater that any injury to the parties opposing the receiver; and (v) the plaintiff's likelihood of success in the action and the possibility of irreparable injury to his or her interests in the property. *Combest Trading Corp.*, 481 F. Supp. at 441. Additionally, courts should evaluate whether the interests sought to be protected would be well served by the receiver, that is, whether the assets subject to the proposed receivership would be of sufficient value to outweigh the added costs that likely would result from the receivership. *Id.* Finally, courts also determine whether a defendant is compliant with discovery or other requests or "willfully opposing discovery or refusing to answer questions relating to relevant business operations." *CFTC v. Lake Shore Asset Management Ltd.,* 2007 WL 2915647, at *17 (N.D.Ill. 2007).

The Court should deny the FTC's request to extend the receivership over the corporate Defendants through the preliminary injunction for the same reasons it should deny the FTC's request for an asset freeze. *First*, as shown above, the Defendants did not engage in any type of consumer fraud or deceptive marketing practices, and the FTC is unlikely to prevail on the merits.

*Second*, as shown above, there is no risk of dissipation of the corporate Defendants' or Mr. Dorfman's assets. The FTC has failed to offer a scintilla of evidence showing that there is a likelihood that the corporate Defendants' or Mr. Dorfman's assets being marshalled and controlled by the Receiver will be concealed, diverted or dissipated before a final judgment in this case.

*Third*, the balance of the equities favors removal of the Receiver (as well as denying the other injunctive relief sought). Given the record evidence here, it is evident that appointment of the

receiver has imposed a much greater harm on the corporate Defendants and Mr. Dorfman than any alleged potential harm that might occur if the Receiver is removed.  Mr. Dorfman's companies have been stripped from him—without notice—and their assets and operations marshalled by the receiver.  Through no fault of the Receiver himself, who is simply following the orders the FTC requested that the Court impose on the receiver, the receivership has fundamentally disrupted and likely destroyed the corporate Defendants' businesses; only served to exacerbate any alleged customer complaints, which constitute a fraction of the corporate Defendants' customer base; left the corporate Defendants' employees without pay due to them; and interrupted the provision of tens of thousands of health insurance policies as individuals head into the open enrollment period for obtaining necessary health insurance.  Conversely, the FTC has not shown any overriding reason why the receivership is necessary given that it has not shown any dissipation of assets.

*Fourth*, Mr. Dorfman has been forthcoming and open in sharing information with the FTC and the receiver about the corporate Defendants.  Within a few days of receiving the TRO, he provided the FTC with a financial disclosure requiring significant information about his assets and financial history, and he also met with the Receiver and his counsel and has responded to their various inquiries requesting information.

Given consideration of these factors, the Court should refuse to continue the temporary receivership through a permanent injunction and it should allow Mr. Dorfman to take possession of the corporate Defendants and provide for their respective defense in this action.  It is clear that a receiver is not only unnecessary, but that the takeover of the corporate Defendants and cessation of their business has hurt the Defendants and their diverse stakeholders.  Alternatively, if the Court would prefer some level of supervision of over the corporate Defendants' operations, then Mr. Dorfman requests that the Court convert the receivership into a corporate monitorship whereby Mr.

Dorfman and the monitor agree to a revised business plan for the corporate Defendants and the monitor supervises the corporate Defendants' operations and receives periodic reports regarding corporate Defendants' services and its finances.

## CONCLUSION

For the foregoing reasons, Mr. Dorfman respectfully requests that the Court deny the entry of a preliminary injunction, dissolve the asset freeze and receivership, and for all further relief the Court deems just and proper.

Dated:  March 25, 2019                    **DLA Piper LLP (US)**

                                             */s/ Ryan D. O'Quinn*
                                             Ryan D. O'Quinn (FBN 0513857)
                                             *ryan.oquinn@dlapiper.com*
                                             Elan A. Gershoni (FBN 95969)
                                             *elan.gershoni@dlapiper.com*
                                             200 South Biscayne Boulevard
                                             Suite 2500
                                             Miami, Florida 33131
                                             Telephone:  305.423.8554
                                             Facsimile:  305.675.7885

                                             *Counsel for Defendant*
                                             *Steven Dorfman*

## CERTIFICATE OF SERVICE

The undersigned certifies that he filed this pleading through the court's electronic filing system and that all parties requesting electronic notice of pleadings have been served with the pleading.

                                             */s/ Ryan D. O'Quinn*
                                             Ryan D. O'Quinn