# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 18–cv–62593–DPG

**Federal Trade Commission,**

        Plaintiff,

  v.

**Simple Health Plans LLC, et al.,**

        Defendants.

.

# PLAINTIFF'S REPLY MEMORANDUM
# IN SUPPORT OF A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.  Introduction………………………………………………………………………1

II.  Overwhelming Evidence Uncovered Since Entry of the TRO Shows the
Magnitude of Defendants' Fraud………………………………………………...4

   A.  Defendants' Brazenly Deceptive Lead Generation Practices…………………...…4

   B.  Defendants' Facially Deceptive Sales Scripts…………………………....…..6

      1.  "Fear of God"……………………………………………....……....7

      2.  "Legitimizing" the Products………………………………....................8

      3.  "Information is [the] enemy in this business"………………………….9

   C.  Defendants' Sham Compliance and Verification Departments……………..……11

      1.  "Verification Rebuttals"……………………………………….………....12

      2.  Defendants Permitted Telemarketers to Make Deceptive Off Script
Claims With Impunity………………………………………....………….………13

      3.  Defendants Concealed Hundreds of Thousands of Recorded Sales
Calls from State Regulators……………………………….……………14

   D.  Defendants' Sham Customer Service Department………………………….....16

   E.  Consumer Harm……………………………………………………...……………18

III.  The FTC is Likely to Succeed on the Merits………………………………...………19

   A.  The Court Has the Authority to Enter a Preliminary Injunction……………...……19

   B.  Defendants Are Liable for Misrepresentations Made By Lead Generators…...……20

   C.  After-the-Fact Disclosures and Sham Verifications Do Not Cure the
Misrepresentations Made During Sales Calls……………………………………20

   D.  Dorfman Controlled and Participated in the Fraud and is Individually Liable…...22

   E.  Defendants Operated as a Common Enterprise Controlled by Dorfman………...23

   F.  An Asset Freeze and Receiver Are Critical to Maintaining the Status Quo……...24

IV.  Conclusion………………………………………………..………………….....25

## TABLE OF EXHIBITS

| PX Number | Description | First Page | Last Page |
|:---:|:---|:---:|:---:|
| **Filed with Reply in Support of a PI** | | | |
| 32 | Declaration of Roberto Menjivar, Investigator | 1 | 457 |
| 33 | Declaration of Douglas McKenney, Investigator | 1 | 77 |
| 34 | Declaration of Nathaniel Al-Najjar, Paralegal | 1 | 485 |
| 35 | Declaration of Emil George, Forensic Accountant | 1 | 4 |
| 36 | Declaration of Richard Kaplan, Computer Forensic Examiner | 1 | 3 |
| 37 | Declaration of Calvin Brown, Computer Forensic Examiner | 1 | 5 |
| 38 | Declaration of Dr. Brian Miller, Expert Witness | 1 | 76 |
| 39 | Declaration of Ahmad Bashir, Consumer | 1 | 28 |
| 40 | Declaration of Elizabeth Belin, Consumer | 1 | 13 |
| 41 | Declaration of Christopher Mitchell, Consumer | 1 | 54 |
| 42 | Declaration of Brenda Riley, Consumer | 1 | 30 |
| 43 | Declaration of Connie Young, Consumer | 1 | 25 |

## I.      INTRODUCTION

In entering the *ex parte* temporary restraining order ("TRO") in this case, the Court found good cause to believe Defendants illegally marketed their limited benefit plans and medical discount memberships to consumers and that Plaintiff Federal Trade Commission ("FTC" or Commission") "is therefore likely to prevail on the merits of this action."  The Court similarly found the imposition of an asset freeze and appointment of a temporary receiver to be in the public interest.  Those findings are supported by four volumes of evidence the Commission submitted in support of its TRO motion.  This evidence establishes that Defendants deceived tens of thousands of consumers into paying at least $150 million for what they believed would be comprehensive health insurance covering all of their medical needs.  Instead, Defendants sold these consumers nearly worthless products that offered virtually none of the promised benefits.  Based on the FTC's compelling evidentiary showing at the TRO stage, the Court directed Defendants to "show cause, if there is any," why a preliminary injunction should not be entered.  Defendants have failed to satisfy that burden.

By contrast, the strength of the FTC's evidence has increased dramatically.  Under the terms of the TRO, the FTC has inspected and copied Defendants' business records as well as obtained new evidence from third parties.  These materials include *hundreds of thousands of recorded sales and customer service calls*,[1] despite Defendants' repeated insistence to regulators that such recordings did not exist.  It is abundantly clear why Defendants sought to conceal the existence of these recordings—they explicitly reveal how Defendants regularly deceived consumers with their initial sales pitch, and then continued to lie when consumers raised concerns, attempted to cancel, or sought refunds.  This new evidence also includes the facially

---

[1] A small fraction of these recordings have been transcribed and submitted as attachments with this Memorandum.  *See* PX 34, ¶¶ 22-26.  If the Court requests, the FTC can submit some or all of these recordings, which contain sensitive personal information, on electronic media for *in camera* review.

deceptive sales scripts that Defendants required their telemarketers to follow as well as internal documents showing how their "compliance" department regularly allowed the use of even more deceptive claims to secure sales.  All of this unlawful conduct took place under the direction and close supervision of Defendants' sole owner and Chief Executive Officer Defendant Steven J. Dorfman ("Dorfman").

Defendants' records also reveal in stunning detail the shamelessly misleading online advertising campaigns they used to lure unsuspecting consumers searching for comprehensive health insurance.  These campaigns, into which Defendants poured millions of dollars, primarily targeted consumers who searched Google using the keywords "Obamacare" or "Blue Cross," despite the fact that Defendants did not sell these types of insurance products.  Defendants generated hundreds of thousands of leads from these deceptive ads, thereby misleading consumers even before subjecting them to Defendants' fraudulent telemarketing sales pitch.

New evidence obtained by the FTC also highlights the staggering harm caused by Defendants' scam.  This evidence includes additional declarations from consumer victims; internal logs documenting the flood of confused, outraged consumers who attempted in vain to seek even the most basic information from Defendants' customer service agents, let alone cancel their plans or obtain refunds; and scores of formal complaints regularly filed against Defendants. Their callous treatment of consumers with chronic health conditions requiring ongoing medical care is especially outrageous.  Almost inevitably, these consumers found themselves either burdened with significant medical debts or unable to obtain critical treatment or medication.

After five months of access to his own business premises and records, repeated onerous demands for documents served on the Court-appointed receiver, two grants of expedited discovery, and over 1,500 pages of documents produced by the FTC, Dorfman has submitted

essentially *one piece of "evidence"*—his own, uncorroborated, self-serving statement. Dorfman's statement consists almost entirely of sweeping, conclusory assertions that are unsupported by a shred of concrete, substantive evidence. This statement, and his opposition as a whole, are a transparent attempt by Dorfman to absolve himself by blaming others for his unlawful conduct – rogue employees, business associates, even his victims, who he insinuates are somehow responsible for being defrauded. As proof of this last proposition, Dorfman refers vaguely to recordings of calls with certain consumer witnesses, implying that these recordings will contradict their statements, yet he fails to provide the Court with a single transcript of these calls despite being in possession of the recordings for months.

