## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-cv-62593-GAYLES

**FEDERAL TRADE COMMISSION,**

    **Plaintiff,**

**v.**

**SIMPLE HEALTH PLANS LLC, et al.,**

    **Defendants.**

_____/

### <u>PRELIMINARY INJUNCTION</u>

**THIS CAUSE** comes before the Court on Plaintiff Federal Trade Commission's ("FTC")

*Ex Parte* Motion for a Temporary Restraining Order with Asset Freeze, Appointment of a

Temporary Receiver, and other Equitable Relief and Order to Show Cause why a Preliminary

Injunction Should Not Issue [ECF No. 3], specifically the FTC's request for preliminary injunctive

relief.  The Court has reviewed the Motion and the record and is otherwise fully advised.

This action revolves around consumers' decisions to purchase health insurance to cover

routine and unexpected medical expenses.   Through its evidence, the FTC gives a well-

documented account of a classic bait and switch scheme—aided by rigged internet searches,

deceptive sales scripts, and predatory practice.  Though consumers believed they were purchasing

comprehensive health insurance coverage, Defendants sold them practically worthless limited

indemnity or discount plans.  While Defendants, under the control of Defendant Steven J. Dorfman

("Dorfman"), profited from their scheme, consumers were left with inadequate health coverage

and devastating medical bills.  Dorfman, relying primarily on his own declaration, disputes the

FTC's account and contends that consumers were not misled.  Based on the record before it, the

1

Court finds that a preliminary injunction is necessary to protect consumers, prevent future violations of the law, protect assets, and to preserve the status quo pending the resolution of this litigation.

## PROCEDURAL BACKGROUND

On October 29, 2018, the FTC filed its Complaint for Permanent Injunction and Other Equitable Relief [ECF No. 1] against Defendants Simple Health Plans LLC ("Simple Health"), Health Benefits One LLC ("HBO"), Health Center Management LLC ("HCM"), Innovative Customer Care ("ICC"), Simple Insurance Leads LLC ("SIL"), Senior Benefits One LLC ("SBO") (collectively the "Corporate Defendants"), and Dorfman (together with the Corporate Defendants collectively referred to as the "Defendants") alleging that Defendants violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310. In conjunction with the Complaint, the FTC filed an Emergency *Ex Parte* Motion for a Temporary Restraining Order [ECF No. 3]. On October 31, 2018, the Court entered a Temporary Restraining Order (the "TRO") and froze all of Defendants' assets, including Dorfman's personal assets. [ECF No. 15]. The Court also appointed Receiver Michael Goldberg (the "Receiver") to administer the affairs of the Corporate Defendants and to take necessary actions to protect consumers. [*Id.*].

On April 16, 2019, the Court held an evidentiary show cause hearing on the FTC's request for preliminary injunctive relief.[1] The FTC relied on approximately 43 exhibits—encompassing

---

[1]     The Court initially set the preliminary injunction hearing for November 14, 2018 [ECF No. 15]. Defendant later requested, and the FTC consented to, two extensions of the Temporary Restraining Order, the first to December 6, 2018, and the second to January 29, 2019. [ECF Nos. 18 & 30]. On December 19, 2018, Defendant requested an additional delay, proposing a February 26, 2019, date. The Court again continued the hearing and set the case for a status conference on January 16, 2019. A government shutdown followed and the FTC requested a stay which the Court granted. [ECF No. 59]. On Dorfman's emergency motion, the Court lifted the stay to allow the parties to litigate a discovery dispute but found good cause to continue the preliminary injunction hearing [ECF No. 64]. The Court lifted the stay when the government shutdown ended and asked the parties to submit a proposed schedule. Dorfman proposed an April 16, 2019, hearing date. [ECF No. 75]. The Court approved Dorfman's proposed schedule.

over 1000 pages of documents, the Receiver's First Interim Report ("RR") [ECF No. 122], and the live testimony of two of Defendants' former customers. Dorfman relied on his own declaration, selections from the FTC's exhibits, and two of his own exhibits.

## FINDINGS OF FACT

I.     **Brief Overview of Health Insurance Industry**

To effectuate their bait and switch scheme, Defendants led consumers to believe they were receiving comprehensive health insurance when, in fact, they received limited indemnity plans or discount memberships.  Comprehensive health insurance is exactly what the name implies—comprehensive.  It generally covers a large portion of the expense for doctor's visits, emergency room visits, hospital stays, laboratory services, and prescription medicine.  With comprehensive health insurance, after the payment of a premium, a deductible, and a co-payment, the risk of large medical bills shifts from the consumer to the insurance company. Plaintiff's Exhibit ("PX") 23, at 15.  In addition, many comprehensive health insurance plans comply with the Affordable Care Act ("ACA"), 42 U.S.C. § 18001.  ACA-qualified plans include coverage of pre-existing conditions and cover emergency medical care, hospitalization, prescription medication, preventative care, maternity care, and pediatric care.  PX 23, at 15.  During the relevant time period, individuals enrolled in ACA-qualified insurance plans were not required to pay the penalty imposed on people who could afford insurance but chose not to purchase it.     Related to comprehensive health insurance is the concept of a preferred provider organization ("PPO").  In a PPO, the plan contracts "with a broad range of providers (physicians, health systems), designated

---

[ECF No. 76].  Dorfman later moved to strike the Temporary Restraining Order, arguing, in part, that it had expired. [ECF No. 79].  Following an expedited hearing, the Court denied the motion to strike via a paperless order, with a written opinion to follow, and found good cause to continue the temporary restraining order through the hearing on April 16, 2019.  [ECF No. 83].  Dorfman immediately appealed the Court's denial of its motion to strike.  On April 16, 2019, the Eleventh Circuit dismissed the appeal for lack of subject matter jurisdiction.  [ECF No. 129].

as the 'preferred network.'  A plan member can use any of the preferred providers, typically with favorable co-insurance, copay; and count towards a deductible." *Id.* at 9.

In contrast, "[i]ndemnity plans provide a defined financial benefit paid to consumers after medical expenses are incurred." *Id.* at 5.  Under a limited indemnity plan, consumers are merely purchasing medical services at pre-negotiated discounted rates. With these plans, the risk of high medical bills falls solely on the consumer. *Id.* at 10.  Limited indemnity plans are sometimes combined with medical discount plans.  Medical discount plans are not insurance and do not guarantee coverage of medical services, "rather, they serve as a 'buyer's club' akin to a grocery store savers card . . ." *Id.* at 6.  Limited indemnity plans and medical discount plans are not ACA-compliant.  *Id.*  As a result, a consumer who only had a limited indemnity or medical discount plan was subject to the ACA penalty for failing to obtain compliant insurance.

## II.     The Parties

The FTC is an independent agency of the United States Government which is authorized to initiate federal district court proceedings to enjoin unfair or deceptive acts or practices in or affecting commerce. 15 U.S.C. §§ 45(a), 53(b).

The Corporate Defendants, operating under the umbrella name of Simple Health, are a network of companies structured to influence consumers at every step of the sales process. Defendant Simple Health has no independent operations and was only formed to protect the name under which the other entities worked. *Dorfman Declaration* [ECF No. 104-1, at ¶ 19].   SIL operates to generate leads—potential customers—who are looking for health insurance.  *Id.* at ¶¶ 30, 97.  HBO is a seller of, among other things, limited medical indemnity policies.  *Id.* at ¶ 50. SBO sells Medicare products to consumers.  *Id.* at ¶ 81.  ICC is the customer service arm of the enterprise. *Id.* at ¶ 102.   HCM holds 100% of the interest in Simple Health, SIL, HBO, SBO, and

ICC. *Id.* at ¶ 41.  Until the receiver was appointed in this case, Dorfman was the CEO of each of the Corporate Defendants. *Id.* at ¶ 40.   In addition, Dorfman owned 99% of the membership interests in HCM. *Id.* at ¶ 41.

## III.  Defendants' Bait, Switch, and Delay Business Model

### A.  Consumer Searches the Internet for Health Insurance

Defendants' bait and switch scheme typically began when a consumer seeking health insurance coverage turned to the internet to research their options.  SIL, Defendants' lead generator, paid Google to ensure that when specific "AdWords"[2] were used in an online search, consumers would be directed to SIL's lead generation websites.  RR, at 11.  As a result, when consumers seeking comprehensive health coverage searched Google using words such as "Obama Care" or "Obama Care Insurance," they were directed to a long list of SIL-controlled websites.  *Id.* In other instances, Defendants' affiliate marketers would disseminate links to Defendants' websites to consumers via email or text messages.  PX 1 ¶ 18.

