UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

FEDERAL TRADE COMMISSION,

       Plaintiff,

   vs.

SIMPLE HEALTH PLANS LLC, a Florida limited
liability company;

HEALTH BENEFITS ONE LLC, a Florida limited
liability company, also d/b/a Health Benefits Center,
Simple Health, Simple Health Plans, Simple
Insurance, Simple Insurance Plans, Simple Auto,
Simple Home, Simple Home Plans, Simple Care,
Simple Life, and National Dental Savings;

HEALTH CENTER MANAGEMENT LLC, a
Florida limited liability company;

INNOVATIVE CUSTOMER CARE LLC, a Florida
limited liability company;

SIMPLE INSURANCE LEADS LLC, a Florida
limited liability company, also d/b/a Health
Insurance Services;

SENIOR BENEFITS ONE LLC, a Florida limited
liability company;

STEVEN J. DORFMAN, individually and as an
officer, member, or manager of SIMPLE HEALTH
PLANS LLC, HEALTH BENEFITS ONE LLC,
HEALTH CENTER MANAGEMENT LLC,
INNOVATIVE CUSTOMER CARE LLC, SIMPLE
INSURANCE LEADS LLC, and SENIOR
BENEFITS ONE LLC; and

CANDIDA L. GIROUARD, individually and as an
officer or manager of SIMPLE HEALTH PLANS
LLC, HEALTH BENEFITS ONE LLC, HEALTH
CENTER MANAGEMENT LLC, INNOVATIVE
CUSTOMER CARE LLC, SIMPLE INSURANCE
LEADS LLC, and SENIOR BENEFITS ONE LLC;

**Case No.: 18-cv-62593-DPG**

**AMENDED COMPLAINT FOR
PERMANENT INJUNCTION AND
OTHER EQUITABLE RELIEF**

|  | Defendants. |
|---|---|

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, as amended.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), and 6105(b).

3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1)-(3), (c)(1)-(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108, as amended.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, as amended, which prohibits deceptive and abusive telemarketing acts or practices.

2

Exhibit A

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 57b, 6102(c), and 6105(b).

## DEFENDANTS

### Corporate Defendants

6.      Simple Health Plans LLC is a Florida limited liability company with its principal place of business at 2 Oakwood Boulevard, Suite 100, Hollywood, Florida 33020.  Simple Health Plans transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Simple Health Plans has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States.

7.      Health Benefits One LLC, also doing business as Health Benefits Center, Simple Health, Simple Health Plans, Simple Insurance, Simple Insurance Plans, Simple Auto, Simple Home, Simple Home Plans, Simple Care, Simple Life, and National Dental Savings, is a Florida limited liability company with its principal place of business at 2 Oakwood Boulevard, Suite 100, Hollywood, Florida 33020.  Health Benefits One transacts or has transacted business in this district and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Health Benefits One has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States.

8.      Health Center Management LLC is a Florida limited liability company with its principal place of business at 2 Oakwood Boulevard, Suite 100, Hollywood, Florida 33020.

Exhibit A

Health Center Management is a manager of Simple Health Plans LLC and Senior Benefits One LLC.  Health Center Management transacts or has transacted business in this district and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Health Center Management has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States.

9.      Innovative Customer Care LLC is a Florida limited liability company with its principal places of business at 3389 Sheridan Street #632, Hollywood, Florida 33021, and 2 Oakwood Boulevard, Suite 100, Hollywood, Florida 33020.  Innovative Customer Care transacts or has transacted business in this district and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Innovative Customer Care has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States.

10.     Simple Insurance Leads LLC, also doing business as Health Insurance Services, is a Florida limited liability company with its principal place of business at 2 Oakwood Boulevard, Suite 100, Hollywood, Florida 33020.  Simple Insurance Leads transacts or has transacted business in this district and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Simple Insurance Leads has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States.

11.     Senior Benefits One LLC is a Florida limited liability company with its principal place of business at 2 Oakwood Boulevard, Suite 100, Hollywood, Florida 33020.  Senior Benefits One transacts or has transacted business in this district and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Senior

Benefits One has advertised, marketed, distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States.

