UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>            Plaintiff,<br><br>   v.<br><br>SIMPLE HEALTH PLANS LLC, a Florida limited liability company, et al.,<br><br>            Defendants. | **Case No.: 18-cv-62593-DPG**<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT CANDIDA GIROUARD** |

## I.  INTRODUCTION

The Federal Trade Commission ("FTC") seeks a Preliminary Injunction against newly named defendant Candida Girouard, the Chief Compliance Officer of the six corporate Defendants. Girouard, along with already-enjoined defendant Steven Dorfman, was at the heart of Defendants' "bait and switch"[1] scheme to deceptively market and sell as comprehensive health insurance what were in fact "practically worthless" products.[2] The scheme left thousands of consumers without insurance, while Defendants received $180 million in commissions for the deceptive sales. The Court already has found that the FTC is likely to succeed on its claims against the corporations for which Girouard served as the Chief Compliance Officer. The only question now is whether the FTC is likely to show that Girouard participated in or was authorized to control the Defendants' misconduct. The evidence shows both.

---

[1] D.E. 139 at 1.

[2] *Id.*

1

As the Chief Compliance Officer, Girouard was charged with maintaining a "Compliance Program [that] effectively prevents and/or detects violations of law [and] regulations."[3] Girouard did precisely the opposite—rather than prevent and detect fraud, she perpetrated it. Giroaurd drafted deceptive sales scripts, created and supervised a customer service department that furthered Defendants' deception, and deceived regulators and the Better Business Bureau about Defendants' unlawful practices. She and her subordinates routinely responded to victimized consumers' complaints, usually with an insulting and dishonest form letter that mischaracterized the Defendants' sales pitch as a "needs and costs analysis to find a suitable product," when in fact Defendants only varied their product offering based on the consumer's budget, never based on a consumer's medical or health needs.[4] Her conduct showed as little regard for consumers' plights as it did for the truth about Defendants' practices.

After Defendants' business was halted by the Court's orders in this case, Girouard has found employment with other companies engaged in the marketing and sale of products similar, if not identical to, the products deceptively sold by Defendants. To ensure that Girouard does not continue to participate in the deceptive sale of healthcare products, the Court should enter a preliminary injunction prohibiting her from engaging in the unlawful conduct at the center of this scheme.

---

[3] Supplemental Declaration of Roberto Menjivar, Exhibit 1 ("Menjivar Dec."), Attachment A at 1 (Job Description for Simple Health Chief Compliance Officer); 4 (Simple Health Compliance Program).

[4] *See, e.g.*, D.E. 116-7 at 489-90, 493-94, 496-97, 500-501, 504-505, 507-508, and 510-11. The letters also suggested that consumers should have understood that treatment for any preexisting conditions they disclosed during their sales call would not be covered, when in fact the sales script explicitly said that the plans offered by Defendants did "not discriminate against any of your preexisting conditions." *See* D.E. 116-7 at 6, 26, and 52.

## II.  BACKGROUND

The FTC filed its original Complaint in this matter on October 29, 2018 alleging violations of the Federal Trade Commission Act and the Telemarketing Sales Rule.  (D.E. 1.) The FTC simultaneously moved the Court for a Temporary Restraining Order to put a halt to the original Defendants' unlawful conduct, appoint a receiver over the Corporate Defendants, and to freeze the Defendants' assets.  (D.E. 1 and 3.)  On October 31, 2018, the Court entered the TRO. (D.E. 15.)  On April 16, 2019, the Court held a daylong evidentiary hearing on the FTC's Motion for a Preliminary Injunction, during which two of Defendants' victims testified.  On May 14, 2019, the Court entered the Preliminary Injunction against the seven original Defendants (the "May 2019 Preliminary Injunction"), continuing the asset freeze, and making the Receiver's appointment permanent.  (D.E. 139.)  The May 2019 Preliminary Injunction cogently describes Defendants' scheme as "bait, switch, and delay."[5]  This captures the various stages and tools of the scheme: deceptive lead generation websites to lure consumers; misleading sales and verification scripts used in telemarketing phone calls to convince consumers to purchase what they later learn are "practically worthless" products; and a customer service department that further confused and frustrated consumers, making it nearly impossible for them to cancel their deceptively sold plans.  Girouard was involved in each stage, whether by turning a blind eye to practices she was authorized to control or through her own active malfeasance.

