UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CV-62593-GAYLES

FEDERAL TRADE COMMISSION,

    Plaintiff,

vs.

SIMPLE HEALTH PLANS LLC, et al,

    Defendants.

_____/

## RECEIVER'S SECOND INTERIM REPORT

Michael I. Goldberg, the Court-appointed receiver (the "Receiver") over Defendants Simple Health Plans LLC ("Simple Health"), Health Benefits One LLC ("HBO"), Health Center Management LLC, Innovative Customer Care LLC, Simple Insurance Lead LLC ("SIL"), Senior Benefits One LLC, and each of their subsidiaries, affiliates, and successors (collectively, the "Receivership Entities"), respectfully submits this Second Interim Report and states as follows: October 29, 2018, the Federal Trade Commission (the "FTC") commenced this action in the United States District Court for the Southern District of Florida against the Receivership Entities and Steven Dorfman ("Dorfman") (Dorfman and the Receivership Entities are collectively referred to as the "Defendants") [ECF No. 1].

**I.     Introduction and Procedural Background**

Plaintiff Federal Trade Commission ("FTC") filed the above-captioned action, under seal, on October 29, 2018 against the Receivership Entities and Steven Dorfman ("Dorfman" and with the Receivership Entities, the "Defendants"), under Section 13(b) of the Federal Trade

Commission Act (the "FTC Act"), 15 U.S.C. § 53(b) and the Telemarketing and Consumer Fraud and Abuse Act, 15 U.S.C. §§ 6101-6108, alleging the Defendants violated Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) and the FTC's Telemarketing Sales Rule, 16 C.FR Part 310, as amended.

### A. The Temporary Restraining Order

On October 31, 2018, the Court entered an Order [ECF No. 15] Granting the FTC's Motion for Temporary Restraining Order with Asset Freeze, Appointment of A Temporary Receiver, and Other Equitable Relief, and Order to Show Cause Why A Preliminary Injunction Should Not Issue (the "TRO"). The TRO reflected the Court's finding that good cause existed to appoint a temporary receiver over the Receivership Entities, for purposes of, among other things, to take exclusive custody, control and possession of all assets of, or in the possession, custody or under the control of any Receivership Entity, wherever situated and to conserve, hold, manage and prevent the loss of all assets of the Receivership Entities and perform all acts necessary or advisable to preserve the value of those assets pending future Court orders. *See* TRO, Section XII. On November 1, 2018, the Receiver took possessions of the assets of the Receivership Entities and shut down the business operations.

The TRO scheduled a hearing to take place on November 14, 2018 at which time Defendants shall appear before the Court to show cause, if there is any, why the Court should not enter a preliminary injunction, pending final ruling on the Complaint against Defendants. Upon the request of the FTC and the Defendants, the Court continued that hearing on multiple occasions. In the interim, the Court extended the asset freeze and other restrictions set forth in the TRO. On March 4, 2019, Dorfman filed a Notice of Appeal of the TRO [ECF No. 85]. Dorman also filed an Emergency Motion (I) Seeking Confirmation that The Scheduling Order is Abated Pending

Resolution of the Appeal; (II) To Stay The Proceeding Pending Resolution of The Appeal; or (III) To Expedite Status Conference, dated March 13, 2019 [ECF No. 94]. The Court entered an Order denying the Emergency Motion [ECF No. 100]. On April 16, 2019, the Eleventh Circuit Court of Appeals entered an Order [ECF No. 129] dismissing the appeal for lack of jurisdiction.

### B. The Preliminary Injunction

On April 16, 2019, the Court held an evidentiary show cause hearing on the FTC's request for preliminary injunctive relief. After hearing testimony and reviewing documentary evidence, the Court made findings, including the following:

> "The record clearly reflects a continued need for the Receiver in this action to preserve assets and maintain the status quo. The "Receiver is also necessary to determine the full extent of Defendants' deceptive practices, identify the victims of Defendants' scheme, and prevent further fraudulent practices during the pendency of the preliminary injunction … The record supports a preliminary finding that Defendants devised a fraudulent scheme to use consumer funds to enrich themselves. Accordingly, the Court finds that a preliminary injunction is necessary to maintain the status quo pending a trial on the merits."

