UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

FEDERAL TRADE COMMISSION,

        Plaintiff,

   v.

SIMPLE HEALTH PLANS LLC, a Florida limited
liability company, et al.,

        Defendants.

**Case No.: 18-cv-62593-DPG**

### PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT THEREOF

## <u>TABLE OF CONTENTS</u>

I.  Background and Summary of Undisputed Facts ................................................................ 2

   A.  Procedural History ...................................................................................................... 2

   B.  Defendants' Deceptive Telemarketing Operation ..................................................... 3

      1.  Defendants' Memberships and Discount Plans ................................................... 3

      2.  Defendants' Deceptive Lead Generation ............................................................. 5

      3.  Defendants' Deceptive Telemarketing Calls ....................................................... 7

         a.  Defendants Began Calls By Instilling the "Fear of God" in Consumers .............. 8

         b.  Defendants Falsely Described Their Products to "Legitimize" Them .................. 9

      4.  Defendants Rushed Consumers Through a Bogus Verification Process That Their
          Own Script Instructed Consumers To Ignore ......................................................... 11

   C.  Many Consumers Complained About Defendants' Misrepresentations ......................... 12

      1.  Complaints to Defendants During Cancellation ....................................................... 12

      2.  Complaints and Escalations to Defendants' Plan Administrator ............................... 144

      3.  Complaints to Other Third Parties ........................................................................... 15

   D.  Government Investigations ............................................................................................ 17

   E.  The Simple Health Common Enterprise ........................................................................ 177

   F.  Dorfman's Control, Participation, and Knowledge ........................................................ 18

   G.  Consumer Harm ............................................................................................................ 211

II.  The Court Should Draw Adverse Inferences from the Corporate Defendants' Former
     Executives' Fifth Amendment Invocations ..................................................................... 22

III.  Legal Standard .................................................................................................................. 233

IV.  Count I: Defendants Deceived Consumers About Their Products, Qualifications, and
     Affiliations, in Violation of the FTC Act. ...................................................................... 24

A.   Defendants Made Widespread Misrepresentations About Their Affiliations, Expertise, and Products .......................................................................................... 25

B.   Defendants' Representations Were False and Likely to Mislead Reasonable Consumers ................................................................................................. 27

C.   Defendants' Representations Were Material to Consumers ............................... 30

V.   Count II: Defendants Conducted a Massive Nationwide Deceptive Telemarketing Scheme in Violation of the Telemarketing Sales Rule. ................................................ 31

A.   Defendants' Material Misrepresentations Violated Parts 310(a)(2)(iii)  and 310.3(a)(4) of the TSR ..................................................................................... 32

B.   Defendants' False Claims of Affiliation Violated Part 310.3(a)(2)(vii) of the TSR. ....... 32

VI.   The Undisputed Facts Show That Defendants Operated Their Deceptive Scheme as a Common Enterprise. .......................................................................................... 33

VII.   Defendant Dorfman Is Individually Liable for the Defendants' Violations of the FTC Act and the Telemarketing Sales Rule ...................................................................... 34

A.   Dorfman's Authority to Control or Direct Participation in the Unlawful Practices ........ 34

B.   Dorfman's Knowledge of the Unlawful Practices ........................................... 36

VIII.   The Court Should Enter the Proposed Order for Injunctive and Monetary Relief. ............... 377

A.   The Court Should Enter a Permanent Injunction Against Defendants. ........................ 38

B.   The FTC Seeks Reasonable and Appropriate Equitable Monetary Relief to Refund What Defendants Took From Consumers ............................................................ 39

IX.   Conclusion ...................................................................................... 40

## **TABLE OF AUTHORITIES**

**Cases**

*Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997)...........................................................24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...................................................................24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..............................................................................23

*Cole v. Am. Capital Partners Ltd., Inc.*, 2008 WL 2986444 (S.D. Fla. Aug. 4, 2008) ...............22

*Coquina Investments v. TD Bank, N.A.*, 760 F.3d 1300 (11th Cir. 2014)....................................23

*FTC  v. Simple Health Plans LLC*, 801 F. App'x 685 (11th Cir. 2020) .........................................3

*FTC v 1st Guar. Mortg. Corp.*, 2011 WL 1233207 (S.D. Fla. Mar. 30, 2011) ............................36

*FTC v. Amy Travel Serv.*, 875 F.2d 564 (7th Cir. 1989)...........................................................36, 37

*FTC v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011)......................................................40

*FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012) ....................................36

*FTC v. Credit Bureau Center, LLC*, 937 F.3d 764 (7th Cir. 2019) ..............................................36

*FTC v. Cyberspace.Com, LLC*, 453 F.3d 1196 (9th Cir. 2006).....................................................29

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996) .............................................................34

*FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228 (11th Cir. 2014) ..................................................35

*FTC v. Lanier Law, LLC*, 715 F. App'x 970 (11th Cir. 2017) ......................................................33

*FTC v. Life Mgmt. Servs. of Orange County*, 350 F. Supp.3d 1246 (M.D. Fla. 2018)................32

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008) .....................27

*FTC v. NPB Advert., Inc.*, 218 F. Supp. 3d 1352 (M.D. Fla. 2016) .............................................34

*FTC v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356 (S.D. Fla. 2016)...........passim

*FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257 (S.D. Fla. 2019)...............................34, 39

*FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263 (S.D. Fla. 1999) ................................................30

*FTC v. Stefanchik*, 2007 WL 1058579 (W.D. Wash. Apr. 3, 2007) ............................................. 26

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003) ..................................................................... 24

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007) ................. 24, 30, 34, 35

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984) ........................................ 38

*FTC v. USA Beverages, Inc.*, 2005 WL 5654219 (S.D. Fla. Dec. 6, 2005) ................................. 30

*FTC v. USA Fin., LLC*, 415 F. App'x 970 (11th Cir. 2011) .................................................. 29, 38

*FTC v. Washington Data Res.*, 856 F. Supp. 2d 1247 (M.D. Fla. 2012) ............................... 30, 33

*FTC v. Washington Data Res., Inc.*, 704 F.3d 1323 (11th Cir. 2013) .................................... 38, 39

*FTC v. Wilcox*, 926 F. Supp. 1091 (S.D. Fla. 1995) .................................................................. 36

*Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) ....................... 29

*Kraft Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992) ....................................................................... 30

*LiButti v. United States*, 107 F.3d 110 (2d Cir.1997) ............................................................... 23

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) .............................................................. 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................. 24

*McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000) ........................................................... 40

*Novartis v. FTC*, 223 F.3d 783 (D.C. Cir. 2000) ...................................................................... 30

*SEC v. Calmes*, 2010 WL 11505260 (S.D. Fla. Nov. 19, 2010) ............................................... 23

*Tomasini v. Mt. Sinai Med. Ctr. of Fla., Inc.*, 315 F. Supp. 2d 1252 (S.D. Fla. 2004) ............... 24

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953) ............................................................. 38

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) .............. 29

**Statutes**

15 U.S.C. § 45(a)(1) ................................................................................................................ 24

15 U.S.C. § 53(b) ............................................................................................................... 37, 38

15 U.S.C. § 57b ........................................................................................................... 38

16 C.F.R. § 310.3(a)(2)(iii) ......................................................................................... 32

16 C.F.R. § 310.3(a)(2)(vii) ........................................................................................ 32

16 C.F.R. § 310.3(a)(4) ................................................................................................ 32

18 U.S.C. § 18022(b)(1) ................................................................................................. 4

18 U.S.C. §18022(c)(1) .................................................................................................. 4

26 U.S.C. § 5000A ......................................................................................................... 5

42 U.S.C. § 18001 .......................................................................................................... 4

45 CFR § 155.410 .......................................................................................................... 5

## Other Authorities

Fed. R. Civ. P. 56(a) ................................................................................................... 23

## Rules

FTC Policy Statement on Deception, Appended to *Matter of Cliffdale Assocs., Inc.*, 103 F.T.C.

174 (1984) ................................................................................................................. 30

Overwhelming and undisputed facts show that under Defendant Steven Dorfman's direction, an amalgam of companies acting as "Simple Health" ("Corporate Defendants")[1] deceived tens of thousands of consumers into paying at least $400 million for subpar healthcare products. Defendants promised comprehensive insurance with minimal out-of-pocket expenses, but enrolled consumers in wellness plans, discount plans, and association memberships that offered nominal discounts and payouts instead of the promised benefits. This scheme earned Defendants over $195 million before the Court entered a temporary restraining order against them at the Federal Trade Commission's ("FTC") request. (ECF No. 15).

Defendants cannot dispute the clear picture of their years-long, callous deception demonstrated by their own words captured in recordings of their calls with consumers, internal emails, and other business records. Nor can they dispute the substantial harm they caused their consumer victims, as evidenced by the thousands of complaints made to Defendants, their business partners, and regulators. Consumers complained in droves about the complete mismatch between what Defendants promised and what they actually got. Many suffered devastating medical and financial consequences.

The heartbreaking outcomes for their victims did not deter Dorfman or the Corporate Defendants. They denied responsibility, lied about the existence of evidence of their wrongdoing, and continued to line their own pockets using the same practices. The undisputed evidence shows that Dorfman was fully aware of his companies' unlawful conduct and directly participated in it. Because he had the authority to control the unlawful practices, he also had the authority to end them. Instead, he doubled down on the deception during the sales calls, directing his customer service employees to continue to mislead consumers who complained or tried to

---

[1] Individual defendant Candida Girouard and counsel for the FTC have reached a proposed settlement, and this proceeding as to Girouard is stayed pending formal approval by the Commission of the proposed settlement. (ECF No. 341).

cancel their plans. Defendants even concealed their deceptive conduct from state regulators and law enforcement by hiding thousands of inculpatory sales calls.

The FTC moves for summary judgment against Defendants to stop what this Court described as a "well-documented … classic bait and switch scheme," of which Defendant Dorfman was the "mastermind." (ECF No. 139 at 1). The Court-appointed receiver's findings confirm this characterization of the scheme, and the Corporate Defendants have admitted their role in it. (ECF Nos. 122, 373). As shown below, there are no disputed issues of material fact, and the FTC is entitled to judgment as a matter of law on its claims that Defendants violated the FTC Act and the Telemarketing Sales Rule ("TSR"). The egregiousness of the scheme warrants an injunction that, like prior FTC orders addressing similarly wrongful conduct, prohibits Defendants from telemarketing and from marketing health-related products. The Court also should impose a monetary judgment of $195,466,443, which is the undisputed amount of Defendants' gross revenue from this scheme, although far less than what Defendants' misconduct actually cost consumers.

