UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CV-62593-GAYLES/STRAUSS

FEDERAL TRADE COMMISSION,

     Plaintiff,

vs.

SIMPLE HEALTH PLANS LLC, *et al.*,

     Defendants.

_____/

## ORDER GRANTING PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION TO EXCLUDE PROFFERED EXPERT TESTIMONY OF DR. ERIC D. DEROSIA

**THIS CAUSE** is before the Court upon Plaintiff Federal Trade Commission's [("FTC's")] Motion to Exclude Proffered Expert Testimony of Dr. Eric D. DeRosia ("*Daubert* Motion"). (DE 371). The District Court referred the *Daubert* Motion to me for disposition. (DE 372). Defendant Steven Dorfman responded to Plaintiff's *Daubert* Motion on January 21, 2021 ("Response") (DE 386), to which Plaintiff replied on January 28, 2021 ("Reply") (DE 387). Plaintiff's Motion, therefore, is now ripe for disposition. I have carefully reviewed Plaintiff's *Daubert* Motion, the Response, the Reply, and am otherwise duly advised in the premises. For the reasons stated herein, the *Daubert* Motion is **GRANTED**.

## I.   BACKGROUND

This case arises from an FTC enforcement action seeking equitable relief based upon allegations that Defendants engaged in a classic bait and switch scheme to sell limited benefit insurance plans and medical discount memberships to consumers as comprehensive health insurance. (DE 1; DE 139 at 1; DE 289). As the Receiver in this case explained, the difference between the products sold by Defendants and comprehensive health insurance is that "[t]here is no

shifting of the risk" under the products sold by Defendants. (DE 122 at 10). Rather, "the ultimate risk of catastrophic medical bills falls on the consumer and in many cases this [  ] led to devastating financial consequences" to consumers. *Id.* On May 23, 2019, Plaintiff filed "Plaintiff's Expedited Motion Authorizing Notification of Existing Customers About Deceptively Sold Plans and Opportunity to Obtain Comprehensive Health Insurance ("Motion to Notify").[1] (DE 144). The Court's Order, issued on June 13, 2019, granting the Motion to Notify ("Order Authorizing Notification") included the following template for use in notifying customers ("Notice" or "Notices"):[2]

---

[1] The District Court held a hearing on the Motion to Notify on June 13, 2019 ("Hearing"). (DE 386-3 at 2). At the Hearing, Plaintiff and the receiver explained that, in a typical case where a temporary restraining order and preliminary injunction is issued, the defendant(s) would have been prohibited from continuing to bill customers because the receiver would have had control over the products' billing and payment mechanism. *Id.* at 6-7, 19, 21. Here, however, a third party who is not a defendant in the case was doing the billing. *Id.* at 7. Thus, notice(s) were required in the absence of the receiver's ability to directly terminate the billing. Defendants objected to any notification of consumers. *Id.* at 8. Given that the Court determined notification was necessary, however, Defendants suggested that consumers be told that "if you go get care, your coverage is going to be limited to the information related to the policy" and that such notification be accompanied by the policy information that was required to be (and was) delivered to consumers after purchase. *Id.* at 9. The Court responded to Defendants' request by explaining that Defendants' proposal "eliminat[ed] the finding that . . . that **there was deception involved**" in the sale of the products at issue. *Id.* at 9-10 (emphasis added). The Court also heard oral argument at the Hearing regarding whether consumers should have to affirmatively "opt-in" to maintain their coverage. Id. at 13-22. The receiver supported Plaintiff's position "on having a policyholder actually take an affirmative step to actually retain the policy." *Id.* at 22. As detailed below, however, the Court, approved a form of notice that provided for a default option whereby a policyholder would retain the policy and continue making payments if the policyholder did nothing.

[2] The Response defines the Notice as the "Opt Out Notice" and remarks that "[d]espite the loaded language in the Opt Out Notice and numerous [(four)] notices, at most 23% of consumers (the '**Opt Out Rate**') opted out of their . . . [p]lan[ ]." (DE 386 at 8) (emphasis in original). In this Report, I use the terms "Notice" and "Cancellation Rate" rather than "Opt Out Notice" and "Opt Out Rate."

**CONSUMER NOTICE TO SIMPLE HEALTH CUSTOMERS**

**EMAIL SUBJECT LINE:** Important Notice: Your Healthcare Plans May Have Been Sold Deceptively. Decision Required

**TEXT:**

You're getting this message because you bought a healthcare plan from Simple Health Plans. The Federal Trade Commission (FTC), the nation's consumer protection agency, has sued Simple Health for deceiving its customers.

Simple Health claimed to offer comprehensive health insurance or PPOs that would cover many of your medical needs. But Simple Health sold only medical discount memberships, limited benefit plans, and other products that provide a small reimbursement or discount for a few services.