The evidence clearly demonstrates Dorfman's active participation in, and knowledge of, the central conduct at issue in this case. The scale and degree of fraud revealed by this evidence, as well as Dorfman's ruthless attitude toward his victims, is appalling. This Court should give no weight to the unsubstantiated, blanket excuses offered by Dorfman, who:

- is not even licensed to sell insurance and has been the subject of multiple prior regulatory actions for engaging in the unlicensed sale of insurance,

- described his victims as "mostly stupid" people who don't know "apples from oranges to pears," and need to be led around "the dog track or horse track" with "blinders,"

- trained his telemarketers that "information is [their] enemy" in this business,

- orchestrated an elaborate scheme (that included personally acquiring 20 "burner" phones) to submit fake positive BBB reviews on behalf of Defendants, and

- when informed by a business partner of misleading practices by Defendants' employees that were generating consumer complaints, responded, that they could "shove 90% of that shit up [their] ass."[2]

---

[2] PX 32, pp. 355, 372-73, 378; PX 34, pp. 47, 50, 59; D.E. 12, p. 32.

The FTC respectfully requests that the Court enter a preliminary injunction against Dorfman. The FTC also requests that this Court enter a preliminary injunction against the six corporate defendants, which are unrepresented and have not appeared or responded to the TRO.[3]

## II. OVERWHELMING EVIDENCE UNCOVERED SINCE ENTRY OF THE TRO SHOWS THE MAGNITUDE OF DEFENDANTS' FRAUD

Defendants' own business records confirm the substance of the FTC's complaint allegations. Consumers seeking comprehensive health insurance first are enticed by Defendants' misleading search engine and lead generation websites, then subjected to a deceptive telemarketing pitch, run through a sham verification process, and finally, when they attempt to raise concerns or to cancel Defendants' virtually worthless products, are deceived even further.

### A. Defendants' Brazenly Deceptive Lead Generation Practices

Defendants paid millions of dollars to display deceptive search engine advertisements to consumers seeking comprehensive health insurance.[4] These ads, which often served as the first point of contact between Defendants and their victims, targeted consumers who searched Google for "Obamacare," "Blue Cross Blue Shield," "AARP," and variations of these keywords.[5] Consumers who searched for these terms frequently would be presented with ads paid for by Defendants promising "Blue Cross Blue Shield Quotes" and "Obamacare Open Enrollment | Enroll in Obamacare Today." Defendants ran *hundreds of thousands* of campaigns based on

---

[3] Neither Dorfman nor his counsel represent these entities.

[4] The millions invested by Defendants in search engine advertising as well as the substance of these ads is conspicuously absent from Dorfman's otherwise lengthy description of Defendants' lead generation activities in his declaration. (D.E. 104-1, ¶¶ 54-63).

[5] Defendants ran at least 141,099 online ad campaigns with Google using the key words "Blue Cross," or a variation of those terms, at least 229,256 campaigns using the key word "Obamacare," or a variation of that term, and at least 2,502 campaigns using "AARP" or some variation of that term. PX 34, ¶ 12.

these keywords[6] even though *they did not sell these products*.  Sample ads from Defendants'
most active campaigns included:



Defendants paid over $7 million to Google to display these ads and others like them more than
26 million times, resulting in nearly 850,000 clicks and 230,000 inbound telephone calls.[8]  As a
result, before even speaking to a telemarketer, thousands of consumers already were deceived
into believing that Defendants actually sold comprehensive health insurance.  This evidence
flatly contradicts Dorfman's claim that Defendants never represented to consumers that they
were affiliated with Blue Cross Blue Shield or AARP.

Dorfman argues at length that Defendants' lead generation practices are not deceptive
because unspecified lead generation sites operated by Defendants purportedly sold leads to
unspecified insurance agencies that, in turn, sold ACA-compliant health insurance plans or plans
affiliated with BCBS and AARP.  This is absurd on multiple levels.  First, Dorfman, of course,
offers no proof for any of his assertions.  He does not identify a single BCBS, AARP, or ACA-
authorized insurance agency that supposedly purchased leads from Defendants.  Second,
Dorfman's sweeping, unsupported claims are contradicted by actual evidence.  In particular,
Dorfman glosses over his control and ownership of corporate defendant Simple Insurance Leads

---

[6] *Id.*
[7] *Id.* ¶ 13.
[8] *Id.* ¶ 11.

("SIL"), the entity that created and managed these deceptive online campaigns, which were hosted on websites registered to corporate defendant Health Benefits One ("HBO").[9]  Dorfman fails to disclose that almost all of SIL's revenue came from HBO, the selling arm of his scheme.[10]  This completely refutes the notion that SIL had a robust business with "other insurance agencies," much less legitimate ones that sold BCBS, AARP, or ACA products. Third, even if a handful of these as-yet unidentified third party sales existed, this did not somehow make Dorfman's use of these lead generation sites to sell his own products any less deceptive.  Finally, Dorfman acknowledges that SIL controlled several lead generation sites that are deceptive by virtue of their names alone, including "myobamacareapplication.com" and "trumpcarequotes.com."[11]

### B.  Defendants' Facially Deceptive Sales Scripts

After luring consumers with misleading "Obamacare" and "Blue Cross" ads, Defendants used facially deceptive sales scripts to sell their inferior products.[12]  These scripts, located throughout Defendants' call centers,[13] are replete with deceptive statements and high-pressure sales tactics, including: 1) pretending that Defendants can provide the highest quality comprehensive health insurance plans and then scaring consumers into thinking they may not qualify for these plans; 2) "legitimizing" Defendants' products by grossly misstating their benefits and coverage; and 3) omitting critical information about the products.[14]  The intent of

---

[9] D.E. 12-1, PX 1, ¶¶ 14-25.

[10] HBO accounted for 94% of the revenue generated by SIL.  PX 35, ¶¶ 7-8.

[11] D.E. 104-1, p. 17-18.  To the extent Dorfman is making the same arguments regarding lead generation companies that he does not own or control, he again provides not a single piece of evidence for this assertion.

[12] In training materials, Defendants promote "script adherence" as the "fastest way to the money."  PX 32, pp. 13-14 ("Script adherence = Significantly higher closing percentage").

[13] Telemarketers accessed Defendants' scripts through computer terminals at their desks.  PX 33, ¶ 6.