Defendants controlled approximately 129 lead generating websites.[3]  RR, at 11.  These websites were laden with false and misleading information designed to trick consumers into believing Defendants were selling ACA-qualified and/or comprehensive health insurance.  The website addresses, including obamacarequotes.org, myobamacareapplication.com, healthinsurance2017deadline.com, and Amercicanhealthinsure.com, suggested that Defendants were offering comprehensive insurance plans and/or ACA-qualified plans.  *Id.*, Ex. D.  The content of the websites implied that Defendants: (1) specialized in providing affordable, comprehensive health insurance from several different carriers; (2) were affiliated with the Blue Cross Blue Shield

---

[2]     SIL paid Google for many AdWords including "Obama Care," "Obama Care Texas," "Obama Health Care," and "Obama Care Insurance." RR, at 11.
[3]     Defendants register all of their lead generation websites using a privacy protection service that shields their identity.  PX 1 ¶¶ 14–25 & ¶¶ 28–39.

Association; and (3) were experts on, and, providers of, government-sponsored health insurance, including ACA-qualified and Medicare plans.   The websites included:

- Prominent displays of the Blue Cross Blue Shield or AARP logos.  *See e.g.,* PX 1, at 130, 138, 186, and 310.

- Repeated use of the terms "Obamacare" and "ACA."  *Id.* at 130, 132, 165, 298.

- References to beating the deadline for obtaining insurance under the ACA and the penalties if ACA-qualified insurance is not obtained.  *Id.* at 165.

- Indicating that Defendants' policies include low co-pays, coverage for hospitalization, and emergency room visits.  *Id.* at 294, 305.

- Announcements that "[t]his is not a discount health card; it's real insurance." *Id.* at 294.

- Representations that Defendants are experts on government-sponsored insurance, including statements that they have helped "hundreds of thousands of consumers" enroll in Obamacare.  *Id.* at 325.

Once on a lead generation website, consumers were prompted to either submit their contact information or were provided with Defendants' contact information to sign up for insurance.  In most instances, this lead would then be forwarded to HBO.

## B.     The Scripted Sale

After receiving a lead, an HBO salesperson would contact the potential customer.[4] Defendants directed their salespeople to follow scripts—created in part and approved by Dorfman—at all times during the customer calls.[5]  Like the websites, Defendants designed the

---

[4]      The FTC now has hundreds of thousands of Defendants' recorded sales and customer service calls, some of which it transcribed and submitted as evidence.  *See* PX 34 ¶¶ 22–26.

[5]      Defendants monitored sales calls, grading them based on adherence to the scripts.  A review of Defendants' records shows that salespeople frequently deviated from the scripts to make additional misrepresentations to

scripts "to give consumers the impression that the coverage provided by Simple Health's limited benefit plan was equal to, if not better than, major medical insurance." PX 31 ¶¶ 18 & 31.

Although Defendants employed a different sales script for each carrier, the scripts all followed a preset pattern. The scripts began with the salesperson introducing himself and stating that Simple Health was acting on behalf of "many of the MAJOR 'A Rated' CARRIERS," and that he would find the consumer the "BEST PLAN out there for the BEST PRICE!" PX 33.[6] Pursuant to the scripts, the salesperson would then indicate that he wanted to find the consumer: (1) a PPO; (2) prescription and lab coverage; (3) preventative care and maintenance; and (4) a plan that would have very low out of pocket expenses. *Id.* After a brief discussion about the price the consumer would be able to pay, the scripts directed the salesperson to place the consumer on hold while the salesperson purportedly went to search for "the best" plan. *Id.* Despite the hold, the record reflects that the salesperson never searched for different insurance options. Rather, the salesperson was always going to offer the consumer a limited indemnity and/or medical discount plan regardless of the consumer's specific needs.

When the salesperson returned to the line, the scripts directed him to congratulate the consumer on his or her approval for a "health insurance plan." The salesperson would then describe the plan as "similar" to "insurance through an employer" and would represent that the plan included "a prescription drug plan," "doctor office visits," "diagnostic testing," "hospital

---

consumers. Despite these deviations, Defendants generally allowed the salespeople to keep selling. PX 32 ¶ 21. However, Defendants fired at least one salesperson for making comments about the sales process being unethical. *See* PX 34, at 11–14 (salesperson fired after saying "the post close is unethical and they are always lying to the consumer.").

During one of Defendants' training sessions, Dorfman tells his employees "[y]our jobs as a salesperson is to keep the customer focused on that script . . . You're [sic] job is to create tunnel vision with your customers, okay, and to keep them on your beaten path, your script, okay?" *See* PX 34, at 59.

[6]      Plaintiff's Exhibit 33 includes several substantively identical scripts used by Defendants.

coverage," and "medical" and "surgical" care that "can be used at virtually ANY inpatient or outpatient facility in the NATION." *Id.*

The scripts then directed the salesperson to asks for payment.  After the consumer was charged for the enrollment fee and first monthly premium, the salesperson would read the "Post Close Script." *Id.*  Pursuant to the Post Close Script, the salesperson told the consumer that they would be transferred to a corporate verification department where an agent would go over the plan they just purchased.[7]  The scripts directed the salesperson to tell the consumer that, during the verification call, "some of the information will apply to you, and some of which [sic] will not apply to you." PX 33, at 8, 29, 55.

### C.  The Verification

Following the scripted sales call and payment, consumers completed a verification process where, for the first time, they were told that they had purchased a limited benefit plan that was not compliant with the ACA.  Although the post-payment oral verifications were recorded, Defendants would also turn off the recording to respond to consumer questions.  Defendants used a "verification rebuttal" script that instructed employees to provide different and conflicting answers to consumers' questions depending on whether the verification was "on recording" or "off recording."  PX 32, at 411–414.  One "on recording" rebuttal described the product as "not health insurance," while the corresponding "off recording" rebuttal stated, "[t]his is health insurance." *Id.*

### D.  Consumer Complaints

Customers who contacted Defendants with complaints or concerns about coverage were often subjected to additional misrepresentations and delay tactics.  Defendants trained their

---

[7]       Defendants conducted some of the verifications electronically through an e-verification process and some orally, as described above, by asking the consumer to listen to the disclosures read aloud.

customer service representative to make every attempt to save the policy.   PX 32, at 310. Consumers were often passed from one customer service agent to another and were left with inadequate coverage, no refund, and lots of frustration.   *See, e.g.,* PX 34, at 228-33, 242–44, 326–29, 351.[8]

### E.   Defendants' Misrepresentations

Defendants made numerous misrepresentations to perpetrate their bait and switch scheme, including that:

- Defendants' limited benefits plans and medical discount memberships are comprehensive health insurance, or the equivalent of such insurance;

- Defendants' limited benefit plans and medical discount memberships are qualified health insurance plans under the ACA;

- Defendants are experts on, or providers of, government-sponsored health insurance policies, such as those offered pursuant to Medicare and the ACA; and

- Defendants are affiliated with AARP or the Blue Cross Blue Shield Association.

### F.   Defendants' Victims

The record is replete with specific examples of Defendants' misrepresentations to actual consumers.   A few of these examples include:

- Chris Mitchell was sold what Defendants called an excellent "PPO Plan" with an "A-rated carrier" that qualified as an ACA plan.   Defendants represented to Mr. Mitchell that the plan would cover doctors visits, diagnostic testing, blood and lab

---

[8]     To counteract angry consumers' reports to the Better Business Bureau ("BBB"), Defendants, posing as happy customers, used at least twenty pay-as-you-go/burner cell phones to contact the BBB to file false reports regarding positive experiences with Simple Health.

work, surgical, medical, and hospital visits, medication, and dental, vision, and hearing coverage.  Defendants also represented that under this plan, a visit to a doctor would only cost 0-$10.  Mr. Mitchell was later diagnosed with cancer and needed surgery.  Just days before his surgery, Mr. Mitchell learned that his plan did not cover surgeries.  Mr. Mitchell had to pay out of pocket for life-saving cancer surgery. PX 41; Hearing Tr., at 61-99 [ECF No. 137].

- Elizabeth Belin asked Defendants for a plan that would cover knee replacement surgery.  Defendants represented that they found a "PPO" that met her needs and gave her the name of a doctor that was "in-network."  Defendants represented that if she used their "in-network" surgeon, 70% of her knee surgery would be covered.  After her surgery, Ms. Belin was billed $48,000, which Defendants only discounted by $9,000. PX 40; Hearing Tr., at 34-45 [ECF No. 137].

- Defendants' salesperson assured Douglas Meeker that his vascular surgeon would be "in-network," his copays would only be $25 or $50 for medical services, and his out-of-pocket expenses would be limited to $2,000.  The salesperson even described Defendants' plan as "better than a major medical policy."  Contrary to these representations, Defendants enrolled Mr. Meeker in a limited benefit plan with little coverage.  Mr. Meeker later had a heart attack and was diagnosed with lymphoma.   By the time Mr. Meeker passed away in April 2017, he had incurred approximately $300,000 in medical bills, almost none of which were covered by Defendants' plan.  PX 43.