### Individual Defendants

12.     Defendant Steven J. Dorfman is an owner, officer, member, or manager of Simple Health Plans LLC, Health Benefits One LLC, Health Center Management LLC, Innovative Customer Care LLC, Simple Insurance Leads LLC, and Senior Benefits One LLC.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  For example, Dorfman manages Defendants' operations, serves as an officer for several of the corporate defendants, and is a signatory on corporate bank accounts.  Dorfman resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

13.     Defendant Candida L. Girouard is an officer or manager of Simple Health Plans LLC, Health Benefits One LLC, Health Center Management LLC, Innovative Customer Care LLC, Simple Insurance Leads LLC, and Senior Benefits One LLC.  At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  For example, Girouard has drafted and approved Defendants' deceptive sales, verification, and customer service scripts; reviewed and approved lead generation websites; managed Defendants' customer service and compliance teams, including by reviewing recorded sales and customer service phone calls; negotiated and signed contracts and litigation settlement agreements; and responded to consumer complaints regarding misrepresentations lodged with the Better Business Bureau and government regulators.  Girouard actively concealed deceptive business practices

Exhibit A

from government regulators, including by lying under oath about the existence of recorded sales calls.  Girouard resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

### Common Enterprise

14.     Defendants Simple Health Plans LLC, Health Benefits One LLC, Health Center Management LLC, Innovative Customer Care LLC, Simple Insurance Leads LLC, and Senior Benefits One LLC, (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below. Corporate Defendants have conducted the business practices described below through interrelated companies, which have common ownership, officers, managers, business functions, and office locations, which have commingled assets, and which hold themselves out as Simple Health.  Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Defendants Dorfman and Girouard have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

### COMMERCE

15.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

### DEFENDANTS' BUSINESS PRACTICES

### Overview

16.     Since at least October 2013, online and primarily through outbound telemarketing calls, Defendants claim to offer consumers comprehensive health insurance or its equivalent.

Exhibit A

Defendants lead consumers to believe that they will receive a "PPO" health insurance policy that, for a nominal copay, will cover preexisting medical conditions, prescription drug medications, primary and specialty care treatment, inpatient and emergency hospital care, surgical procedures, and medical and laboratory testing.

17.    The products sold by Defendants to consumers are not, in fact, comprehensive health insurance and do not provide consumers with the benefits promised by Defendants. Instead, Defendants typically enroll consumers in an assortment of different programs, including: (1) limited benefit plans, also known as limited benefit indemnity plans and hospital indemnity plans; and (2) medical discount and wellness program memberships.

18.    Comprehensive health insurance plans generally involve an arrangement between an insurance company and a consumer in which the company agrees to pay a substantial portion of the healthcare expenses that the consumer might incur in exchange for consumers' premium payments.  This has the effect of transferring some of the policyholder's risk to the insurance company.

19.    A PPO plan, also known as a preferred provider organization plan, is a type of comprehensive health insurance consisting of medical doctors, hospitals, and other health care providers who have agreed with an insurer or a third-party administrator to provide health care at reduced rates to the insurer's or the administrator's clients.

20.    Limited benefit plans, by contrast, provide non-comprehensive coverage capped at a specific amount for a specific service, treatment, condition, or disease.  Limited benefit plans do not have the effect of transferring enrollees' risk to a third party.  Instead, Defendants incur no risk whatsoever when a customer enrolls in one of their limited benefit plans.

Exhibit A

21.     In the past three years alone, Defendants' scheme has generated over $100 million in revenue.  Unfortunately, Defendants' scheme also has left tens of thousands of consumers who thought they had purchased comprehensive health insurance without such coverage.  In addition to paying monthly "premiums" for Defendants' limited benefit plans and medical discount memberships, many of these consumers have incurred substantial medical expenses under the mistaken belief that these expenses would be covered by the health insurance they thought they had obtained from Defendants.

**Defendants Target Consumers In Need of Health Insurance**

22.     Defendants prey on consumers who are seeking comprehensive health insurance. These consumers typically either do not have health insurance or pay high premiums for their insurance because they have lost their jobs, are unemployed or self-employed, or have lost their group or individual health insurance.

23.     In their advertising and promotional materials, including on their websites, Defendants falsely claim to offer a vast selection of comprehensive health care insurance policies from "the top carriers in every state."  On their primary consumer-facing website, www.simplehealthplans.com, Defendants falsely claim to have "assembled a diverse portfolio of superior health insurance products from leading health insurance carriers, each carefully selected based on its ability to provide exceptional value and coverage to our customers."

24.     Defendants also falsely hold themselves out as experts on, and providers of, government-sponsored health insurance policies, such as those offered pursuant to Medicare and the Patient Protection and Affordable Care Act ("ACA" or "Affordable Care Act"), 42 U.S.C. § 18001 et seq.