After the Court granted it leave to do so, the FTC filed its Amended Complaint naming Girouard as a Defendant on November 1, 2019.  (D.E. 231.)  To avoid the need to file this motion, the FTC invited Girouard to stipulate to a preliminary injunction containing conduct prohibitions identical to those entered by the Court against the original Defendants.  After

---

[5] D.E. 139 at 5.

initially expressing an interest in stipulating, Girouard eventually refused to do so, even though the FTC was not seeking to freeze her assets.  Accordingly, because of the strong evidence of Girouard's participation in and control over the unlawful conduct, and her ongoing work in the marketing and sale of healthcare products, the FTC now seeks entry of a Preliminary Injunction against her.

**III.    GIROUARD PLAYED A KEY ROLE IN DEFENDANTS' DECEPTIVE SCHEME**

For more than six years, Girouard served as the Defendants' Chief Compliance Officer, overseeing their entire compliance program.  Despite her role and responsibilities, she did not ensure that marketing materials, scripts, or lead-generation websites complied with the law, implement changes to business practices in response to patterns of consumer or regulatory complaints, or otherwise oversee a robust compliance program.  Instead, when asked to provide input on lead-generation websites, she signed off despite the deceptive use of well-known insurance carrier's names and logos.  Far from correcting misrepresentations in Defendants' sales scripts and verification rebuttals, Girouard herself infused them with misleading and confusing statements.  When responding to consumer complaints, rather than review sales call recordings for compliance concerns, she lied to regulators and the Better Business Bureau about the sales process and the existence of sales recordings.  She oversaw a customer service department whose primary objective was to keep deceived consumers from canceling their plans.  In other words, Girouard's efforts at "compliance" amounted to developing, countenancing, and then covering up deceptive practices so that Defendants could generate new sales and keep

previously deceived consumers from canceling their plans. She earned a six-figure annual salary for her participation in Defendants' scam.[6]

Girouard's own description of her responsibilities at the companies confirms her participation in and control over the unlawful conduct. In 2017, for example, while seeking a raise from Dorfman based on her significant responsibilities in Defendants' operation, Girouard touted her accomplishments as an "original founder" and the "face of" Dorfman's companies.[7] Girouard indicated that:

- she developed the customer service, licensing, and compliance departments "from the ground up;"
- she developed and maintained "relationships with agents, TPA companies, carriers, attorneys, state regulators as well as federal regulators;"
- the Defendants benefited from her "extensive knowledge of insurance laws, TCPA, FTC and FCC laws;" and
- she was "front facing in regards to all legal and regulatory matters."[8]

Girouard also purported to have established a "full commitment to compliance" at the companies, and she promised to "maintain day to day compliance with corporate policies as well as regulatory standards."[9] Likewise, when deposed in June 2018 in an investigation by the Massachusetts Attorney General's Office, Girouard described her responsibilities as "to respond to consumer complaints, . . . to respond to any inquiries for any regulatory and/or -- that would

---

[6] Menjivar Dec. Att. A at 8 (2015 document showing Girouard was given a raise to $2000 per week).

[7] *Id.* at 9 (July 2017 email chain between Dorfman and Girouard).

[8] *Id.*

[9] She also suggested tying her earnings to "successful work in legal matters," giving her a personal stake in the outcome of matters in which regulators or private plaintiffs accused Defendants of engaging in fraud. *Id.* Indeed, as the FTC showed in the evidence submitted in support of the May 2019 Preliminary Injunction, Girouard frequently lied to regulators, even under oath, to perpetuate Defendants' scheme. *Id.*

include federal and state" and to generally exercise "[o]versight to ensure compliance within" Defendants' operation.[10]

### A. Girouard Participated In Defendants' Brazenly Deceptive Lead Generation Practices

As the Court found in the May 2019 Preliminary Injunction, Defendants controlled or utilized dozens of lead generation websites that led consumers to believe that Defendants: "(1) specialized in providing affordable, comprehensive health insurance from several different carriers; (2) were affiliated with the Blue Cross Blue Shield Association; and (3) were experts on, and, providers of, government-sponsored health insurance, including ACA-qualified and Medicare plans."[11]  Girouard played a key role in this illegal conduct.