*See* Preliminary Injunction (the "PI") [ECF No. 139] at page 24. Accordingly, on May 14, 2019, the Court entered the PI. Dorfman immediately filed a Notice of Appeal [ECF No. 140] of the PI, followed by an Expedited Motion to Stay Proceeding Pending Final Resolution of Appeal, dated May 23, 2019 [ECF No. 145]. The Court entered an Order, dated May 31, 2019 [ECF No. 152], denying the Expedited Motion to Stay Proceeding Pending Final Resolution of Appeal. The Court ruled that it was not divested of its jurisdiction over this matter as "an interlocutory appeal does not completely divest the district court of jurisdiction." *Green Leaf Nursery v. E.I. DuPont De Nemours and Co.*, 341 F.3d 1292, 1309 (11th Cir. 2003) ("The district court has authority to proceed forward with portions of the case not related to the claims on appeal...." (quoting *May v. Sheahan*, 226 F.3d 876, 880 n.2 (7th Cir. 2000))). In addition, the Court considered the four factors to determine whether to issue a stay pending appeal: "(1) whether the stay applicant has made a

strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The Court found that, based on these factors, Mr. Dorfman failed to establish that a stay was warranted.

Dorfman also filed a Motion to Dissolve the Preliminary Injunction, dated June 4, 2019 [ECF No. 157]. On July 10, 2019, the Court entered an Order [ECF No. 183] denying Dorfman's motion. The Court disagreed with Dorfman's argument that the Court must dissolve the PI because the FTC did not initiate an administrative proceeding within twenty days after issuance of the Temporary Restraining Order. The Court referenced long established Eleventh Circuit precedent, that the FTC may obtain preliminary injunctive relief while pursuing a permanent injunction in a federal district court action brought pursuant to Section 13(b) of the FTC Act. *See FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984) (rejecting defendant's argument that the preliminary injunction had to be dissolved because the FTC did not bring an administrative action within twenty days of the issuance of the temporary restraining order). Again, Dorfman filed a Notice of Appeal [ECF No. 200] of the Court's decision. On March 25, 2020 the Eleventh Circuit Court of Appeals issued a Mandate [ECF No. 277] affirming entry of the Preliminary Injunction. *See also* USCA Case Number: 19-11932-DD.

    **C.**     **Expanding the PI to Include Candida L. Girouard**

On September 30, 2019, the FTC filed a Motion for Leave to File Amended Complaint [ECF No. 213]. According to the FTC, since filing its Complaint, the FTC identified an additional individual, Candida L. Girouard ("Girouard"), who had the authority to control Defendants' common enterprise, participated directly in the illegal conduct at issue in this case, and had actual

or constructive knowledge of the unlawful acts. Girouard served as the Chief Compliance Officer for the Corporate Defendants and a trusted advisor to Dorfman. New evidence gathered since the filing of this case shows that Girouard played an integral role in Defendants' telemarketing scam. *See Id*. Among other things, she drafted the facially misleading sales and customer service scripts used to deceive consumers; supervised a sham compliance team that monitored sales calls for adherence to these scripts; and served as Defendants' main point of contact in deflecting complaints, investigations, and other inquiries from carriers and regulators. *Id*.

In addition to naming Girouard, the FTC sought to add as a basis for monetary relief Section 19 of the FTC Act, 15 U.S.C. § 57b, which authorizes the Court to grant, among other things, monetary relief to redress injury to consumers resulting from violations of trade regulation rules promulgated by the FTC—in this case, the Telemarking Sales Rule, 16 C.F.R. Part 310, as amended. The FTC's Complaint originally sought monetary relief pursuant to Section 13(b) of the FTC Act, 15 U.S.C. §53(b). Dorfman, however, repeatedly attempted to argue to the Court (with no success) that the FTC cannot obtain monetary relief under Section 13(b). According to the FTC, in making his arguments about Section 13(b), Dorfman has conceded that the FTC can obtain monetary relief pursuant to Section 19 of the FTC Act. (*See, e.g*., ECF No. 79 at 7, 15-16; ECF No. 134 at 8-9; and ECF No. 157 at 2). On October 31, 2019, the Court entered an Order granting Plaintiff's Motion for Leave to Amend Complaint [ECF No. 227]. On March 4, 2020, the FTC filed a Motion for Preliminary Injunction As to Defendant Candida Girouard  [ECF No. 275], which was approved by Order of the Court dated April 2, 2020.  *See* ECF No. 280.