## I.    Background and Summary of Undisputed Facts
### A.  Procedural History

On October 29, 2018, the FTC filed its complaint alleging that Defendants violated the FTC Act and the Telemarketing Sale Rule.[2] (ECF No. 1). The FTC simultaneously sought, and the Court entered, an *ex parte* temporary restraining order to halt Defendants' unlawful practices, freeze their assets, and appoint a receiver over the Corporate Defendants. (ECF Nos. 12, 15). Defendant Dorfman asked the Court to vacate the TRO, arguing that the FTC is not authorized to seek equitable monetary relief, and the Court relied on controlling Eleventh Circuit law to deny his motion. (ECF Nos. 79, 83). After a daylong evidentiary hearing, the Court entered a

---

[2] The FTC filed its second amended complaint, which is the operative complaint in this matter, on June 23, 2020. (ECF No. 289).

preliminary injunction against Defendants on May 14, 2019, finding that the FTC was likely to succeed on the merits of its claims, and that the FTC had presented "a well-documented account of a classic bait and switch scheme—aided by rigged internet searches, deceptive sales scripts, and predatory practice[s]," over which Dorfman presided as ringleader. (ECF No. 139 at 1). Defendant Dorfman thereafter sought to vacate the Court's order, again arguing that the FTC is not entitled to seek equitable monetary relief, and this Court and the Eleventh Circuit rejected his arguments.[3]

### B. Defendants' Deceptive Telemarketing Operation

Defendants' telemarketing operation consists of six corporate entities created by Defendant Dorfman beginning in 2012 to market and sell products to consumers looking for health insurance.[4] (Plaintiff's Statement of Undisputed Material Facts ("SUMF") ¶¶ 2, 2(a), 5, 5(b)-5(i).) It is undisputed that Defendants did not sell comprehensive health insurance. (SUMF ¶¶ 19-22.) Instead, working with leads generated through deceptive lead generation websites and ads, Defendants' telemarketers used deceptive sales pitches to convince more than 200,000 consumers to enroll in third-party memberships and discount plans.[5] (SUMF ¶¶ 5(b)-5(i), 8-17 (incl. subparts), 20, 20(a), 22(a).) The undisputed facts show these plans did not provide the benefits Defendants promised. (SUMF ¶¶ 19-22 (incl. subparts).)

### 1. Defendants' Memberships and Discount Plans

The health insurance marketplace is complicated, and consumers have limited health

---

[3] *FTC v. Simple Health Plans LLC*, 801 Fed. App'x. 685 (11th Cir. 2020) (affirming PI); ECF No. 157, 183 (Dorfman's motion to dissolve PI and district court order denying it).
[4] Dorfman previously ran a company called American Healthcare Plans, Inc. In 2011 and 2012, he and that company were the subjects of cease and desist orders from the states of Nebraska and Indiana, ordering them to stop the unlicensed sale of health insurance in violation of those states' laws. (SUMF ¶ 1.)
[5] These plans were largely provided and administered by a company called Health Insurance Innovations ("HII"). Consumers paid HII premiums for the plans Defendants sold them, and in turn, HII paid Defendants nearly $200 million in commissions for their sales. (SUMF ¶¶ 2(n), 61.)

insurance literacy. (SUMF ¶ 18.) As detailed below, Defendants took advantage of these two

market conditions, using lengthy, confusing sales calls replete with false or misleading claims to

mask the differences between comprehensive health insurance, including qualified healthcare

plans under the Patient Protection and Affordable Care Act ("ACA" or "Affordable Care Act"),

42 U.S.C. § 18001 et seq, and the inferior products they peddled. Defendants typically offered an

association membership that included a limited indemnity benefit plan, and bundled with that

unrelated products including discount dental or vision plans, wellness plans, or other lifestyle

discount plans. (SUMF ¶¶ 20, 20(a), 22.) Defendants enrolled the vast majority of their

customers in associations that included Legion Limited Indemnity, Principle Advantage,

Humana Protector 360, Health Choice Plus and Unified Health One plans, each of which offered

substantially similar benefits. (SUMF ¶¶ 22, 22(a)-(l).) The differences between those benefits

and those guaranteed in an ACA-qualified plan are stark:

- A qualified healthcare plan under the ACA, often referred to as Obamacare, must provide ten essential health benefits.[6] The plans Defendants sold provided tiny cash payouts instead of those benefits. Defendants' plans did not include insurance coverage for prescription drugs, rehabilitative or habilitative services, laboratory services, preventative services, emergency room coverage, surgical care, anesthesia care, skilled nursing facility care, complex imaging, or outpatient procedures. (SUMF ¶¶ 21, 21(a)-(b), 22(c), (e), (g), (i), (k).)

- ACA plans guarantee coverage for preexisting conditions;[7] Defendants' plans excluded coverage for preexisting conditions. (SUMF ¶ 22(c), (e), (g), (i), (k).)

- ACA plans have an out-of-pocket maximum that caps the consumer's total financial exposure for the year.[8] Defendants' plans provided only a small cash benefit to consumers *after* they paid the medical expenses out of pocket. (SUMF ¶21.) Defendants' typical indemnity plan provided at most approximately $3,200 in cash benefits per year,

---

[6] The ten essential health benefits are: 1) Ambulatory patient services; 2) Emergency services; 3) Hospitalization; 4) Maternity and newborn care; 5) Mental health, substance use disorder services, including behavioral health treatment; 6) Prescription drugs; 7) Rehabilitative and habilitative services and devices; 8) Laboratory services; 9) Preventive and wellness services and chronic disease management; and 10) Pediatric services, including oral and vision care. 18 U.S.C. § 18022(b)(1).
[7] 18 U.S.C. § 18022(b)(1).
[8] 18 U.S.C. § 18022(c)(1).

and only if the consumer was hospitalized for 100 days, which is likely to cost far more than $50,000. (SUMF ¶21(b).) Under an ACA plan with an out-of-pocket maximum, the consumer's exposure would be capped at an amount certain, typically around $7,500, with the insurance company responsible for the remaining cost. (*Id.*)

- Except in limited circumstances, ACA plans are available only during an annual open enrollment period.[9] The plans Defendants sold are available year-round. (SUMF ¶ 21(g).)

- A consumer enrolled in an ACA plan would not have been subject to the associated tax penalty imposed by the ACA.[10] A consumer enrolled in Defendants' plans would be subject to it. (SUMF ¶ 21(f).)

In short, none of the third-party products Defendants sold was comprehensive or ACA-qualified health insurance.

### 2.      Defendants' Deceptive Lead Generation

Defendants generated sales "leads"—that is, contact information for consumers potentially interested in their products—through their own marketing and through third-party lead generators. (SUMF ¶ 5(a).) Both lead-generation channels featured terminology and imagery associated with the ACA, well-known insurance companies, or reputable organizations, even though Defendants did not sell ACA plans and were not affiliated with the companies or organizations whose logos were displayed. (SUMF ¶¶ 5(b), (e)-(f), (h)-(j), 22, 25-27.)

Defendants' own marketing strategy involved targeting consumers searching online for health insurance using keywords such as "Obamacare," "AARP," "Blue Cross Blue Shield," and "BCBS," directing them to Defendants' lead generation websites and then soliciting consumers' contact information to obtain general healthcare information or quotes. (SUMF ¶ 5, 5(b)-(f).) Defendants' lead generation websites included URLS such as healthinsurancedeadline2018.com; myobamacareapplication.com; and trumpcarequotes.com. (SUMF ¶ 5(c).) Defendants' websites implied that they specialized in providing ACA-compliant and/or comprehensive health

_____

[9] 45 CFR § 155.410.
[10] 26 U.S.C. § 5000A.

insurance. (SUMF ¶ 5(f).) Healthinsurancedeadline2018 website, for example, urged consumers to "[g]et[] [h]ealth [i]nsurance now" to avoid the "substantial tax penalty" that the uninsured face, citing "an average Obamacare penalty of almost $1000." (SUMF ¶ 5(d).) Defendants also operated www.usamedsupp.org, which featured the AARP logo and invited consumers to "Compare Medicare Quotes . . . in three simple steps." (SUMF ¶ 5(e).) Defendants used almost all of the leads they generated from their websites for their own sales and sold a limited number to third parties. (SUMF ¶ 5(t).)

In addition to the leads from their own ads and websites, Defendants spent millions of dollars purchasing leads generated by third parties. (SUMF ¶ 5(g).) According to documents produced by third party lead generators, 117,990 leads for Defendants were generated from websites using a Blue Cross Blue Shield insignia, and 218,190 leads were generated from websites referencing the "Affordable Care Act" or "Obamacare." (SUMF ¶ 5(k)-(l).) Among the sites that generated leads for Defendants were official-plans.com, healthexchangerates.org, and Obamacare-plans.com, a site with the tagline "Official Health Insurance Exchange Quotes." (SUMF ¶ 5(g).) As seen below, this site promises "Official rates" and features the logos of Horizon Blue Cross, Anthem Blue Cross, Aetna, and others.



(SUMF ¶ 5(g).) The site also purports to provide educational materials about the ACA and Obamacare plans, which Defendants claim on their own websites and in media interviews to be experts on.[11] (*Id*.)

Defendants also purchased at least 100,000 leads that originated from online ads offering quotes from Blue Cross Blue Shield and other major insurance carriers that would appear when consumers ran searches online. (SUMF ¶ 5(i), (m).) For example, the following ads generated over 45,000 leads:

Call (855) 790-5029
Blue Cross Blue Shield IL
www.individualhealthquotes.com/BCBS
Get Blue Cross Blue Shield Quotes. Call To
Speak With A Live Agent!

Call (866) 531-5648
Blue Cross Blue Shield TX
individualhealthquotes.com/BCBSTX
Get Blue Cross Blue Shield Quotes. (Texas
Residents Only)

Call (888) 769-1078
Aetna Health Insurance TX
aetna.individualhealthquotes.com
Get Aetna Health Insurance Quotes. (Texas
Residents Only)

(SUMF ¶ 5(j).)