**That means your Simple Health Plan is not comprehensive health insurance. If you get sick or have to go to the hospital, you may have to pay almost all of your medical bills.**

Because of the lawsuit, you have two decisions to make soon.

DECISION #1: What to do about your Simple Health Plan

You can:

1. **Cancel your plan.** Call [number] or visit [URL] to cancel your plan. Health Insurance Innovations (HII), the company that bills you monthly, will stop charging you immediately.

2. **Continue paying for your plan.** If you don't call [number] or visit [URL] by [date certain], we will assume you choose to continue your plan. **But remember that what you're paying for is _not_ comprehensive health insurance. If you get sick or have to go to the hospital, you may have to pay almost all of the bills yourself.**

DECISION #2: Whether to apply for comprehensive healthcare coverage

**You may still be able to buy a health insurance plan through the federal Marketplace, www.healthcare.gov. The open enrollment period is over, but the Department of Health and Human Services is providing an exception for people who receive this notice. To apply for coverage through the**

3

**Marketplace, you must take these steps by [date certain – 60 days from date notice is sent]:**

- Visit www.healthcare.gov to create an account and fill out an application to see if you are eligible to purchase Marketplace coverage.

- If you are eligible to purchase a Marketplace plan, call the Marketplace Call Center at **1-800-318-2596** (TTY: 1-855-889-4325). Tell the representative you were a Simple Health customer who bought a plan based on its representations that you were purchasing a comprehensive plan. You can mention the FTC case against Simple Health. The representative will help you enroll using a special enrollment period.

- In the event your eligibility for a special enrollment period cannot be verified at the time of your call, the representative will submit a special enrollment period request for you, which will take up to two weeks to be reviewed. You will get a letter in the mail saying if your request has been approved. If it's approved, choose a plan by visiting www.healthcare.gov or calling the Marketplace Call Center at 1-800-318-2596. **The deadline for Simple Health customers to get coverage through the Marketplace is [date certain – 60 days from date notice sent,] so you must act soon.** If you have questions, call the Marketplace Call Center.

- If you live in CA, CO, CT, DC, ID, MA, MD, MN, NY, RI, VT, or WA, your state operates its own marketplace exchange. Contact your State Exchange directly for help with your application: [insert state exchange phone numbers]

For more information about the FTC's lawsuit against Simple Health, visit: ftc.gov/simplehealthlawsuit.

Sincerely,

Name
affiliation

(DE 162 at 6-7) (formatting modified).  The Order Authorizing Notification directed that existing customers would twice be sent the Notice and that the Notice could be based upon a template that was substantially similar to the above if approved by the Receiver, provided that the Notice included the following:

4

1) notice that the Products they purchased from Defendants are not comprehensive health insurance or its equivalent;

2) accurate information about the Products purchased and the limited coverage offered by such Products;

3) a simple mechanism to opt-in to continue paying for and receiving the Products;

4) notice that the consumers are eligible for a special enrollment period offered by the Center for Medicare and Medicaid Services, during which they can apply for comprehensive health insurance plans through the government-sponsored marketplace; and

5) instructions for how to access the special enrollment period to apply for a plan.

(DE 162 at 2-4).

In March 2020, Defendant Dorfman's counsel retained Dr. DeRosia as an independent consultant to opine on two questions:

Question 1: Does the **Cancellation Rate**[3] that was caused by the Customer Notice Letter [(Notice)] offer any **probative value** regarding . . .

. . . whether Customers **believed** the products they purchased from Simple Health were "comprehensive health insurance" plans when making their initial purchase decision?

. . . whether a belief that the products were "comprehensive health insurance" plans would have been **material** to Customers' initial decision?

Question 2: If the **Cancellation Rate** were to be used as evidence regarding these Customer beliefs and their materiality, would the evidence be biased to yield an **inflated and over-estimated** measure of Customer beliefs and materiality?

---

[3] Dr. DeRosia defined Cancellation Rate as the percentage of Customers (defined as those "'Existing Customers' . . . as described in the Court's Order Authorizing Notification to Existing Customers") who cancelled the plan sold by Defendants following the instructions in the Notice.

(DE 371-2 at 5) (emphasis in original).[4]   As to Question 1, Dr. DeRosia opined that the Cancellation Rate caused by the Notices offers no probative value as to whether Customers believed that they were purchasing comprehensive health insurance when they purchased products sold by Defendants or whether such belief would have been material to their purchase decision. *Id.* at 5.   Further, Dr. DeRosia opined that the Cancellation Rate caused by the Notices offers "no reliable evidence whatsoever" as to Customers' beliefs or their materiality, "as they existed among Customers before [receipt of the Notices]" ("Opinion 1").   *Id.* at 5-6.   As to Question 2, Dr. DeRosia opined that, because the Notice "consistently and repeatedly biases Customers responses toward a higher Cancellation Rate," it "would very likely be biased to yield an **inflated and over-estimated** measure" if used as evidence regarding Customers' beliefs and their materiality ("Opinion 2").   *Id.* at 6 (emphasis in original).