[14] These examples represent just a partial catalog of the misleading characteristics of Defendants' scripts. For example, Defendants strategically interspersed their scripts with insurance terms of art, such as

the scripts is unmistakable—to leave consumers with the impression that they were purchasing comprehensive health insurance or its equivalent.  Dorfman himself closely supervised all aspects of script development, from drafting and editing, to final approval.[15]  He even trained new telemarketers, boasting to them that he is the "puppeteer" of his "customers," who he described as "mostly stupid," who "don't know[s] apples from oranges to pears," and who must be led like a "dog" with "blinders" around the "track" in pursuit of a "rabbit."[16]

### 1.     "Fear of God"

Defendants refer to the first section of their scripts as "Fear of God,"[17] candidly noting in training materials that telemarketers should create a sense of "urgency and fear" in the uninsured consumers as to whether they are eligible for any type of plan.[18]  The scripts begin with, "I will be helping you with your application for an affordable health insurance quote."[19]  The telemarketers then claim that they will conduct an expansive search of available plans "in your state" from "MAJOR 'A Rated' CARRIERS" to find the "BEST PLAN out there for the BEST PRICE!"[20]  After gathering consumers' information, telemarketers placed calls on hold, purportedly to conduct the statewide "search."[21]  In reality, no searches took place, and Defendants offered only one type of insurance product—a limited indemnity plan—along with

---

"PPO" and "copay," to mislead consumers into believing that they would receive comprehensive health insurance.  (D.E. 12, p. 9).  Moreover, Defendants persisted in their use of these terms despite repeated warnings not to use this language in connection with the sale of these products, including from their third party administrator and carriers.  *See, e.g.,* PX 32, pp. 257, 335, 392-93.

[15] *See, e.g.,* PX 32, pp. 356-37, 358-59, 364-369, 374 ("This looks horribly put together and we need to rework it"), 375 ("that script is horrible"), 376 ("we need to make this simpler"), 381-84, 385, 425.

[16] PX 34, ¶ 21, pp. 47, 50, 59.

[17] PX 33, pp. 5, 25, 51

[18] PX 32, pp. 226, 229.

[19] PX 33, pp. 4, 24, 50.

[20] *Id.* (emphasis in original).

[21] To increase consumers' sense of anxiety and their corresponding feeling of relief when telemarketers announce the fake "search" results, Defendants' scripts state, "when I come back, we'll go over all of your options, *if there are any*, and make sure we find you the best plan for the best price" (emphasis added).  PX 33, pp. 5, 25, 51.

several other non-insurance products, such as wellness or medical discount plans.  All of these

products are "guaranteed issue," so qualification was automatic.[22]  To fuel this "sense of

urgency," scripts directed telemarketers to reject requests for written information by falsely

claiming that Defendants' plans are "not for the general public" and carriers therefore do not

provide "packets or brochures about this insurance."[23]

## 2. "Legitimizing" the Products

Defendants' scripts next sought to "legitimize" their inferior products by deceptively

calling them a "health insurance plan," "medical insurance package," "PPO," or "similar" to

"insurance through an employer" that "typically" is available only for "large groups and

businesses."[24]  The scripts then define the plans' coverage expansively, falsely stating they will

include "a prescription drug plan," "doctor office visits," "diagnostic testing," "hospital

coverage" and "medical" and "surgical" care that "can be used at virtually ANY inpatient or

outpatient facility in the NATION."[25]  Critically, the scripts claim that Defendants provide this

array of benefits without discriminating "against any…pre-existing conditions."[26]

The scripts' most audacious lies are reserved for the subject that concerns consumers

most—expected costs for medical expenses.  Consumers are told that they will pay little, if

anything, for medical care and prescription medications.  Scripts describe consumers' expected

out-of-pocket expenses variously as "pennies on the dollar," $25 for a $200 doctor visit, and

---

[22] "Now, fortunately for YOU, this IS a GUANTEED ISSUE health insurance plan.  Because of the OPEN ENROLLMENT in your state, you're approved TODAY, regardless of your conditions."  PX 33, p. 55.  *See also id*. at 8, 29, 31.

[23] *See* "Send Me Something in Writing" rebuttal script.  PX 33, pp. 19, 44, 70 ("if there was ANYTHING OUT THERE that would be more beneficial for you than THIS PLAN, then THAT is what I would be offering to you!").

[24] *Id*. at 5, 6, 7, 19, 25, 26, 44, 51, 70.  Defendants kept this language in their scripts despite warnings that it was deceptive.  PX 32, pp. 64, 257, 426-428.

[25] PX 33, pp. 6, 26, 52.

[26] *Id*. (plans "don't discriminate against any of your pre-existing conditions").

$5,000 for a $50,000 hospital bill.[27]  They even promise that consumers will "NEVER incur any upfront costs," which Dorfman's sworn statement directly contradicts.[28]  Prior versions of Defendants' scripts contain even more egregious misrepresentations, strongly implying that their products worked like a traditional "70-30" insurance policy.[29]

### 3.  "Information is [the] enemy in this business."

In a sales training video, Dorfman explains that "information is your enemy" when it comes to selling Defendants' products and that telemarketers should "keep it simple stupid" because actually providing consumers meaningful information would "confuse them."[30] Consistent with his training, Defendants' scripts are devoid of *any meaningful information* about the products sold to consumers.  The scripts fail to disclose critical facts, including: 1) that those products do not comply with the Affordable Care Act;[31] 2) the names of the carriers associated with the products;[32] 3) that the products are limited benefit indemnity plans, medical discount memberships, or wellness plans; 4) that Defendants' limited benefit plans reimburse consumers only $50 per visit for <u>three</u> doctor visits per year, $50 for one emergency room visit, and $100

---

[27] *See, e.g., id*. at 37:  "When it's all said and done you're looking at paying LITERALLY pennies on the dollar!!"  *See also id*. at 27, 37, 53, 66.

[28] *Id*. at 27, 53.  D.E. 104-1, ¶ 8 ("the insured is responsible for paying his medical costs at the time they are incurred and then seeking indemnity from the insurer by filing a claim.")

[29] For example, a "rebuttal" script directed telemarketers to use the following outrageously deceptive answer when consumers asked whether Defendants' products are "70-30%" health insurance policies: "No.  In certain cases, it can work out even more in your favor."  PX 32, p. 246.  Telemarketers did not stop making this misrepresentation about Defendants' products simply because it had been removed from scripts.  For example, in an October 2017 email chain copying Dorfman, a third-party claims administrator noted that she had been "bombarded with calls from members advising that they are being told the benefits pay 70/30."  *Id*. at 362.

[30] PX 34, ¶ 21, pp. 47, 59.

[31] Defendants' primary sales scripts contain no references either to the ACA or Obamacare.  *See* PX 33, pp. 4-7, 24-28, 50-54.  "Rebuttal" scripts provide information regarding the ACA that is, at best, confusing, inaccurate, and irrelevant.  *See id*. at 14, 39, 67.

[32] In contrast to recognized brands such as Blue Cross, Defendants' actual products are from obscure entities such as Legion Limited Medical, Axis Limited Medical, and 4Core Health, among others.

per day for up to 30 days in the hospital, *with the consumer being responsible for the rest of the cost*; and 5) that the "prescription drug plan" is nothing more than a savings card.[33]

Dorfman argues that a PPO is "merely a network of healthcare providers," (D.E., p. 12) and that Defendants' limited indemnity plans can provide access to a PPO network, making it acceptable to promise without qualification that consumers will receive a "PPO."  This is not a meaningful distinction.  *Access* to a PPO network is entirely different from *enrollment* in a PPO insurance plan.[34]  If one has access to providers in a PPO network, but no underlying comprehensive insurance to shift risk of medical expenses, then access to that network has almost no value and, *at most,* constitutes a discount plan.[35]  Dorfman himself admits that Defendants' promise of "PPO network repricing" is nothing more than "a big fancy term for discount,"[36] and, as his Chief Compliance Officer explained to him, "No one can confirm there even is one."[37]

---

[33] As detailed in the Commission's TRO memorandum, there is a stark difference between Defendants' promises and what the indemnity plan provides—which *at most* is $3200 per year.  (D.E. 12, p. 17). Among other things, the indemnity plans do not cover medications, emergency room care, surgical care, anesthesia care, skilled nursing facility care, rehabilitative or habilitative services, complex imaging, or outpatient procedures.  PX 38, pp. 8-9.