- When a consumer[9] suffering from leukemia attempted to cancel a limited benefit plan because it was not covering his medical expenses, Defendants' customer service employee repeatedly and falsely represented that the plan covered 70% of the consumer's medical bills.  PX 34, at 342–47.

- Brenda Riley, a diabetic, purchased a plan offered by Defendants with the understanding that it would cover her life-saving insulin.  When she called customer service to complain that she was being charged $1,000 per month for insulin and that none of the costs appeared to be covered by her plan, the salesperson falsely told her that she could obtain medication for $35 per month by enrolling in another product.  PX 42.

G.     **Defendants' Sales/Revenue**

Defendants' income was primarily derived from commissions for enrolling customers in Health Insurance Innovations' ("HII") limited benefit insurance plans.  RR, at 29.  From 2014 through approximately October 2018, HII paid approximately $180 million in commissions to HBO which HBO then distributed to the other receivership entities.  *Id.*

At the time the Receiver filed his First Interim Report, approximately $3,186,655.48[10] had been frozen from the Corporate Defendants' accounts pursuant to the TRO. *Id.* at 8.  The Receiver also took control of three automobiles titled in the names of the Corporate Defendants: (1) a 2013 Land Rover Range Rover; (2) a 2012 Lamborghini Aventador; and (3) a 2015 Rolls-Royce Wraith. *Id.*  Dorfman also delivered 13 pieces of jewelry to the Receiver.  *Id.* at 9.

---

[9]     Some consumers' names have been redacted from the record to protect their privacy.
[10]    This amount does not include $4.5 million that the Receiver received in March 2019 from HII.  RR, at 8.

## CONCLUSIONS OF LAW

The FTC Act "empower[s] and direct[s]" the FTC to prevent "unfair or deceptive acts or practices" in the marketplace. *See* 15 U.S.C. § 45(a). The statutory scheme underlying the FTC Act provides the FTC "an influential role" in interpreting whether an act or practice is "unfair or deceptive" under Section 5 of the Act. *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 384–85 (1965); *see also FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454 (1986); *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 242–43 (1972). "Moreover, as an administrative agency which deals continually with cases in the area, the [FTC] is often in a better position than are courts to determine when a practice is 'deceptive' within the meaning of the Act." *Colgate-Palmolive*, 380 U.S. at 385. As such, "the [FTC's] judgment is to be given great weight by reviewing courts." *Id.* It is with this deferential framework in mind that the Court makes the following conclusions of law.

## I.      Standards for Granting a Preliminary Injunction

The purpose of a preliminary injunction is to maintain the status quo pending a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

> Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing . . . and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*Id.* Because the procedures are less formal for a preliminary injunction hearing, the evidentiary rules are relaxed and the Court is permitted to rely on evidence that might not be admissible for a permanent injunction, "so long as the evidence is appropriate given the character and purpose of the injunction proceedings." *Caron Found. of Fla., Inc. v. City of Delray Beach*, 879 F. Supp. 2d

1353, 1360 (S.D. Fla. 2012) (citing *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) and *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310–13 (11th Cir. 1998)).

"For the FTC to obtain injunctive relief, it must show that (1) it is likely to succeed on the merits, and (2) injunctive relief is in the public interest." *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014) (citing *FTC v. Univ. Health, Inc*., 938 F.2d 1206, 1217–18 (11th Cir. 1991)). Unlike private litigants, the FTC is not required to demonstrate irreparable injury to obtain injunctive relief. *Id.* at 1232.

## II.     The Court has the Authority to Enter a Preliminary Injunction

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to seek, and this Court to grant, preliminary and permanent injunctive relief enjoining violations of Section 5 of the FTC Act, as well as "any ancillary relief necessary to accomplish complete justice." *FTC v. USA Fin., LLC*, 415 F. App'x 970, 976 (11th Cir. 2011) (per curiam) (quoting *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir. 1984) (per curiam)).   Section 13(b) does not specifically authorize courts to grant monetary relief.   However, the Eleventh Circuit has expressly held that "the unqualified grant of statutory authority to issue an injunction under section 13(b) carries with it the full range of equitable remedies, including the power to grant consumer redress and compel disgorgement of profits." *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 468 (11th Cir. 1996). *see also FTC v. WV Univ. Mgmt, LLC,* 877 F.3d 1234, 1239 (11th Cir. 2017).

Dorfman asks this Court to disregard Eleventh Circuit precedent and find that Section 13(b) does not authorize the FTC to seek disgorgement, restitution, and an asset freeze.   Specifically, Dorfman relies on the Supreme Court's decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), and the Eleventh Circuit's decision in *SEC v. Graham*, 823 F.3d 1357 (11th Cir. 2016), to argue that

the FTC may not obtain legal monetary remedies because they are not specifically authorized under Section 13(b). Dorfman's reliance on *Kokesh* and *Graham* is misplaced as these cases dealt with the limited issue of whether disgorgement operated as a penalty in the context of the limitations period set forth in 28 U.S.C. § 2462. In *Kokesh*, the Supreme Court expressly noted that "[n]othing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context. The sole question presented in this case is whether disgorgement, as applied in SEC enforcement actions, is subject to § 2462's limitations period." *Kokesh*, 137 S. Ct. at 1642 n.3. In *Graham,* like *Kokesh*, the Eleventh Circuit only held that the remedy of disgorgement constitutes a forfeiture under § 2462 and, therefore, the 5-year statute of limitations applied to the SEC's claims. *Graham*, 823 F.3d at 1364. Neither the Supreme Court nor the Eleventh Circuit held that disgorgement and restitution are legal monetary remedies not available to the SEC and the FTC.

Finally, Dorfman argues that the concurrence in *FTC v. AMG Capital Management LLC¸* 910 F.3d 417, 429 (9th Cir. 2018), should persuade the Court to find that disgorgement is a form of legal relief and therefore is outside the scope of Section 13(b). Dorfman's position is untenable. First, in *AMG Capital Management*, the Ninth Circuit held that restitution and disgorgement were equitable relief. *Id.* at 426. While Judge O'Scannlain raised concerns with the Ninth Circuit's interpretation of Section 13(b), his concurrence did not change Ninth Circuit precedent. More importantly, this Court is bound by Eleventh Circuit precedent and is not empowered to simply ignore that precedent to make new law. *See In re Hubbard*, 803 F.3d 1298, 1309 (11th Cir. 2015) (finding error where "district court inadvertently transgressed the fundamental rule that courts of this circuit are bound by the precedent of this circuit."). Accordingly, the Court finds, consistent

14

with long-standing Eleventh Circuit precedent, that the FTC may seek disgorgement and restitution.[11]

### III.   Likelihood of Success on the Merits

The FTC alleges that Defendants violated Section 5(a) of the FTC Act and the TSR through their deceptive sale of limited indemnity plans and medical discount memberships.   Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).   The TSR prohibits deceptive and abusive telemarketing practices, including misrepresenting any material aspect of the nature or central characteristics of goods or services, 16 C.F.R. § 310.3(a)(2)(iii), or making a false or misleading statement to induce any person to pay for goods or services. 16 C.F.R. § 310.3(a)(4).

### A.   The FTC Act

#### 1.   Deceptive Acts and Practices

To establish that an act or practice is deceptive under Section 5(a) of the FTC Act, "the FTC must establish that (1) there was a representation, (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). When assessing whether a representation is likely to mislead consumers acting reasonably under the circumstances, courts consider the "overall, net impression rather than the literal truth or falsity" of the representation. *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009) (per curiam) (citing *FTC v. Peoples Credit First, LLC*, No. 03-2353, 2005 WL 3468588, at *5 (M.D. Fla. Dec. 18, 2005), *aff'd*, 244 F. App'x 942 (11th Cir. 2007) (per curiam)).

---

[11]      Albeit in a different context, while this action was pending, the Eleventh Circuit held that that "disgorgement is an equitable remedy."  *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, No. 18-10877, 2019 WL 1771292 (11th Cir. Apr. 23, 2019) (holding that disgorgement is an equitable remedy in the context of a Lanham Act claim).