25.     Defendants tout their purported ACA expertise in their marketing materials and in statements promoting their business.  On their main website, for example, Defendants falsely claim that their "one objective" is to "help consumers through the complexities of the Affordable Care Act."  In a newspaper interview, a company spokesperson stated that Defendants could provide better advice to consumers about health insurance options than an ACA-certified "navigator" because Defendants "have the freedom to help the consumer figure out what's in their best interest."  An ACA navigator is an individual or organization trained to help consumers look for health coverage options available through the ACA.  Navigators are required to be unbiased, and their services are free to consumers.

26.     Defendants also use the ACA as an employee recruitment tool, promising that prospective employees "WILL HAVE MONEY THROWN AT YOU" during "open enrollment."  Beneath an image of a cigar-smoking individual tossing a wad of cash, one of Defendants' job postings states:  "If you are not making money hand over first [*sic*] this open enrollment you are not making the most of your time left on this earth.  Well guess what… here is your golden opportunity to MAKE THAT MONEY!"  *See* Image A below.  Under the ACA, "open enrollment" is a window during which individuals or employees may add or drop their health insurance, or make changes to their coverage.  This term has no applicability to the limited benefit plans and medical discount memberships sold by Defendants.

Exhibit A





**Image A**

27.     In fact, Defendants are not experts on, and do not provide, government-sponsored, ACA-compliant health insurance policies.

28.     In some of their advertising materials and campaigns, Defendants falsely claim to be affiliated with AARP and the Blue Cross Blue Shield Association.  Defendants are not affiliated with AARP or the Blue Cross Blue Shield Association.

29.     Defendants advertise their limited benefit plans and discount memberships primarily through a network of lead generation websites.  Defendants own some of these sites themselves, and also pay lead generators for leads generated on third-party sites.  Consumers typically find these websites by conducting internet searches for health insurance.

30.     The third-party lead generation sites typically claim to provide information about obtaining comprehensive health insurance, including insurance available through the marketplaces established pursuant to the ACA.  In many cases, the sites refer to the ACA and Medicare and use terms associated with the ACA, such as "Obamacare" and the "Obamacare Marketplace."  The sites also feature the branded logos of well-known insurance carriers, such as Blue Cross Blue Shield.  *See* Images B and C below.

Exhibit A



**Image B (third-party site)**
*www.official-plans.com*

Exhibit A



**Image C (third-party site)**
*www.obamacare-plans.com*

31.      Many consumers who submit their names and telephone numbers to the third-party lead generation sites believe that they will receive information about comprehensive health insurance plans, including government-sponsored policies like those offered pursuant to the ACA.  Defendants then purchase this consumer information from the operators of the third-party lead generation websites such as those described above in Paragraph 30.

32.      Defendants also operate their own lead generation websites on which they promise to connect consumers with licensed insurance agents who purportedly will provide consumers with information about health insurance plans.  For example, one of Defendants' lead generation websites, www.trumpcarequotes.com, claims to offer "Health Insurance for Smart People" from "the Nation's Leading Carriers"  at "Low Affordable Premiums" with

13

"Prescription Drug Coverage."  The site features the branded logos of several major health insurance carriers, including Anthem BlueCross.  *See* Image D below.



**Image D (Defendants' site)**
*www.trumpcarequotes.com*

33.     Another one of Defendants' lead generation websites warns that consumers who do not have health insurance will "[f]ace a substantial tax penalty."  This site claims that

14

Exhibit A

uninsured consumers "will pay an average Obamacare penalty of almost $1000," cautions that this amount "is likely to increase in the coming year," and advises consumers to "[a]void these penalties by getting insured today."  *See* Image E below.



**Image E (Defendants' site)**
*www.healthinsurancedeadline2018.com*

15

34.     Under the ACA, individuals who can afford health insurance, but choose not to buy it, are required to pay a fee.  Because Defendants' limited benefit plans and discount memberships do not qualify as health insurance under the ACA, consumers who participate in Defendants' plans will still be subject to this ACA fee.

35.     Defendants also operate multiple lead generation websites on which they falsely claim to sell Medicare health insurance policies.  These sites include www.simplemedicare.com, which promotes "Medicare Health Plans for Your Needs and Budget" and invites consumers to "Learn about Medicare and Choose a Plan with Confidence."  *See* Image F below.  Defendants also operate www.usamedsupp.org, which features the AARP logo and encourages consumers to "Compare Medicare Quotes…in three simple steps."  *See* Image G below.