First, based on the documents obtained from Defendants' business premises, Girouard's purported "compliance program" seems to have had no policy or procedure for reviewing lead generation websites for compliance.  Under her watch, Defendants relied on blatantly misleading lead generation websites, which listed major insurance carriers as partners, even though Defendants did not sell their products.  In one instance, for example, a site falsely claimed that Defendants had "assisted hundreds of thousands of consumers with their enrollment in major medical insurance, short term insurance, and Obamacare."[12]  Similarly, Girouard made no discernable effort to correct the Defendants' misleading internet search keywords that drove

---

[10] Menivar Dec. Att. B at 4.

[11] D.E. 139 at 5-6.

[12] D.E. 12-2 at 60.

consumers to the lead generation websites, including "Obamacare," "AARP," and "Blue Cross Blue Shield."[13]

When specific problematic lead generation sites were brought to Girouard's attention due to complaints from consumers or state regulators, she did not correct the false claims on them. For example, Girouard knew of concerns about the facially deceptive Trumpcarequotes.com, which featured the logo for Anthem health insurance (a member of the Blue Cross Blue Shield Association ("BCBSA") and whose products Defendants never sold) and promised "plans from the nation's leading carriers," but she failed to take effective, corrective action.[14] Although Girouard recommended Defendants temporarily take the site down to avoid regulatory scrutiny, she held out hope for reactivating the site when regulatory attention on it decreased.[15] Indeed, the site was live—with false claims intact—at the time the FTC filed its original complaint in October 2018, a full year after these internal discussions.

Similarly, just a month before the FTC filed its original Complaint in this case, one of Defendants' marketing employees sought Girouard's guidance on the placement of a disclosure on several of their lead generation websites, including Trumpcarequotes.com.[16] The disclosure disclaimed a relationship between the sites and the government healthcare marketplace. While

---

[13] *See* 116-7 at 81 (describing Defendants' use of misleading adwords); D.E. 139 at 5 (same). Interestingly, Girouard did communicate to the sales staff that saying Blue Cross Blue Shield during a sales call was forbidden. Menjivar Dec. Att. A at 12. She nonetheless assented to its unauthorized use to lure consumers to Defendants' lead generation sites simply because she renewed a license she had with Blue Cross Blue Shield, even though Defendants did not sell their products. *Id.* at 14.

[14] D.E. 12-1 at 186-205 (Trumpcarequotes.com website); D.E. 116-6 at 41, Girouard was warned that "regardless of disclaimers, it would be viewed as a misleading headline/opener."

[15] Menjivar Dec. Att. A at 11.

[16] *Id.* at 18-20.

she paid lip service to the notion that a disclosure must be "prominent" on the websites, Girouard ultimately agreed to an inconspicuous placement farther down the site.

### B. Girouard Drafted, Revised, and Approved Defendants' Facially Deceptive Sales Scripts

Girouard drafted[17] Defendants' scripts that, as the Court found in its May 2019 Preliminary Injunction, "were designed to give consumers the impression that the coverage provided by [Defendants' products] was equal to, if not better than, major medical insurance." (D.E. 139 at 6-7.) Her "compliance" concerns were limited to reducing complaints to avoid scrutiny, rather than striving to selling products honestly and in compliance with the law.

The script Girouard drafted for Defendants to use in describing a limited indemnity product provided by Humana exemplifies her approach. In discussions with Dorfman, Girouard complained that Humana would not allow the script to contain Defendants' typical deceptive promise of "network repricing" of healthcare services because that was not a confirmed benefit of the plan. Rather than agree that the absence of this benefit should render it off-limits in a sales script, Girouard expressed her hope that ultimately the script could "at least imply it."[18] In addition, when consumers complained that Defendants' telemarketers were falsely describing the Humana product as a PPO, rather than the limited indemnity product it actually was, Girouard appeased Humana by promising to remove the phrase "PPO" from the sales script.[19] However,

---

[17] Menjivar Dec. Att. A at 22 (Girouard charged with drafting a Humana limited medical script); 26 (Girouard drafted a wellness plan sales script).
[18] D.E. 116-6 at 22 (email).