**II.**    T**he Receivership Entities' Business Operations**

As more fully described in the Receiver's Initial Report and the Preliminary Injunction ("PI") , the Corporate Defendants, operating under the umbrella name of Simple Health, were a

network of companies structured to influence consumers at every step of the sales process for the purchase of health insurance to cover medical expenses. PI at p. 5. Through the evidence presented at the PI hearing, the FTC and the Receiver provided the Court with a well-documented account of a classic bait and switch scheme—aided by rigged internet searches, deceptive sales scripts, and predatory practice. PI at page 1. Though consumers believed they were purchasing comprehensive health insurance coverage, Defendants sold them practically worthless limited indemnity or discount plans. *Id*. While Defendants, under the control of Dorfman, profited from their scheme, consumers were left with inadequate health coverage and devastating medical bills. *Id.* To effectuate their bait and switch scheme, Defendants led consumers to believe they were receiving comprehensive health insurance when, in fact, they received limited indemnity plans or discount memberships. *Id*. at page 3. Defendant Simple Health has no independent operations and was only formed to protect the name under which the other entities worked. *Id*. at page 4. SIL operated to generate leads—potential customers—who are looking for health insurance. *Id*. HBO was a seller of, among other things, limited medical indemnity policies. *Id*. SBO sold Medicare products to consumers. *Id.* ICC was the customer service arm of the enterprise. *Id*. HCM held 100% of the interest in Simple Health, SIL, HBO, SBO, and ICC. *Id*. Until the Receiver was appointed, Dorfman was the CEO of each of the Corporate Defendants. *Id*. at page 5. In addition, Dorfman owned 99% of the membership interests in HCM. *Id*.

Defendants' bait and switch scheme typically began when a consumer seeking health insurance coverage turned to the internet to research their options. *Id*. SIL, Defendants' lead generator, paid Google to ensure that when specific "AdWords" were used in an online search, consumers would be directed to SIL's lead generation websites. *Id.* As a result, when consumers seeking comprehensive health coverage searched Google using words such as "Obama Care" or

"Obama Care Insurance," they were directed to a long list of SIL-controlled websites. *Id*. In other instances, Defendants' affiliate marketers would disseminate links to Defendants' websites to consumers via email or text messages. *Id*. Defendants controlled approximately 129 lead generating websites. *Id*. These websites were laden with false and misleading information designed to trick consumers into believing Defendants were selling ACA-qualified and/or comprehensive health insurance. *Id*.

After receiving a lead, an HBO salesperson would contact the potential customer. *Id*. at page 6. Defendants directed their salespeople to follow scripts—created in part and approved by Dorfman—at all times during the customer calls. *Id*. Like the websites, Defendants designed the scripts "to give consumers the impression that the coverage provided by Simple Health's limited benefit plan was equal to, if not better than, major medical insurance." *Id* at pages 6-7. Customers who contacted Defendants with complaints or concerns about coverage were often subjected to additional misrepresentations and delay tactics. *Id*. at page 7. Defendants trained their customer service representative to make every attempt to "save" the customer. *Id* at page 8.

Defendants' income was primarily derived from commissions for enrolling customers in Health Insurance Innovations' ("HII") limited benefit insurance plans. *Id*. at page 11. From 2014 through approximately October 2018, HII paid approximately $180 million in commissions to HBO which HBO then distributed to the other receivership entities. *Id*. At the time the Receiver filed his First Interim Report, approximately $3,186,655 had been frozen from the Corporate Defendants' accounts pursuant to the TRO. *Id.* Now, the Receiver holds approximately $20 million in his receivership bank account.