Defendants were not affiliated with the insurance companies identified in these ads, and they were not experts on (and did not offer any) ACA-qualified healthcare plans. It is undisputed that Defendants had no affiliation with Blue Cross Blue Shield or the AARP, as representatives of both organizations have testified. (SUMF ¶¶ 26-27.) It also is undisputed that Defendants enrolled *at most* thirty consumers into ACA-qualified healthcare plans in 2015 (out of over 103,000 plans sold that year) and then exited the ACA marketplace altogether. (SUMF ¶ 25.)

### 3.   Defendants' Deceptive Telemarketing Calls

After obtaining leads in these deceptive ways, Defendants made telemarketing calls to the leads and used high-pressure sales tactics and facially deceptive sales scripts to sell their inferior

---

[11] Specifically, Defendants have claimed that their employees provide better guidance to consumers about the ACA in particular, and health insurance options in general, than ACA-certified advisors (called "navigators"). (SUMF ¶ 4.) In a press release, for example, Defendant Steven Dorfman claimed that compared to navigators, his employees have a "deeper, surer feel of the policies, companies, and networks, and how they compare." (*Id.*)

products. These scripts, which the FTC found throughout Defendants' call centers, are replete

with deceptive statements, including those: 1) pretending that Defendants can provide

comprehensive health insurance through well-known providers; and 2) grossly misstating the

benefits and coverage Defendants' products provide.[12] (SUMF ¶¶ 8-9 (incl. subparts).) Dorfman

once described information as the "enemy" of his telemarketing operation (SUMF ¶ 49) and his

scripts reflected this perspective, revealing few specifics about the plans Defendants actually

provided (SUMF ¶ 9.). The intent of the scripts was unmistakable—to convince consumers they

were purchasing comprehensive health insurance or its equivalent. (SUMF ¶ 8-9 (incl.

subparts).)

> ### a. Defendants Began Calls By Instilling the "Fear of God" in Consumers

Defendants labeled the first section of their scripts "Fear of God," candidly instructing in

training materials that telemarketers should create a sense of "urgency and fear" in uninsured

consumers as to whether they are eligible[13] for and can afford healthcare coverage. (SUMF ¶

8(c).) Defendants warned consumers that "most insurance plans these days have HIGH

DEDUCTIBLES and HIGH PREMIUMS," and that Defendants may be unable to find a plan

that fits the consumer's needs and budget. (SUMF ¶ 8(d).) Although the introduction of

Defendants' scripts said that they would conduct an expansive search of available plans from

"MAJOR 'A Rated' CARRIERS" to find the best option (SUMF ¶ 8(a)-(b)), Defendants

conducted no such search. Instead, Defendants' telemarketers offered nearly the same products

---

[12] Defendants also strategically interspersed their scripts with terms of art, such as "PPO" and "deductible," associated with comprehensive health insurance. (SUMF ¶¶ 8(d), (f)-(g), (k)-(l), (p), 12.) And Defendants continued to use these terms despite repeated warnings not to, including from their third party administrator and carriers, one of whom equated the term "PPO" with a "traditional co-insurance plan, such as an 80/20." (SUMF ¶ 12.)

[13] In fact, all of the Defendants' products are "guaranteed issue," so there were no eligibility screening criteria and a consumer's qualification was automatic. (SUMF ¶ 21(g).)

to every consumer, which they bundled together in a way that maximized their own commissions, with no consideration of the consumer's actual needs. (SUMF ¶ 20, 20(a)-(b), 22.)

### b. Defendants Falsely Described Their Products to "Legitimize" Them

After placing consumers on hold to "search," Defendants' scripts informed consumers they were "approved" for a "PPO" with an "A Rated carrier" and  sought to "legitimize" their inferior products by deceptively calling them a "health insurance plan," "medical insurance package,"  "PPO," and "similar" to "insurance through an employer" that "typically" is available only for "large groups and businesses."[14] (SUMF ¶ 8(e)-(g).) The scripts also defined the plans' coverage expansively, falsely stating there were "no limits on plan usage," and that the plans would include "a prescription drug plan," "doctor office visits," "diagnostic testing," "hospital coverage" and "medical" and "surgical" care that "can be used at virtually ANY inpatient or outpatient facility in the NATION." (SUMF ¶ 8(i).) Critically, the scripts claimed that Defendants' plans provide this array of benefits without discriminating "against any…pre-existing conditions." (SUMF ¶ 8(h).) In truth, however, Defendants' products were not traditional insurance or PPOs, included limits on even the minimal benefits offered, did not cover preexisting conditions, and left consumers struggling to get coverage from their medical providers. (SUMF ¶¶ 19-22, 31 (incl. subparts).) Access to a "PPO Network" is not the same as enrollment in a PPO plan; it does not provide insurance and at best offers a discount.  (SUMF ¶¶ 21(d), 22(l).)

The scripts' most audacious lies were reserved for the subject that concerns consumers the most—their own expected costs for medical expenses. According to the scripts, consumers would pay little, if anything, for medical care and prescription medications. Scripts described

---

[14] Defendants kept this language in their scripts despite warnings from HII that it was deceptive. (SUMF ¶¶ 11, 12, 21(f), 33(b)-(c).)

consumers' expected out-of-pocket expenses variously as "pennies on the dollar," $25 for a $200 doctor visit, and $5,000 for a $50,000 hospital bill. (SUMF ¶ 8(j), 8(l).) They even promised that consumers will "NEVER incur ANY upfront costs," which Dorfman's sworn statement directly contradicts. (SUMF ¶¶ 8(k), 21.) Certain versions of Defendants' scripts directed telemarketers to "rebut" consumers' inquiries about coverage by saying that Defendants' products could "work out even more in consumers' favor" than a traditional "70-30" insurance policy that covers 70% of the costs of consumers' medical care.[15] (SUMF ¶ 16.) In fact, consumers received—at most— access to a discount that could not be ascertained prior to incurring the cost of a service, nothing close to standard cost-sharing with a defined co-pay that would limit their out-of-pocket expenses to "pennies on the dollar."[16]

Dorfman insisted that the telemarketers stick to the deceptive scripts to maximize sales and commissions.[17] Defendants' recorded sales calls and transcripts of the FTC's recorded undercover sales calls nearly all contain the misrepresentations discussed above verbatim. (SUMF ¶ 10, 10(a).) Indeed, statistical analysis of 13,816 of Defendants' own recordings confirms that in more than 90% of Defendants' sales calls, the telemarketers misrepresented the availability of specific benefits such as coverage for surgical treatment, prescription drugs, and diagnostic testing, and falsely called the products being sold "PPOs." (SUMF ¶ 10(a).) At least

---

[15] In an October 2017 email chain copying Dorfman, a third-party claims administrator noted that she had been "bombarded with calls from members advising that they are being told the benefits pay 70/30." (SUMF ¶ 52.)

[16] The FTC's expert witness Dr. Brian Miller, describes how Defendants' plans work as compared to an ACA-qualified plan: "Suppose that during a plan year, a patient experiences a myocardial infarction (MI), is admitted to the hospital where they undergo cardiac catheterization and stenting to open up blocked vessels, with subsequent coronary bypass grafting (CABG). The patient is discharged after 14 days and incurs a $34,126 hospital bill. The Simple Health plan . . . would reimburse a patient $50/day for 14 days, or $700. The consumer would be left with a $33,426 bill. A traditional major medical plan with . . . an annual out-of-pocket maximum of $7,500 would leave the patient with a $7,500 bill." (SUMF ¶ 21(h).)

[17] In training, Defendants promote "script adherence" as the "fastest way to the money." (SUMF ¶ 7.)

83% of the time, Defendants expressly told consumers that there were "no limits" on the product's usage.[18] (*Id.*)

After deceiving consumers into agreeing to enroll in association memberships and discount plans, Defendants collected consumers' payment information and congratulated them on what Defendants' scripts describe as their "NEW INSURANCE POLICY."[19] (SUMF ¶ 8(n).)

### 4. Defendants Rushed Consumers Through a Bogus Verification Process That Their Own Script Instructed Consumers To Ignore

The final stage of Defendants' telemarketing process, called verification, was purportedly to confirm consumers' understanding of their enrollments, but instead was used by Defendants to further hide their deception from third parties and regulators. Plan providers required Defendants to obtain either an audio recording or an e-signature record confirming consumers' agreement to enroll, which could be used to counter any complaints from consumers about the sales process. Defendants' scripts primed consumers to ignore any information in the verification that contradicted the sales pitch, and advised them not to ask questions. (SUMF ¶ 14(a)-(b).) The audio verifications consisted of inconsistent disclosures about the products quickly read aloud by one of Defendants' employees. (SUMF ¶ 14((b).) The electronic verifications displayed pages of densely worded, barely legible fine print disclosures (often on a mobile device) while Defendants' telemarketer urged them to proceed quickly. (SUMF ¶ 14(c).)

In rushing consumers through the bogus "verification" process, Defendants used a "verification rebuttal" script that instructed employees to provide different and conflicting answers to consumers' common questions depending on whether the verification was recorded or

---

[18] Defendants did sometimes veer from the scripts to make additional deceptive claims, such as promising consumers that they would have small (or no) copays for services and treatments. (SUMF ¶ 11, 11(b).)
[19] To obscure what they were actually selling, scripts directed telemarketers to reject requests for written information by falsely claiming that their plans are "not for the general public" and carriers therefore do not provide "packets or brochures about this insurance. (SUMF ¶ 15.) Their "Send Me Something in Writing" rebuttal script said "if there was ANYTHING OUT THERE that would be more beneficial for you than THIS PLAN, then THAT is what I would be offering to you!" (*Id.*)

not. (SUMF ¶ 14(d).) Unbelievably, one "on recording" rebuttal described the product as "not health insurance," while the corresponding "off recording" rebuttal stated, "This is health insurance." (SUMF ¶ 14(d)(i).) Similarly, the on-recording verification rebuttal for questions about ACA qualification confirms that the consumer is subject to the ACA tax penalty. (SUMF ¶ 14(d)(ii).) The off-recording rebuttal is several confusing sentences long, and does not state that consumers will be subject to the tax penalty. (*Id.*)

### C.  Many Consumers Complained About Defendants' Misrepresentations

Defendants' deceptive practices led to high cancellation rates and generated thousands of complaints to Defendants and to third parties, including their business partners, the Better Business Bureau ("BBB"), and state departments of insurance. (SUMF ¶ 30(a)-(j).) Many consumers did not immediately discover that Defendants' plans were not as described. Some may not have at all. Consumers who did realize they had been deceived were sometimes able to cancel before they received medical care and before they had paid significant premiums. (SUMF ¶ 30(c).) Other consumers were not so lucky, learning of Defendants' deception and the paucity of their actual benefits only after they had incurred significant medical bills for which they had no coverage. (SUMF ¶ 31(b)-(d).) Others learned before incurring medical costs when told by their care providers that they would be responsible for the entire cost of a scheduled surgery, MRI, or hospitalization. (*Id.*)

Whether consumers canceled their plans with Defendants or complained to third parties, they consistently reported believing that Defendants had enrolled them in a plan that carried the comprehensive benefits they were promised. (SUMF ¶¶ 30(b), (d)-(e),(g)-(h), (k).)