Dr. DeRosia considered a number of materials in forming his opinions, including a form of the Notice substantially the same as the Notice set forth above and the "website to which consumers [were] directed in the . . . [Notice] (ftc.gov/simplehealthlawsuit)" ("Website"), page 1 of which is shown below as taken from Dr. DeRosia's Report:

---

[4] Defendant's Response attaches a copy of Dr. DeRosia's Report.  (DE 386-2).  For the sake of expediency, the Court references only the copy of Dr. DeRosia's Report attached to Plaintiff's motion.

4/4/2020                    FTC Halts Purveyors of Sham Health Insurance Plans | Federal Trade Commission



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

**Appendix D to the Expert Report of Dr. DeRosia**
The email/letter that was sent to consumers asks them to visit ftc.gov/simplehealthlawsuit. On April 4, 2020, I visited that website. It instantly and automatically redirects visitors to www.ftc.gov/news-events/press-releases/2018/11/ftc-halts-purveyors-sham-health-insurance-plans. I captured the website as a PDF file, as shown below.

# FTC Halts Purveyors of Sham Health Insurance Plans

## Florida-based Simple Health Plans LLC has collected more than $100 million with deceptive scheme targeting Americans in need of coverage

·  ·  ·

## Share This Page

FOR RELEASE

November 2, 2018

TAGS: deceptive/misleading conduct | Bureau of Consumer Protection | Midwest Region | Consumer Protection | Advertising and Marketing | Health Claims | Telemarketing

**Footnote A**

At the request of the Federal Trade Commission, a federal judge temporarily shut down a Florida-based operation that allegedly collected more than $100 million by preying on Americans in search of health insurance, selling these consumers worthless plans that left tens of thousands of people uninsured. Many of these consumers have incurred substantial medical expenses and have been stuck with thousands of dollars in unpaid medical bills.

**Footnote B**

A federal court temporarily halted the operation pending resolution of the case. The FTC seeks to permanently stop the defendants' practices and return money to consumers.

**Footnote C**

In a complaint filed in federal court against Simple Health Plans LLC, the company's owner, Steven J. Dorfman, and five other entities, the FTC alleged that the defendants misled people to think they were buying comprehensive health insurance that would cover preexisting medical conditions, prescription drugs, primary and specialty care treatment, inpatient and emergency hospital care, surgical procedures, and medical and laboratory testing.

Consumers who enrolled reported paying as much as $500 per month for what was actually a medical discount program or extremely limited benefit program that did not deliver the promised benefits and effectively left consumers uninsured, the FTC alleged.

"Many consumers were misled into thinking they had purchased comprehensive health insurance, but when they needed to rely on that insurance, they learned they had none of the promised benefits," said Andrew Smith, the Director of the FTC's Bureau of Consumer Protection. "The plans defendants were selling are not health insurance and they aren't a substitute for health insurance. Get the details in writing and take your time before signing up for any of these plans."

ᴬ Link is to an electronic copy of this case's Dkt. No. 12 (https://www.ftc.gov/system/files/documents/cases/simple_health_plans_tro_memo.pdf)
ᴮ Link is to an electronic copy of this case's Dkt. No. 15 (https://www.ftc.gov/system/files/documents/cases/simple_health_tro_signed.pdf)
ᶜ Link is to an electronic copy of this case's Dkt. No. 1 (https://www.ftc.gov/system/files/documents/cases/simple_health_plans_complaint_11-2-18.pdf)

https://www.ftc.gov/news-events/press-releases/2018/11/ftc-halts-purveyors-sham-health-insurance-plans                    1/3

(DE 371-2 at 31). Dr. DeRosia also stated that the following understandings informed his opinions:

"It is my understanding that the legal definition of false advertising[5] is similar to the definition in consumer psychology:[6] an advertisement is false or misleading if it has deceived consumers in a way that was material to their purchase decision. This definition has two separate[7] components: (1) consumers were deceived, meaning that due to the advertisement, consumers believed (i.e., understood or perceived) something about the product/service that was untrue, and (2) the consumer's untrue belief was material to their purchase decision, meaning that the belief is sufficiently important to be at least part of the reason that consumers chose to purchase the product/service.[8] Therefore, in this report I will use the terms "beliefs" and "materiality" according to the following definitions:

> Beliefs: The extent to which Customers believed the health insurance products marketed by Simple Health were "comprehensive health insurance" when they purchased the product from Simple Health.

---

[5] Dr. DeRosia's report cites in a footnote here:

the FTC Act, 15 U.S.C. §55 (a)(1) ("The term 'false advertisement' means an advertisement ... which is misleading in a material respect.").