[34] To be considered a PPO, a health insurance plan must contract "with a broad range of providers (physicians, health systems), designated as the 'preferred network.'  A plan member can use any of the preferred providers, typically with favorable co-insurance, copay; and count towards a deductible.  As Simple Health plans have no preferred network with favorable contracting terms, they are therefore not tiered, and cannot be considered a PPO."  PX 38, p. 5.

[35] At most, consumers' access to Defendants' so-called PPO network is comparable to a discount membership that *might* afford modest price reductions for medical services or medications.  However, the extent of any potential discounts is unknowable until *after* consumers incur the expense *and* navigate a nightmarish claims process.  *Id*. at 4-5; *see, also, e.g.*, PX 34, pp. 404-08 (transcript of call from office of medical provider who spent over two hours attempting without success to verify benefits associated with Defendants' plan); PX 39, ¶¶ 7-12; PX 40, ¶¶ 4-10; PX 41, ¶¶ 14-23; PX 42, ¶¶ 8-11.

[36] PX 34, page 55.

[37] PX 32, pp. 358 (when Dorfman asked his Chief Compliance Officer why a script for a particular limited benefit plan did not discuss network repricing, she told him that the carrier, Humana, instructed sellers not to discuss it with potential customers); *see also id.* at 387 (providing the network repricing for specific services "cannot be done").  Of course, this did not stop Defendants from touting repricing in the script for this product.  PX 33, p. 27 ("So again, first the PPO network will take your entire hospital bill, and re-price it").

Dorfman also contends that Defendants did not deceive certain consumer declarants because they did not say the magic words "comprehensive health insurance" or "ACA-compliant" during their initial sales calls.  This simplistic argument is easily refuted by reference to the actual sales calls.  Indeed, unlike Dorfman, the FTC has submitted transcripts of every recorded sales call associated with these consumer declarants that could be located.[38] Unsurprisingly, these transcripts confirm Defendants' blatant deception, and, in many instances, reveal misrepresentations more egregious than those described by consumers in their declarations.[39]  Of course, in not a single transcript does the telemarketer tell the consumer the truth—that Defendants were selling a limited indemnity plan with a *maximum* annual reimbursement potential of only a few thousand dollars,[40] no prescription coverage, and exclusion of preexisting conditions.[41]

### C.  Defendants' Sham Compliance and Verification Departments

Defendants maintained compliance and verification departments primarily for three purposes:  1) skirting post-sale disclosures mandated by carriers, in part, through the use of unapproved, deceptive "verification rebuttal" scripts; 2) insuring telemarketers adhered to

---

[38] PX 34, ¶ 22.

[39] *See, e.g.,* D.E. 12-8, PX 13, ¶¶ 4-7 (Macary Declaration); PX 34, ¶ 22, pp. 74-76 (Macary sales call transcript); D.E. 12-8, PX 15, ¶¶ 4-6 (Prescher Declaration); PX 34, ¶ 22, pp. 194-195 (Prescher sales call transcript); D.E. 12-9, PX 21, ¶¶ 3-4 (Touchet Declaration); PX 34, ¶ 22, pp. 85-90 (Touchet sales call transcript).

[40] The so-called "wellness plans" sold to many consumers in place of indemnity plans did not even offer these meagre reimbursements and were unequivocally not insurance, yet Defendants' scripts described these products as "a medical insurance package."  PX 33, p. 2.  Dorfman himself approved the use of this language, even after his own employees objected that it was misleading.  PX 32, p. 381.

[41] Dorfman also asserts in perfunctory fashion that Defendants' products actually provide benefits for "doctors visits, hospital visits, diagnostic testing, medications, and surgical procedures," (D.E. 104-1, ¶ 8), yet characteristically provides no documentary support or specifics to back up this assertion.  As the FTC has already established, and the actual plan documents confirm, Dorfman's claim is false—the coverage provided by Defendants' plans is virtually worthless relative to consumers' monthly "premiums" and leaves consumers exposed to limitless financial risk.  PX 38, pp. 2-3.  Moreover, without citing any new evidence or refuting existing evidence showing that Defendants had not sold a single ACA-qualified plan *since 2014*, Dorfman unbelievably asserts that his employees somehow were qualified to advise consumers about the ACA.  (D.E. 104, p. 20).

Defendants' misleading sales scripts, while largely allowing them to make additional off script misrepresentations; and 3) deceiving law enforcement and consumers about the thousands of complaints routinely filed against Defendants. Fittingly, Defendants' Chief Compliance Officer, Candida Girouard, lied repeatedly to regulatory authorities, including under oath. It is Dorfman himself, however, who best reflects how little Defendants valued legal compliance. In reaction to an email from Health Insurance Innovation ("HII"), Defendants' third party administrator, warning about numerous problematic sales practices by his telemarketers, Dorfman responded to Girouard: "How bout you shove 90% of that shit up HIIs ass for me."[42]  Ironically, Dorfman now attempts to rely on HII's audits to avoid liability for his own conduct.[43]

### 1. "Verification Rebuttals"

As outlined in the Commission's TRO memorandum (D.E. 12, p. 22), after finishing their deceptive sales pitch and obtaining consumers' payment information, Defendants engaged in a phony "verification" process to create the appearance that they fully apprised consumers of the many limitations of Defendants' plans. These verifications either were conducted electronically by requiring consumers to review pages of densely worded, barely legible disclosures (typically on their mobile devices),[44] or orally by forcing consumers to listen to these disclosures quickly read aloud by a separate employee. Prior to the start of the recorded oral verifications,

---

[42] PX 32, p. 378.  Dorfman displayed a similarly scornful tone in response to another email from HII forwarded by Girouard.  In this email, HII's chief risk officer expressed the opinion that one of Defendants' lead generation websites, Trumpcarequotes.com, was "misleading."  Dorfman replied to Girouard:  "Tell him to Fly a kit [sic]."  *Id.* at 377.

[43] To the extent Dorfman is arguing that his reliance on these audits shows either good faith or a lack of intent, that argument fails because the FTC need not prove intent to deceive and a good faith belief in deceptive conduct is no defense.  *See Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1368 (11th Cir.1988) (defendant cannot avoid liability under FTC Act by showing he acted in good faith with no intent deceive).

[44] *See e.g.*, PX 34, p. 333 (consumer describing being rushed through e-verification process).