"A representation is material if it is of a kind usually relied upon by a reasonably prudent person." *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007). "If a significant number of prospective purchasers are likely to attach importance to the representation in determining whether to engage in a proposed transaction, the representation is material." *FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247, 1272–73 (M.D. Fla. 2012) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 3, cmt. b (1995)). "Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material." *Transnet Wireless Corp.*, 506 F. Supp. 2d at 1267. "Express claims directly represent the fact at issue while implied claims do so in an oblique or indirect way." *Kraft, Inc. v. FTC*, 970 F.2d 311, 318 n.4 (7th Cir. 1992). Implied claims are material if there is evidence that the seller intended to make the claims or if the claims address the central characteristics of the product or service offered. *See Novartis Corp. v. FTC*, 223 F.3d 783, 786–87 (D.C. Cir. 2000); *Kraft*, 970 F.2d at 322; *see also FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993) ("[N]othing in statute or case law [ ] protects from liability those who merely imply their deceptive claims; there is no such loophole.").

As detailed above, the record supports a finding that Defendants made a series of material misrepresentations that were likely to influence consumers' decisions to purchase Defendants' services. Defendants' misrepresentations include that:

- Defendants' limited benefits plans and medical discount memberships are comprehensive health insurance, or the equivalent of such insurance;

- Defendants' limited benefit plans and medical discount memberships are qualified health insurance plans under the ACA;

16

- Defendants are experts on, or providers of, government-sponsored health insurance policies, such as those offered pursuant to Medicare and the ACA; and

- Defendants are affiliated with AARP or the Blue Cross Blue Shield Association.

These misrepresentations are likely to mislead consumers acting reasonably under the circumstances because they provide the net impression that Defendants will provide the promised services and results—namely comprehensive health insurance and/or ACA-qualified plans. *See FTC v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1365 (S.D. Fla. 2016) (Defendants selling medical discount card deceived consumers into believing defendants were selling insurance by using terms "like 'copay,' 'premium,' and 'deductible' which are commonly associated with insurance.").

Defendants' representations are also material: they consist of both express claims and deliberately made implied claims that would induce the purchase of Defendants' services. For example, by showing an affiliation with Blue Cross Blue Shield or by using key terms such as "ObamaCare" or "real insurance," Defendants websites imply that Defendants are offering comprehensive health insurance and ACA-qualified plans.[12] These implied claims, combined with the express misrepresentations in the scripted sales calls, clearly induced consumers to purchase the plans offered by Defendants.

Although the FTC "need not present proof of subjective reliance by each victim," *Transnet Wireless Corp.*, 506 F. Supp. 2d at 1266–67 (citation omitted), or proof of actual deception to establish a violation of Section 5, "such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *FTC v. Cyberspace.com LLC*,

---

[12]     Dorfman argues that the Defendants cannot be held responsible for the advertising practices of any of the independently operated lead generation websites.  However, to the extent Defendants obtained leads from third parties, they can still be held liable, as principals, for the misrepresentations of their agents. *See FTC v. Partners In Health Care Assoc., Inc.*, 189 F. Supp. 3d 1356 (S.D. Fla. 2016)

453 F.3d 1196, 1201 (9th Cir. 2006). Here, the FTC has submitted sworn affidavits and live testimony from multiple consumers.   These consumers relied on Defendants' representations that they would be receiving comprehensive health insurance and/or ACA-qualified plans when they paid their premiums.

### 2.    Verification

Defendants' Post-Close script/verification process, completed after consumers paid their premiums, does not shield them from liability. First, "[c]*aveat emptor* is not the law in this circuit." *IAB Mktg.*, 746 F.3d at 1233. In *IAB Marketing*, the Eleventh Circuit affirmed a preliminary injunction against defendants who sold trade-association memberships to consumers but led consumers to believe that they were purchasing major medical insurance. On appeal, the defendants argued, *inter alia*, that the disclosures they sent consumers following their purchases revealed that consumers had purchased memberships in a trade association offering medical-discount plans rather than major medical insurance. The Eleventh Circuit rejected the defendants' argument not only because the disclaimers were sent to consumers after they had made their purchases but also because "*caveat emptor* is not a valid defense to liability arising from misrepresentations." *IAB Mktg.*, 746 F.3d at 1233 (citing *Tashman*, 318 F.3d at 1277).

Second, even if *caveat emptor* were a valid defense, "[d]isclaimers or qualifications . . . are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings." *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 12 (1st Cir. 2010); *see also FTC v. Capital Choice Consumer Credit*, No. 02-21050, 2003 WL 25429612, at *5 (S.D. Fla. June 2, 2003). Defendants' verifications, made after the consumers paid for the product and after Defendants told consumers that some of the

verification information did not apply to them, are insufficient to avoid liability.  Indeed, this is the functional equivalent of "small print."  *See FTC v. A to Z Mktg., Inc*., No. 13-00919, 2014 WL 12479617, at *3 (C.D. Cal. Sept. 17, 2014) ("[M]isleading statements may not be sufficiently cured merely by the inclusion of disclaimers in small print.").

Third, even if the verification contained unambiguous disclosures, it failed to change the net impression created by Defendants' salespeople who verbally promised comprehensive health insurance and ACA-qualified plans. *See Cyberspace.com*, 453 F.3d at 1200 ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."); *IAB Mktg.*, 746 F.3d at 1233 ("IAB offers no authority for the proposition that disclosures sent to consumers after their purchases somehow cure the misrepresentations occurring during the initial sales.").

The record supports the conclusion that the FTC is likely to succeed on the merits on its FTC Act claim. Defendants' misrepresentations were deceptive as they were likely to mislead consumers acting reasonably under the circumstances, and they were material to consumers' decisions to purchase Defendants' services. That Defendants' services may have provided some value to customers is of no consequence. Even assuming this were true, "liability for deceptive sales practices does not require that the underlying product be worthless." *IAB Mktg.*, 746 F.3d at 1233; *see also Figgie Int'l*, 994 F.2d at 606 ("The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each [product] that is not useful to them."). As the record demonstrates, Defendants' misrepresentations misled Simple Health customers, and unless Defendants are enjoined, their misrepresentations will continue misleading other consumers acting reasonably under the circumstances. *See FTC v. Primary Group Inc.*, No. 15-1645, 2015 WL 12976115, at *5 (N.D. Ga. June 8, 2015) ("Defendants' actions

are likely to recur without injunctive relief because scripts containing false and deceptive representations in violation of the FDCPA were effective and used within the past several months.").

### B.    TSR

The record also supports the conclusion that the FTC is likely to succeed on the merits of its TSR claim.  Defendants falsely led consumers to believe that they would receive comprehensive health insurance and/or ACA-qualified plans.  *See* 16 C.F.R. § 310.3(a)(2)(iii) (prohibiting the misrepresentation of any material aspect of the nature or central characteristics of goods or services) and 16 C.F.R. § 310.3(a)(4) (prohibiting making a false or misleading statement to induce any person to pay for goods or services).  In addition, Defendant falsely claimed to be experts on, and providers of, government-sponsored health insurance policies.  *Id.*  Finally, Defendants have misrepresented an affiliation with AARP and Blue Cross Blue Shield Association.  *See* 16 C.F.R. § 310.3(a)(2)(vii) (prohibiting misrepresentations regarding an affiliation with, or endorsement or sponsorship by, any person or government entity).

### C.    Common Enterprise

"If the structure, organization, and pattern of a business venture reveal a 'common enterprise' or a 'maze' of integrated business entities, the FTC Act disregards corporateness." *FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012).  Courts consider several factors to determine if a common enterprise exits, including: (1) maintaining officers and employees in common; (2) operating under common control; (3) sharing of office space; (4) operating the business through a maze of interrelated companies; (5) commingling of funds; and (6) sharing of advertising and marketing.  *See id.*; *FTC v. Lanier Law, LLC*, 715 F. App' x 970, 979 (11th Cir. 2017).  Through a "maze" of integrated entities, all controlled by Dorfman,

Defendants engaged in the same health insurance scam, shared ownership and managements, operated under the same "Simple Health" name, shared leads and websites, and commingled funds. Indeed, Dorfman is the CEO and 99% owner of each Corporate Defendant.  The senior officers were the same for all of the companies. PX 32.  Of the three Corporate Defendants that had employees and payroll, their payrolls were funded entirely by HBO. *Id.*  As a result, the Court finds that, based on the record before it, the FTC is likely to succeed in proving that the Corporate Defendants engaged in a common enterprise.

> **D.**     **Dorfman's Liability**

"Individuals may be liable for FTC Act violations committed by a corporate entity if the individual 'participated directly in the [deceptive] practices or acts or had authority to control them.'"  *IAB Mktg Assocs.*, 746 F.3d at 1233 (quoting *FTC v. Amy Travel Serv, Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).  The record clearly reflects Dorfman's control over the Corporate Defendants and his participation in the fraud.  As detailed above, Dorfman is the CEO and 99% owner of each of the Corporate Defendants.  Moreover, Dorfman not only wrote, reviewed, and approved the deceptive sales scripts, he trained employees on how to use them.  Dorfman is the mastermind behind the Simple Health bait and switch scheme.  As a result, the Court finds that the FTC is likely to succeed in proving that Dorfman is individually liable.