**Image F (Defendants' site)**
***www.simplecare.com***

16



**Image G (Defendants' site)**
*www.usamedsupp.org*

36.     Some consumers learn about Defendants' lead generation websites through email and text message solicitations containing links to these sites.  Defendants pay third parties to disseminate these emails and text messages.  One such message encourages consumers to "[t]ake advantage of open enrollment and find a carrier near you."  As noted above in Paragraph 26, "open enrollment" is a term associated with the ACA that does not apply to the type of products sold by Defendants.

**Defendants Claim to Sell Comprehensive Health Insurance**

37.     Defendants engage in both outbound and inbound telemarketing with potential customers.  Consumers who submit their contact information to one of Defendants' lead

17

generation websites subsequently receive a call from one of Defendants' telemarketers. Consumers also may contact Defendants directly by calling one of the toll-free numbers displayed on Defendants' lead generation websites.  In both cases, consumers speak to one of Defendants' telemarketers, who typically identify themselves as an insurance agent licensed in the consumer's state.  In some instances, consumers first speak to a pre-qualification representative, who gathers personal background information about the consumer before transferring the call to another telemarketer purportedly licensed to sell insurance.  In many instances, these telemarketers are not, in fact, properly licensed insurance agents.

38.　　　Defendants record sales and customer service calls with consumers, and they save these recordings.  To mislead regulatory authorities, however, Defendants claim that such recordings either do not exist or are not maintained.

39.　　　In calls with consumers, Defendants' telemarketers claim that for a one-time enrollment fee ranging from approximately $60 to $175 and a monthly payment ranging from approximately $40 to $500, Defendants can provide consumers with a "PPO" health insurance plan.  Defendants claim that, like comprehensive health insurance, their plan will cover preexisting medical conditions, prescription medication, hospitalization, lab work and access to primary care physicians, specialists, and other healthcare providers for a nominal copayment.

40.　　　In many instances, Defendants' telemarketers have referred to the monthly payments consumers must make as "premiums" and have used other insurance terms of art in their sales pitches, such as "PPO," "copay," "deductible," "coverage," and "preexisting condition."  These terms have no relevance to the limited benefit plans and discount memberships sold by Defendants.

Exhibit A

41.     Defendants often tell consumers that the purported "PPO" health insurance plan is widely accepted by doctors in the consumers' geographical areas or that it is accepted by virtually all, or the vast majority of, doctors in the country.  However, when consumers look for a covered provider after purchasing what they believe to be a "PPO" health insurance plan, many discover that the limited benefit plan is not accepted by their providers or that the available discounts are negligible.

42.     In some instances, Defendants' telemarketers falsely claim that their "PPO" health insurance plan is a qualified health plan under the ACA.  A "qualified health plan" provides essential health benefits, follows established limits on cost-sharing (like deductibles, copayments, and out-of-pocket maximum amounts), and meets other requirements under the ACA.  All qualified health plans meet the ACA requirement for having health coverage, known as "minimum essential coverage."

43.     If consumers ask for written information about Defendants' plan before buying it, telemarketers often refuse to provide it, stating that they either are not allowed to provide such information or are not capable of providing it.

44.     Defendants often claim that their "PPO" health insurance plan is at least as good as comprehensive health insurance because it offers comparable coverage at a lower price, and without deductibles.

45.     Once consumers express interest in purchasing Defendants' "PPO" health insurance plan — believing it to be, based on the telemarketers' misrepresentations, actual comprehensive health insurance — Defendants' telemarketers arrange for payment by asking for the consumers' debit card or credit card information.

Exhibit A

46.     After taking consumers' payment information, Defendants' telemarketers transfer consumers to a different employee, who guides consumers through a "verification" process. Before transferring them, however, Defendants' telemarketers often instruct consumers to disregard any statements in the post-sale "verification" process that indicate that consumers will not be receiving comprehensive health insurance that covers preexisting medical conditions.

47.     During verification, consumers are asked to confirm a series of complex, lengthy statements that are either read by the verification employee or transmitted electronically by email or text message.  Consumers are cautioned not to ask any questions during verification or they will be transferred back to the sales representative, where the entire sales process will start over again.  Telemarketers frequently instruct consumers to disregard verification statements that are inconsistent with Defendants' sales pitch.  For these reasons, consumers often feel pressured to agree with all of the verification statements, even if they conflict with representations made by the sales representative or if the consumers do not understand or actually agree with the verification statements.  Moreover, consumers who choose to receive the disclosures electronically must review and "e-sign" them on their devices prior to completing verification. On mobile devices, these disclosures are rendered in pages of small, barely legible text.  *See* Image H below.