[19] D.E. 116-6 at 56 (email).

8

nearly a year later, the Humana script in use by Defendants still contained the promise of a PPO.[20]

Girouard's scripts were written to maximize Defendants' sales without attracting attention from outside compliance departments or regulators.  In one case, Girouard included discussion of a travel benefit for purposes of justifying the use of the word "nationwide" to describe the purported benefits of a wellness discount plan.[21]  In another, Girouard spent hours trying to maintain Defendants' "flare [sic]" in a script while doing just enough to meet a third party's compliance requirements.[22]

### C. Girouard Oversaw Defendants' Sham Compliance Department and Verification Procedures

What Girouard touted as a "culture of compliance" was actually a culture of covering up Defendants' wrongdoing; her compliance program was designed to ensure telemarketers adhered to the deceptive scripts she drafted while at the same time evading detection by regulators.  Her department's quality assurance reviews of sales calls focused solely on faithfulness to the script.[23]  However, the scripts themselves were replete with misrepresentations, falsely promising, among other things, comprehensive coverage by a PPO plan.  When confronted with hundreds of complaints from consumers who were misled by Defendants' scripted telemarketing pitch, Girouard did nothing to adjust the scripts to address this concern.  Instead, she covered up the deception to perpetuate the Defendants' scheme.

---

[20] D.E. 116-7 at 25 (Human Protector 360 script).

[21] Menjivar Dec. Att. A at 24.

[22] Id. at 27.

[23] D.E. 116-6 at 2-12 (Defendants' Quality Assurance Manual).

As just one example of her efforts to thwart state regulators, Girouard's direct reports prepared form letters in response to the hundreds of department of insurance complaints received from dozens of states. These responses, which often went out under Girouard's signature, and always with her approval, described the Defendants' sales pitch as a "needs and cost" analysis to determine which products were most appropriate for the consumers.[24] In truth, the pitch was the "bait and switch" found by the Court, and consumers were right to complain. Defendants' telemarketers did not engage in any analysis or assessment of needs beyond confirming the state the consumer lived in and how much she was willing to spend per month. Rather than meaningfully respond to the deluge of complaints and adjust the sales pitch to match the products sold, Girouard and her compliance team simply continued to lie.

Girouard also approved deceptive "verification rebuttals" for Defendants' telemarketers to utilize if a consumer asked questions during the verification process. These scripted rebuttals were necessary for a range of frequently voiced concerns, including ACA compliance and whether the products were actually health insurance. As the Court noted in the May 2019 Preliminary Injunction, verification was the first time consumers were told that they were enrolling in a limited benefit plan, rather than comprehensive health insurance.[25] Most carriers required that Defendants record this portion of the call, so the verification scripts themselves were "clean." Defendants developed rebuttals to use when consumers expressed concern about the truthful information provided during verification, because it so starkly differed from what Defendants had told them in the sales pitch. Girouard drafted and approved the verification

---

[24] *See, e.g.*, D.E. 116-7 at 489-90, 493-94, 496-97, 500-501, 504-505, 507-508, and 510-11.

[25] D.E. 139 at 8.

rebuttals, including those used only "off recording."[26] As the Court noted, one "on recording" rebuttal described the product as "not health insurance," while the corresponding "off recording" rebuttal stated, "This is health insurance."[27] Girouard was responsible for this blatantly deceptive "verification" practice.