II. **Steps Taken by the Receiver to Implement the TRO and PI**

    A. **Leasehold interests**

The Defendants operated their businesses at three locations: their main office in Hollywood, Florida (the "Hollywood Office"); a call center located in Doral, Florida ("Doral"); and a call center located in Dallas, Texas. The Defendants also used a warehouse in Pompano Beach, Florida. As of the Receiver's appointment, he shut down the operations of the Defendants, including the Doral call center. The Receiver discovered that the Receivership Entities were tenants under two sub-leases in Dallas, Texas, but were not using either office. Since the Receivership Entities had no use for these leaseholds, on May 22, 2019, the Receiver filed a Motion for Authority to Cancel Certain Non-Residential Real Property Leases [ECF No. 143]. The motion included the Dallas sub-leases, Doral and the Pompano Beach Warehouse. Over Dorfman's objection (stating the requested relief was premature) [ECF No. 158], the Court entered an Order authorizing the Receiver to cancel these leases. *See* ECF No. 161. Soon thereafter, the Receiver abandoned any interest in the personal property remaining on those premises. *See* ECF No. 169.

The Receiver excluded the Hollywood Office from the motion because the Receiver intended on holding an auction of the personal property located at the Hollywood Office. The Receiver had commissioned an appraisal of the personal property and it is estimated that the current market value of the property was approximately $134,650. Although the Receiver expected the liquidated value of the personal property to be significantly less, the Receiver believed there was sufficient value in the personal property to warrant a sale of the personal property for the benefit of the creditors of the Receivership. On July 3, 2019, the Receiver filed a Motion for Authority (I) to Cancel Non-Residential Real Property Lease at Oakwood Business Center in Hollywood, Florida Effective August 1, 2019 or Upon Completion of Auction of Personal Property, Whichever is Later and (II) to Auction Personal Property and Abandon

Remaining Items [ECF No. 178]. The Court entered an Order approving the Receiver's motion. *See* ECF No. 195. The auction took place on September 16, 2019 and recovered the sum of $86,431.23 for the benefit of the receivership estate. Thereafter, the Hollywood office was turned over to the landlord.

### B. The Defendants' Bank Accounts

Immediately upon his appointment, the Receiver and his professionals, in coordination with the FTC, took steps to secure all knowns bank and brokerage accounts of Defendants pursuant to the TRO. At the time the Receiver filed his First Interim Report, approximately $3,186,655 had been frozen from Defendants' accounts. *See* Exhibit "B" attached to the Receiver's First Interim Report [ECF No.: 122] for a list of the frozen accounts.

On or about November 26, 2018, the Receiver received a letter advising that Health Benefits One owned two (2) brokerage accounts and one (1) premier credit line at UBS. As of June 30, 2019, one brokerage had a total account value of $2,387,277.63 and the other brokerage account had a total account value of $2,682,873.53. The premier credit line had a loan balance of $2,959,864.57. One of the brokerage accounts had been pledged as security against the premier credit line. Given that the outstanding loan balance exceeds the value of the account, the Receiver sought authority from the Court to liquidate the brokerage accounts to must include additional monies to satisfy the outstanding obligation. On July 5, 2019 the Receiver filed a Motion For Authorization to Liquidate UBS Brokerage Accounts [ECF No. 179]. On August 5, 2019, the Court entered an Order authorizing the Receiver to liquidate the brokerage accounts and in conjunction with the liquidation, to repay the balance owing on the premier credit line. *See* ECF No. 196. The Receiver liquidated the brokerage accounts and paid off the loan.

To date, the Receiver holds approximately $20 million in cash and there remains nearly $2.8 million in frozen funds on behalf of the Defendants at various financial institutions.

### C. Non-Business Related Assets[1]

#### i. *Automobiles*

Upon his appointment, the Receiver, with Dorfman's cooperation, took control of three automobiles all titled in the name of the Receivership Entities - - (i) a 2013 Land Rover Range Rover; (ii) a 2012 Lamborghini Aventador, and (iii) a 2015 Rolls-Royce Wraith.  The Receiver secured these vehicles in an air conditioned, secure storage facility in Fort Lauderdale.  The Receiver later learned that the Lamborghini was leased, and in his business judgment, determined that the lease should be terminated to avoid unnecessarily continuing to incur large monthly lease payments.  The Receiver reached agreements with the leasing company to return the vehicle in return for the leasing company waiving any deficiency.  The Receiver filed a motion with the Court to terminate the lease of the Lamborghini [ECF No. 70].  By Order dated February 21 2019, [ECF No. 82], the Court granted the motion and the Receiver returned the Lamborghini to the leasing company.