### 1.  Complaints to Defendants During Cancellation

Many of consumers' cancellation requests are described in the Defendants' daily "drop off" reports, which were circulated daily to Dorfman. (SUMF ¶¶ 30(b), 31(f)-(g), 50.) These

records, which reflect only cancellations made within the first 30 days, show that more than 20% of the consumers that Defendants enrolled in associations and discount plans canceled within that time, and that a substantial number canceled due to a lack of benefits or because the plans were not ACA-compliant. (SUMF ¶¶ 30(a)-(b).) Between 2016 and 2018, for example, between 20 to 58% of the total cancellations were coded in the reports as "benefits," reflecting that consumers reported canceling because the plans did not have the promised benefits. (SUMF ¶ 30(b).)

Defendants' notes on these drop off reports sometimes indicate that consumers complained that they had been misled about critical benefits, such as prescription coverage for insulin or drugs used to treat opioid addiction (Naloxone), and coverage for surgery. (SUMF ¶ 31(g).) More generally, the notes reveal a pattern of misrepresentations about benefits and the ACA qualification of the plans.[20] In December 2017 alone, for example, Defendants' notes included:

- "member called in upset stating she was lied to none of the information the agent provided was true and she wants to cancel and refund her account;"

- "mbr called to cxl. mbr adv was mislead regrading [sic] coverage;"

- "membere [sic] wants to cancel because this policy was sold to him as mayor [sic] medical;"

- "Spoke with A[] who called to cancel mbr stated she was mislead [sic] she was under the impression she was receiving major medical;"

- "called in to cancel because its nt [sic] aca supported and he will have a penalty from his tax proffessional [sic];"

- "Mbr ci to cancel his plan because . . . agent misrepresented the plan . . . Mbr says that

---

[20] Defendants refused to provide consumers any written materials about their plans until after they enrolled. (SUMF ¶ 15.) The plan documents and other materials, when finally provided, did indicate that the products were not comprehensive or major medical insurance, which then prompted some new enrollees who read the plan documents to cancel. (SUMF ¶¶ 20, 30(a)-(b).)

his plan does not cover hospital stays. . . Cancel requested."

- "Mbr called in requesting to cancel because this policy is not ACA compliance [sic] and he was told by the sales agent that he would not be taxed at the end of the year and that we were ACA compliance [sic];"

- "C[] call to cancel because its not ACA. I read rebuttal and ex[alin [sic] why its npt [sic] ACA due to maternity. I advise her she has great affordable plan . . . Member decline to keep;" and

- "Mbr called in requesting to cancel because this policy is not ACA compliance [sic] and he was told by the sales agent that he would not be taxed . . . and that we were ACA compliance [sic]. . . mbr said we are scam artist." (SUMF ¶ 31(g).)

Monthly drop off reports for other months include similar entries. (SUMF ¶ 31(g).)

Even after the first 30 days, Defendants continued to be inundated with cancellation requests. One of Defendants' call centers received between 300 and 500 calls *per day* requesting cancellation. (SUMF ¶ 30(d).) Dorfman monitored these drop offs and cancellations closely, sometimes forwarding the daily report to his customer service staff. (SUMF ¶ 50-51, 51(b).) Rather than examining the sales practices that consumers cited as their reasons for canceling, Dorfman urged his customer service staff to "save" the sales to avoid losing commissions. (SUMF ¶ 51(b).) This often resulted in Defendants' customer service representatives making more misrepresentations to try to keep consumers enrolled who, for example, needed cancer treatment or insulin, needed or already had surgery, or had incurred substantial uncovered medical expenses, none of which Defendants' plans covered. (SUMF ¶¶ 32, 32(a).)

### 2.  Complaints and Escalations to Defendants' Plan Administrator

Deceived consumers often complained to HII, because their monthly payments were made to that company. HII kept records of complaints and what it called "escalations," and it regularly shared those records with Defendants. (SUMF ¶ 30(f).) From 2014 until this case was filed in late 2018, Defendants received nearly 7,500 "escalations" from HII forwarding customer complaints. (*Id.*) The vast majority of the HII escalations are characterized as "agent misrep,"

including misrepresentations about "Obamacare," "Policy Coverages,"

"Copay/Coinsurance/Deductible/Cash Benefits," and "Policy Type." (SUMF ¶30(g).)

Internally, HII recognized that complaints about Defendants were "very high and not

getting better," and that Defendants' purported compliance efforts were "a daily joke." (SUMF ¶

33.) HII representatives variously described Defendants' sales and customer service tactics as

"coercive/misleading," "reinforc[ing] incorrect information, mak[ing] confusing and misleading

statements," "brow-beat[ing] the customer into submission for up to an hour," "less than stellar,"

"terrible," "systematically abus[ive]," and "mak[ing] the cancellation process very difficult

through avoidance." (*Id*.) In fact, in November 2016, HII noted that one customer's description

of her "nightmare" dealing with Simple Health's "lies" raised "all too common themes when

dealing with Simple." (SUMF ¶ 33(a).) As early as 2015, HII expressed concern internally and to

Dorfman about Defendants' false claims to consumers, including that Defendants' plans were

"70/30" plans, where 70% of medical expenses would be covered. (SUMF ¶ 33(b).) Throughout

2016, 2017, and into 2018, HII continued to see and flag internally and to Defendants many of

these same issues about the plans being misrepresented. (SUMF ¶ 33(c).)

### 3.  Complaints to Other Third Parties

Hundreds of consumers also filed complaints about Defendants with their state

departments of insurance, the BBB, and other third parties. (SUMF ¶ 30(e), 30(h)-(j).) These

complaints reveal a similar pattern of misrepresentations. In addition to the dozens of BBB

complaints filed directly against Defendants, HII attributed over 350 BBB complaints it received

to sales made by Defendants, many of which HII labeled as alleging "agent misreps." (SUMF ¶

30(i)-(j).)

Defendants enrolled at least 23,000 consumers in wellness plans for third party

Wellness Plans of America ("WPA"). (SUMF ¶ 23.) The WPA product sold by Defendants bore

15

no resemblance whatsoever to comprehensive or ACA-qualified health plans, and WPA instructed Defendants not to use insurance terms in describing the products in their sales calls. (SUMF ¶ 12, 23(a)-(b).) Nevertheless, consumers still complained to WPA that Defendants misrepresented the plan as comprehensive insurance.[21]

Perhaps the most telling complaints are those filed with state departments of insurance, because the complaints typically include a narrative from consumers themselves. From 2014 through October 2018, consumers filed nearly 400 such complaints against Defendants (SUMF ¶30(e)), reflecting the full range of Defendants' misrepresentations, including the following:[22]

- In a January 2018 complaint, a Texas consumer described how he specifically sought to enroll in an ACA plan during open enrollment to avoid the tax penalty, and was assured by Defendants' telemarketer that his policy was ACA qualified. Shortly after enrolling, he needed kidney dialysis, which Defendants' plan did not cover. Because the open enrollment period had ended, he could not enroll in an ACA plan for an entire calendar year, and was therefore without comprehensive coverage for the care he needed. (SUMF ¶ 30(e)(i).)

- A Wyoming consumer searched online for health insurance, and after providing his contact information on a website, Defendants called him. He specifically asked "many many times" if his family, including three children, "would be covered if needing to go to our doctors, or an ER visit." Defendants "repeatedly" assured him that his coverage would meet those needs, and enrolled him in an indemnity plan. His wife thereafter required a visit to the emergency room, and none of the associated costs were covered, leaving them with a $10,000 bill. The consumer noted that at the time of his call from Defendants, he could have enrolled in a marketplace plan, but that opportunity was gone by the time he realized he had been deceived. As a result, he was left uninsured for even longer.

---

[21] *See, e.g.*, SUMF 23(c) ("Deceiving sales tactics that led me to believe I would have regular medical insurance coverage to avoid paying taxes for not have medical; talked to a sales rep on the phone 9/13/16 who was very pushy and assured me I would be covered when tax season came; come to find out this was not medical insurance.").

[22] During the preliminary injunction hearing, the Court heard from Christopher Mitchell from Kansas and Elizabeth Belin from Ohio, who described Defendants' deception and the resulting financial and psychological hardships they each suffered. Mr. Mitchell's life-saving cancer surgery was delayed because Defendants' plan provided no coverage for it. Mr. Mitchell and his wife spent hours on the phone trying to ascertain why it would not be covered and were given the runaround by Defendants. Ultimately, unable to delay the surgery further, Mr. Mitchell was forced to charge much of the cost to a credit card. Ms. Belin was nearly forced to file for bankruptcy when she received a $37,000 bill for knee replacement surgery. She ultimately had to use her retirement savings to pay the bill. (SUMF ¶¶ 31(b)-(c).)

(SUMF ¶ 30(e)(ii).)

### D. Government Investigations

Defendants' deceptive marketing practices and failure to comply with state licensing requirements have triggered numerous government investigations. Indeed, in their home state, the Florida Department of Financial Services ("DFS") conducted significant investigations of Defendants over the course of three years regarding, among other things, the deceptive advertising on their websites and press releases regarding the sale of ACA products, and deceptive and misleading representations about the terms of policies sold. (SUMF ¶ 34.) Numerous other state regulatory agencies conducted investigations, filed actions, issued cease and desist orders, or issued consumer alerts warning about deceptive practices, including the Indiana Commissioner of Insurance, the Nebraska Department of Insurance, the Montana Commissioner of Securities and Insurance, the Pennsylvania Insurance Department, the Nebraska Attorney General, and the Massachusetts Attorney General. (*Id.*) Two cease and desist orders were entered against Dorfman personally (SUMF ¶ 1), and Defendant Girouard updated him periodically about the status of others. (SUMF ¶¶ 37, 46, 51(a).) Despite these numerous investigations, Defendants continued their deceptive practices unabated.