[6] Dr. DeRosia's report cites in a footnote here:

Michael J. Barone, Kay M. Palan, & Paul W. Miniard, *Brand Usage and Gender as Moderators of the Potential Deception Associated with Partial Comparative Advertising*, 33 JOURNAL OF ADVERTISING 19, 19 (2004) ("An initial determination that must be made is whether the ad is likely to mislead consumers. In addition, the deceptive effects associated with the ad must be material, that is, the ad must influence consumer beliefs regarding product attributes that are of sufficient salience to potentially influence choice behavior.").

[7] Dr. DeRosia's report cites in a footnote here:

*North American Medical Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1224 (11th Cir. 2008) (Differentiating whether "the ads deceived, or had the capacity to deceive, consumers" from whether "the deception had a material effect on purchasing decisions.")

[8] Dr. DeRosia's report cites in a footnote here:

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002) ("The materiality requirement is based on the premise that not all deceptions affect consumer decisions.").

Materiality: The extent to which those beliefs among Customers were material to their purchase of a plan marketed by Simple Health.

## II.   LEGAL STANDARDS

"Under [Federal] Rule [of Evidence] 702 and *Daubert*, district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). The court's inquiry, however, is a flexible one. *Daubert*, 509 U.S. at 594. For an expert's testimony to be admissible, a party must demonstrate that the following elements are satisfied (by a preponderance of the evidence):

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Rink*, 400 F. 3d at 1291-92 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). While an analysis of the foregoing elements may necessarily entail some overlap, the concepts of qualification (first element), reliability (second element), and fit or helpfulness (third element)[9] are nonetheless distinct concepts that should not be conflated. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

In exercising its gatekeeping role, a court should not "make ultimate conclusions as to the persuasiveness of the proffered evidence." *Id.* Instead, a court should analyze the methodology of the expert at issue. *Id. See also Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely

---

[9] The third element, "goes primarily to relevance." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir. 2016) (quoting *Daubert*, 509 U.S. at 591).

9

on principles and methodology, not on the conclusions that they generate."). That is because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. In other words, the gatekeeper role of the court "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)).

III.   **ANALYSIS**

Here, I agree with Plaintiff that Dr. DeRosia's testimony is not reliable nor helpful for reasons that I explain below. Plaintiff argues that Dr. DeRosia's opinions are unreliable because they are based on "unsupported speculation." (DE 371 at 16-20). As to Opinion 2 specifically, Plaintiff argues that the opinion fails to consider relevant areas of inquiry, ignores contrary evidence, and is untethered from the facts of the case. *Id.* at 20-24. Additionally, Plaintiff argues that the opinions are unhelpful because they do not address matters that require an expert. *Id.* at 10-13. Furthermore, Plaintiff argues that Dr. DeRosia offers improper legal opinion as to the implications of the contents of the Notices. *Id.* at 13-16. Plaintiff also argues that Dr. DeRosia's opinions are irrelevant in that Plaintiff's motion for summary judgment does not rely on the Cancellation Rate.[10] *Id.* at 10. Plaintiff does not attack Dr. DeRosia's qualifications, only the reliability and helpfulness, or fit, of the opinions he proffered.

---

[10] I note that Dr. DeRosia's opinions would only become relevant in the hypothetical event that Plaintiff sought to affirmatively use the Cancellation Rate as evidence that Customers were deceived or that the deceptive statements were material. While Plaintiff asserts that it has not relied on the Cancellation Rate in its summary judgment motion, Plaintiff fails to state that it will not under any circumstances rely on such evidence in this case, such as if its summary judgment motion fails and the case proceeds to trial. Thus, the Court cannot grant the motion on the basis of Plaintiff's relevance argument alone. However, because Plaintiff fails to state that it will not

Defendant Dorfman ("Defendant"), on the other hand, argues that Dr. DeRosia's opinions *are* reliable because his analysis is supported by "numerous studies and data from peer-reviewed publications and journals," and his opinions were not simply based upon speculation and conjecture as Plaintiff alleges. (DE 386 at 15-21). Further, Defendant argues that Dr. DeRosia was not required "to consider every potential area of inquiry in reaching his opinions," and the alleged unexplored areas of inquiry would go to the weight of the opinions and be in the province of a rebuttal expert, which Plaintiff chose not to engage. *Id.* at 6-7, 16. Defendant also argues that Dr. DeRosia's opinions *will* assist the trier of fact because the trier of fact will decide whether the Cancellation Rate is probative of materiality and whether Defendants' alleged misrepresentations were material, and Dr. DeRosia opines on the *impact*, if any, the Notice(s) had on the Cancellation Rate. *Id.* at 10-11. Specifically, Defendant argues that Dr. DeRosia's "testimony is not that the Defendants' alleged misrepresentations were material or not, which [Defendant] agrees are the province of the trier of fact," but rather that the opinions relate to the impact of the Notice on the Cancellation Rate and the reliability of the Cancellation Rate as a metric. *Id.* at 15.