Defendants' scripts show that telemarketers told consumers not to ask any questions during the verification and to disregard statements that contradicted what they were told in the sales pitch.[45]

Moreover, newly obtained records from Defendants' offices reveal that this verification process is even more of a farce than initially understood.  Specifically, Defendants used a "verification rebuttal" script that instructed employees to provide different and conflicting answers to consumers' common questions during this process depending on whether the verification was "on recording" or "off recording." [46]  Unbelievably, one "on recording" rebuttal described the product as "not health insurance," while the corresponding "off recording" rebuttal stated, "This is health insurance."[47]  No legitimate business would "verify" a consumer's understanding in this blatantly deceitful manner.

### 2. Defendants Permitted Telemarketers to Make Deceptive Off Script Claims With Impunity

Although Dorfman's approved sales scripts were themselves deceptive, Defendants routinely allowed telemarketers to make even more egregious off script misrepresentations. Defendants' "quality department" monitored sales calls, grading them based on how closely they adhered to the deceptive scripts.[48]  Scores of documents—including "quality assurance" reports, Defendants' customer database, sales recordings, and internal communications—starkly illustrate the frequency with which telemarketers deviated from the scripts to use unsanctioned, outright falsehoods.  Written evaluations regularly documented examples of telemarketers deceptively assuring consumers that they would only pay relatively low fixed amounts (often falsely

---

[45] PX 33, pp. 8, 29, 55 (telling consumers the "corporate verification department" agent would go over the plan, but that "SOME OF THE INFORMATION WILL APPLY TO YOU, AND SOME OF WHICH WILL NOT APPLY TO YOU.  I just want you to know what parts affect you, and what don't; because they read the SAME SCRIPT to everyone.").
[46] PX 32, pp. 411-414.
[47] Id, p. 412.
[48] Id. pp. 338-48 ("Quality Assurance Manual").

described as "copays") for doctor visits, prescription medications, hospitalization, or other medical care, similar to a traditional comprehensive health insurance policy.[49]

Although they regularly documented these transgressions, Defendants typically allowed problem telemarketers to continue selling.[50]  For example, despite generating three complaints from state regulatory agencies,[51] and failing internal quality reviews,[52] one telemarketer recorded 1,265 sales between March 2016 through the entry of the Court's TRO.  In striking contrast, Defendants did not hesitate to fire a telemarketer overheard making the following statement to another employee:  "This is the crap I be talking about…we're lying to people around here."[53]

### 3.  Defendants Concealed Hundreds of Thousands of Recorded Sales Calls from State Regulators

Defendants often received complaints and inquiries from state insurance regulators, who frequently requested audio recordings of sales calls.  Without exception, Defendants claimed that such recordings did not exist.  In a September 1, 2017, email to Dorfman, for example, Girouard described telling Florida insurance investigators, who had conducted an unannounced visit, that Defendants "do not record sales calls."[54]  Defendants responded similarly to written requests for recorded sales calls from regulators, flatly denying that they existed.[55]  The most blatant example of this obstruction took place during a June 2018 deposition conducted in connection with an investigation by the Massachusetts Office of the Attorney General.  Asked under oath whether

---

[49] *See, e.g.,* PX 33, pp. 264-304.

[50] In a June 2018 deposition, Defendants' Chief Compliance Officer, Girouard, appeared unsure whether she had the authority to prevent telemarketers from making off script misrepresentations:  "I can't force them to read it [the script] verbatim.  I can highly suggest them to read it verbatim."  PX 34, ¶ 8, pp. 21-22.  This directly contradicts Dorfman's assertion on the same subject.  (D.E. 104-1, ¶ 64).

[51] PX 32, ¶ 21, pp. 18, 86, 330.  Defendants received a fourth complaint related to this telemarketer's sales practices from a carrier.  *Id.* at 305.

[52] *Id.* at 264 (claimed that consumer would have $25 copay) and 265 (same).  There is no indication in Defendants' records they contacted misled consumers to provide truthful information or offer refunds.

[53] PX 34, ¶ 7, pp. 11-14.

[54] PX 32, p. 391.

[55] *Id.* at 15, 86-87; PX 43, p. 25.

Defendants recorded sales calls, Girouard replied:  "To the best of my knowledge, no, sir."[56]  In another instance, when responding to a request from the Missouri Department of Insurance, Girouard knew that her staff had reviewed a recorded sales call in which a consumer had asked whether the plan was "Obama Care" and that the telemarketer had falsely replied "Yes."  Girouard nevertheless instructed her assistant to respond to state regulators that there was no recording.[57]  In reality, Defendants maintained dozens of servers containing hundreds of thousands, possibly millions, of their recorded sales calls.[58]

One such recording compellingly illustrates why Defendants have sought for so many years to hide this evidence.  In 2017, consumer Connie Young filed a regulatory complaint on behalf of her brother, Douglas Meeker, alleging that he had purchased a limited benefit plan deceptively represented by Defendants as comprehensive health insurance.[59]  In Girouard's written response to Ms. Young's complaint, she stated that, "Simple Health does not record sales calls."[60]  The FTC has identified and transcribed two conversations between Mr. Meeker and Defendants' telemarketer.[61]  In these recordings, the telemarketer assured Mr. Meeker that his vascular surgeon would be "in network" and made a variety of additional misrepresentations regarding the coverage that Mr. Meeker would receive under Defendants' plan, including $25 or $50 "copays" for various medical services, $5 or $20 "copays" for medication, and a maximum out-of-pocket expense of $2000.[62]  The telemarketer even described Defendants' plan as "better

---

[56] PX 34, ¶ 8, p. 28.  This answer is simply not true.  As a part of her job, Girouard reviewed recorded sales calls.  *See, e.g.*, PX 32, ¶ 15.  Moreover, as noted below, Defendants maintained servers that stored hundreds of thousands – if not millions – of recorded sales calls.

[57] PX 32, pp. 394-96.  Girouard's exact instructions to her assistant, Melissa Melendez, were:  "Ok, so change the answer to NO.  Simple."

[58] PX 36, ¶¶ 9-10; PX 37.

[59] PX 43, ¶ 11, pp. 20-22.

[60] *Id*. at 25.

[61] *Id*., ¶¶ 5-7, pp. 5-18.

[62] *Id*., ¶ 6.

than a major medical policy."[63]  As Ms. Young eventually discovered, however, Defendants

enrolled Mr. Meeker in a limited benefit plan that covered virtually nothing.[64]  By the time Mr.

Meeker passed away in April 2017, he had incurred approximately $300,000 in medical bills,

almost none of which were covered by Defendants' plan.[65]

### D.  Defendants' Sham Customer Service Department

The influx of consumers who regularly contacted Defendants with complaints or

concerns were subjected to additional misrepresentations.  Defendants' customer service agents,

many of whom were unlicensed and based in offshore call centers,[66] had one primary objective–

preventing cancellations and thereby preserving the commissions paid to Defendants for every

month consumers stayed enrolled.  Defendants' training materials make clear that permitting

cancellation is an agent's "LAST option."[67]  The same training encourages the agents to respond

to questions about specific coverage limitations with blatant falsehoods, including telling

consumers that Defendants do not sell plans that limit coverage to three doctor's visits, when

most of the limited benefit plans they sold contained such a restriction.[68]  Detailed customer

service notes reveal a distressing pattern of thousands of consumers attempting to cancel after

learning their plan is not as represented in the initial sales call only to be talked out of canceling,

or "saved," through additional misrepresentations.[69]  Defendants deceptively "saved" consumers,

---

[63] *Id.*, ¶ 7.