## IV.    **Injunctive Relief is in the Public Interest**

"The public interest in ensuring the enforcement of federal consumer protection laws is strong." *FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011); *see also FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) ("[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight."). Based on its review of the record, the Court concludes that the FTC has met its burden of proving that the equities favor a preliminary injunction against Defendants. The public interest in this

case—enjoining conduct that violates the FTC Act, and preserving assets that may be used for restitution to victims who have suffered financial losses—is compelling and entitled to great weight. *See World Wide Factors*, 882 F.2d at 347 (affirming district court finding that "there is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment."). The Court also accepts the Receiver's assessment that it is unlikely that Defendants' business can be run profitably and lawfully as it was "largely based on deceiving consumers." RR, at 122, 123.  The Court therefore finds that the FTC has met its burden of showing that injunctive relief is in the public interest.

## V.       An Asset Freeze is Appropriate

In addition to injunctive relief, the FTC also seeks an asset freeze to preserve the availability of funds to provide monetary restitution for consumers victimized by Defendants' unlawful practices. "An asset freeze is within the district court's equitable powers." *IAB Mktg.*, 746 F.3d at 1234. The Eleventh Circuit has repeatedly upheld the authority of district courts to order an asset freeze to preserve the possibility of consumer redress. *See, e.g.*, *Id.*; *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996); *U.S. Oil & Gas*, 748 F.2d at 1433–34. Moreover, "[t]he FTC's burden of proof in the asset-freeze context is relatively light." *IAB Mktg.*, 746 F.3d at 1234, citing *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) (per curiam). Only "a reasonable approximation of a defendant's ill-gotten gains" is required for an asset freeze and "[e]xactitude is not a requirement." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004).

Defendants' ill-gotten gains are measured as the amount of money that defendants wrongfully gained by their misrepresentations. *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1345 (11th Cir. 2008). Here, from 2014 through October 2018, Defendants received over $180

22

million in commissions from HII, based on sales to thousands of consumers,[13] yet the funds in the Receivership account total approximately $3,186,655.48.  The vast disparity between Defendants' substantial ill-gotten gains and the value of the frozen assets supports maintaining the asset freeze. *See FTC v. IAB Mktg. Assocs., LP*, 972 F. Supp. 2d 1307, 1314 (S.D. Fla. 2013).

Dorfman argues that the threshold inquiry in assessing the necessity of an asset freeze is whether there is a risk that Dorfman will dissipate, conceal, or transfer away assets before a final judgment is rendered. However, the FTC does not need to present evidence that the assets will be dissipated; rather, it need only show a concern that the Defendants' assets will disappear. *IAB Mktg.*, 972 F. Supp. 2d at 1317 n.3, citing *ETS Payphones*, 408 F.3d at 734; *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001). The Court finds that the FTC has established, at this stage of the litigation, that there is a concern that Defendants will dissipate the assets if not enjoined. First, Defendants have the infrastructure and means to move millions of dollars.  Indeed, Defendants maintain bank accounts in Panama and the Dominican Republic to which they could transfer funds in the absence of an asset freeze.  PX 5 ¶ 37.  Second, absent an illicit movement of assets, Dorfman's request to unfreeze additional assets to pay for legal fees and living expenses[14] constitutes a dissipation of assets, as these expenditures would deplete the assets available for consumer redress. Dissipation does not necessarily mean that assets will be spirited away in secret; rather, it means that less money will be available for consumer redress.

## VI.    Continued Appointment of a Receiver

The Court has authority to appoint a receiver for the Corporate Defendants pursuant to the Court's equitable powers under Section 13(b) of the FTC Act. *U.S. Oil & Gas*, 748 F.2d at 1432.

---

[13]      As of February 2019, 59,308 customers were still paying monthly fees to HII.  RR, at 40.

[14]      The Court has already modified the asset freeze to provide Dorfman with $5000 per month to pay reasonable living expenses.  The Court also directed the Receiver to release $75,000 of Dorfman's frozen personal assets to pay for Dorman's legal fees.  [ECF No. 48].

The appointment of a receiver is appropriate where, as here, there is "imminent danger of property being lost, injured, diminished in value or squandered, and where legal remedies are inadequate." *Leone Indus. v. Assoc. Packaging*, 795 F. Supp. 117, 120 (D.N.J. 1992). When a defendant has used deception to obtain money from consumers, "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of [victims]." *SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 438 (5th Cir. 1981); *see also IAB Mktg.*, 746 F.3d at 1232, 1236 (affirming preliminary injunction with the appointment of a receiver).

As noted above, the Receiver has determined that it is unlikely Simple Health can be run lawfully and/or profitably.  RR, at 34.  Nonetheless, Defendants ask that the Court discharge the Receiver or convert his role into that of a monitor. Neither is appropriate. The record clearly reflects a continued need for the Receiver in this action to preserve assets and maintain the status quo. The Receiver is also necessary to determine the full extent of Defendants' deceptive practices, identify the victims of Defendants' scheme, and prevent further fraudulent practices during the pendency of the preliminary injunction.

## CONCLUSION

The record supports a preliminary finding that Defendants devised a fraudulent scheme to use consumer funds to enrich themselves. Accordingly, the Court finds that a preliminary injunction is necessary to maintain the status quo pending a trial on the merits.

It is therefore, **ORDERED AND ADJUDGED** as follows:

## I.   Prohibited Misrepresentations

Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or offering for sale

of any goods or services, are restrained and enjoined from misrepresenting or assisting others in misrepresenting, expressly or by implication, any material fact, including:

     A.    That Defendants' limited benefit plans and medical discount memberships are comprehensive health insurance, or the equivalent of such insurance;

     B.    That Defendants' limited benefit plans and medical discount memberships are qualified health insurance plans under the ACA;

     C.    That Defendants are experts on, or providers of, government-sponsored health insurance policies, such as those offered pursuant to Medicare and the ACA;

     D.    That Defendants are affiliated with AARP or the Blue Cross Blue Shield Association; or

     E.    Any other fact material to consumers concerning any good or service, such as:  the total costs; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics.

## II.    Prohibition on Release of Customer Information

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are restrained and enjoined from:

     A.    Selling, renting, leasing, transferring, or otherwise disclosing, the name, address, birth date, telephone number, email address, credit card number, bank account number, Social Security number, or other financial or identifying information of any person that any Defendant obtained in connection with any activity that pertains to the subject matter of this Order; or

     B.    Benefiting from or using the name, address, birth date, telephone number, email address, credit card number, bank account number, Social Security number, or other financial or

identifying information of any person that any Defendant obtained in connection with any activity that pertains to the subject matter of this Order.

However, Defendants may disclose such identifying information to a law enforcement agency, to their attorneys as required for their defense, as required by any law, regulation, or court order, or in any filings, pleadings or discovery in this action in the manner required by the Federal Rules of Civil Procedure and by any protective order in the case.

## III.     Asset Freeze[15]

**IT IS FURTHER ORDERED** that Defendants and Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are restrained and enjoined from:

A.      Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, relinquishing, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any Assets that are:

    1.      owned or controlled, directly or indirectly, by any Defendant;

    2.      held, in part or in whole, for the benefit of any Defendant;

    3.      in the actual or constructive possession of any Defendant; or

    4.      owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant;

---

[15]      "Asset" includes any legal or equitable interest in, right to, or claim to, any property, wherever located and by whomever held, and all proceeds, product, offspring, rents, or pro fit of or from that property.

B.      Opening or causing to be opened any safe deposit boxes, commercial mail boxes, or storage facilities titled in the name of any Defendant or subject to access by any Defendant, except as necessary to comply with written requests from the Receiver acting pursuant to its authority under this Order, and after providing Plaintiff prior notice and an opportunity to inspect the contents to determine that they contain no Assets covered by this Section;

C.      Incurring charges or cash advances on any credit, debit, or ATM card issued in the name, individually or jointly, of any Corporate Defendant or any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant or of which any Defendant is an officer, director, member, or manager.  This includes any corporate bankcard or corporate credit card account for which any Defendant is, or was on the date that this Order was signed, an authorized signor; or

D.      Depositing or cashing any checks or depositing any money orders or cash received from consumers, clients, or customers of any Defendant.

The Assets affected by this Section shall include: (1) all Assets of Defendants as of the time the TRO was entered; and (2) Assets obtained by Defendants after this Order is entered if those Assets are derived from any activity that is the subject of the Complaint in this matter or that is prohibited by this Order.  This Section does not prohibit any transfers of Assets to the Receiver or agreed to in writing by Plaintiff, or repatriation of foreign Assets specifically required by this Order.