Exhibit A

**Image H**

48.     Many of Defendants' deceptive sales tactics are evident in recorded undercover

transactions conducted by Plaintiff.  In one such transaction, an FTC investigator stated clearly

that he wanted to obtain major medical insurance, had no interest in purchasing a medical

discount membership, and claimed to have three preexisting medical conditions, including

diabetes.  Defendants' telemarketer informed the FTC's investigator that he qualified for a

"PPO" health insurance plan that provided coverage for preexisting medical conditions, had no

21

"deductibles," and included prescription drug coverage.  Under this plan, according to the

telemarketer, the investigator would pay no more than $25 to see his physicians and $4 to $12 to

fill a prescription for a specific diabetes medication.  As discussed below, the limited benefit

plans actually sold by Defendants do not provide any of the promised benefits.

**Defendants Actually Sell Limited Benefit Plans and Medical Discount Memberships**

49.     As noted above, Defendants' limited benefit plans and medical discount

memberships are not, in fact, comprehensive health insurance and do not provide consumers

with the benefits promised in Defendants' sales pitch.  For example, a typical limited benefit

plan sold by Defendants to consumers pays only $50 toward physician visits – capped at three

visits per calendar year – and a maximum of $100 per day for hospitalization.  Moreover, despite

assurances to the contrary made by Defendants' telemarketers, these plans provide no coverage

for preexisting medical conditions or prescription medications.

50.     In addition, the medical discount and wellness memberships sold by Defendants

at best merely provide consumers with access to various pre-negotiated discounts from third

parties, only some of which relate to healthcare.  In addition to prescription medications, for

example, these discounts allegedly also apply to identity theft protection, cell phone service,

flowers, vitamins, travel, car rental and purchase, diet and exercise programs, magazine

subscriptions, pet insurance and medications, dining, and movie tickets.  Other membership

programs allegedly offer thousands of dollars' worth of benefits consisting of access to "wellness

specialists," "life extension naturopaths," and "comprehensive education lifestyle coaching."

51.     There is a vast difference between what Defendants promise consumers and what

consumers actually get.  For example, in the undercover transaction described in Paragraph 48

above, Defendants sold the FTC investigator a limited benefit plan rather than the promised

Exhibit A

comprehensive health insurance.  This plan would not have paid any of the costs associated with a routine office visit for the physicians identified by the investigator as his primary care doctors. It also would have required the investigator to pay $850-$900 to fill a prescription for a diabetes drug that the telemarketer claimed would cost $4 to $12.

**Tens of Thousands of Consumers Have Been Harmed by Defendants' Practices**

52.     Many consumers purchase Defendants' plans believing them to be comprehensive medical insurance.  Consumers report that Defendants' telemarketers specifically claim to offer "PPO" health insurance plans or qualified health plans under the ACA.  Consumers rely on these representations in agreeing to purchase Defendants' limited benefit plans and medical discount memberships.

53.     Many consumers pay Defendants enrollment fees and substantial monthly payments for what they believe to be comprehensive health insurance.  Consumers have reported paying $500 or more per month for Defendants' plans, which do not provide the promised insurance.

54.     Many consumers have been unable to use the limited benefit plans and discount memberships for healthcare services typically covered by health insurance.  Consumers frequently do not realize they are uninsured until after incurring substantial medical expenses, often under the mistaken belief that these expenses will be covered by the insurance they thought they had purchased from Defendants.  For example, one consumer received $61,000 in hospital bills, none of which were covered by the policy that Defendants sold to her, despite assurances to the contrary by Defendants' telemarketer.

55.     When consumers have contacted Defendants to complain, cancel their plans or memberships, and seek refunds, Defendants have routinely ignored their requests.  Some

Exhibit A

consumers have received refunds only after directly requesting them from the third-party administrator of the plans and memberships or after seeking the assistance of the Better Business Bureau or law enforcement agencies.  Many of the consumers have received only partial refunds.