### D. Girouard Concealed Hundreds of Thousands of Recorded Sales Calls from State Regulators

As described above, Defendants routinely received complaints and inquiries from state insurance regulators, who frequently requested audio recordings of sales calls, which of course were replete with Defendants' false claims about their products. Without exception, Defendants claimed that such recordings did not exist. In a September 1, 2017, email to Dorfman, for example, Girouard described telling Florida insurance investigators, who had conducted an unannounced visit, that Defendants "do not record sales calls."[28] Defendants responded similarly to written requests for recorded sales calls from regulators, flatly denying that they existed.[29] The most blatant example of this obstruction took place during a June 2018 deposition conducted in connection with an investigation by the Massachusetts Office of the Attorney General. Asked under oath whether Defendants recorded sales calls, Girouard replied: "To the best of my knowledge, no, sir."[30] In another instance, when responding to a request from the Missouri

---

[26] D.E. 116-6 at 75-78.

[27] *Id*. at 76.

[28] D.E. 116-6 at 55.

[29] D.E. 116-2 at `6, 87-88; 116-8 at 150.

[30] D.E. 116-7 at 106. This answer was a blatant lie. Defendants maintained servers that stored hundreds of thousands – if not millions – of recorded sales calls. Girouard unquestionably knew the sales calls were recorded. *See, e.g.*, Menjivar Dec. Att. A at 32 (Girouard discussing the false representation made to a third party that sales recordings did not exist); Id. at 31 (email copying

Department of Insurance, Girouard knew that her staff had already reviewed a recorded sales call in which a consumer had asked whether the plan was "Obama Care" and that the telemarketer had falsely replied "Yes." Girouard nevertheless instructed her assistant to tell state regulators there was no recording.[31] In reality, Defendants maintained dozens of servers containing hundreds of thousands, possibly millions, of recorded sales calls.[32]

She also participated in the bizarre and ultimately unsuccessful scheme to improve Defendants' BBB rating that involved Dorfman purchasing 20 "burner" phones. Girouard then created fake customer profiles, and she and select staff submitted two phony positive BBB reviews per week.[33] Again, Girouard's claimed "culture of compliance" was in reality a culture of cover-ups.

### E. Girouard Has Continued to Work in the Healthcare Industry Since This Case Was Filed

After engaging in deceptive practices concerning healthcare products for years, and despite notice of the Preliminary Injunction entered in this case, Girouard continues to work in the healthcare industry. Based on her sworn financial statement, Girouard currently is employed at a company called Stride Force Solutions as an independent contractor, a consultant, and

---

Girouard describing recorded sales call that was reviewed after the consumer complained that he had been told the product sold by Defendants was ACA compliant).

[31] D.E. 116-6 at 58-59. Girouard's exact instructions to her assistant, Melissa Melendez, were: "Ok, so change the answer to NO. Simple."

[32] D.E. 116-7 at 569 and 571-75 (Declarations of FTC forensic examiners).

[33] D.E. 116-7 at 9 ("Get 20 burners [sic] phones for BBB"), 34-36 (Dorfman asks, "Are we still submitting 2 positive reviews each week?" Girouard replies "Yes we are. …I do the posting."). Emails and other documents show that Girouard managed the creation of the false identities and tracking of interactions with the BBB related to the fake positive reviews. Menjivar Dec. Att. A at 28-30.

salesperson, and earning a substantial income.[34] Stride Force Solutions is co-owned by Girouard's wife, and the company holds itself out as a seller of healthcare products, including limited medical and major medical plans.[35] Similar to Defendants' websites, the Stride Force Solutions website includes the logo for Anthem and the Blue Cross Blue Shield Association, as well as the logos of other major healthcare providers.[36] Its promotional flyer also touts a relationship with "Florida Blue," similar to the misuse of other Blue Cross Blue Shield Association names and logos by Defendants.[37] Similarly, the Facebook page for Stride Force Solutions uses the open enrollment period for the Affordable Care Act as a marketing hook, and highlights fixed indemnity plans as a product it sells.[38] The company also actively recruited salespeople, citing the "open enrollment period" as a good time to "get onboard" with the company, just as Defendants did despite not selling any ACA-compliant plans.[39] The FTC has requested from counsel for Girouard information about the products and plans Stride Force Solutions sells, whether they are ACA-compliant, and whether anyone at the company is appointed to sell Anthem and BCBS products, but nothing has been provided. A Preliminary

---

[34] Menjivar Dec. Att. C at 3.