The Receiver continues to maintain possession of the Range Rover and Rolls Royce in a special air-conditioned storage facility.  The Receiver intends to seek permission from the Court to sell these two vehicles shortly.

#### ii. *Jewelry*

Upon his appointment, the Receiver worked with Dorfman and his counsel to obtain the turnover of the jewelry listed in the TRO.  Dorfman was cooperative, and through his counsel, delivered 13 pieces of jewelry to the Receiver, including all of the items listed in the TRO.

---

[1] These are assets not used in the operation of the Receivership Entities' businesses, but paid with funds from the Receivership Entities' bank accounts.

Attached to the Receiver's First Interim Report as Exhibit "C" [ECF No. 122] is a list of the jewelry and photos. The Receiver continues to maintain the jewelry in a secured vault pending further order of the Court.

### iii. Sports Memorabilia

The Receiver discovered an extensive sports memorabilia collection in Dorfman's office at the time of his appointment. There appear to be numerous notable pieces which are itemized on pages 22 through 24 of the Receiver's Inventory of the Hollywood office attached as part of Composite Exhibit A to the Receiver's First Interim Report [ECF No. 122]. The memorabilia remains secured by the Receiver.

### iv. Real Property

To the best of the Receiver's knowledge, Dorfman does not own any real property in Florida. The only real property the Receiver is aware of that Dorfman has an interest in is an expensive, undeveloped residential lot located in Las Vegas, Nevada. Dorman paid $2,900,000 for this lot in May 2018 financing the purchase price by taking out a margin loan against securities held in the Receivership Entities' account at UBS. The Receiver satisfied this loan. The Receiver has filed the TRO in the chain of title to the Las Vegas property to prevent it from being transferred pending further order of the Court. The Receiver has obtained an appraisal of this property and commenced marketing it for sale.

## III. Miscellaneous

### A. Shutting Down the Business

#### i. Websites and Social Media Pages

Simple Health maintained a public-facing website, *www.simplehealthplans.com*, along with approximately 129 third-party lead generation websites, discussed above. Each of these

domains were operated through a single account with GoDaddy.com that was owned and controlled by Dorfman. The Receiver now controls the GoDaddy.com account, which was authorized by the TRO. The Receiver has directed the public-facing web address along with all of the third-party lead generation websites to the Receiver's website, *www.simplehealthreceivership.com*.

### ii. Securing ESI

The Receiver has secured all of Simple Health's electronic records and has also produced copies of those records to Dorfman's attorneys in response to their requests. To accomplish this task, the Receiver retained the services of two of Simple Health's former IT employees. The Receiver secured, among other things, Simple Health's accounting and payroll records, employee files, and all of the data associated with the company's primary business operations. In addition to maintaining Simple Health's internal records, the Receiver is responsible for all of the cloud-based services previously utilized by Simple Health. These services include web hosting provided by Amazon and Simple Health's use of SalesForce.com to store customer data and call recordings. SalesForce.com is particularly important because this service was utilized by Simple Health to store information related to the company's interaction with its customers pre and post-sale. The Receiver has renegotiated the terms of Simple Health's license with SalesForce.com and has retained access to all of the historical information stored in the database. The Receiver has also made efforts to retain the services of Flexential, which houses servers that are property of Simple Health and supplies IT services related to those servers.

### B. Mr. Dorfman's Personal Expenses

Against Dorfman's objection, the Court granted the Receiver's motion to terminate Dorfman's monthly living expenses.

C.     **The Receivership Entities' relationship with HII**

This case presents some interesting issues from a receivership perspective. More specifically, due to the nature of the product sold by the Receivership Entities, many consumers unwittingly purchased limited benefit plans rather than customary insurance policies. HII provides the Receivership Entities with, among other services, billing and premium collection services whereby HII collects monthly payments from consumers on sales made by the Receivership Entities to customers. In connection with these services, HII provides an accounting and splitting of customer payments between the carriers and the Receivership Entities. As part of this service, HII distributes earned commissions to the Receivership Entities. HII also furnishes the Receivership Entities access to its on-line platform with the ability to quote and sell various products from carriers. To that end, HII and HBO entered into a Managing General Agent Agreement ("MGAA") which permitted HBO to promote and sell various products. HII unilaterally terminated the MGAA on November 2, 2018. Finally, HII also provides post-sale customer service in responding to customer inquiries concerning their policies. HII has continued to provide these services post-receivership.