### E. The Simple Health Common Enterprise

The Corporate Defendants all operated under the Simple Health moniker, with Dorfman in charge. (SUMF ¶ 2(a), (d)-(e), (g).) Dorfman is the 99% owner of Defendant Health Center Management LLC, which wholly owns each of the other Corporate Defendants.  (SUMF ¶ 2(b).) Defendant Health Benefits One LLC ("HBO") was the hub of the telemarketing operation and generates nearly all of Defendants' income from sales commissions. (SUMF ¶ 2(i)-(j), (n), (p).) Defendant Simple Insurance Leads LLC ("SIL") served as HBO's marketing arm and purchased or generated leads for the enterprise. (SUMF ¶ 2(h).) HBO transferred over $80 million to SIL

for the cost of those leads. (SUMF ¶ 2(i).) HBO was also the registrant for lead generation sites used by SIL. (SUMF ¶ 2(f).) Defendant Senior Benefits One nominally serviced the market for Medicare supplement plans, but generated little revenue doing so. (SUMF ¶ 2(o).) Defendant Innovative Customer Care provided customer service support for consumers HBO enrolled. (SUMF ¶ 2(j).)

The companies and their shared senior managers, including Dorfman, Defendant Girouard, who was the Chief Compliance Officer, the Chief Operating Officer, the Vice President of Sales, and the Chief Marketing Officer, operated primarily out of the same location in Hollywood, Florida. (SUMF ¶ 2(k).) At that location, Dorfman met with the executive team to discuss strategy across the enterprise. (SUMF ¶ 2(l).) Employees in the accounting, IT, and human resources departments worked out of Hollywood as well and were shared by the various Corporate Defendants. (SUMF ¶ 2(m).)

Commingling of corporate funds was typical, with millions of dollars flowing from HBO to the other companies, none of which had other significant sources of revenue. (SUMF ¶ 2(i)-(j), (p).) For example, over 92% of SIL's incoming funds originated from HBO. (SUMF ¶ 2(i).)

### F. Dorfman's Control, Participation, and Knowledge

As founder and CEO of the Corporate Defendants and 99% owner of their holding company, Defendant Steve Dorfman controlled and participated directly in all substantial aspects of Defendants' business operations. Dorfman was the signatory on Corporate Defendants' bank accounts and also personally guaranteed millions of dollars in loans made by HII to HBO and SIL. (SUMF ¶¶ 39,45.) He supervised all of the Corporate Defendants' executives, including the Chief Marketing Officer, Chief Compliance Officer, Vice President of Sales, and Chief Operations Officer, and he communicated with them routinely about Defendants' operations. (SUMF ¶¶ 40, 44.) He had authority to hire and fire employees and he called meetings of the

companies' executive leadership, who provided him with detailed reports on their departments. (SUMF ¶ 42, 44.) He was integrally involved in the day-to-day business, authorizing everything from dress code requirements, to commission structures, to payments to lead generation vendors. (SUMF ¶ 46.) He wrote, reviewed, approved, and trained new employees on Defendants' deceptive scripts—including sales, customer service, and verification scripts—as well as closely oversaw compliance and regulatory matters. (SUMF ¶¶ 46, 48, 49.) Indeed, while training new telemarketers, he boasted that he is the "puppeteer" of his "customers," who he described as "mostly stupid" people who "don't know[s] apples from oranges to pears," and who must be led like a "dog" with "blinders" around the "track" in pursuit of a "rabbit." (SUMF ¶ 49.)

Dorfman received reports keeping him apprised of the operation's performance on a daily or weekly basis, including sales, cancellations, and the performance of specific lead generation campaigns. (SUMF ¶ 50.) He often engaged with his staff about the information in the reports and dictated how he wanted matters handled. For example, he reviewed data and made decisions regarding lead generation flow and volume, and made determinations regarding whether Defendants should continue to use one of their lead generation websites (trumpcarequotes.com) that he knew was misleading consumers. (SUMF ¶ 51(a).) In another example, after reviewing data showing increasing cancellations, Dorfman demanded that his customer service staff work harder to avoid cancellations. (SUMF ¶ 51(b).) Dorfman also directed Defendant Girouard to renew an individual contract that allowed her to sell insurance on behalf of BCBS because he mistakenly believed that would justify Defendants' use of BCBS's logo in their marketing, even though Defendants did not sell BCBS products. (SUMF ¶¶ 27, 54.)

Dorfman also exercised complete control over Defendants' finances and regularly used corporate funds to pay his personal expenses, including the rent on his luxury residence, leases

on his automobiles, gambling, personal travel, jewelry, expenses related to his wedding, and day-to-day expenses such as dining out and clothing. (SUMF ¶ 56.) Dorfman placed his mother and wife on the HBO payroll, even though he was unable to articulate their exact roles or describe any specific work they did for the company. (SUMF ¶ 57.) Dorfman even raided the companies' advance commissions for his personal expenses before those commissions were earned. (SUMF ¶ 58.)

Dorfman had complete knowledge of his companies' deceptive conduct. As evidenced by internal communications seeking his edits to or approval of scripts, he was aware of the content of Defendants' deceptive scripts. (SUMF ¶ 48, 48(a).) In 2017, for example, Dorfman revised Defendants' proposed script for the Humana Protector 360 plan, which falsely called the product a "PPO," something Humana itself identified as false and Defendants were told to remove. (SUMF ¶ 48(a).) He received daily and weekly reports about Defendants' major operational matters, including the disposition of calls received from different lead generation campaigns, a weekly sales report, and daily "drop off" reports that described the reasons consumers were canceling their plans. (SUMF ¶ 50.) He listened to sales calls, and even directed his staff to hide recordings of calls that were especially damning. (SUMF ¶ 53.) Over the years, his own staff, as well as his business partners at HII, provided him with consumer complaints or complaint summaries and discussed compliance concerns with him, including his telemarketers' continued use of the "70/30" language that suggested consumers would be responsible for only 30% of their medical costs. (SUMF ¶ 52, 52(a)-(c).)

Dorfman was well aware of the volume and character of the complaints against his companies. (SUMF ¶ 52.) For example, in 2017, HII forwarded Dorfman a summary of more than one hundred consumer complaints about Defendants compiled by a claims administration

company in just two months. (SUMF ¶ 52(a).) The complaints were from consumers who already had their claims for medical costs denied, and they described the various ways Defendants had misrepresented the benefits of their plans.[23] Similarly, during an executive leadership meeting in June 2018, Defendants' Chief Compliance Officer reported that Defendants had been the subject of 2,004 complaints to HII already that year, and that the "Majority [were] labeled as Agent Misrep." (SUMF ¶ 52(b).) In 2016, Dorfman responded to HII's list of the top five things Defendants could do to decrease consumer complaints by telling Girouard that HII could "shove 90% of that shit up [their] ass."[24] (SUMF ¶ 52(c).)

Dorfman also monitored complaints and negative reviews about Defendants online, and hatched a scheme to inflate Defendants' poor BBB rating. At Dorfman's direction, Defendants' employees obtained 20 "burner" phones, which he suggested they use to create fake customer profiles and submit two phony positive BBB reviews per week.[25] (SUMF ¶ 55.) When asked in his deposition why he directed his staff to lie to the BBB, his only response was that the BBB was not a regulatory agency. (*Id.*)

### G.  Consumer Harm

As reflected by the undisputed evidence described above, Defendants deceived consumers into paying more than $400 million for their substandard plans. (SUMF ¶ 60.) Defendants earned more than $195,466,443 in commissions for selling these products.[26] (SUMF

---

[23] The summaries include statements such as "was misinformed on benefits when signing up;" was told surgical benefits were covered;" was told all office visits were covered – not limited to 3;" They Totally Lied To Me;" Was told CT scan was covered at 80%;" "was told this is major medical coverage;" "was not informed of any limitations." (SUMF ¶¶ 30(h).)

[24] Among the top five improvements HII suggested was that Defendants should "be clear on all calls that [limited medical] is not an ACA compliant plan and tax penalties may apply." (SUMF ¶ 52(c).)

[25] "Get 20 burners [sic] phones for BBB." "Has any [sic] started creating fake positive reviews… ." (SUMF ¶ 55.)

[26] Consumers' premiums and enrollment fees were paid primarily to third parties, who then paid Defendants commissions for their sales. (SUMF ¶ 2(n).) Defendants primarily received such commissions from Health Insurance Innovations ("HII"), now known as Benefytt Technologies, but did receive

¶ 61.) The harm to Defendants' victims, however, far exceeded what they paid for Defendants' plans. Those with medical conditions often could not afford the medications and care they needed, or they went ahead and incurred significant uncovered medical expenses, sometimes amounting to hundreds of thousands of dollars. (SUMF ¶31(a)-(g).) Many consumers also lost the opportunity to enroll in ACA-qualified plans during the open enrollment period, leaving them uninsured. (SUMF ¶ 31(h).) Defendants' callous deception endangered people's lives and their financial well-being.

## II.   The Court Should Draw Adverse Inferences from the Corporate Defendants' Former Executives' Fifth Amendment Invocations.

In support of its Motion for Summary Judgment, the FTC has submitted testimony from Defendants' former Chief Compliance Officer, Defendant Candida Girouard, and their former Vice President of Sales, John Sand, who each invoked their Fifth Amendment privilege against self incrimination. The Court should draw an adverse inference against the Corporate Defendants from the refusal of these witnesses to testify.[27] Courts in this district have drawn adverse inferences against corporate defendants when an individual defendant who refused to testify was "acting in the scope of their employment by the respective corporate defendants when they engaged in the conduct they refused to testify about," as Defendant Girouard was here. *Cole v. Am. Capital Partners Ltd., Inc.*, No. 06-80525-CIV-HURLEY, 2008 WL 2986444, at *5 (S.D. Fla. Aug. 4, 2008). Thus, an adverse inferernce would clearly apply to Girouard's invocation of the Fifth Amendment.

Similarly, an adverse inference also is appropriate from Sand's testimony. The Eleventh

---

commissions from other third parties as well. (SUMF ¶ 2(n), 61.) Because Defendants did not collect the full amount of consumers' payments, consumers' losses substantially exceed Defendants' gross revenues. (SUMF ¶ 60.)

[27] The FTC has indicated within its SUMF the facts upon which it asks the Court to draw an adverse inference from the two witnesses' invocation of their Fifth Amendment privilege. In all cases, the adverse inference is in addition to other record evidence that supports the fact at issue.