### A. **Reliability**

In assessing reliability, courts consider whether the reasoning or methodology underlying an expert's testimony is scientifically valid and whether the reasoning or methodology can properly be applied to facts of the case. *United States v. Frazier*, 387 F.3d 1244, 1261–62 (11th

---

rely on the Cancellation Rate as evidence at all, I find it necessary to note that the Notices were never intended to create a neutral statistical case study of what Customers believed about their health plans when they bought them or the materiality of descriptions of those plans. The Notices were intended to warn Customers about deception based on the Court's preliminary findings. (DE 386-3 at 9). Therefore, I question the wisdom and propriety of putting forth the Cancellation Rate as a measure of Customers' beliefs or the materiality of Customers' beliefs should the case proceed to trial.

Cir. 2004) (citation omitted).   Courts may use the following four guideposts to assist with the reliability evaluation: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community."   *Id.* at 1262 (citations omitted).   These guideposts are non-exhaustive inquiries, and alternative questions may be more probative of reliability.   *Id.*   As a result, trial judges have considerable discretion in determining whether a particular expert's testimony is reliable.   *Id.* at 1258 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

With these principles in mind, I find Plaintiff's arguments to be persuasive as to why Dr. DeRosia's testimony is not reliable.   Plaintiff arguments are as follows: (1) the opinions were based upon speculation rather than available data or empirical research (DE 371 at 17-19; DE 387 at 11); (2) Opinion 2 ignores relevant areas of inquiry that would contradict his opinion (DE 371 at 20-23; DE 387 at 13); and (3) Opinion 2 is disconnected from the facts of this case because it treats the notices as advertising when they are not (DE 371 at 23-24; DE 387 at 14).   I discuss each of these arguments in turn.

### 1.   Whether Dr. DeRosia's Opinions are Based Upon Speculation

Plaintiff's first argues that Dr. DeRosia's opinions are based upon speculation because he did not use empirical data available to test his conclusions.   (DE 371 at 17; DE 387 at 11).   In support for the proposition that Dr. DeRosia's opinions should be excluded for failure to use empirical data, Plaintiff cites *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256-57 (11th Cir. 2002).   In *McCorvey*, which was a product defect suit, the engineering expert's affidavit was excluded because the expert did not test alternative designs, did not talk with appropriate persons,

could not cite scientific literature in support of theories, and did not consider or test possibilities for failure not inherent in the product itself.  Plaintiff also cites *McDowell v. Brown*, 302 F.3d 1283, 1300 (11th Cir. 2004), a § 1983 suit for delayed medical treatment.  *McDowell* excluded an expert's opinion that a plaintiff's injury could have been prevented if plaintiff had entered surgery four hours sooner because the opinion was not based upon "empirical data, survey, study, or literature" to support the expert's theory and because the expert had not tested his theory "nor determined any error rate associated with it."

Here, Plaintiff argues that Dr. DeRosia failed to consider primary evidence in forming his opinions.  (DE 371 at 17).  Indeed, Plaintiff avers that Dr. DeRosia conceded that he could have conducted a survey to test "any and all" parts of his opinions but did not.  (DE 371 at 17; DE 371-3 at 40).  Plaintiff also argues that Dr. DeRosia failed to interview any of Defendants' customers, failed to listen to any of Defendants' consumer calls or recordings of such calls and failed to review any call scripts, transcripts, complaints, or purchase and cancellation data.  (DE 371 at 18; DE 371-3 at 44:12-45-8).  Further, Plaintiff notes that Dr. DeRosia testified that he did not even know the Cancellation Rate attributable to the Notices despite the fact that it was a defined term in his report and was the subject of the questions that his opinions addressed.  (DE 371 at 18; DE 371-3 at 61:1-63:4).  Additionally, Plaintiff argues that Dr. DeRosia even admitted that there is "not an empirical basis for [his] opinion."  (DE 371 at 17; DE 371-3 at 75:18-76:8, 96:14-15).

Defendant argues that Dr. DeRosia's opinions are rooted in peer-reviewed and accepted research, data, and methodologies.  (DE 386 at 16).  Defendant asserts that Dr. DeRosia analyzed "consumers' likely response" to the Notice(s) by applying generally accepted empirical methods and data to the Notice's contents, nature, and structure.  *Id.*  Furthermore, Defendant argues that

Dr. DeRosia is not required to "consider every possible source of information under the sun in reaching his . . . opinions." *Id.* at 17.  Defendant also attacks Plaintiff's legal citations as "overly-simplified and distinguishable because the experts in those cases "failed to . . . address the factual foundation for [the] opinion, or failed to consider alternative theories that would have discredited the expert's *entire* testimony." *Id.* at 18 (emphasis in original).  Defendant argues that Plaintiff's alleged deficiencies in Dr. DeRosia's opinions go to weight and not admissibility citing, in part, *Daubert*, 509 U.S. at 596 for the proposition that "the appropriate method of challenging [less credible] testimony is through cross-examination rather than exclusion." *Id.*