[64] *Id.*, ¶¶ 9-13.

[65] *Id.* ¶ 13.  The telemarketer who handled Mr. Meeker's transaction recorded a total of 687 sales during his employment with Defendants, including dozens that took place following the sale to Mr. Meeker.  PX 32, ¶ 20.

[66] *See, e.g.*, PX 32, p. 453 (organizational chart showing sales and customer service by offshore entity).

[67] *Id.* at 310.  *See also id.* at 312 ("Your primary goal is to SAVE the policy, so every interaction with the member should be positioned to save the policy.")

[68] *Id.* at 318; D.E. 12-10, PX 23, p. 18 (plan documents reviewed by FTC's expert witness show that Defendants' indemnity products, at most, cover $50 per doctor office visit with a maximum of three visits per calendar year).

[69] PX 32, ¶¶ 23-24.

no matter the consumers' circumstances, including, for example, consumers who had recently been diagnosed with cancer,[70] needed surgery,[71] were diabetic,[72] already had or could get insurance through their employers,[73] or had already incurred thousands of dollars in hospital bills not covered by Defendants' plans.[74]  In 2018 alone, according to their customer database, Defendants processed over 12,700 "saves."[75]

Defendants also recorded their customer service calls, some of which have been transcribed and submitted as attachments.[76]  These recordings, combined with Defendants' internal notes and other correspondence, paint a disturbing picture of the deceptive practices that Defendants regularly engaged in long after the initial sales pitch.  For example, the FTC urges the Court to review the full transcript of a customer service call in which a consumer suffering from leukemia and his wife attempt in vain to cancel their limited benefit plan, which Defendants' employee repeatedly and falsely describes as "great" and which covers 70% of the consumer's medical bills.[77]  Similarly, after a diabetic consumer informed Defendants' customer service agent that her life-saving medication cost $1,000 per month and that none of these costs appeared to be covered by her plan, the agent deceptively told the consumer that she could obtain this medication for $35 per month by enrolling in yet another bogus product.[78]  These calls are

---

[70] PX 34, pp. 344-47 (leukemia); PX 32, ¶¶ 23.a., 24.g. (uterine cancer) & h. (dental cancer).

[71] PX 32, ¶¶ 23.c., 24.c.-f.

[72] Id., ¶¶ 23.b., 24.i.-j.

[73] Id., ¶¶ 24.k. – m.

[74] Id., ¶¶ 25.a. ($11,000, of which $500 was paid by the plan), b. ($45,000 bill, of which $150 was paid by the plan), c. ($24,000 bill, of which $25 was paid by the plan), d. ($16,283 bill, of which $50 was paid by the plan), and e. ($35,000 bill, nothing paid by plan).

[75] Id., ¶ 23.

[76] PX 34, ¶¶ 23-24 (transcripts of 13 customer service calls).

[77] Id. at 342-47.

[78] PX 42, ¶¶ 7-12.

the tip of the iceberg when it comes to the grief that Defendants needlessly subjected consumers to after the deceit of the initial sales pitch.[79]

### E. Consumer Harm

In the face of staggering evidence of the harm that his fraud has inflicted on tens of thousands of consumers, Dorfman's argument that this case is premised on only "a few disgruntled customers" is both desperate and insulting.  First, as shown by their own facially deceptive scripts, *Defendants' telemarketers fed the same lies to every consumer.*  Second, since entry of the TRO, the FTC has obtained additional declarations from defrauded consumers as well as reviewed dozens of recorded sales calls and complaints received by Defendants from regulators.[80]  Third, Defendants received thousands of "escalations" from HII forwarding complaints from consumers about misrepresentations by Defendants' telemarketers.[81]  The stories recounted by consumers in these records are consistent with, or worse than, allegations in the FTC's complaint, and are confirmed by recordings of sales calls that Defendants have sought to hide for years from regulators.[82]

The following brief summaries are examples of the hardship experienced by two of Defendants' victims who will be attending the Preliminary Injunction hearing to testify:

---

[79] *See, e.g.*, PX 34, pp. 326-29 (deceived consumer is given infuriating runaround and then refused a refund); *Id.* at 362-64 (frustrated consumer who was told 70% coverage receives no assistance and is sent to a medical bill mediation company); *Id.* at 228-33 (deceived consumer continues to be misled about plan coverage and tax penalty); *Id.* at 237 (deceived consumer told that she had "made an agreement" during the sham verification process); *Id.* at 242-44 (deceived consumer trying to cancel is further harassed and lied to); *Id.* at 247-50 (deceived consumer trying to get more information is further misled about coverage and tax penalty); *Id.* at 351 (consumer attempting to cancel after learning plan covers no more than $50 for a doctor's visit is falsely told the policy covers "up to 70 percent").

[80] The FTC has attached a sampling of this evidence. *See* PX 34, ¶¶ 22, 24 (19 sales call transcripts); ¶ 27 (21 complaints to the state insurance regulators); PX 39-43 (sworn statements from five consumers).

[81] PX 34, ¶¶ 15-20.

[82] *See, e.g.*, *id.*, pp. 267-68, 271-72, 277-79, 288-90, 299-301, 309-12, 318-19 (misrepresenting plan as a "PPO"); pp. 267-68, 271, 277, 288, 295, 299-301, 309-10, 318 (misrepresenting types of services covered); pp. 267-68, 289, 309-10, 319 (misrepresenting the amount or percentage covered, such as 50-70% off); pp. 301, 311, 322 (misstating that the plan is not a discount plan).

- Chris Mitchell was sold what Defendants called an excellent "PPO Plan" with an "A-rated carrier" that qualified as an ACA plan to avoid the tax penalty, would cover "doctors' visits, diagnostic testing, blood and lab work, surgical, medical and hospital visits, medication, dental, vision, and hearing coverage." Defendants said that under this plan, a $200 doctor's visit would cost 0-$10.  After paying his premium for over two years, Mr. Mitchell was diagnosed with cancer and required critical surgery. Days before his surgery, he learned that the hospital would not conduct the procedure because Defendants' plan did not cover surgeries.  After spending hours on the phone with multiple companies, Mr. Mitchell had no choice but to proceed with the procedure without coverage.  Afterwards, while recovering from surgery, he negotiated for months with the hospital over his $40,000 bill.  At most, Defendants' "insurance" covered $450.[83]

- Elizabeth Belin asked Defendants for a plan that would, among other things, substantially cover a knee replacement surgery.  Defendants assured her they found her a "PPO" that met her needs.  Defendants gave her the name of a surgeon who was "in-network" and assured her that if she used this surgeon, 70% of her knee surgery would be covered, including the hospital stay, the surgeon's time, and the cost of a rehabilitation program.  After the surgery, Ms. Belin received a $37,000 bill.  This unexpected financial burden forced Ms. Belin to cancel her already-scheduled second knee surgery, negotiate a payment plan with the hospital that required her to use her retirement funds, and consider filing for bankruptcy.[84]