## IV.    Duties of Asset Holders and Other Third Parties

**IT IS FURTHER ORDERED** that any financial or brokerage institution, Electronic Data Host, credit card processor, payment processor, merchant bank, acquiring bank, independent sales organization, third party processor, payment gateway, insurance company, business entity, or person who receives actual notice of this Order (by service or otherwise) and that (a) holds,

controls, or maintains custody of, through an account or otherwise, any Document on behalf of any Defendant or any Asset that is: owned or controlled, directly or indirectly, by any Defendant; held, in part or in whole, for the benefit of any Defendant; in the actual or constructive possession of any Defendant; or owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant; (b) holds, controls, or maintains custody of any Document or Asset associated with credits, debits or charges made on behalf of any Defendant, including reserve funds held by payment processors, credit card processors, merchant banks, acquiring banks, independent sales organizations, third party processors, payment gateways, insurance companies, or other entities; or (c) has held, controlled, or maintained custody of any such Document, Asset, or account at any time since the date of entry of the TRO shall:

A.      Hold, preserve, and retain within its control and prohibit the withdrawal, removal, alteration, assignment, transfer, pledge, encumbrance, disbursement, dissipation, relinquishment, conversion, sale, or other disposal of any such Document or Asset, as well as all Documents or other property related to such Assets, except by further order of this Court;

B.      Deny any Person, except the Receiver, access to any safe deposit box, commercial mail box, or storage facility that is titled in the name of any Defendant, either individually or jointly, or otherwise subject to access by any Defendant;

C.      Provide Plaintiff's counsel and the Receiver, within three business days of receiving a copy of this Order, a sworn statement setting forth, for each Asset or account covered by this Section:

1.      The identification number of each such account or Asset;

2.      The balance of each such account, or a description of the nature and value of each such Asset as of the close of business on the day on which this Order is served, and, if the account or other Asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other Asset was remitted; and

3.      The identification of any safe deposit box, commercial mail box, or storage facility that is either titled in the name, individually or jointly, of any Defendant, or is otherwise subject to access by any Defendant; and

D.      Provide Plaintiff's counsel and the Receiver, within five business days of a request from Plaintiff's counsel or the Receiver, with copies of all records or other Documents pertaining to such account or Asset, including originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, including wire transfers and wire transfer instructions, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and all logs and records pertaining to safe deposit boxes, commercial mail boxes, and storage facilities.

However, this Section does not prohibit any transfers to the Receiver or agreed to in writing by Plaintiff, or repatriation of foreign Assets specifically required by this Order.

## V.    Financial Disclosures

**IT IS FURTHER ORDERED** that each Defendant, within five days of the entry of this Order, unless previously provided in compliance with the TRO, shall prepare and deliver to Plaintiff's counsel:

A.      completed financial statements on the forms attached to the TRO as **Attachment A** (Financial Statement of Individual Defendant) for each Individual Defendant, and **Attachment B** (Financial Statement of Corporate Defendant) for each Corporate Defendant; and

B.      completed TRO **Attachment C** (IRS Form 4506, Request for Copy of a Tax Return) for each Individual and Corporate Defendant.

## VI.      Foreign Asset Repatriation

**IT IS FURTHER ORDERED** that within five days following entry of this Order, unless previously completed in compliance with the TRO, each Defendant shall:

A.      Provide Plaintiff's counsel and the Receiver with a full accounting, verified under oath and accurate as of the date of this Order, of all Assets, Documents, and accounts outside of the United States which are:  (1) titled in the name, individually or jointly, of any Defendant; (2) held by any person or entity for the benefit of any Defendant or for the benefit of any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant; or (3) under the direct or indirect control, whether jointly or singly, of any Defendant;

B.      Take all steps necessary to provide Plaintiff's counsel and Receiver access to all Documents and records that may be held by third parties located outside of the territorial United States, including signing the Consent to Release of Financial Records appended to the TRO as **Attachment D**;

C.      Transfer to the territory of the United States any and all Documents and Assets located in foreign countries which are: (1) titled in the name, individually or jointly, of any Defendant; (2) held by any person or entity for the benefit of any Defendant or for the benefit of any corporation, partnership, asset protection trust, or other entity that is directly or indirectly

owned, managed or controlled by any Defendant; or (3) under the direct or indirect control, whether jointly or singly, of any Defendant; and

D.      The same business day as any repatriation, (1) notify the Receiver and counsel for Plaintiff of the name and location of the financial institution or other entity that is the recipient of such Documents or Assets; and (2) serve this Order on any such financial institution or other entity.

## VII.   Non-Interference with Repatriation

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are restrained and enjoined from taking any action, directly or indirectly, which may result in the encumbrance or dissipation of foreign Assets, or in the hindrance of the repatriation required by this Order, including:

A.      Sending any communication or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time that all Defendants' Assets have been fully repatriated pursuant to this Order; or

B.      Notifying any trustee, protector or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to a court order, until such time that all Defendants' Assets have been fully repatriated pursuant to this Order.

## VIII.   Consumer Credit Reports

**IT IS FURTHER ORDERED** that Plaintiff may obtain credit reports concerning any Defendants pursuant to Section 604(a)(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(a)(1), and that, upon written request, any credit reporting agency from which such reports are requested shall provide them to Plaintiff.

## IX.    Preservation of Records

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are restrained and enjoined from:

A.    Destroying, erasing, falsifying, writing over, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, Documents[16] that relate to:  (1) the business, business practices, Assets, or business or personal finances of any Defendant; (2) the business practices or finances of entities directly or indirectly under the control of any Defendant; or (3) the business practices or finances of entities directly or indirectly under common control with any other Defendant; or

B.    Failing to create and maintain Documents that, in reasonable detail, accurately, fairly, and completely reflect Defendants' incomes, disbursements, transactions, and use of Defendants' Assets.

## X.    Report of New Business Activity

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are restrained and enjoined from creating, operating, or exercising any control over any business entity, whether newly formed or

---

[16]    For purposes of this Order, Document is synonymous in meaning and equal in scope to the usage of "document" and "electronically stored information" in Fed. R. Civ. P. 34(a), and includes writings, drawings, graphs, charts, photographs, sound and video recordings, images, Internet sites, web pages, websites, electronic correspondence, including email and instant messages, contracts, accounting data, advertisements, FTP Logs, Server Access Logs, books, written or printed records, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, computer records, customer or sales databases and any other electronically stored information, including Documents located on remote servers or cloud computing systems, and other data or data compilations from which information can be obtained directly or, if necessary, after translation into a reasonably usable form.  A draft or non-identical copy is a separate document within the meaning of the term.

previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship, or corporation, without first providing Plaintiff's counsel and the Receiver with a written statement disclosing: (1) the name of the business entity; (2) any fictitious business names associated with the entity; (3) the address and telephone number of the business entity; (4) the state of incorporation or organization of the business entity; (5) the Employee Identification Number or Federal Employer Identification Number of the business entity; (6) the names of the business entity's officers, directors, principals, managers, and employees; and (7) a detailed description of the business entity's intended activities.

## XI.     Permanent Receiver

**IT IS FURTHER ORDERED** that Michael Goldberg, Esq., is appointed as permanent receiver ("Receiver") of the Receivership Entities[17] with full powers of an equity receiver.  The Receiver shall be solely the agent of this Court in acting as Receiver under this Order.

## XII.    Duties and Authority of Receiver

**IT IS FURTHER ORDERED** that the Receiver is directed and authorized to accomplish the following:

A.     Assume full control of Receivership Entities by removing, as the Receiver deems necessary or advisable, any director, officer, independent contractor, employee, attorney, or agent of any Receivership Entity from control of, management of, or participation in, the affairs of the Receivership Entity;

B.     Take exclusive custody, control, and possession of all Assets and Documents of, or in the possession, custody, or under the control of, any Receivership Entity, wherever situated,

---

[17]     The Receivership Entities are the Corporate Defendants as well as any other entity that has conducted any business related to Defendants' advertising, marketing, promoting, offering for sale, or sale of limited benefit plans and medical discount memberships, including by transferring, commingling, or receiving Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant.

including Assets the Receiver has a reasonable basis to believe were purchased using funds from any Receivership Entity's corporate accounts, including the items listed in Section XII(B) of the TRO;

C.      Conserve, hold, manage, and prevent the loss of all Assets of the Receivership Entities, and perform all acts necessary or advisable to preserve the value of those Assets.  The Receiver shall assume control over the income and profits therefrom and all sums of money now or hereafter due or owing to the Receivership Entities.  The Receiver shall have full power to sue for, collect, and receive all Assets of the Receivership Entities and of other persons or entities whose interests are now under the direction, possession, custody, or control of, the Receivership Entities.  Provided, however, that the Receiver shall not attempt to collect any amount from a consumer if the Receiver believes the consumer's debt to the Receivership Entities has resulted from the deceptive acts or practices or other violations of law alleged in the Complaint in this matter, without prior Court approval;