## VIOLATIONS OF THE FTC ACT

56.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

57.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I
### Misrepresentations in Violation of the FTC Act

58.     In numerous instances, in connection with the advertising, marketing, promoting, offering for sale, or sale of limited benefit plans and medical discount memberships, Defendants represent, directly or indirectly, expressly or by implication, that:

   a.   Defendants' limited benefit plans and medical discount memberships are comprehensive health insurance, or the equivalent of such insurance;

   b.   Defendants' limited benefit plans and medical discount memberships are qualified health plans under the Affordable Care Act;

   c.   Defendants are experts on, or providers of, government-sponsored health insurance policies, such as those offered pursuant to Medicare and the Affordable Care Act; or

   d.   Defendants are affiliated with AARP or the Blue Cross Blue Shield Association.

59.     In truth and in fact:

Exhibit A

a.   Defendants' limited benefit plans and medical discount memberships are not comprehensive health insurance, or the equivalent of such insurance;

b.   Defendants' limited benefit plans and medical discount memberships are not qualified health plans under the Affordable Care Act;

c.   Defendants are not experts on, or providers of, government-sponsored health insurance policies, including policies offered under Medicare or the Affordable Care Act; or

d.   Defendants are not affiliated with AARP or the Blue Cross Blue Shield Association.

60.     Therefore, Defendants' representations, as set forth in Paragraph 58, above, are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE TELEMARKETING SALES RULE

61.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

62.     Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), (gg).  A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration.  16 C.F.R. § 310.2(dd). A "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.  16 C.F.R. § 310.2(ff).  "Telemarketing" means a

25

plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call.  16 C.F.R. § 310.2(gg).

63.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of the goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii).  The TSR also prohibits sellers and telemarketers from misrepresenting, directly or by implication, a seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.  16 C.F.R. § 310.3(a)(2)(vii). Likewise, the TSR prohibits sellers and telemarketers from making any false or misleading statements to induce a person to pay for goods or services.  16 C.F.R. § 310.3(a)(4).

64.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II**
**Deceptive Telemarketing Calls in Violation of the TSR**

65.     In numerous instances, in connection with the advertising, telemarketing, promoting, offering for sale, or sale of limited benefit plans and medical discount memberships, Defendants misrepresent, directly or indirectly, expressly or by implication, that:

      a.  Defendants' limited benefit plans and medical discount memberships are comprehensive health insurance, or the equivalent of such insurance;

      b.  Defendants' limited benefit plans and medical discount memberships are qualified health plans under the Affordable Care Act;

26

    c.   Defendants are experts on, or providers of, government-sponsored health

insurance policies, such as those offered pursuant to Medicare and the

Affordable Care Act; or

    d.   Defendants are affiliated with AARP or the Blue Cross Blue Shield

Association.

66.    The acts or practices of Defendants as described in Paragraph 65, above, are

deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. §§ 310.3(a)(2)(iii),

(a)(2)(vii) & (a)(4).

## CONSUMER INJURY

67.    Consumers have suffered and will continue to suffer substantial injury as a result

of Defendants' violations of the FTC Act and the TSR.  In addition, Defendants have been

unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this

Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm

the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

68.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant

injunctive and such other relief as the Court may deem appropriate to halt and redress violations

of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable

jurisdiction, may award ancillary relief, including rescission or reformation of contracts,

restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and

remedy any violation of any provision of law enforced by the FTC.

69.    Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the

Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court

Exhibit A

finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

## **PRAYER FOR RELIEF**

70.     Wherefore, Plaintiff, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A.     Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, a temporary and preliminary injunction, asset freeze, appointment of a receiver, an evidence preservation order, and expedited discovery;

B.     Enter a permanent injunction to prevent future violations of the FTC Act and the TSR;

C.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

Exhibit A

       D.       Award Plaintiff the costs of bringing this action, as well as such other and

additional relief as the Court may determine to be just and proper.

Dated:          , 2019.       Respectfully submitted,

                                 ALDEN F. ABBOTT
                                 General Counsel

_____

ELIZABETH C. SCOTT, Special Bar No. A5501502
escott@ftc.gov; (312) 960-5609
JAMES H. DAVIS, Special Bar No. A5502004
jdavis@ftc.gov; (312) 960-5611
JOANNIE WEI, Special Bar No. A5502492
jwei@ftc.gov; (312) 960-5607

Federal Trade Commission
230 S. Dearborn Street, Suite 3030
Chicago, Illinois  60604
Telephone:  (312) 960-5634
Facsimile: (312) 960-5600

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

Exhibit A