[35] Menjivar Dec. Att. E.

[36] Menjivar Dec. Att. E at 5.

[37] Menjivar Dec. Att. D.

[38] Menjivar Dec. Att. G.

[39] Menjivar Dec. Att. H.

Injunction would give the FTC the ability to conduct discovery into this very topic to ensure Girouard's ongoing compliance.[40]

## IV. A PRELIMINARY INJUNCTION AGAINST GIROUARD IS WARRANTED

As both this Court and the Eleventh Circuit already have held in this case, the FTC may seek, and the Court has authority to enter, a preliminary injunction. *FTC v. Simple Health Plans LLC*, 2020 WL 570811 (Feb. 5, 2020 11th Cir.); *see also FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996) ("[A] district court may order preliminary relief, including an asset freeze, that may be needed to make permanent relief possible."). To grant preliminary injunctive relief in an FTC Act case, district courts consider: (1) the likelihood that the Commission will ultimately succeed on the merits, and (2) the balance of the equities. *See FTC v. IAB Mktg. Assoc., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014); *see also FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217 (11th Cir. 1991). The FTC, unlike private plaintiffs, need not establish irreparable harm. *See IAB Mktg*, 746 F.3d at 1232. As demonstrated below, the FTC's evidence satisfies the two-part test and warrants a preliminary injunction against Girouard.[41]

### A. The FTC is Likely to Succeed on the Merits of Its Claims against Girouard

To show that it is likely to succeed on the merits, the FTC need only present evidence that it "likely will prevail," rather than evidence that would justify a "final determination." *Univ. Health*, 938 F.2d at 1218. The FTC satisfies the standard by establishing "some chance of

---

[40] Girouard also notes in her sworn financial statement that prior to her employment at Stride Force Solutions, she worked in "compliance" with Adroit Health Group, Inc., another insurance marketing company offering "affordable health and wellness" products. Menjivar Dec. Atts. C and F.

[41] Unlike the May 2019 Preliminary Injunction, the order the FTC seeks against Girouard does not include an asset freeze, since she has been aware of this action for over a year and the sworn financial disclosure she provided to the FTC includes little in the way of assets. The FTC would seek equitable monetary relief in any final judgment against Girouard.

14

probable success on the merits." *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989); *FTC v. Wash. Data Res.*, 2009 WL 4885033 at *11 (M.D. Fla. Dec. 14, 2009), *aff'd in part, vac'd in part on other grounds by FTC v. Bishop*, 425 F. App'x 796 (11th Cir. 2011).[42]

Here, the Court has already found that the FTC is likely to prevail in its claims that the seven original Defendants violated the FTC Act and the Telemarketing Sales Rule through their deceptive sale of association memberships that included limited benefit plans and medical discount memberships. The evidence also shows that Girouard is individually liable because she controlled and participated in the unlawful conduct. Accordingly, the FTC is likely to succeed on the merits of its claims against her.

### B. Girouard Controlled and Participated in the Fraud and is Individually Liable

An individual may be held liable for injunctive relief under the FTC Act if the individual participated directly in or had authority to control the practices, and may be held liable for monetary relief if the individual had actual or constructive knowledge of the unlawful acts.[43] *See IAB Mktg.*, 746 F.3d at 1233; *Gem Merch. Corp.*, 87 F.3d at 470; *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 636 (7th Cir. 2005); *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005). Authority to control may be evidenced by active involvement in the corporation's business affairs, including assuming the duties of an officer, particularly when the corporate

---

[42] The evidence used to support such a showing can include "affidavits and hearsay materials." *Levi Strauss & Co. v. Sunrise Int'l Trading*, 51 F.3d 982, 985 (11th Cir. 1995); *see also FTC v. Primary Grp, Inc.*, 2015 WL 12976115, at *4 (N.D. Ga. June 8, 2015).