HII and HBO also entered into a Master Commission Advance Agreement ("MCAA") whereby HII would advance commissions to HBO prior to the commissions being earned. The agreement was designed to advance HBO money, which essentially served as a loan to be paid back from future commissions earned by HBO. To secure repayment of these advances, HBO granted HII a security interest in HBO's future commissions and accounts receivable. HBO unilaterally terminated the MCAA on November 2, 2018.

Subsequent to the commencement of the receivership, HII claimed that it was owed $2,684,850.91. HII unilaterally offset this sum from the payments it collected from the Receivership Entities' customers subsequent to the receivership and the Receivership Entities no longer owe HII this sum. To date, HII collected and forwarded $18,885,572.68 to the Receiver. The Receivership entities relationship with HII was certainly complex and millions of dollars flowed between the companies. The Receiver plans to further investigate the relationship.

## V.    Recommendations

The Receiver continues to secure and maintain the assets of the Receivership Entities, analyze the finances of the Defendants and respond to inquiries from the customers, creditors and other interested parties. The Receiver anticipates taking the following actions: *(i)* investigate and commence litigation against third parties; *(ii)* continue to review transfers of the individual partnership funds and seek to recover funds which were fraudulently transferred; *(iii)* respond to inquiries from investors, creditors, government officials and interested parties; administer estate assets and work with federal authorities investigating the pre-receivership affairs. The Receiver will continue to provide periodic updates to the Court as the case commences.

Respectfully submitted,

  /s/ Michael I. Goldberg
Michael I. Goldberg, Esq.
Florida Bar Number: 886602
Email: michael.goldberg@akerman.com
*Court-Appointed Receiver*

AKERMAN LLP
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL  33301-2999
Phone: (954) 463-2700
Fax: (954) 463-2224

**CASE NO. 18-CV-62593-GAYLES**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on this May 29, 2020 via the Court's notice of electronic filing on all CM/ECF registered users entitled to notice in this case as indicated on the attached Service List and posted on the Receiver's website www.simplehealthreceivership.com.

By: *s/* Michael I. Goldberg
Michael I. Goldberg, Esq.

## SERVICE LIST

ALDEN F. ABBOTT, General Counsel
Elizabeth C. Scott, Special Bar No.: A5501502
Joannie Wei, Special Bar No.: A5502492
Matthew Schiltz, Special Bar No.: A5502617
Federal Trade Commission
230 S. Dearborn Street, Suite 3030
Chicago, Illinois 60604
312.960.5609; *escott@ftc.gov*
312.960.5607; *jwei@ftc.gov*
312.960.5619; *mschiltz@ftc.gov*
*Counsel for Plaintiff, Federal Trade Commission*

Ryan D. O'Quinn, Esq.
Florida Bar No.: 0513857
305.423.8553; *ryan.oquinn@dlapiper.com*
Elan A. Gershoni, Esq.
Florida Bar No.: 95969
305.423.8567; *elan.gershoni@dlapiper.com*
Jordan Allyn Ziegler, Esq.
Florida Bar No.: 119982
305.423.8558; *jordan.ziegler@us.dlapiper.com*
DLA Piper LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
*Counsel for Defendant, Steven J. Dorfman*

Naim S. Surgeon, Esq.
Florida Bar No.: 101682
*naim.surgeon@akerman.com*
AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, Florida 33131
Telephone: (305) 374-5600
Facsimile:  (305) 349-4654
*Counsel for Receiver*

Joan M. Levit, Esq.
Florida Bar Number: 987530
*joan.levit@akerman.com*
AKERMAN LLP
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2999
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
*Counsel for Receiver*

Brian Hobbs Mallonee, Esq.
Florida Bar Number: 160148
*bmallonee@stluciecriminallaw.com*
*legalassistant@stluciecriminallaw.com*
130 S. Indian River Drive, Suite 302
Fort Pierce, FL 34950
Telephone: (772) 464-1991
Facsimile: (772) 464-3949
*Counsel for Candida L. Girouard*