Circuit has found it appropriate to draw an adverse inference against a party from the refusal of a non-party witness to testify upon considering four non-exclusive factors to assess trustworthiness: "(1) the nature of the relevant relationships; (2) the degree of control of the party over the nonparty witness; (3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation." *Coquina Investments v. TD Bank, N.A.*, 760 F.3d 1300, 1310–11 (11th Cir. 2014) (citing *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir.1997) (internal quotations omitted)). Here, as in *Coquina*, three factors weigh in favor of drawing the inference with respect to Sand's testimony. First, he identified Defendant Dorfman as his "best friend," strongly suggesting that he remains loyal to the Corporate Defendants, all of which Dorfman controlled. Second, Sand has a shared interest with the Corporate Defendants in the outcome of the litigation, having been involved in the practices at issue and having exposure to criminal prosecution based on the misconduct. Finally, as Vice President of Sales, Sand was a primary actor in the conduct described in the FTC's complaint, as evidenced by internal documents showing he participated in drafting scripts and his testimony about his role supervising the very telemarketers who lied to consumers.

Because the FTC meets these standards and has "adduce[d] other proof regarding [each] matter[,]" the requested adverse inferences are proper. *SEC v. Calmes*, Case No. 09-80524-CIV-ZLOCH, 2010 WL 11505260, at *4 (S.D. Fla. Nov. 19, 2010).

## III.   Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might

affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

A genuine dispute means "sufficient evidence favoring the nonmoving party for [the factfinder]

to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The

nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Although the evidence is viewed in the light most favorable to the nonmoving party, that party

has a "duty to present affirmative evidence to defeat a properly supported motion for summary

judgment." *Tomasini v. Mt. Sinai Med. Ctr. of Fla., Inc.*, 315 F. Supp. 2d 1252, 1257 (S.D. Fla.

2004) (internal citation omitted).[28]

## IV.   Count I: Defendants Deceived Consumers About Their Products, Qualifications, and Affiliations, in Violation of the FTC Act.

The uncontroverted evidence—including facts admitted by the Corporate Defendants,

lead generation websites, sales scripts, call recordings, and consumer complaints—shows

Defendants made material misrepresentations to consumers in violation of Section 5 of the FTC

Act, which prohibits "deceptive acts or practices in or affecting commerce." 15 U.S.C. §

45(a)(1). Deception occurs when: (1) defendants make a representation or omission; (2) that is

likely to mislead consumers acting reasonably; and (3) that representation or omission is material

to consumers' decisions. *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *FTC v.

Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266-67 (S.D. Fla. 2007). Here, the undisputed

evidence establishes all three elements.

---

[28] Dorfman raised several defenses in his Answer to the Second Amended Complaint (ECF No. 346) that
are actually denials that the FTC has met its burden to prove the elements of its claims, and so resolution
of the claims at Summary Judgment in the FTC's favor would dispose of these defenses. These include
Dorfman's First (puffery), Second (disclaimers), Fourth (First Amendment), Tenth (failure to state a
claim), and Eleventh (misrepresentations made by third parties) defenses.

### A. Defendants Made Widespread Misrepresentations About Their Affiliations, Expertise, and Products.

The undisputed facts concerning Defendants' lead generation practices and telemarketing pitches show that Defendants regularly represented (1) that their products were comprehensive insurance plans that provided significant benefits, including for hospitalization, emergency care, doctor's appointments, and prescriptions, (2) that they offered ACA-qualified plans or had the expertise to do so, and (3) that they were affiliated with prominent health-related organizations and companies. As detailed in the next section, none of these representations was true.

Screenshots of lead generation websites and affiliate advertisements, along with data showing the extent of their use by Defendants, reflect widespread claims that Defendants were affiliated with nationally recognized insurance providers like Blue Cross Blue Shield. These websites and advertisements prominently featured the logos and names of specific insurance providers, as depicted above and in the record. Those same websites also used the terms "Obamacare" or "ACA" and referenced open enrollment deadlines that applied to health insurance obtained pursuant to the ACA, but not to the products Defendants actually provided. By specifically calling out the ACA and its complexities, offering assistance in navigating it, and even boasting that Defendants have helped "hundreds of thousands of consumers" enroll in ACA plans, the lead generation websites conveyed that consumers would be dealing with companies that had ACA expertise. Defendants owned and operated several of these websites and paid for leads on an ongoing basis from others. Defendants also paid significant sums to Google to lead consumers searching for keywords that included AARP, Obamacare, and Blue Cross Blue Shield to their own lead generation websites.[29] Having searched for those terms, consumers would

---

[29] Defendants ran at least 141,099 online ad campaigns with Google using the key words "Blue Cross," or a variation of those terms, at least 229,256 campaigns using the key word "Obamacare," or a variation of that term, and at least 2,502 campaigns using "AARP" or some variation of that term. (SUMF ¶ 5(b).)

reasonably infer that there was a relationship between their search term and the resulting website. *See, e.g.*, *FTC v. Stefanchik*, No. C04-1852RSM, 2007 WL 1058579, at *5 (W.D. Wash. Apr. 3, 2007), *aff'd*, 559 F.3d 924 (9th Cir. 2009) ("reasonable consumers are not required to doubt the veracity of express representations").

Defendants' scripts and sales calls then build on the misimpression conveyed by Defendants' lead generation practices, but independently convey widespread misrepresentations about the characteristics of Defendants' products. Defendants' carefully crafted scripts informed consumers that they would be enrolled in PPOs that would provide coverage for surgery, diagnostic testing, and doctor's visits. Defendants told consumers that they conducted broad searches and submitted consumers' applications for approval, that they worked with many carriers, all "A-Rated," and had pinpointed the very best option for the consumer. Defendants described the products as being like "insurance through an employer," and said there would be "no limits" on the plan's usage. Defendants touted benefits that would limit consumers' out of pocket costs to "pennies on the dollar" and that a doctor's appointment would cost as little as $20, and a major hospitalization as little as $5,000. Recorded sales calls corroborate that Defendants' telemarketers regularly made these representations as scripted. For example, at least 83% of the time, Defendants expressly told consumers that there were "no limits" on the product's usage. Defendants' telemarketers also made other, unscripted representations to consumers about Defendants' plan offerings and the extent of coverage, including that consumers would have only a small co-pay for unlimited doctor's visits and specific prescriptions, or that the plan operated as a "70/30" plan, with the consumer responsible for only 30% of any medical costs.

This evidence alone would be enough to establish Defendants' widespread deception, but

this element also is demonstrated by the thousands of consumer complaints describing the above

misrepresentations, the multiple regulatory investigations that resulted from those complaints,

and internal and third party emails about Defendants' ongoing compliance issues. Defendants'

misconduct was so persistent, in fact, that one HII executive described their promises to improve

compliance and stop making misrepresentations as a "daily joke."

### B.  Defendants' Representations Were False and Likely to Mislead Reasonable Consumers

Undisputed evidence also shows Defendants' claims about their products' benefits, their

affiliations, and their expertise were false. Those claims also were likely to mislead—and in fact

did mislead—reasonable consumers. When assessing whether a representation is likely to

mislead consumers acting reasonably under the circumstances, courts look both to the particular

statements made and to the overall "net impression" of the representations. *FTC v. Nat'l*

*Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008), aff'd, 356 F. App'x 358

(11th Cir. 2009) (per curiam) (internal citation omitted). Both Defendants' express

representations and the overall "net impression" of their sales practices were likely to mislead

reasonable consumers. *See, e.g.*, *FTC v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d

1356, 1365 (S.D. Fla. 2016) (medical discount card sellers misrepresented they were selling

insurance by using terms "like 'copay,' 'premium,' and 'deductible' which are commonly

associated with insurance").

Although Defendants' lead generation websites led consumers to believe that Defendants

would enroll them in ACA-qualified healthcare plans, the plan documents themselves

indisputably show that Defendants did not enroll consumers in products that met the minimum

essential coverage requirements of the ACA. Specifically, Defendants' plans did not provide

coverage for maternity care, prescription drugs, rehabilitation services, laboratory services, or

preventive services. Likewise, although Defendants' lead generation websites claimed affiliations with the AARP and Blue Cross Blue Shield, it is undisputed that Defendants were not affiliated with Blue Cross Blue Shield or AARP, and did not sell their products.

Similarly, Defendants' on-script representations about the benefits their plans would provide were false and misleading. The limited indemnity benefits available to Defendants' consumers bore no resemblance to the benefits described in their sales scripts and sales calls. These products are not PPOs, and they do not limit out of pocket expenses to "pennies on the dollar." In fact, because Defendants' products have no out of pocket maximum, they expose consumers to far greater financial risk than the comprehensive plan Defendants described.

Despite the promise that there would be "no limits on the plan's usage," Defendants' products are by their very nature exceptionally limited. Indemnity benefits work in exactly the opposite way from traditional health insurance—the carrier has a defined, nominal obligation, such as $50 for each of three visits to a doctor per year, and the consumer must cover every other cost from those visits. For example, between the amounts paid for doctor visits and other medical services, one of Defendants' products had a maximum annual pay-out value of approximately $3,200, which consumers would reach only if they happened to need every covered service, including hospitalization for 100 days that year. Hospitalization for such a lengthy period alone could cost well over $200,000; with Defendants' plan, the consumer would be responsible for at least $197,000. Under an ACA qualified plan, by contrast, the bulk of covered medical expenses are paid by the plan, with the consumer being responsible only for a much smaller out of pocket maximum, which in 2018 was $7,500 on an ACA plan.

When Defendants departed from their sales scripts to tell even more egregious lies about their products, those representations were similarly false and misleading. Contrary to

Defendants' promises, their products do not have co-pays for appointments or treatments, and they do not have an out of pocket maximum. Nor did Defendants' plans cover 70% of consumers' healthcare costs, a claim that Defendants made for years, as evidenced by consumer complaints and correspondence from HII. Many of Defendants' customers were left with medical debt far exceeding the limits Defendants represented, which alone establishes that those claims were false.

Although the FTC is not required to show that consumers were actually misled, the FTC has done so here through numerous declarations from consumer victims, recordings of customer service and verification calls, cancellation records, and consumer complaints from Defendants' and third parties' business records. Proof of consumers actually being misled is "'highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances.'" *FTC v. USA Fin., LLC*, 415 F. App'x 970, 973 (11th Cir. 2011) (quoting *FTC v. Cyberspace.Com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006)).