Here, I credit Plaintiff's argument that Dr. DeRosia's opinions lack reliability because he failed to consider empirical data and test his theory.  Dr. DeRosia did not use empirical data available to evaluate whether Customers believed that the health insurance products marketed by Defendants were "comprehensive health insurance" at the time they purchased the products.  Yet, he essentially opines that the Cancellation Rate has no bearing on what Customers believed.  In Opinion 2, he goes even further to essentially state that the Cancellation Rate would overestimate the number of Customers who purchased Defendants' products because they believed that Defendants' products were comprehensive health insurance.  Dr. DeRosia did not test his theory through available empirical data that the Notices "biase[d] Customers responses toward a higher Cancellation Rate" such that the Cancellation Rate would be an inflated estimate of consumer beliefs and materiality.  As Plaintiff notes, data was available, and Dr. DeRosia acknowledged that he could have conducted, but did not conduct, a survey to test his opinions.  That Dr. DeRosia analyzed "consumers' likely response" to the Notice(s), as Defendant argues, does not make his opinions reliable in the face of his failure to consider available empirical data and in the absence

14

of testing that could determine the actual basis for Customers' responses and their actual beliefs. Thus, I conclude that Plaintiff correctly argues that Dr. DeRosia's opinions are founded on speculation.  *See Frazier*, 387 F.3d at 1265 (upholding district court's decision to exclude probalistic opinion without hard information concerning rates).

## 2.  <u>Whether Opinion 2 Ignores Relevant Areas of Inquiry</u>

Plaintiff argues that Opinion 2, stating that the Cancellation Rate "would very likely be biased to yield an inflated and over-estimated measure of consumer beliefs and materiality" ignored other factors that Dr. DeRosia admitted would necessarily depress the Cancellation Rate. (DE 371 at 21-23).  In its Reply, Plaintiff argues that Defendant concedes that Dr. DeRosia ignored other relevant areas of inquiry by not addressing Plaintiff's argument in this regard in his Response. (DE 387 at 12-13).  In particular, Plaintiff argues that Dr. DeRosia acknowledged familiarity with "open rates"—the rate at which consumers open letters and emails—but did not consider this in arriving at his conclusion that the Cancellation Rate was an overinflated measure of Customers' beliefs and materiality.  (DE 371 at 21; DE 371-3 at 34).  Additionally, Plaintiff argues that Dr. DeRosia's report omits discussing status quo bias despite Dr. DeRosia demonstrating familiarity with the principle by defining it as the "tend[ency] to choose the default option" in the face of a choice.  (DE 371 at 22; DE 371-3 at 36).  Dr. DeRosia acknowledged in his deposition that the Notice(s) provided a "default choice."  (DE 371-3 at 38).  The Notice(s) provided a default option by stating "we will assume you choose to continue your plan" if the Customer did not act to cancel the plan.  (DE 162 at 6).  Dr. DeRosia stated that, "in [his] view that [default option was] specifically mandated by the Court, so [he] did not view it as part of [his] purview and sort of nothing [he] could really comment on."  (DE 371-3 at 38).  Plaintiff notes that Dr. DeRosia

backtracked later in his deposition and stated that he "did contemplate the questions of open rate and default response, but . . . decided that . . . those were not relevant." (DE 371 at n.6; DE 371-3 at 39).

Defendant argues that Plaintiff "cannot honestly assert that [the lack of consideration of open rates] significantly undermines Dr. DeRosia's Expert Opinions" on the basis that Plaintiff communicated to the Court that the procedure for sending four copies of the Notice "would ensure that consumers would receive, read, and act as appropriate." (DE 386 at 19-20). Defendant also argues that Dr. DeRosia's failure to consider alternative impacts to the Cancellation Rate goes to the weight and not to the admissibility of his opinion. *Id.* at 20. Further, Defendant argues that Plaintiff's failure to introduce a rebuttal expert should not give Plaintiff "unassailable authority to declare what evidence and methodologies Dr. DeRosia should have considered." *Id.*

I find that Plaintiff has demonstrated that Dr. DeRosia did not consider relevant areas of inquiry that would have contradicted Opinion 2. Dr. DeRosia acknowledges the areas of inquiry—default choice and status quo bias—that Plaintiff argues would depress the Cancellation Rate. Dr. DeRosia's conclusory assertion that these areas of inquiry were not relevant is unpersuasive as is Defendant's assertion that these areas of inquiry would be rendered irrelevant by the sending of four Notices. Certainly, a default choice and status quo bias can apply to four Notices just as such considerations can apply to one Notice, and Defendant does not offer any explanation to the contrary. Therefore, I conclude that Dr. DeRosia failed to consider relevant alternative explanations for the Cancellation Rate, which failure renders his methodology unreliable.