Defendants' willingness to sell nearly worthless products to individuals with chronic illnesses requiring ongoing expensive medical care has been especially harmful.  For example, from 2016 through October 2018, Defendants made over 10,000 sales to consumers who indicated they were diabetic and over 1,500 sales to consumers who suffered from bipolar disorder.[85]  Practically none of the routine medical care and prescriptions for these conditions is covered by Defendants' product, exposing consumers to great financial and health risks.[86]

## III.   THE FTC IS LIKELY TO SUCCEED ON THE MERITS

### A.  The Court Has the Authority to Enter a Preliminary Injunction

Dorfman's argument that this Court should disregard binding Eleventh Circuit precedent holding that the FTC Act authorizes the entry of a preliminary injunction, including an asset

---

[83] PX 41.
[84] PX 40.
[85] PX 32, ¶¶ 18-19.
[86] PX 38, pp. 7-8, 10-14.

freeze and receivership, is without merit.  As the FTC demonstrated in its opposition to

Dorfman's Motion to Strike the TRO (D.E. 81), and as the Court held in denying his motion

(D.E. 83), this argument is wholly at odds with existing law.

### B.  Defendants Are Liable For Misrepresentations Made By Lead Generators

Dorfman's assertion that "[i]ndividual agencies are not responsible for the advertising

practices of the independently operated lead generation websites" they used to obtain their

customers (D.E. 104-1, ¶ 36) is a legal conclusion, and plainly incorrect.  Even to the extent

Defendants acquired leads from third parties, principals are liable for the misrepresentations of

their agents under the FTC Act.  *FTC v. Partners In Health Care Assoc., Inc.*, 189 F. Supp.3d

1356 (S.D. Fla. 2016); *FTC v. Credit Bureau Ctr., LLC*, 325 F. Supp. 3d 852, 859 (N.D. Ill.

2018); *FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir.2009); *see also Int'l Art Co. v. FTC*, 109

F.2d 393, 396 (7th Cir.1940) ("We know of no theory of law by which the company could hold

out to the public these salesmen as its representatives, reap the fruits from their acts and doings

without incurring such liabilities as attach thereto.").  Neither Dorfman nor his wholly owned

corporations can escape liability for the deceptive lead generation practices they paid for and

relied on to attract customers.

### C.  After-the-Fact Disclosures and Sham Verifications Do Not Cure the Misrepresentations Made During Sales Calls

Instead of presenting actual evidence to refute the FTC's overwhelming evidence in

support of the TRO and Preliminary Injunction, Dorfman attempts to shift the blame to his

victims, pointing to the disclaimers that appear in documents provided to some consumers or the

bogus verification process, both of which occur *after* Defendants have already sold the products

to consumers and collected payment.[87]  These disclaimers and sham verifications have no legal

significance and certainly do not exonerate Dorfman.

First, "[c]aveat emptor is not the law in this circuit."  *FTC v. IAB Mktg. Assoc., LP*, 746

F.3d 1228, 1233 (11th Cir. 2014).  Disclosures to consumers after their purchases do not cure the

misrepresentations that occur during the sales.  In *IAB*, a case with many parallels to this one, the

Eleventh Circuit affirmed a preliminary injunction against defendants that sold trade association

memberships to consumers while leading them to believe they were purchasing major medical

insurance.  *Id.*  Like Dorfman, the *IAB* defendants argued that post-sale disclosures cured

deceptive statements made during initial sales transactions.  The Court rejected this argument,

holding that "*caveat emptor* is not a valid defense to liability arising from misrepresentations."

*Id.* at 1233 (citing *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *see also FTC v.

World Patent Mktg.*, 2017 WL 3508639 at *13 (S.D. Fla. 2017) (same).  Here, the post-sale

disclosures provided to some consumers do not cure the numerous misrepresentations made prior

to and during Defendants' sales call.  Moreover, the verification process relied on by Dorfman

takes place after the sale, and Defendants' own scripts advise consumers to disregard any

conflicting information provided during the verifications.[88]

Second, even if *caveat emptor* were a valid defense, "[d]isclaimers or qualifications . . .

are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to

change the apparent meaning of the claims and to leave an accurate impression.  Anything less is

only likely to cause confusion by creating contradictory double meanings."  *World Patent*

---

[87] Dorfman's lengthy description of the sales and verification process conspicuously omits the point at which his telemarketers request payment from consumers.  Defendants' scripts are crystal clear on this point.  Specifically, step 10 of Defendants' sales script, which takes place *prior* to verification, is entitled "Ask for the Money."  PX 32, p. 225; PX 33, pp. 7, 27, 53.
[88] PX 33, ¶¶ 8, 29, 55 ("SOME OF THE INFORMATION WILL APPLY TO YOU, AND SOME OF WHICH WILL NOT APPLY TO YOU. … they read the SAME SCRIPT to everyone.").

*Mkting*, 2017 WL 3508639 at *13 (citing *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 122

(1st Cir. 2010.  The disclaimers here were neither prominent nor unambiguous.

　　　　Third, even if Defendants provided clear post-sale disclosures to consumers, such

disclosures would do little to change the net impressions that consumers took away from

Defendants' aggressive, facially deceptive lead generation, sales, and customer service practices.

In determining whether a solicitation is likely to mislead consumers, courts consider the overall

"net impression" it creates.  *See FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1329

(M.D. Fla. 2010) (citing *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009)).  "A solicitation

may be likely to mislead by virtue of the net impression it creates even though the solicitation

also contains truthful disclosures."  *RCA Credit Servs.,* 727 F. Supp. at 1329 (quoting *FTC v.

Cyberspace.Com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)).[89]  Here, consumers are lied to

expressly and repeatedly, throughout the sales process about *every material consideration*

consumers would have when purchasing health insurance—the type of plan, what it covers, and

the costs of services.  Nothing in the later contradictory disclaimers or verification recordings

changes the clear net impression made by Defendants' ads, telemarketing pitches, customer

service agents, and other deceptive conduct.

### D.  Dorfman Controlled and Participated in the Fraud and is Individually Liable

　　　　As the Eleventh Circuit has held, individuals may be liable for FTC Act violations

committed by a corporate entity if the individual "participated directly in the [deceptive]

---

[89] *See also FTC v. Word Patent Mktg., Inc.*, 2017 WL 3508639 at *13-14 (S.D. Fla., August 16, 2017)
(finding that later disclaimers that contradicted salespeople did not change net impression of consumers);
*FTC v. QT, Inc*., 448 F. Supp. 2d 908, 924 n.15, 930 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858, (7th Cir 2008)
(inconspicuous small-font disclosure in 30-minute infomercial did not change net impression of pain
relief claims made throughout infomercial).

practices or acts or had authority to control them." *IAB Mktg.*, 746 F.3d at 1233.[90]  The FTC

already has presented overwhelming evidence of Dorfman's knowledge of and control over the

corporate defendants, which he has not refuted.  New evidence provides additional confirmation

of his involvement in every aspect this scam.  For example, Dorfman wrote, reviewed, approved,

and trained new employees on the use of Defendants' deceptive scripts,[91] as well as closely

oversaw compliance and regulatory matters.[92]  He also coordinated an intricate, bizarre, and

ultimately unsuccessful scheme to improve Defendants' BBB rating that involved purchasing 20