D.      Obtain, conserve, hold, manage, and prevent the loss of all Documents of the Receivership Entities, and perform all acts necessary or advisable to preserve such Documents. The Receiver shall:  divert mail; preserve all Documents of the Receivership Entities that are accessible via electronic means (such as online access to financial accounts and access to electronic documents held onsite or by Electronic Data Hosts, by changing usernames, passwords or other log-in credentials); take possession of all electronic Documents of the Receivership Entities stored onsite or remotely; take whatever steps necessary to preserve all such Documents; and obtain the assistance of the FTC's Digital Forensic Unit for the purpose of obtaining electronic documents stored onsite or remotely;

E.      Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

F.      Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order, and to incur, or authorize the making of, such agreements as may be necessary and advisable in discharging his or her duties as Receiver.  The Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the Receivership Entities prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure Assets of the Receivership Entities, such as rental payments;

G.      Take all steps necessary to secure and take exclusive custody of each location from which the Receivership Entities operate their businesses.  Such steps may include, as the Receiver deems necessary or advisable:  (1) securing the location by changing the locks and alarm codes and disconnecting any internet access or other means of access to the computers, servers, internal networks, or other records maintained at that location; and (2) requiring any persons present at the location to leave the premises, to provide the Receiver with proof of identification, and/or to demonstrate to the satisfaction of the Receiver that such persons are not removing from the premises Documents or Assets of the Receivership Entities. Law enforcement personnel, including police or sheriffs, may assist the Receiver in implementing these provisions in order to keep the peace and maintain security.  If requested by the Receiver, the United States Marshal will provide appropriate and necessary assistance to the Receiver to implement this Order and is authorized to use any necessary and reasonable force to do so;

H.      Take all steps necessary to prevent the modification, destruction, or erasure of any web page or website registered to and operated, in whole or in part, by any Defendants, and to provide access to all such web page or websites to Plaintiff's representatives, agents, and assistants, as well as Defendants and their representatives;

I.      Enter into and cancel contracts and purchase insurance as advisable or necessary;

J.      Prevent the inequitable distribution of Assets and determine, adjust, and protect the interests of consumers who have transacted business with the Receivership Entities;

K.      Make an accounting, as soon as practicable, of the Assets and financial condition of the receivership and file the accounting with the Court and deliver copies thereof to all parties;

L.      Institute, compromise, adjust, appear in, intervene in, defend, dispose of, or otherwise become party to any legal action in state, federal or foreign courts or arbitration proceedings as the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Entities, or to carry out the Receiver's mandate under this Order, including actions challenging fraudulent or voidable transfers and including any claims the Receivership Entities may have in law or equity against any third party;

M.      Issue subpoenas to obtain Documents and records pertaining to the receivership, and conduct discovery in this action on behalf of the receivership estate, in addition to obtaining other discovery as set forth in this Order;

N.      Open one or more bank accounts at designated depositories for funds of the Receivership Entities.  The Receiver shall deposit all funds of the Receivership Entities in such designated accounts and shall make all payments and disbursements from the receivership estate from such accounts.  The Receiver shall serve copies of monthly account statements on all parties;

O.      Maintain accurate records of all receipts and expenditures incurred as Receiver;

36

P.       Allow Plaintiff's representatives, agents, and assistants, as well as Defendants and their representatives, reasonable access to the premises of the Receivership Entities, or any other premises where the Receivership Entities conduct business.  The purpose of this access shall be to inspect and copy any and all books, records, Documents, accounts, and other property owned by, or in the possession of, the Receivership Entities or their agents.  The Receiver shall have the discretion to determine the time, manner, and reasonable conditions of such access;

Q.       Allow Plaintiff's representatives, agents, and assistants, as well as Defendants and their representatives reasonable access to all Documents in the possession, custody, or control of the Receivership Entities;

R.       Cooperate with reasonable requests for information or assistance from any state or federal civil or criminal law enforcement agency;

S.       Suspend business operations of the Receivership Entities if in the judgment of the Receiver such operations cannot be continued legally and profitably;

T.       If the Receiver identifies a nonparty entity as a Receivership Entity, promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court.  Provided, however, that the Receiver may delay providing such notice until the Receiver has established control of the nonparty entity and its assets and records, if the Receiver determines that notice to the entity or the parties before the Receiver establishes control over the entity may result in the destruction of records, dissipation of assets, or any other obstruction of the Receiver's control of the entity;

U.       If in the Receiver's judgment the business operations cannot be continued legally and profitably, take all steps necessary to ensure that any of the Receivership Entities' web pages or websites relating to the activities alleged in the Complaint cannot be accessed by the public, or

37

are modified for consumer education and/or informational purposes, and take all steps necessary to ensure that any telephone numbers associated with the Receivership Entities cannot be accessed by the public, or are answered solely to provide consumer education or information regarding the status of operations; and

V.      File reports with the Court on a reasonable and timely basis on matters that the Receiver believes should be brought to the Court's attention.

**XIII.     Transfer of Receivership Property to Receiver**

**IT IS FURTHER ORDERED** that Defendants and any other person with possession, custody or control of property of, or records relating to, the Receivership Entities shall, upon notice of this Order by personal service or otherwise, fully cooperate with and assist the Receiver in taking and maintaining possession, custody, or control of the Assets and Documents of the Receivership Entities and immediately transfer or deliver to the Receiver possession, custody, and control of, the following:

A.      All Assets held by or for the benefit of the Receivership Entities;

B.      All Documents of or pertaining to the Receivership Entities;

C.      All computers, mobile devices, tablets, and other electronic storage devices or machines used to conduct the business of the Receivership Entities;

D.      All Assets and Documents belonging to other persons or entities whose interests are under the direction, possession, custody, or control of the Receivership Entities; and

E.      All keys, codes, user names, and passwords necessary to gain or to secure access to any Assets or Documents of or pertaining to the Receivership Entities, including access to their business premises, means of communication, accounts, computer systems (onsite and remote), Electronic Data Hosts, or other property.

In the event that any person or entity fails to deliver or transfer any Asset or Document, or otherwise fails to comply with any provision of this Section, the Receiver may file, *ex parte*, an Affidavit of Non-Compliance regarding the failure and a motion seeking compliance or a contempt citation.  Upon the filing of the affidavit, the Court may authorize, without additional process or demand, Writs of Possession or Sequestration or other equitable writs requested by the Receiver. The writs shall authorize and direct the United States Marshal or any sheriff or deputy sheriff of any county, or any other federal or state law enforcement officer, to seize the asset, Document, or other thing and to deliver it to the Receiver.

## XIV.   Provision of Information to Receiver

**IT IS FURTHER ORDERED** that, unless previously provided in compliance with the TRO, Defendants shall immediately provide to the Receiver:

A.      A list of all Assets and accounts of the Receivership Entities that are held in any name other than the name of a Receivership Entity, or by any person or entity other than a Receivership Entity;

B.      A list of all agents, employees, officers, attorneys, servants and those persons in active concert and participation with the Receivership Entities, or who have been associated or done business with the Receivership Entities; and

C.      A description of any Documents covered by attorney-client privilege or attorney work product, including files where such Documents are likely to be located, authors or recipients of such Documents, and search terms likely to identify such electronic Documents.

## XV.   Cooperation with the Receiver

**IT IS FURTHER ORDERED** that Defendants; Receivership Entities; Defendants' or Receivership Entities' officers, agents, employees, and attorneys, all other persons in active concert or participation with any of them, and any other person with possession, custody, or control

of property of or records relating to the Receivership entities who receive actual notice of this Order shall fully cooperate with and assist the Receiver.  This cooperation and assistance shall include providing information to the Receiver that the Receiver deems necessary to exercise the authority and discharge the responsibilities of the Receiver under this Order; providing any keys, codes, user names and passwords required to access, and allowing the Receiver to inspect, any computers, mobile devices, tablets and other electronic storage devices and machines (on site or remotely) and any cloud account (including specific method to access account) or electronic file in any medium; advising all persons who owe money to any Receivership Entity that all debts should be paid directly to the Receiver; and transferring funds at the Receiver's direction and producing records related to the Assets and sales of the Receivership Entities.

## XVI.   Non-Interference with the Receiver

**IT IS FURTHER ORDERED** that Defendants; Receivership Entities; Defendants' or Receivership Entities' officers, agents, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, and any other person served with a copy of this Order, are restrained and enjoined from directly or indirectly:

A.      Interfering with the Receiver's efforts to manage, or take custody, control, or possession of, the Assets or Documents subject to the receivership;

B.      Transacting any of the business of the Receivership Entities;

C.      Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any Assets owned, controlled, or in the possession or custody of, or in which an interest is held or claimed by, the Receivership Entities; or

D.      Refusing to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their duties or authority under any order of this Court.