[43] The FTC does not need to show intent to defraud. *See IAB Mktg.*, 746 F.3d at 1233; *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1234 (9th Cir. 1999). Although the evidence leaves no room to doubt that Girouard had actual knowledge of the material misrepresentations, the FTC need not prove that she knew or should have known of them, because it is not seeking to freeze Girouard's assets. *See USA Fin., LLC*, 415 Fed. Appx. at 974; *see also FTC v. FTN Promo., Inc.*, No. 8:07-CV-1279, 2008 WL 821937, *2 (M.D. Fla. March 26, 2008); *FTC v. Jordan Ashley*, No. 93-2257, 1994 WL 200775, *3 (S.D. Fla. Apr. 5, 1994). Participation in corporate affairs is probative of knowledge. *See IAB Mktg.*, 746 F.3d at 1233.

defendant is a small, closely held entity. *See IAB Mktg.*, 746 F.3d at 1233; *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573-74 (7th Cir. 1989)).

Girouard was a C-Suite executive with oversight responsibilities for compliance across the Defendants' operations. Her position and responsibilities unquestionably meet the standard for individual liability. Under her tenure, Defendants deceived thousands of consumers into purchasing "virtually worthless" products with promises of comprehensive, PPO health insurance. When consumers realized they had been lied to, Girouard oversaw the department that further confused and misled both consumers and state regulators, allowing this misconduct to go on for years.[44] She drafted sales scripts and verification rebuttals, each of which was deceptive. She received and responded to hundreds of consumer complaints about Defendants' deceptive practices. But rather than honor her supposed commitment to a "culture of compliance," she lied with impunity to keep those deceptive practices hidden from regulators.

### C. The Public Interest Requires the Entry of a Preliminary Injunction to Prevent Ongoing Consumer Harm

Once the FTC has shown a likelihood of success on the merits, the Court must balance the equities, giving greater weight to the public interest than to any of Girouard's private concerns. *See World Wide Factors, Ltd.*, 882 F.2d at 347; *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988). The equities clearly favor entry of a preliminary injunction against Girouard. There is a strong public interest in ensuring that Girouard does not engage in deceptive sales practices while this case is pending, given her

---

[44] Girouard worked with a third party administrator to arrange for calls from consumers complaining about misrepresentations made by Defendants to be transferred to Defendants, rather than handled by the third party administrator. Called the "warm transfer program," this made it possible for Defendants to continue to mislead consumers and avoid cancellations, which would result in lost revenue to Defendants. Menjivar Dec. Att. A at 33-34.

ongoing work with companies selling similar products. She has no legitimate interest in continuing to defraud consumers about healthcare products.

A preliminary injunction against Girouard is critical because she continues to actively work *in the same industry*, selling *the same types of products* at issue in this case. Consumers are, and will continue to be, at serious risk of harm if Girouard is not under an order while this litigation proceeds that prohibits her from engaging in the same deceptive sales practices she engaged in for years. Indeed, given her central role in both perpetrating the Defendants' fraud, and in actively hiding the misconduct from regulators for years, it would be difficult to conjure up a situation more appropriate for a preliminary injunction.

## V.     CONCLUSION

For the above reasons, the FTC respectfully requests that this Court issue the proposed Preliminary Injunction against Candida Girouard.[45]

Dated:  March 4, 2020	Respectfully submitted,

ALDEN F. ABBOTT
General Counsel
*/s/Elizabeth C. Scott*
ELIZABETH C. SCOTT, Special Bar No. A5501502
escott@ftc.gov; (312) 960-5609
JOANNIE WEI, Special Bar No. A5502492
jwei@ftc.gov; (312) 960- 5607
MATTHEW SCHILTZ, Special Bar No. A5502617
mschiltz@ftc.gov; (312) 960-5619

Federal Trade Commission
230 S. Dearborn Street, Suite 3030
Chicago, Illinois  60604
Telephone:  (312) 960-5634
Facsimile: (312) 960-5600

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

---

[45] A proposed preliminary injunction order is attached as Exhibit 2 and has been submitted pursuant to the Court's procedures.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on this March 4, 2020, by the Notice of Electronic Filing, and was electronically filed with the Court via the CM/ECF system, which generates a notice of filing to all counsel of record.

*/s/Elizabeth C. Scott*
ELIZABETH C. SCOTT, Special Bar No. A5501502