This voluminous and incontrovertible evidence, including the reasons cited by thousands of consumers who canceled their plans, demonstrates that based on Defendants' pervasive misrepresentations, thousands of consumers bought what they thought was comprehensive health insurance or its equivalent.[30]

---

[30] Because the undisputed evidence shows that Defendants' representations to consumers were false and misleading, Dorfman's purported First Amendment defense (ECF No. 346 at 7) is inapplicable and insufficient as a matter of law. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554 (2001) ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading." (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 557 (1980))); *see also Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976) (collecting cases and holding that "[u]ntruthful speech, commercial or otherwise, has never been protected for its own sake."). Similarly, Dorfman's attempt to rely on post-sale disclosures or disclaimers as a defense to the FTC's claims also fails. (ECF No. 346 at 6). The undisputed evidence shows that any such disclaimers were given after consumers agreed to make a purchase, and were insufficiently clear to correct the false net impression created by Defendants' advertising and sales pitch.

### C. Defendants' Representations Were Material to Consumers

Defendants cannot plausibly suggest that their misrepresentations here were not material. Whether a representation is material, like the question whether a representation is likely to mislead consumers, is evaluated from the perspective of the "reasonable prospective purchaser." *FTC v. Washington Data Res.*, 856 F. Supp. 2d 1247, 1272 (M.D. Fla. 2012). A representation is material "if it is of a kind usually relied upon by a reasonably prudent person." *Transnet Wireless Corp.*, 506 F. Supp. 2d at 1266. Only a tendency to affect a reasonable consumer's choice concerning the product is required; "subjective reliance by each victim" is not. *Id*. at 1266-1267 (citation omitted).

Defendants' representations were indisputably material for at least three reasons. First, Defendants' express, deliberate representations are presumptively material. *Id*. at 1267 ("Express claims, or deliberately made implied claims used to induce the purchase of a particular product or service are presumed to be material."); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999). The same is true for Defendants' claims involving "health, safety, or other areas with which reasonable consumers would be concerned." *Kraft Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992); *Novartis v. FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000) (claims about efficacy of a health-related product deemed material).

Second, Defendants' representations about what their plans would cover go to "the heart of a consumer's decision to purchase" a product or service and are presumptively material. *FTC v. USA Beverages, Inc.*, No. 05-61682, 2005 WL 5654219, at *6 (S.D. Fla. Dec. 6, 2005), *report and recommendation adopted*, No. 05-61682, 2005 WL 5643834 (S.D. Fla. Dec. 9, 2005).

Third, Defendants' representations led to substantial consumer injury, and therefore are demonstrably material. *See* FTC Policy Statement on Deception, Appended to *Matter of Cliffdale Assocs., Inc.*, 103 F.T.C. 174, 183 (1984) ("Injury exists if consumers would have chosen

30

differently but for the deception. If different choices are likely, the claim is material, and injury is likely as well. Thus, injury and materiality are different names for the same concept."). As a result of Defendants' scheme, consumers not only enrolled in their plans, collectively losing more than $400 million on fees, but many of them also incurred substantial uncovered medical expenses. Due to the lack of coverage under Defendants' plans, moreover, some consumers were forced to delay or forgo much needed care or medications. And as evidenced by the significant numbers of consumers who canceled their enrollments within days, citing the insufficiency of benefits or that the plans were not ACA-qualified, Defendants' misrepresentations clearly impacted their enrollment decisions, leaving some uninsured until the next year's open enrollment period.

Because the undisputed evidence establishes all elements of a deception claim under Section 5 of the FTC Act, the Court should enter summary judgment in favor of the FTC on Count I.

**V.      Count II: Defendants Conducted a Massive Nationwide Deceptive Telemarketing Scheme in Violation of the Telemarketing Sales Rule.**

The Court has already ruled that Defendants' nationwide telemarketing campaign is subject to the Telemarketing Sales Rule.[31] (ECF No. 287; ECF No. 298-1 at 34-35). The above undisputed facts, including those admitted by the Corporate Defendants, demonstrate that, in the course of that nationwide telemarketing campaign, Defendants (a) misrepresented materials aspects of the product they sold; (b) misrepresented their own affiliation with the government and multiple private entities; and (c) made false and misleading statements to consumers to induce them to pay for Defendants' phony insurance plans. It is thus beyond genuine dispute that, in each of the above three ways, Defendants have violated the TSR.

---

[31] Defendants marketed products to hundreds of thousands of consumers across the country through the use of outbound telemarketing. (SUMF ¶ 3(c),(d).)

### A.      Defendants' Material Misrepresentations Violated Parts 310.3(a)(2)(iii) and 310.3(a)(4) of the TSR

The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of the goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii). The TSR also prohibits sellers and telemarketers from making any false or misleading statements to induce a person to pay for goods or services. 16 C.F.R. § 310.3(a)(4). As discussed at length in Section IV. above, Defendants made material misrepresentations about the very nature of the products they sold to induce consumers to purchase them, violating these two provisions of the TSR. *Cf. Partners In Healthcare Ass'n*, 189 F. Supp. 3d at 1368.

### B.      Defendants' False Claims of Affiliation Violated Part 310.3(a)(2)(vii) of the TSR.

The TSR also prohibits sellers and telemarketers from misrepresenting, directly or by implication, a seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity. 16 C.F.R. § 310.3(a)(2)(vii). As discussed in Section I.B.2. above, Defendants' lead generation websites deliberately suggested that Defendants were affiliated with AARP and nationally recognized insurance carriers like Blue Cross Blue Shield, and that Defendants were sellers of government-sponsored health insurance. Defendants shored up these claimed affiliations by representing during sales calls that they offered plans from "major A rated carriers." The undisputed evidence establishes that Defendants were not affiliated with AARP or Blue Cross Blue Shield, and that they were not sellers of, or experts on, government-sponsored health insurance. Therefore, Defendants have violated this provision of the TSR. *Cf. FTC v. Life Mgmt. Servs. Of Orange County*, 350 F. Supp.3d 1246, 1264-65 (M.D. Fla. 2018).

Because the undisputed evidence establishes that Defendants violated Parts 310.3(a)(2)(iii), 310.3(a)(4), and 310.3(a)(2)(vii) of the TSR, the Court should enter summary

judgment in favor of the FTC on Count II.

## VI.   The Undisputed Facts Show That Defendants Operated Their Deceptive Scheme as a Common Enterprise.

"If the structure, organization, and pattern of a business venture reveal a 'common enterprise' or a 'maze' of integrated business entities, the FTC Act disregards corporateness." *Washington Data Res.*, 856 F. Supp. 2d at 1271. Courts consider several factors to determine if a common enterprise exists, including: (1) maintaining officers and employees in common; (2) operating under common control; (3) sharing of office space; (4) operating the business through a maze of interrelated companies; (5) commingling of funds; and (6) sharing of advertising and marketing. *See id.*; *FTC v. Lanier Law, LLC*, 715 F. App'x 970, 979 (11th Cir. 2017). Each of these elements favors treating the Corporate Defendants as a common enterprise.

The Corporate Defendants shared common officers and employees, including their Chief Marketing Officer, Chief Compliance Officer, Vice President of Analytics and Operations, and their IT, accounting, and human resources staff. They were commonly controlled by Dorfman, who had a 99% ownership interest in Health Center Management LLC, which owned all of the other Corporate Defendants. Dorfman was the CEO of each Corporate Defendant, and his office was at the Hollywood, Florida location where each of the Corporate Defendants primarily operated.

The undisputed evidence establishes that these interrelated companies operated together as Simple Health to support the telemarketing done by HBO. The revenue for all of the Corporate Defendants consisted almost entirely of the commissions paid for HBO's sales. SIL, for example, received more than 92% of its revenues directly from HBO, which also funded its payroll. Innovative Customer Care had no outside source of revenue. Senior Benefits One's minimal revenues were from telemarketing targeted at consumers over the age of 65. Money was

frequently transferred between the Corporate Defendants. In 2015, the Corporate Defendants were all rebranded under the single DBA of "Simple Health," which was the name on the signs at each of the business locations and the public-facing identity of this operation. (SUMF ¶ 2(e),(g).)

These facts align this case with the many others where courts in the Eleventh Circuit have granted summary judgment in the FTC's favor on common enterprise allegations. *See, e.g.*, *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1269 (S.D. Fla. 2019) (finding a common enterprise among companies that, among other things, "maintained an unholy alliance" as evidenced by shared resources and complete reliance on each other for survival) (internal quotation marks and citation omitted); *FTC v. NPB Advert., Inc*., 218 F. Supp. 3d 1352, 1362 (M.D. Fla. 2016) (finding a common enterprise where corporations operated under common control, commingled funds, shared advertising, and retained the same employees).

## VII.   Defendant Dorfman Is Individually Liable for the Defendants' Violations of the FTC Act and the Telemarketing Sales Rule.

Dorfman is liable for both injunctive and monetary relief for the Corporate Defendants' unlawful practices if he (1) "participated directly in the practices or acts or had the authority to control them" and (2) "had some knowledge of the practices." *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996). The undisputed evidence satisfies both elements.

### A.  Dorfman's Authority to Control or Direct Participation in the Unlawful Practices

The FTC satisfies the participation or control prong by proving *either* authority to control or direct participation. Here, the undisputed facts easily satisfy both prongs.

First, Dorfman had the authority to control Defendants' conduct. Specifically, his undisputed "status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation." *Transnet*, 506 F. Supp. 2d at 1270; *Partners in Health Care Ass'n*,

189 F. Supp. 3d at 1367. That presumption is difficult to rebut and has not been rebutted here.

*Transnet*, 506 F. Supp. 2d at 1270 ("A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception." (internal quotations omitted).

The FTC may also prove authority to control where, as here, the individual is "active[ly] involve[d] in business affairs and the making of corporate policy." *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1233 (11th Cir. 2014). As described in Section I.F. above, Dorfman was fully involved in all business operations and had the authority to make business decisions ranging from the most minor, such as dress code or funds to buy candy for staff, to the most important, such as what Defendants' sales scripts should say, how commissions should be structured, and whether vendors could be paid. He supervised all of the company's executives, had the authority to hire and fire employees, could (and did) place anyone he wanted on the payroll, even people who did not work at the company, such as his wife and mother, and used corporate accounts as his own "personal 'piggy bank.'"

In addition to having control over the enterprise, Dorfman actively participated in the Corporate Defendants' deceptive scheme. Critically, Dorfman reviewed, revised, and approved the misleading sales scripts used by Defendants' telemarketers. He received detailed reports on various metrics of the business, including daily sales numbers, daily cancellations, and the performances of specific lead generation campaigns. He also was heavily involved in marketing and lead generation decisions, including weighing in on which lead generation websites to use and how Defendants would tout an affiliation with BCBS in their marketing. Confronted with compliance issues and complaints, Dorfman directed his employees to lie and cover up the companies' failings, rather than take the corrective measures necessary to honestly enroll

consumers in their plans. This conduct alone establishes his liability. *Partners in Health Care Ass'n*, 189 F. Supp. 3d at 1367 ("Awareness of fraudulent practices and failure to act within one's authority to control such practices is sufficient to establish liability." (internal quotations omitted)).

These facts demonstrate Dorfman's participation in, and authority to control, Defendants' illegal conduct—either of which is sufficient to hold him individually liable for injunctive relief.

### B. Dorfman's Knowledge of the Unlawful Practices

Dorfman also indisputably had "some knowledge" of the unlawful practices. The "knowledge" element is satisfied if Dorfman (1) had "actual knowledge of material misrepresentations" or other unlawful conduct, (2) was "reckless[ly] indifferen[t] to the truth or falsity of such misrepresentations," or (3) had an "awareness of a high probability of fraud" and intentionally avoided knowing the truth. *See FTC v. Wilcox*, 926 F. Supp. 1091, 1104 (S.D. Fla. 1995). "An individual's degree of participation in the business is probative of knowledge." *Partners in Health Care Ass'n*, 189 F. Supp. 3d at 1367. In particular, an individual's "pervasive role and authority" over a defendant creates a "strong inference" that the individual had knowledge. *See FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1082 (C.D. Cal. 2012), *aff'd in part and vacated in part on other grounds*, 815 F.3d 593 (9th Cir. 2016). Evidence of a "pervasive role" includes serving as principal owners and officers, drafting telemarketing scripts, controlling the businesses' finances, and overseeing their activities. *FTC v. Amy Travel Serv.*, 875 F.2d 564, 574-75 (7th Cir. 1989), *overruled on other grounds by FTC v. Credit Bureau Center, LLC*, 937 F.3d 764 (7th Cir. 2019). As discussed above, the undisputed evidence shows that Dorfman did all of those things and more. Dorfman's active participation in Defendants' operations assures that, at a minimum, he had a reckless disregard or awareness of a high probability of fraud with an intentional avoidance of the truth. *See FTC v 1st Guar. Mortg.*

*Corp.*, Case No. 09-cv-61840, 2011 WL 1233207, at *15 (S.D. Fla. Mar. 30, 2011) (*quoting Amy Travel Serv.*, 875 F.2d at 574).[32] This alone would satisfy the knowledge requirement.

The undisputed evidence also convincingly establishes Dorfman's actual knowledge of Defendants' unlawful practices. As discussed, he was fully aware of the misrepresentations in Defendants' scripts, and, by virtue of the daily reports he requested and received, Dorfman was aware that consumers complained daily about the misrepresentations made during Defendants' sales calls. Dorfman received reports from HII and Defendant Girouard about the thousands of complaints regarding agent misrepresentations. He personally listened to sales call recordings and directed his staff to lie about the existence of certain recordings. He even ordered his staff to submit fake positive BBB reviews to hide Defendants' deceptive conduct. Given such facts, courts routinely find individual defendants liable for monetary relief in FTC cases. *E.g.*, *Partners in Health Care Ass'n*, 189 F. Supp 3d at 1368 (finding that individual defendant "had knowledge of the deceptive practices through numerous consumer complaints, the Better Business Bureau's investigation, emails from his employees . . . and the high cancellation rate").[33]

## VIII.   The Court Should Enter the Proposed Order for Injunctive and Monetary Relief.

Pursuant to Section 13(b) of the FTC Act, this Court may enter a permanent injunction for violations of "any provision of law enforced by the FTC." 15 U.S.C. § 53(b). Section 13(b) also gives courts authority to grant "ancillary relief necessary to accomplish complete justice."

---

[32] Indeed, while the record establishes actual knowledge, Dorfman's testimony and discovery responses in this case also illustrate reckless disregard or an intentional avoidance of the truth. When asked in his deposition if he was aware that "consumers complained to departments of insurance about Simple Health," he testified "I wasn't involved in the day-to-days with regards to Simple Health's compliance. Could have heard, you know, from time to time that there may have been one." In response to requests for admission asking whether his companies had ever sold ACA-qualified health plans (as advertised for years) or described their plans as having "no limits on . . . usage" (they did, as scripted), he responded that he did not know.

[33] Although Dorfman has pleaded in his defense that unspecified third parties are actually responsible for the deceptive conduct at issue (ECF No. 346 at 6), the undisputed evidence establishes that Dorfman and his companies participated directly in the unlawful conduct. The potential involvement of others does not immunize the named Defendants.

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984). This includes the authority to order restitution and disgorgement of unlawfully obtained funds. *Partners in Health Care Ass'n*, 189 F. Supp. 3d at 1370 (S.D. Fla. 2016).

Because Defendants' conduct also violated the TSR, Section 19b of the FTC Act provides an independent basis for ordering equitable monetary relief. Section 19b confers upon the FTC the authority to obtain such relief "as the court finds necessary to redress injury to consumers or other persons." 15 U.S.C. § 57b. Moreover, the Eleventh Circuit has explicitly held that where liability is established for "violation[s] of [both] section 5(a) and the TSR, the FTC [is] entitled to seek relief under both section 13(b), 15 U.S.C. § 53(b), and section 19(b), 15 U.S.C. § 57b, of the FTC Act." *FTC v. Washington Data Res., Inc.*, 704 F.3d 1323, 1326 (11th Cir. 2013).

Here, because there is a cognizable danger that Defendants, if left to their own devices, would again violate the FTC Act and the TSR, a permanent injunction is necessary to protect future consumers. As part of a common enterprise, through which they engaged in concerted wrongdoing, Defendants are jointly and severally liable for equitable monetary relief. The appropriate measure here is the full amount Defendants collected in commissions.

**A. The Court Should Enter a Permanent Injunction Against Defendants.**

Section 13(b) of the FTC Act authorizes the Court to issue a permanent injunction when a defendant violates any law enforced by the FTC and there is "some cognizable danger" that they will continue to violate such laws. *See, e.g., USA Fin., LLC*, 415 F. App'x at 975 (11th Cir. 2011); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (to issue a permanent injunction, court must only determine that there is "some cognizable danger of a recurrent violation, something more than the mere possibility which serves to keep the case alive"). Not only does Defendants' egregious misconduct in this case alone necessitate strong injunctive

relief, but their history of ignoring warnings from and misleading regulators evidences an

unwillingness to course correct even when faced with disciplinary action.

The attached proposed permanent injunction would ban the Defendants from engaging in

any future telemarketing as well as the marketing and sale of any healthcare-related products.

The proposed order would also prohibit them from making misrepresentations in the sale of any

other products. Defendants' shameless scheme to prey on vulnerable consumers in need of health

insurance and their repeated lies to state regulators and law enforcement about the existence of

damning sales call recordings show that absent these bans, Defendants are likely to deceive

consumers again through similar means. The order also would impose standard compliance

reporting, monitoring, and recordkeeping obligations that will aid the FTC in monitoring

Defendants' compliance. Each provision is similar or identical to those imposed by courts in this

district in other FTC matters. *See, e.g., FTC v. Partners In Health Care Ass'n*, Case No. 14-

23109-CIV-SCOLA (S.D. Fla. June 27, 2016), ECF No. 206 (after granting summary judgment

for FTC, imposing nearly identical healthcare-related and telemarketing bans and monetary

judgment against defendants);  *FTC v. Pointbreak Media, LLC*, Case No. 18-CIV-61017-CMA

(S.D. Fla. April 25, 2019), ECF No. 266 (after granting summary judgment for FTC, imposing

telemarketing and other bans and monetary judgment against individual defendants). The

proposed order also would prohibit further charges to Defendants' victims absent the consumer's

affirmative consent to ongoing enrollment and fees, which would be ascertained by a notice

process undertaken by the Receiver.

### B.  The FTC Seeks Reasonable and Appropriate Equitable Monetary Relief to Refund What Defendants Took From Consumers.

Eleventh Circuit law holds that Defendants' gross revenues, less refunds and

chargebacks, is the appropriate measure of monetary relief. *Washington Data Res., Inc.*, 704 F.3d

at 1327. The attached proposed permanent injunction would impose a $195,466,443 judgment against Dorfman and the Corporate Defendants as equitable monetary relief.[34] Where, as here, Defendants have made material and widespread misrepresentations, consumer reliance is presumed. *See, e.g., McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000). Defendants bear the burden of proving any offsets by providing evidence that individual consumers were not injured by their unlawful conduct. *See, e.g., FTC v. Bronson Partners, LLC*, 654 F.3d 359, 369 (2d Cir. 2011). Because Defendants have thus far not established a factual basis for any such offsets, the Court should enter a monetary judgment of $195,466,443.

## IX.        Conclusion

For the foregoing reasons, the FTC respectfully requests that the Court grant the FTC summary judgment against Dorfman and the Corporate Defendants on all counts in its Second Amended Complaint and enter the attached proposed final order of permanent injunction and monetary judgment.

---

[34] This amount likely understates appropriate equitable monetary relief. Although Defendants began operating in 2012, the earliest data produced to the FTC concerning Defendants' revenues is from October 2013.

Dated: January 15, 2021        Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

*/s/ Elizabeth C. Scott*
ELIZABETH C. SCOTT, Special Bar No. A5501502
escott@ftc.gov; (312) 960-5609
JOANNIE WEI, Special Bar No. A5502492
jwei@ftc.gov; (312) 960-5607
PURBA MUKERJEE, Special Bar No. A5502694
pmukerjee@ftc.gov; (312) 960-5611
Federal Trade Commission
230 S. Dearborn Street, Suite 3030
Chicago, Illinois  60604
Telephone:  (312) 960-5634
Facsimile: (312) 960-5600

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on January 15, 2021, by the Notice of Electronic Filing, and was electronically filed with the Court via the CM/ECF system, which generates a notice of filing to all counsel of record.

*/s/ Elizabeth C. Scott*
ELIZABETH C. SCOTT
Special Bar No. A5501502