### 3.   **Whether Opinion 2 is Disconnected from the Facts**

Plaintiff argues that, by treating the Notices as advertisements, Dr. DeRosia's second opinion suffers from "'too great an analytical gap between the data and the opinion proffered,' and his opinion is thus 'connected to existing data only by [his own] *ipse dixit*.'"  (DE 371 at 23) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  In its Reply, Plaintiff argues that Defendant "barely bothers to rebut" its contention that Dr. DeRosia's opinion suffers from an analytical gap.  (DE 371 at 14).  Plaintiff asserts that, instead, Defendant argues only that Dr. DeRosia's methodology relied on comparing: (1) neutral and non-persuasive notices;[11] and (2) intentionally persuasive advertisements; with (3) the Notice(s).  (DE 387 at 14).  Plaintiff contends that this description of the underpinnings of Dr. DeRosia's methodology highlights the problem because the Notice(s) are neither non-persuasive survey stimuli ("Neutral Surveys") nor advertisements ("Advertisements"), which Dr. DeRosia himself conceded.  *Id.*  Thus, as in the *Daubert* Motion, Plaintiff argues that the Notice(s) are not analytically connected to Neutral Surveys and Advertisements, and such disconnectedness causes the gap that renders Dr. DeRosia's testimony unreliable.  (DE 371 at 23-24; DE 387 at 14).  Defendant, on the other hand, justifies Dr. DeRosia's comparison of the Notice(s) with Neutral Surveys and Advertisements by arguing that the Notice "had numerous qualities that render it more like a persuasive advertisement, biasing consumers towards opting out of their health insurance plans, as opposed to a neutral notice."

---

[11] Dr. DeRosia's report observes regarding Question 2 that the Notice(s) "var[y] *substantially* from the neutral and unbiased consumer surveys that courts have traditionally relied upon when they need empirical evidence regarding beliefs and materiality in false advertising cases."  (DE 371-2 at ¶16).

(DE 386 at 20).  Defendant also asserts, once again, that any deficiency in Dr. DeRosia's opinion goes only to its weight.  *Id.* at 20-21.

Here, Plaintiff correctly argues that an excessive analytical gap exists between the data that Dr. DeRosia relied upon and his opinion that the Cancellation Rate would represent an overestimation of Customers' beliefs and materiality.   As Plaintiff notes, Dr. DeRosia acknowledged at his deposition that there is no basis in his academic discipline for measuring a non-advertisement by the standards of an advertisement:

> Q:     [Y]ou are not comparing ads to things that aren't advertising anything at all, like a passage in a book an encyclopedia or something? . . . I mean specifically the empirical studies that you are citing . . .
>
> A:     . . . no, it would not be looking at just a passage in a book, it would be something that could be an advertisement but is not.

(DE 371 at 24; DE 371-3 at 30-31).  In the deposition excerpt that Plaintiff attached, Dr. DeRosia went immediately on to explain that: "[advertorials are] something that doesn't really look like to consumers that it's an ad when, in fact, it is an ad.  That is all of this kind of research."  (DE 371-3 at 31).  Thus, I find that Dr. DeRosia was using research about advertisements to derive his conclusions about the Notices, which are not advertisements.

Plaintiff also notes that Dr. DeRosia stated that he was unaware of any other expert having analyzed a court-ordered notice in the way that he did.  (DE 371 at 24; DE 371-3 at 42).  Plaintiff cites *Kumho Tire*, 526 U.S. at 152 for the principle that the Court must "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  (DE 371 at 24).  Here, Dr. DeRosia admits that "this was a unique situation as far as I can tell at least with regard to the specifics of a Court ordered Customer Notification Letter."  (DE 371-3 at 42).  Defendant does not even address, let alone dispute,

Plaintiff's argument that Dr. DeRosia's second opinion relies upon a methodology not previously used in his field.  Neither does Defendant counter Plaintiff's assertion that the analytical gap between the Notice(s) and the comparators that Dr. DeRosia uses renders Opinion 2 unreliable. Rather, Defendant merely asserts generally that any deficiencies in the opinions go to weight. Accordingly, I find that Defendant fails to demonstrate that the methodology Dr. DeRosia used in forming Opinion 2 is reliable.

### B.  Fit or Helpfulness

For reasons I explain herein, Defendant fails to carry his burden to show that Dr. DeRosia's testimony will be helpful to the trier of fact.  Here, the parties dispute: (1) whether Dr. DeRosia addresses matters that require expert testimony, and (2) whether Dr. DeRosia's opinions are mere legal conclusions.  I address each of these issues below.

### 1.  Whether the Matters addressed Require Expert Testimony

Plaintiff argues that Dr. DeRosia's testimony does not concern matters that are beyond the average lay person's ability to understand.  (DE 371 at 10-13).  Defendant argues that Dr. DeRosia's opinions are helpful because his "specialized expert testimony contextualizes the [Cancellation Rate]," which may affect the trier of fact's determination whether Defendants' alleged misrepresentations are material. (DE 386 at 11-12).  In reply, Plaintiff argues that Dr. DeRosia cannot assess the impact of the Notice(s) on the Cancellation Rate because he did not consider any evidence pertaining to that impact or to Customers' decisions.  (DE 387 at 8).

Specifically, Plaintiff argues that Dr. DeRosia's Opinions addressed his view of the contents of the Notices, which the Court and the trier of fact can themselves assess.  (DE 371 at 11-12) (citing, among other authority, *Frazier*, 387 F.3d at 1262 ("[E]xpert testimony is admissible

if it concerns matters that are beyond the understanding of the average lay person.")).  First, as previously discussed, the Court specifically ordered that the wording of the Notices would incorporate the Court's finding that deception was involved in the selling of the products at issue. Thus, the Court was aware that the Notices would alert Customers to this finding.  The purpose of the Notices, in fact, was to alert Customers about the fact that Defendants may have deceptively sold the products to them.  Second, given the purpose of the Notice, it is unsurprising that the Notices would influence cancellations of the subject policies.  Expert testimony is not required to assist the trier of fact with this determination.  Defendant's argument that Dr. DeRosia's testimony "contextualizes" the Cancellation Rate because it may be used to prove that Defendants made material misrepresentations—an element of Plaintiff's case—is unavailing because Plaintiff is correct that the Dr. DeRosia's opinions offer nothing beyond what the average lay person can determine for themselves.

As Plaintiff also notes, the attorneys are certainly capable of arguing in their closing arguments that the Notices influenced the Cancellation Rate.  *Frazier*, 387 F.3d at 1262-62 ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.").  Thus, for this reason as well, Dr. DeRosia's opinions are unhelpful to the trier of fact.

Moreover, as Plaintiff also argues and as previously discussed, Dr. DeRosia failed to consider primary evidence in coming to his conclusions regarding the Cancellation Rate thus making his opinions pertaining to the impact of the Notices' or to Customers' decisions resulting from the Notices unreliable.  Therefore, even if expert testimony could be helpful regarding the Notices' impact on the Cancellation Rate, as previously discussed, Dr. DeRosia's methodology

does not reliably assess the impact.  Accordingly, for all of the above reasons, I conclude that Dr. DeRosia's testimony should be excluded as unhelpful.

## 2.   <u>Whether the Opinions are Legal Conclusions</u>

Plaintiff argues that Dr. DeRosia's report contains improper legal conclusions.  (DE 371 at 13-16).  Defendant denies that Dr. DeRosia's Opinions are legal conclusions.  (DE 386 at 14). Specifically, Defendant contends that opinions relating to the impact of the Notices on the Cancellation Rate and the reliability of the Cancellation Rate as a metric "due to consumer bias caused by the [Notice] . . . are not 'pure legal conclusions.'"  *Id.* at 15.  Plaintiff's Reply observes that Defendant's assertion that Dr. DeRosia offers no legal conclusions is "devoid of law" because Defendant cites no legal authority nor disputes or distinguishes Plaintiff's numerous cases holding that opinions such as those Dr. DeRosia proffered are inadmissible.  (DE 387 at 9-10).

Expert's may not merely proffer legal conclusions.  *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (holding that "the court must be the jury's only source of law").  In addition, an expert "cannot offer testimony about the legal implications of evidence." *United States v. Thanh Quoc Hoang*, 891 F. Supp. 2d 1355, 1361-62 (M.D. Ga. 2012), *aff'd*, 560 F. App'x 849 (11th Cir. 2014).  Plaintiff cites specific statements in Dr. DeRosia's report that could be considered improper legal conclusions, such as stating the definition of false advertising or whether the word "charged" is a proper term to use in a civil case as opposed to a criminal case. (DE 371 at 14).  The statements within Dr. DeRosia's Report, however, are unnecessary to individually address because the Report and the Opinions in it are inadmissible on grounds that Dr. DeRosia's testimony impermissibly instructs the jury how to weigh potential evidence.  Dr. DeRosia opines as to the probative value of the Cancellation Rate.  Therefore, he is opining "about

the sufficiency of [Plaintiff's] evidence." *Id.* at 1361.   Because Dr. DeRosia's testimony would instruct the jury about how to weigh the evidence, the Court must exclude it.

### IV.   <u>CONCLUSION</u>

For the foregoing reasons, it is hereby

**ORDERED AND ADJUDGED** that Plaintiff's *Daubert* Motion (DE 386) is **GRANTED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 3rd day of March 2021.

*Jared Strauss*

**Jared M. Strauss**
**United States Magistrate Judge**

Copies furnished counsel via CM/ECF