"burner" phones, using these phones to create fake customer profiles, and then tasking his staff,

*including his Chief Compliance Officer*, with submitting two phony positive BBB reviews per

week.[93]

### E.  Defendants Operated as a Common Enterprise Controlled by Dorfman

Other than his own conclusory testimony, Dorfman offers no evidence to support his

assertion that the corporate defendants did not operate as a common enterprise.  As a preliminary

matter, it is unclear what Dorfman stands to gain by making this argument because he does not

dispute that he is the owner and operator of all of the corporate defendants, and thus would be

liable for the fraud by any and all of these entities.  His authority to control the companies is not

in question, and the evidence of his day-to-day involvement with their deceptive conduct is

undisputed.  Even if this issue had any relevance to Dorfman's liability, the actual evidence of

common enterprise is overwhelming, easily satisfying the standard set out by the Eleventh

---

[90]  *See also FTC v. Gem Merch. Corp.*, 87 F.3d 466, 467-68 (holding an individual liable under the FTC Act where he was "aware that sales people made material representations to consumers to induce sales, and he was in a position to control the salespeople's behavior").

[91]  *See, supra,* note 15.  *See also* PX 34, pp. 37-60 (transcript of Dorfman's sales training video).

[92]  *See* PX 32, pp. 335, 360-63, 375, 377-80, 389-91.

[93]  *Id.* at 355 ("Get 20 burners [sic] phones for BBB"), 370-73 ("Has any [sic] started creating fake positive reviews…").  *See also* D.E. 12-11, PX 25, ¶¶ 17-19.

Circuit.[94]  Dorfman admits he is the CEO and 99% owner of every corporate defendant,[95] all of which operated out of the same location.[96]  The senior officers, or executive leadership, were the same for the entire operation, and they all met regularly with Dorfman to discuss business strategy.[97]  This included the Chief Marketing Officer, who worked for two of the corporate defendants.[98]  Employees in the accounting, IT, and human resources departments were shared across the companies.[99]  Only three of the corporate defendants had employees and payrolls, and all of those payrolls were funded nearly entirely by corporate defendant Health Benefits One.[100]  Comingling of corporate funds was typical.  Over 90% of SIL's incoming funds originated from Health Benefits One and all companies were "taxed under Health Center Management LLC."[101]

### F.  An Asset Freeze and Receiver Are Critical to Maintaining the Status Quo

The Court already has found that the asset freeze and receivership were proper and necessary to maintain the status quo.  They remain necessary for the same reasons.  In *FTC v. IAB Mktg. Asocs.*, *LP*, 972 F.Supp.2d 1307, 1313-14 (S.D. Fla. 2013), the court refused to lift the asset freeze because, as here, the available assets were a fraction of the consumer injury.  Moreover, where, as here, a company's business operations are permeated by fraud, courts have found a strong likelihood that assets may be dissipated during the pendency of the case.[102]

---

[94] To determine if a common enterprise exists, courts consider various factors, including: (1) maintaining officers and employees in common; (2) operating under common control; (3) sharing of office space; (4) operating the business through a maze of interrelated companies; (5) commingling of funds; and (6) sharing of advertising and marketing. *See FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012); *see also FTC v. Lanier Law, LLC*, 715 F. App'x 970, 979 (11th Cir. 2017) (per curiam).
[95] D.E. 104-1, ¶¶ 40-41.
[96] PX 32, ¶¶ 5-7.
[97] *Id.* at 21-61, 435.
[98] *Id.* at 16-17.
[99] *Id.* at 336, 409, 415.
[100] *Id.* at 409, & 415; PX 35, ¶¶ 9-10.
[101] PX 35, ¶ 7; *Id.*, ¶ 9 (99.7% of the credits into corporate defendant Innovative Customer Care account from corporate defendant Health Benefits One); PX 32, p. 432.
[102] *See Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2d Cir. 1974), cert. denied, 417 U.S. 932 (1974); *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972); *see also, e.g., FTC v.*

Dorfman has siphoned millions of dollars from the corporate bank accounts, including more than $1.4 million related to his lavish wedding and $2.5 million for a property in Nevada.[103]  He also has not been forthcoming with the Court about overseas operations and finances.  Without presenting any evidence, Dorfman asserts that the millions of dollars transferred offshore are attributable to "outsourced" business services.[104]  Dorfman does not disclose that he is a director of the Panamanian company that received nearly $10 million from the corporate defendants, and that he established its bank account.[105]  He also controlled the bank account for the offshore operation in the Dominican Republic, which he referred to as a "branch" of defendant Health Benefits One, and which was included in company organizational charts.[106]  Dorfman's denial that he controlled any overseas bank account is directly contradicted by this evidence.  What happened to funds transferred into these accounts remains an open question.

Given the scope and nature of the fraud and the millions of dollars in asset dissipation by Dorfman, he should not be allowed to regain control of the corporate defendants and their assets.  For these reasons, and the substantial ongoing harm to consumers charged monthly for products that were deceptively sold to them by Defendants, the Receiver also must remain in place.

## IV.   CONCLUSION

For the above reasons, the FTC respectfully requests that this Court issue the proposed Preliminary Injunction with asset freeze, appointment of a receiver and other equitable relief.[107]

---

*U.S. Oil & Gas*, 748 F.2d 1431, 1434 (11th Cir. 1984); *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982).
[103] PX 32, pp. 332-34.
[104] D.E. 104-1, ¶¶ 108-13.
[105] PX 34, ¶ 14, Att. D; PX 32, p. 416; D.E. 12-7, p. 90.
[106] PX 32, pp. 353, 453 (contrary to Dorfman's representation in paragraph 109 of his declaration, this chart shows the Dominican Republic team engaging in sales and customer service).
[107] A proposed preliminary injunction order is attached and has been submitted pursuant to the Court's procedures.

Dated:  April 8, 2019                     Respectfully submitted,

                                          ALDEN F. ABBOTT
                                          General Counsel

                                          */s/ James H. Davis*
                                          ELIZABETH C. SCOTT, Special Bar No. A5501502
                                          escott@ftc.gov; (312) 960-5609
                                          JAMES H. DAVIS, Special Bar No. A5502004
                                          jdavis@ftc.gov; (312) 960-5611
                                          JOANNIE WEI, Special Bar No. A5502492
                                          jwei@ftc.gov; (312) 960- 5607

                                          Federal Trade Commission
                                          230 S. Dearborn Street, Suite 3030
                                          Chicago, Illinois  60604
                                          Telephone:  (312) 960-5634
                                          Facsimile: (312) 960-5600

                                          Attorneys for Plaintiff
                                          FEDERAL TRADE COMMISSION

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on this April 8, 2019, by the Notice of Electronic Filing, and was electronically filed with the Court via the CM/ECF system, which generates a notice of filing to all counsel of record.

/s/ James H. Davis
JAMES H. DAVIS, Special Bar No. A5502004