### XVII.  Stay of Actions

**IT IS FURTHER ORDERED** that, except by leave of this Court, during the pendency of the receivership ordered herein, Defendants, Defendants' officers, agents, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, and their corporations, subsidiaries, divisions, or affiliates, and all investors, creditors, stockholders, lessors, customers and other persons seeking to establish or enforce any claim, right, or interest against or on behalf of Defendants, and all others acting for or on behalf of such persons, are enjoined from taking action that would interfere with the exclusive jurisdiction of this Court over the Assets or Documents of the Receivership Entities, including:

A.      Filing or assisting in the filing of a petition for relief under the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, or of any similar insolvency proceeding on behalf of the Receivership Entities;

B.      Commencing, prosecuting, or continuing a judicial, administrative, or other action or proceeding against the Receivership Entities, including the issuance or employment of process against the Receivership Entities, except that such actions may be commenced if necessary to toll any applicable statute of limitations; or

C.      Filing or enforcing any lien on any asset of the Receivership Entities, taking or attempting to take possession, custody, or control of any Asset of the Receivership Entities; or attempting to foreclose, forfeit, alter, or terminate any interest in any Asset of the Receivership Entities, whether such acts are part of a judicial proceeding, are acts of self-help, or otherwise. However, this Order does not stay:  (1) the commencement or continuation of a criminal action or proceeding; (2) the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; or (3) the enforcement of a

judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

## XVIII.  Compensation of Receiver

**IT IS FURTHER ORDERED** that the Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the Assets now held by, in the possession or control of, or which may be received by, the Receivership Entities.  The Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation, with the first such request filed no more than sixty days after the date of entry of this Order.  The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.

## XIX.   Access to Business Premises and Records

**IT IS FURTHER ORDERED** that:

A.      To allow Plaintiff and the Receiver to preserve Assets and evidence relevant to this action and to expedite discovery, Plaintiff and the Receiver, and their representatives, agents, contractors, and assistants, shall have access to any business premises and storage facilities owned, controlled, or used by the Receivership Entities.  Such locations include: (1) 2 Oakwood Plaza, Suite 100, Hollywood, Florida 33021; (2) 8400 Doral Boulevard, Suite 260, Doral, Florida 33166; (3) 5720 Lyndon B. Johnson Freeway, Suite 610, Dallas, Texas 75240; (4) 1769 Blount Road, Unit 109, Pompano Beach, Florida 33069, and any offsite location or commercial mailbox used by the Receivership Entities, including, without limitation, 3389 Sheridan Street #632, Hollywood, Florida 33021, 1722 Sheridan Street, Ste. 628, Hollywood, Florida 33020, and 401 East Las Olas

130-627, Fort Lauderdale, Florida 33301. The Receiver may exclude Defendants, Receivership Entities, and their employees from the business premises during the immediate access;

B.     Plaintiff and the Receiver, and their representatives, agents, contractors, and assistants, are authorized to obtain the assistance of federal, state and local law enforcement officers as they deem necessary to effect service and to implement peacefully the provisions of this Section;

C.     Plaintiff and the Receiver, and their representatives, agents, contractors, and assistants, are authorized to remove Documents from the Receivership Entities' premises in order that they may be inspected, inventoried, and copied. Plaintiff shall return any removed materials to the Receiver within five business days of completing inventorying and copying, or such time as is agreed upon by Plaintiff and the Receiver;

D.     Plaintiff's access to the Receivership Entities' Documents pursuant to this Section shall not provide grounds for any Defendant to object to any subsequent request for Documents served by Plaintiff;

E.     If any Documents, computers, mobile devices, tablets, or other electronic storage devices containing information related to the business practices or finances of the Receivership Entities are at a location other than those listed herein, including personal residence(s) of any Defendant, then, immediately upon receiving notice of this order, Defendants and Receivership Entities shall produce to the Receiver all such Documents, computers, mobile devices, tablets, and other electronic storage devices, along with any codes or passwords needed for access; and

F.     If any communications or records of any Receivership Entity are stored with an Electronic Data Host, such Entity shall, immediately upon receiving notice of this order, provide the Receiver with the username, passwords, and any other login credential needed to access the

communications and records, and shall not attempt to access, or cause a third party to attempt to access, the communications or records.

## XX.    Distribution of Order by Defendants

**IT IS FURTHER ORDERED** that Defendants shall immediately provide a copy of this Order to each affiliate, telemarketer, marketer, sales entity, successor, assign, member, officer, director, employee, agent, independent contractor, client, attorney, spouse, subsidiary, division, and representative of any Defendant, and shall, within ten days from the date of entry of this Order, provide Plaintiff's counsel and the Receiver with a sworn statement that this provision of the Order has been satisfied, which statement shall include the names, physical addresses, phone number, and email addresses of each such person or entity who received a copy of the Order.  Furthermore, Defendants shall not take any action that would encourage officers, agents, members, directors, employees, salespersons, independent contractors, attorneys, subsidiaries, affiliates, successors, assigns or other persons or entities in active concert or participation with them to disregard this Order or believe that they are not bound by its provisions.

## XXI.   Expedited Discovery

**IT IS FURTHER ORDERED** that, notwithstanding the provisions of the Fed. R. Civ. P. 26(d) and (f) and 30(a)(2)(A)(iii), and pursuant to Fed. R. Civ. P. 30(a), 34, and 45, Plaintiff and the Receiver are granted leave, at any time after service of this Order, to conduct limited expedited discovery for the purpose of discovering:  (1) the nature, location, status, and extent of Defendants' Assets; (2) the nature, location, and extent of Defendants' business transactions and operations; (3) Documents reflecting Defendants' business transactions and operations; or (4) compliance with this Order.  The limited expedited discovery set forth in this Section shall proceed as follows:

A.        Plaintiff and the Receiver may take the deposition of parties and non-parties.  Forty-eight hours of notice shall be sufficient notice for such depositions.  The limitations and conditions

44

set forth in Fed R. Civ. P. 30(a)(2)(B) and 31(a)(2)(B) regarding subsequent depositions of an individual shall not apply to depositions taken pursuant to this Section.  Any such deposition taken pursuant to this Section shall not be counted towards the deposition limit set forth in Fed R. Civ. P. 30(a)(2)(A) and 31(a)(2)(A) and depositions may be taken by telephone or other remote electronic means.

B.     Plaintiff and the Receiver may serve upon parties requests for production of Documents or inspection that require production or inspection within five days of service, provided, however, that three days of notice shall be deemed sufficient for the production of any such Documents that are maintained or stored only in an electronic format.

C.     Plaintiff and the Receiver may serve upon parties interrogatories that require response within five days of service.

D.     Plaintiff and the Receiver may serve subpoenas upon non-parties that direct production or inspection within five days of service.

E.     Service of discovery upon a party to this action, taken pursuant to this Section, shall be sufficient if made by facsimile, email, or by overnight delivery.

F.     Any expedited discovery taken pursuant to this Section is in addition to, and is not subject to, the limits on discovery set forth in the Federal Rules of Civil Procedure and the Local Rules of this Court.  The expedited discovery permitted by this Section does not require a meeting or conference of the parties, pursuant to Fed R. Civ. P. 26(d) and (f).

G.     The parties are exempted from making initial disclosures under Fed. R. Civ. P. 26(a)(1) until further order of this Court.

## XXII.  Service of this Order

**IT IS FURTHER ORDERED** that copies of this Order may be served by any means, including facsimile transmission, electronic mail or other electronic messaging, personal or

overnight delivery, U.S. Mail or FedEx, by agents and employees of Plaintiff, by any law enforcement agency, or by private process server, upon any Defendant or any person (including any financial institution) that may have possession, custody or control of any Asset or Document of any Defendant, or that may be subject to any provision of this Order pursuant to Fed. R. Civ. P. 65(d)(2). For purposes of this Section, service upon any branch, subsidiary, affiliate or office of any entity shall effect service upon the entire entity.

## XXIII. Correspondence and Service on Plaintiff

**IT IS FURTHER ORDERED** that, for the purpose of this Order, all correspondence and service of pleadings on Plaintiff shall be addressed to:

>  Elizabeth Scott
>  James Davis
>  230 South Dearborn, Suite 3030
>  Chicago, Illinois 60604
>  312-960-5634 (phone)
>  312-960-5600 (fax)
>  escott@ftc.gov
>  jdavis@ftc.gov

## XXIV. Retention of Jurisdiction

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for all purposes.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 14th day of May, 2019.

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE