## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-cv-62593-GAYLES

**FEDERAL TRADE COMMISSION,**

  **Plaintiff,**

**v.**

**SIMPLE HEALTH PLANS LLC, et al.,**

  **Defendants.**

_____/

## <u>ORDER</u>

  **THIS CAUSE** comes before the Court on Plaintiff Federal Trade Commission's ("FTC")

Motion for Summary Judgment ("FTC's Motion"), [ECF No. 374], and Defendant Steven

Dorfman's ("Dorfman") Motion for Summary Judgment ("Dorfman's Motion"), [ECF No. 379].

The Court has reviewed the motions and the record and is otherwise fully advised. As set forth

below, the FTC's Motion is granted, and Dorfman's Motion is denied.

### BACKGROUND[1]

---

[1] The facts are taken from the FTC's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment, [ECF 376], Dorfman's Opposition Statement of Material Facts, [ECF No. 392], Dorfman's Statement of Material Facts, [ECF No. 375], the FTC's Response to Dorfman's Statement of Material Facts, [ECF No. 391], and the corresponding exhibits.

 In many of his responses to the FTC's statement of material facts, Dorfman states that "the FTC's analysis of certain Corporate Defendants' unauthenticated alleged business records is inadmissible hearsay." [ECF No. 392]. These blanket, generalized objections are insufficient to raise an evidentiary challenge. *See e.g. Stroud v. Bank of Am.*, No. 11-22489, 2012 WL 3150054, at *3 (S.D. Fla. Aug. 1, 2012) (overruling evidentiary challenge where opponent "failed to identify specifically which documents he is referencing" in a record that was "thousands of pages long."). Moreover, even if Dorfman had properly objected, the Court finds that the Corporate Defendants' records—obtained pursuant to the Court's Temporary Restraining Order—were properly authenticated and fall within the business records hearsay exception of Federal Rule of Evidence 803(6) and/or include statements of a party opponent under Federal Rule of Evidence 801(d)(2). Moreover, the records seized from Defendants' offices are also admissible under the Rule 807 residual hearsay exception.

 In addition, many of Dorfman's statement of "facts" are based on Dorfman's own unsupported assertions about the health insurance industry. *See* [ECF No. 375]. However, Dorfman is not an insurance expert. *See* [ECF No. 391 ¶ 2]. Accordingly, to the extent Dorfman's "facts" opine on the workings of the insurance industry, they will not be considered. Finally, the Court will not consider Dorfman's references to Dr. Eric DeRosia's opinions as Magistrate Judge Strauss granted the FTC's *Daubert* Motion to exclude Dr. DeRosia's testimony. [ECF No. 401].

The undisputed facts in this action present a well-documented account of a classic bait and switch scheme—aided by rigged internet searches, deceptive sales scripts, and predatory practices. Though consumers believed they were purchasing comprehensive health insurance coverage, Defendants sold them practically worthless limited indemnity or discount plans. Defendants profited from their scheme, while consumers were left with inadequate health coverage and devastating medical bills.

From 2012 to 2016, Dorfman founded Defendants Simple Health Plans, LLC ("Simple Health"), Health Benefits One LLC ("HBO"), Health Center Management LLC ("HCM"), Innovative Customer Care LLC ("ICC"), Simple Insurance Leads, LLC ("SIL"), and Senior Benefits One LLC ("SBO") (collectively the "Corporate Defendants") (together with Dorfman, the "Defendants"). [ECF No. 376 ¶ 2a].[2] As detailed below, Defendants led over 100,000 consumers to believe they were receiving comprehensive health insurance when, in fact, they received limited indemnity plans or discount memberships.[3]

## I.    Defendants' Offerings in the Health Insurance Marketplace

Comprehensive health insurance is exactly what the name implies—comprehensive. It generally covers a large portion of the expense for doctor's visits, emergency room visits, hospital stays, laboratory services, and prescription medicine. With comprehensive health insurance, after the payment of a premium, a deductible, and a co-payment, the risk of large medical bills shifts from the consumer to the insurance company. In addition, many comprehensive health insurance plans comply with the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18001,

---

[2] Defendant Candida Girouard was the Chief Compliance Officer for one or more of the Corporate Defendants and worked with Dorfman to build the Corporate Defendants' customer service, licensing, and compliance departments. [ECF No. 376 ¶ 2c]. On September 8, 2021, following her settlement with the FTC, the Court entered a Stipulated Order for Permanent Injunction and Suspended Monetary Judgment as to Girouard. [ECF No. 449].

[3] Health Insurance Innovations ("HII") provided and administered most of the plans Defendants sold. Consumers paid HII premiums for the plans, and HII paid Defendants nearly $200 million in commissions for their sales. [ECF No. 376 ¶¶ 2(n), 61].

2

often referred to a "Obamacare." ACA-qualified plans: (1) must provide ten essential health benefits[4];  (2) must guarantee coverage for preexisting conditions; (3) must have an out-of-pocket maximum that caps the consumer's total financial exposure for the year; and (4) except in limited circumstances, are only available during an annual enrollment period. *See* 18 U.S.C. § 18022(b)(1), (c)(1); 45 CFR § 155.410. In addition, consumers enrolled in ACA-qualified plans are not required to pay the penalty imposed on people who could afford insurance but chose not to purchase it. 26 U.S.C. § 5000A.

Defendants did not sell comprehensive health insurance compliant with the ACA. [ECF No. 376 ¶¶ 19-22]. Rather, Defendants enrolled consumers in association memberships that typically included a limited indemnity plan bundled with discount dental or vision plans, wellness plans, or other lifestyle discount plans. *Id.* ¶¶ 20, 20(a), 22. Limited indemnity plans provide only a predetermined, limited financial benefit to consumers after medical expenses are incurred; consumers pay upfront out of pocket, with no cap on their exposure, and are reimbursed a fixed amount after the fact.[5] *Id.* ¶ 21. Thus, they are not compliant with the ACA.[6] Indeed, the plans Defendants sold provided small cash payouts instead of the ten essential health benefits provided by ACA-qualified plans,[7] excluded coverage for preexisting conditions, and are sold year-round. *Id.* ¶¶ 21, 21(g), 22(c), (e), (i), (k). As a result, a consumer who only had one of Defendants'

---

[4] The ten essential health benefits are: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services, including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventative and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care. 18 U.S.C. § 18022(b)(1).

[5] The maximum benefit provided under a typical limited indemnity plan is around $3200 per year, realized only if the consumer is hospitalized 100 days. In this example, the consumer's total cost of care would likely exceed $50,000, with the consumer paying the over $45,000 balance. [ECF No. 376 ¶ 21(b)]

[6] The plans sold by Defendants also are not PPO insurance. [ECF No. 376 ¶ 21(c)].

[7] For example, Defendants' plans did not provide coverage for prescription drugs, rehabilitative or habilitative services, laboratory services, preventative services, emergency room coverage, surgical care, anesthesia care, skilled nursing facility care, complex imaging or outpatient procedures. [ECF No. 376 ¶¶ 21(a)-(b),

offered plans was subject to the ACA penalty for failing to obtain compliant insurance. *Id.* ¶ 21(f). At bottom, none of the products Defendants sold constituted comprehensive or ACA-qualified health insurance.

## II.     Defendants' Deceptive Business Model

### A.       Lead Generation

Defendants' first step in their scheme was to obtain contact information for potential consumers—known as sales leads. *Id.* ¶ 5. Defendants obtained sales leads through two avenues: (1) leads generated internally and (2) leads generated by third parties. *Id.* ¶ 5(a).[8]

To generate their own leads, Defendants targeted consumers searching online for health insurance coverage using terms such as "Obamacare," "AARP," "Blue Cross Blue Shield," and "BCBS." *Id.* ¶ 5(b).[9] Consumers who used these keywords were directed to Defendants' lead generation websites, each of which implied that Defendants specialized in providing ACA-qualified and/or comprehensive health insurance. *Id.* ¶ 5(c), (f). For example, Defendants' website healthinsurancedeadline.com urged consumers to "[g]et[] [h]ealth [i]nsurance now" to avoid the "substantial tax penalty" that the uninsured face, *Id.* ¶ 5(d); and another of Defendants' websites, www.usamedsupp.org, featured the AARP logo and invited consumers to "Compare Medicare Quotes . . . in three simple steps," *Id.* ¶ 5(e).[10]

Defendants also purchased leads generated by third parties. *Id.* ¶ 5(g). Defendants procured 117,990 leads from third-party websites using a Blue Cross Blue Shield insignia and 218,190 leads from third-party websites referencing the "Affordable Care Act" or "Obamacare." *Id.* ¶ 5(k), (1).

---

[8] SIL operated as the internal marketing department for Defendants and handled the lead generation process. [ECF No. 376-6 ¶ 14].
[9] Defendants used Google Adwords and other accounts to run targeted ad campaigns. [ECF No. 376 ¶ 5(b)].
[10] Defendants' other lead generation websites included obamacarehealthquotes.org, myobamacareapplication.com, healthinsurance2018deadline.com, americanhealthinsure.com, trumpcarequotes.com, and premiuimhealthquotes.com. [ECF No. 376 ¶ 5c].

Many of these third-party websites promised "Official rates", featured the logos of Horizon Blue Cross, Anthem Blue Cross, Aetna, and others, and purported to provide educational materials about the ACA and Obamacare plans. *Id.* ¶ 5(g), (h). Defendants also purchased at least 100,000 leads originating from online ads offering quotes from major insurance carriers that would appear when consumers ran online searches. *Id.* 5(i), (m).

Despite the messaging conveyed by their own and third-party websites, Defendants were not affiliated with Blue Cross, Aetna, or AARP. *Id.* ¶ 26-27. Moreover, Defendants were not experts on, nor did they offer, ACA-qualified healthcare plans. *Id.* ¶ 19.[11]

### B.   The Scripted Sale

After receiving a lead, one of Defendants' telemarketers would contact the potential customer using facially deceptive sales scripts. *Id.* ¶¶ 6-9. Defendants required their telemarketers to use the sales scripts and promoted "stick[ing] to the script" as the "fastest way to the money." *Id.* ¶ 7. The scripts each followed a similar format and falsely implied that Defendants can provide comprehensive health insurance through well-known providers and misstated the benefits and coverage that Defendants' products actually provided. *Id.* ¶¶ 8-9.

#### 1.   "The Fear of God"

The scripts began with the telemarketer stating his or her affiliation with Simple Health, that Simple Health "represent[s] many of the MAJOR 'A Rated' CARRIERS," and that he or she would find the consumer the "BEST PLAN out there for the BEST PRICE." *Id.* ¶ 8(a)-(b). The scripts then led into the "Fear of God" Section. *Id.* ¶ 8(c). Defendants trained their telemarketers to create a sense of "urgency and fear" in consumers as to whether they are eligible for[12] and can

---

[11] Defendants only enrolled thirty consumers into ACA-qualified healthcare plans in 2015 and then completely exited the ACA marketplace.  [ECF No. 376 ¶ 25].

[12] This fear was unfounded as all of Defendants' products are "guaranteed issue," so there were no eligibility screening criteria and a consumer's qualification was automatic. [ECF No. 376 ¶ 21(g)].

afford healthcare coverage. During this point in the call, telemarketers were to warn consumers that "most insurance plans these days have HIGH DEDUCTIBLES and HIGH PREMIUMS," and that Defendants may be unable to find a plan that fits the consumer's needs. *Id.*  ¶ 8(d).

### 2.   The Fake Search

The scripts then directed the telemarketer to place the consumer on hold while the telemarketer purportedly searches for "the best" plan from "'A' rated carriers". *Id.* ¶ 8(e). Despite the hold, telemarketers never searched for the "best" options. *Id.* Rather, Defendants' telemarketers offered nearly the same products to every consumer, bundled together in a way to maximize their own commissions without consideration of the consumer's actual needs. *Id.*

### 3.   Legitimize Carrier

After the hold, Defendants' scripts falsely told consumers that they were "approved" for a "PPO" with an "A Rated carrier." *Id.* ¶ 8(f). This section of the script, labeled Legitimize Carrier, deceptively described Defendants' products as a "health insurance plan," "medical insurance package," "PPO," and "similar" to "insurance through an employer" that "typically" is available only for "large groups and businesses." *Id.* ¶ 8 (e)-(g). The scripts also falsely stated that there were "no limits on plan usage," and that the plans would include "a prescription drug plan," "doctor office visits," "diagnostic testing," "hospital coverage," and "medical" and "surgical" care that "can be used at virtually ANY inpatient or outpatient facility in the NATION." *Id.*¶ 8(i). The scripts also represented that Defendants' plans provided these benefits without discriminating "against any . . . pre-existing conditions." *Id*. ¶ 8(h). Despite the representations in the scripts, Defendants' products (1) were not traditional insurance or PPOs, (2) included limits on the benefits offered, (3) did not cover preexisting conditions, and (4) left consumers struggling to get coverage from their medical providers. *Id.* ¶¶ 19-22.

The scripts also contained gross misrepresentations about consumers' expected costs for medical expenses. They described a consumer's expected out-of-pocket expenses as "pennies on the dollar" and that the consumer would pay "only $25 for a $200 doctor visit or $5,000 for a $50,000 hospital visit"; and they promised consumers that they will "NEVER incur ANY upfront costs." *Id.* ¶¶ 8(j)-(l). Some versions of Defendants' scripts directed telemarketers to "rebut" consumers' inquiries about coverage by saying that Defendants' products could "work out even more in consumers' favor" than a traditional "70-30" insurance policy that covers 70% of the costs of consumers' medical care. *Id.* ¶ 16. Defendants' representations were lies. Consumers received, at most, access to a discount that could not be ascertained prior to incurring the cost of a service. *Id.* ¶ 21.

### 4. Collect Payment Information

After consumers agreed to enroll in the offered association memberships and discount plans, Defendants collected consumers' payment information. The scripts directed telemarketers to congratulate the consumer on their "NEW INSURANCE POLICY." *Id.* ¶ 8(n).

### 5. Verification and Continued Deception

The last step in Defendants' overwhelmingly deceptive process—verification—was purportedly to confirm the consumers' understanding of their enrollments. However, Defendants really used the audio and electronic verifications to hide their deceptive conduct from third parties and regulators. As set forth in the scripts, Defendants' telemarketers (1) falsely told consumers that only parts of the verification call applied to them but did not specify which parts, (2) instructed consumers not to interrupt or ask questions during the verification process, and (3) coached consumers to answer yes to verification questions even if the consumers wanted to add information or ask questions. *Id.* ¶ 14(a)-(b). The audio verifications contained inconsistent disclosures about

7

the products which were quickly read aloud by one of Defendants' employees. *Id.* ¶ 14(b). The electronic verifications displayed pages of densely worded, barely legible fine print disclosures. *Id.* ¶ 14(c). Defendants' telemarketers urged consumers to quickly click through the disclosures and affix an electronic signature. *Id.*

Defendants also used a "verification rebuttal" script that instructed employees to provide different and conflicting answers to consumers' common questions depending on whether the verification was recorded or not. *Id.* ¶ 14(d). One "on recording" rebuttal stated that Defendants' products "are not [h]ealth [i]insurance," and the corresponding "off recording" rebuttal stated "[t]his is health insurance." *Id.* Another "on recording" rebuttal about ACA qualification and the tax penalty stated a consumer is "susceptible" to the tax penalty, while the "off recording" rebuttal is multiple convoluted sentences and does not state that consumers will be subject to the tax penalty with Defendants' plans. *Id.*

### 6. Use of Scripts

The record reflects that Defendants' telemarketers routinely followed the scripts. Defendants' recorded sales calls nearly all contain the misrepresentations detailed above. *Id.* ¶ 10. A statistical analysis of 13,816 of Defendants' own recordings confirms that in more than 90% of Defendants' sales calls, telemarketers misrepresented the availability of specific benefits such as coverage for surgical treatment, prescription drugs, and diagnostic testing, and falsely called the products being sold as PPOs. *Id.* ¶ 10(a). At least 83% of the time, Defendants told consumers that there were "no limits" on the product's usage. *Id.*

### C. Consumer Complaints and Cancellations

Defendants' scheme resulted in high cancellation rates and thousands of complaints to Defendants and third parties, including the Better Business Bureau ("BBB") and state departments

8

of insurance. *Id.* ¶ 30(a)-(j). Consumers consistently reported believing that Defendants had enrolled them in a plan that provided comprehensive benefits as promised by Defendants' telemarketers. *Id.* ¶ 30(b), (d), (e), (g), (h), (k).

### 1.  Complaints During Cancellation

Defendants maintained "drop off" reports which documented cancellation requests in the first thirty days of enrollment. *Id.* ¶ 30(b). Dorfman received the drop off reports daily. *Id.* ¶¶ 30, 50. As reflected in Defendants' notes in the drop off reports, more than 20% of consumers who Defendants enrolled in plans cancelled within the first thirty days; a significant portion of these consumers cancelled because of misrepresentations by Defendants' telemarketers or because the benefits of the plans were not as expected. *Id.* Many consumers discovered Defendants' scheme and cancelled their plans before incurring ongoing payments and unpaid medical bills. *Id.* ¶ 30(c). Others were not so lucky. Complaints documented in the drop off reports included that consumers were misled as to (1) prescription and surgery coverage, (2) major medical coverage, (3) coverage for hospital stays; (4) compliance with the ACA; and (5) the tax penalty. *Id.* ¶ 31(g).

Cancellation requests were not limited to the first thirty days, and Defendants continued to be inundated with calls. Indeed, one of Defendants' call centers received between 300 and 500 calls per day requesting cancellation. *Id.* ¶ 30(d). Dorfman urged his customer service staff to "save" the sales in order to avoid losing commissions. *Id.* ¶ 51(b). These efforts at saving the sales often led to more misrepresentations. *Id.* ¶ 31.

### 2.  Complaints to Defendants' Plan Administrator

Consumers also complained to Health Insurance Innovations ("HII"), Defendants' plan administrator. HII kept records of these "escalations" and routinely shared those records with Defendants. *Id.* ¶ 30(f). From 2014 until late 2018, HII forwarded nearly 7,500 escalations to

Defendants, the majority of which were characterized as "agent misrep[resentations]." *Id.* ¶ 30(g). Internally, HII acknowledged that complaints about Defendants were "very high and not getting better" and that Defendants' purported compliance efforts were "a daily joke." *Id.* ¶ 33. HII representatives described Defendants' sales tactics as "coercive/misleading," "reinforc[ing] incorrect information, mak[ing] confusing and misleading statements," "brow-beat[ing] the customer into submission for up to an hour," "systematically abus[ive]," and "mak[ing] the cancellation process very difficult through avoidance." *Id.*

### 3. Complaints to Other Third Parties

Consumers also filed complaints about Defendants with their state departments of insurance, the BBB, and other third parties. These complaints reflect a similar pattern of misrepresentation. *Id.* ¶30(i)-(j). Notably, consumers filed almost 400 complaints against Defendants with state departments of insurance, documenting misrepresentations regarding ACA compliance, coverage for doctors and hospital visits, and the nature of the plans. *Id.* ¶¶ 30-31.

## III. Government Investigations

In addition to the FTC's investigation and filing of this action, Defendants' practices have prompted several government investigations. The Florida Department of Financial Services ("DFS") conducted investigations of Defendants regarding the deceptive advertising on their websites and press releases regarding the sale of ACA products and deceptive and misleading representations about the terms of the plans they sold. *Id.* ¶ 34. Other agencies conducted investigations, filed actions, issued cease and desist orders, or issued consumer warnings about deceptive practices, including the Indiana Commissioner of Insurance, the Nebraska Department of Insurance, the Montana Commissioner of Securities and Insurance, the Pennsylvania Insurance Department, the Nebraska Attorney General, and the Massachusetts Attorney General. *Id.* In

10

addition, on February 23, 2022, Dorfman, Girouard, and John Sand[13] were indicted for Conspiracy to Commit Wire Fraud, Wire Fraud, and Mail Fraud in the Southern District of Illinois. *See United States v. Dorfman*, Case No. 22-CR-30024-SPM (S.D. Ill. 2022).[14]

## IV.      Dorfman Controlled Defendants' Common Enterprise

Dorfman perpetrated the scheme detailed above through the network of Simple Health companies under his control, all of which operated as a common enterprise structured to influence consumers at every step of the sales process.

### A.      Common Enterprise

The Corporate Defendants shared a common address in Hollywood, Florida, and, by 2015, worked collectively under the name "Simple Health." *Id.* ¶¶ 2d, 2g. Executive leadership, including Dorfman as Chief Executive Officer ("CEO"), Girouard as Chief Compliance Officer, Robert Kneeter and then Kimberly O'Connell-Calvo as the Chief Marketing Officer ("CMO"), David Caldes as the Vice President of Operations and Data Analytics, and Sand as the Vice President of Sales, also worked out of the Hollywood location and met on a regular basis. *Id.* ¶¶ k, l. The Corporate Defendants shared accounting, human resources, and IT staff—all of whom worked out of the Hollywood location. *Id.* ¶ m. In addition, the Corporate Defendants commingled funds.[15] *Id.* ¶ 2p. Indeed, the revenue for each of the Corporate Defendants consisted primarily of

---

[13] Sand was Defendants' Vice President of Sales. [ECF No. 376 ¶2k].

[14] As of the date of this Order, Girouard has pled guilty and is scheduled for sentencing on May 15, 2024. Dorfman and Sand are set for trial on January 29, 2024.

[15] Dorfman disputes—without any evidentiary support—that the Corporate Defendants commingled funds. However, the undisputed record evidence overwhelmingly demonstrates commingling. *See* [ECF No. 376 ¶ 2p]; [ECF No. 391 ¶ 16].

the commissions resulting from HBO's sales.[16] *Id.* ¶¶ 2i, 2n. HBO transferred millions of dollars to the other Corporate Defendants, none of which had significant sources of revenue. *Id.* ¶ 2p.[17]

## B. Dorfman's Control, Participation, and Knowledge

Dorfman controlled nearly all aspects of the Simple Health Enterprise. From 2012 to 2016, Dorfman founded each of the Corporate Defendants. [ECF No. 376 ¶ 2a]. Dorfman was CEO of Simple Health, HBO, ICC, SIL, and SBO and owned 99% of the membership interests in HCM, the holding company that holds 100% of the interests in the other Corporate Defendants. *Id.* ¶¶ 2a-b. He was the signatory on the Corporate Defendants' bank accounts and personally guaranteed loans made by HII to HBO and SIL. *Id.* ¶¶ 39, 45. He controlled the Corporate Defendants' finances and routinely used corporate funds to pay for his personal expenses, including the rent on his residence, automobile leases, gambling, jewelry, and daily expenses such as dining and clothing. *Id.* ¶ 56.

Dorfman was also involved in the regular operations of the Corporate Defendants. He supervised the Corporate Defendants' executives and regularly communicated with them. *Id.* ¶¶ 40, 44. Dorfman had the authority to hire and fire employees, dictate dress codes, and approve payments to vendors. *Id* ¶¶ 42, 44, 46. In addition, as detailed above, Dorfman wrote, reviewed, and trained employees on Defendants' scripts. *Id.* ¶¶ 46, 48, 49. In short, nothing of substance happened at Simple Health without Dorfman. As a result, he was well-aware of the deceptive conduct. Indeed, he (1) knew the content of the scripts; (2) listened to sales calls; (3) was aware of and reviewed customer complaints; and (4) monitored complaints and negative reviews online. *Id.* ¶ 48, 52, 53, 55. Indeed, with respect to the online reviews, Dorfman directed employees to obtain

---

[16]  Over 92 percent of SIL's revenue was paid to it by HBO. [ECF No. 376 ¶ i]. Over 99 percent of ICC's revenue came from HBO. *Id.* ¶ j.
[17]  The Corporate Defendants had at least 17 separate bank accounts and 7 separate credit cards in the name of an individual Corporate Defendant. [ECF No. 376 ¶¶ 14-15].

"burner" phones and suggested they use those phones to create false positive reviews of Simple Health to submit to the BBB. *Id.* ¶ 55.

## V.      Consumer Harm

Defendants deceived consumers into paying more than $400 million for limited indemnity and discount plans. *Id.* ¶ 60. Defendants earned more than $196,466,433 from HII and other third parties in commissions for these sales. *Id.* ¶ 61. The harm to consumers, however, is not limited to the amount they paid for the plans. *Id.* ¶ 31. Indeed, many consumers could not afford medication or medical procedures and suffered without them. *Id.* Others incurred uncovered medical expenses, sometimes in the hundreds of thousands of dollars. *Id.* And many consumers lost the opportunity to enroll in an ACA-qualified policy during the open enrollment period. *Id.*

## VI.     Procedural History

On October 29, 2018, the FTC filed its Complaint for Permanent Injunction and Other Equitable Relief, [ECF No. 1], against Dorfman and the Corporate Defendants alleging violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310. In conjunction with the Complaint, the FTC filed an Emergency *Ex Parte* Motion for a Temporary Restraining Order. [ECF No. 3]. On October 31, 2018, the Court entered a Temporary Restraining Order (the "TRO") and froze all of Defendants' assets, including Dorfman's personal assets. [ECF No. 15]. The Court also appointed Receiver Michael Goldberg to administer the affairs of the Corporate Defendants and to take necessary actions to protect consumers. *Id.* On May 14, 2019, following an evidentiary show cause haring, the Court entered a preliminary injunction. [ECF No. 139].[18] On June 23, 2020, the FTC filed the Second Amended

---

[18] Dorfman filed two interlocutory appeals of the preliminary injunction and asset freeze. The Eleventh Circuit affirmed this Court on both appeals. *See Federal Trade Commission v. Simple Health Plans, LLC*, 801 F. App'x 685 (11th Cir. 2020); *Federal Trade Commission v. Simple Health Plans LLC*, 58 F.4th 1322 (11th Cir. 2023).

Complaint, which added Girouard as a defendant and Section 19 of the FTC Act, 15 U.S.C. § 57b, as an additional basis for relief. [ECF No. 289].

On January 15, 2021, the FTC and Dorfman filed their cross motions for summary judgment. In the FTC's Motion, it argues that the undisputed material facts establish as a matter of law that (1) Dorfman violated the FTC Act and the TSR; (2) the Defendants operated as a common enterprise; (3) Dorfman is individually liable for violations of the FTC Act and the TSR; and (4) the Court should issue injunctive and monetary relief. In Dorfman's Motion, he argues that (1) the McCarran-Ferguson Act divests the Court of subject matter jurisdiction over this proceeding; (2) Defendants did not make any material misrepresentations that consumers relied on; (3) Defendants cannot be liable for violating the Telemarketing Sales Rule because Defendants did not initiate any contacts with consumers; and (4) the FTC is not authorized to seek, and the Court is not authorized to grant, the forms of monetary relief requested.[19]

## LEGAL STANDARD

Summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), "is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)) (internal quotation marks omitted). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)

---

[19] The Court has already ruled that (1) Defendants did not engage in the business of insurance such that the McCarran-Ferguson Act divests the Court of subject matter jurisdiction, [ECF No. 182]; (2) Defendants' conduct is subject to the Telemarketing Sales Rule, [ECF Nos. 298-1 at 34-35; 338]; and (3) the FTC is authorized to seek, and the Court is authorized to grant, the requested monetary relief. *See FTC v. Simple Health*, 379 F. Supp. 3d 1346 (S.D. Fla. 2019). Nothing in the record before the Court changes these findings. As a result, the Court will not devote any additional time on Defendants' unmeritorious arguments.

(emphasis in original). An issue is "genuine" when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).

The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014). However, to prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

## DISCUSSION

The FTC brings claims against Defendants for violating Section 5 of the FTC Act (Count I) and the TSR (Count II). As set forth below, the Court finds that the FTC has established no genuine issue as to any material facts and that it is entitled to judgment as a matter of law on both claims.

## I.    Count I—Defendants Violated the FTC Act

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).

### Deceptive Acts and Practices

To establish that an act or practice is deceptive under Section 5(a) of the FTC Act, "the FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances; and (3) the representation was material."

15

*FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). In determining whether a representation is likely to mislead consumers acting reasonably under the circumstances, courts consider the "overall, net impression rather than the literal truth or falsity" of the representation. *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009) (per curiam).

"A representation is material if it is of a kind usually relied upon by a reasonably prudent person." *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007). "If a significant number of prospective purchasers are likely to attach importance to the representation in determining whether to engage in a proposed transaction, the representation is material." *FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247, 1272–73 (M.D. Fla. 2012) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 3, cmt. b (1995)). "Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material." *Transnet Wireless Corp.*, 506 F. Supp. 2d at 1267. "Express claims directly represent the fact at issue while implied claims do so in an oblique or indirect way." *Kraft, Inc. v. FTC*, 970 F.2d 311, 318 n.4 (7th Cir. 1992). Implied claims are material if there is evidence that the seller intended to make the claims or if the claims address the central characteristics of the product or service offered. *See Novartis Corp. v. FTC*, 223 F.3d 783, 786–87 (D.C. Cir. 2000); *Kraft*, 970 F.2d at 322.

As detailed above, the undisputed facts establish that Defendants made a series of material misrepresentations that were likely to influence consumers' decisions to purchase the plans offered by Defendants. Defendants' misrepresentations include that:

- Their products were comprehensive health insurance plans that provided significant benefits, including for hospitalization, emergency care, doctor's appointments, and prescriptions;

- They offered ACA-qualified plans or had the expertise to do so; and

- They were affiliated with AARP, Blue Cross Blue Shield, and other prominent health-related organizations.

Defendants' deceptive conduct began with their websites which misled consumers into thinking that Defendants were affiliated with nationally recognized insurance providers, including using terms such as "Obamacare" or "ACA". The deception continued—and grew—during the scripted sales calls. Every section of Defendants' scripts led consumers to believe that they were purchasing comprehensive health insurance policies that would provide coverage for surgery, diagnostic testing, and doctor's visits. Defendants falsely represented to consumers that they conducted searches for the best "A-Rated" plans, when, in fact, no such searches were conducted. Defendants told consumers that their out-of-pocket costs would be limited when nothing could be farther from the truth.

These misrepresentations were likely to mislead consumers acting reasonably under the circumstances because they provided the net impression that Defendants would provide the promised services and results—namely comprehensive health insurance and/or ACA-qualified plans. *See FTC v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1365 (S.D. Fla. 2016) (Defendants selling medical discount card deceived consumers into believing defendants were selling insurance by using terms "like 'copay,' 'premium,' and 'deductible' which are commonly associated with insurance.").

17

Defendants' representations are also material. First, Defendants' express, deliberate representations are presumptively material. *Transnet Wireless Corp.*, 506 F. Supp. 2d at 1267. Second, Defendants' representations about what their plans would cover go to "the heart of a consumer's decision to purchase" a product or service and are presumptively material. *FTC v. USA Beverages, Inc.*, No. 05-61682, 2005 WL 5654219, at *6 (S.D. Fla. Dec. 6, 2006), *report and recommendation adopted*, No. 05-61682, 2005 WL 5643834 (S.D. Fla. Dec. 9, 2005). Finally, Defendants' representations led to substantial consumer injury and, therefore, are demonstrably material. *See* FTC Policy Statement on Deception, Appended to *Matter of Cliffdale Assocs.*, *Inc.*, 103 F.T.C. 174, 183 (1984) ("Injury exists if consumers would have chosen differently but for the deception. If different choices are likely, the claim is material, and injury is likely as well. Thus, injury and materiality are different names for the same concept."). Indeed, in addition to consumers losing over $400 million on fees for subpar plans, Defendants' scheme forced many consumers to incur uncovered medical expenses and/or to delay or forgo medical treatment or medications. And, as demonstrated by the drop off reports and other evidence, many consumers cancelled their enrollments because Defendants' plans provided insufficient benefits or were not ACA-qualified. This evidence clearly establishes that Defendants' misrepresentations impacted consumers' enrollment decisions.

Although the FTC "need not present proof of subjective reliance by each victim," *Transnet Wireless Corp.*, 506 F. Supp. 2d at 1266–67 (citation omitted), or proof of actual deception to establish a violation of Section 5, "such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *FTC v. USA Fin., LLC,* 415 F. App'x 970, 973 (11th Cir. 2011) (quoting *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006)). Here, the evidence, including the reasons cited by the thousands of consumers who

canceled their plans, demonstrates consumers purchased the subpar plans in reliance on Defendants' false representations about coverage and ACA-qualification.

As the undisputed material facts establish the elements of a deception claim under Section 5 of the FTC Act, summary judgment shall be entered in favor of the FTC as to Count I.[20]

## II.     Count II—Defendants Violated the TSR

The TSR prohibits deceptive and abusive telemarketing practices, including misrepresenting any material aspect of the nature or central characteristics of goods or services, 16 C.F.R. § 310.3(a)(2)(iii), making a false or misleading statement to induce any person to pay for goods or services, 16 C.F.R. § 310.3(a)(4), and misrepresenting an affiliation with any person or government entity, 16 C.F.R. § 310.3(a)(2)(vii).[21] The undisputed material facts establish that Defendants violated each of these provisions. First, Defendants misrepresented material aspects of the products they sold, including that the plans were comprehensive health insurance and/or ACA-qualified. *See* 16 C.F.R. § 310.3(a)(2)(iii). Second, Defendants made material misrepresentations about their plans to induce consumers to buy them. *See* 16 C.F.R. § 310.3(a)(4). Finally, Defendants misrepresented their own affiliation with the government and multiple private entities,

---

[20] Defendants' Post-Close script/verification process, completed after consumers paid their premiums, does not shield them from liability. First, "*caveat emptor* is not a valid defense to liability arising from misrepresentations." *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1233 (11th Cir. 2014) (citing *Tashman*, 318 F.3d at 1277). Second, even if *caveat emptor* were a valid defense, "[d]isclaimers or qualifications . . . are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings." *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 12 (1st Cir. 2010); *see also FTC v. Capital Choice Consumer Credit*, No. 02-21050, 2003 WL 25429612, at *5 (S.D. Fla. June 2, 2003). Defendants' verifications, made after the consumers paid for the product and after Defendants told consumers that some of the verification information did not apply to them, are insufficient to avoid liability. Third, even if the verification contained unambiguous disclosures, it failed to change the net impression created by Defendants' salespeople who verbally promised comprehensive health insurance and ACA-qualified plans. *See FTC v. Cyberspace.com, LLC*, 453 F.3d 1196,1200 (9th Cir. 2006) ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."); *IAB Mktg.*, 746 F.3d at 1233 ("IAB offers no authority for the proposition that disclosures sent to consumers after their purchases somehow cure the misrepresentations occurring during the initial sales.").
[21] The Court has already ruled that the TSR applies to Defendants' nationwide telemarketing campaign. [ECF Nos. 287; 298-1]. Moreover, the undisputed facts confirm the Court's prior ruling. *See* [ECF No. 376 ¶ 3(c),(d)].

including the ACA, Blue Cross, and AARP. *See* 16 C.F.R. § 310.3(a)(2)(vii). Based on these

violations, summary judgment shall be entered in favor of the FTC as to Count II.

**III.    Defendants Operated as a Common Enterprise**

"If the structure, organization, and pattern of a business venture reveal a 'common

enterprise' or a 'maze' of integrated business entities, the FTC Act disregards corporateness."

*Washington Data Resources*, 856 F. Supp. 2d at 1271. Courts consider several factors to determine

if a common enterprise exits, including: (1) maintaining officers and employees in common; (2)

operating under common control; (3) sharing of office space; (4) operating the business through a

maze of interrelated companies; (5) commingling of funds; and (6) sharing of advertising and

marketing. *See id*; *FTC v. Lanier Law, LLC*, 715 F. App' x 970, 979 (11th Cir. 2017). The

undisputed material facts establish each of these factors.

Through a "maze" of integrated entities, all controlled by Dorfman, Defendants engaged

in the same health insurance scheme, shared ownership and managements, operated under the same

"Simple Health" name, shared leads and websites, and commingled funds. Indeed, the Corporate

Defendants shared common officers and employees, including their Chief Marketing Officer,

Chief Compliance Officer, Vice President of Analytics and Operations, and their IT, accounting,

and human resources staff. Dorfman was CEO of each Corporate Defendant and had a 99%

ownership interest in HCM, which owned the other Corporate Defendants. The Corporate

Defendants operated together as Simple Health to support HBO's telemarking operation. Nearly

all of the Corporate Defendants' revenue came from the commissions paid for HBO's sales and

the companies frequently commingled funds. Based on this record, the Court finds that the

Corporate Defendants engaged in a common enterprise. *See FTC v. Pointbreak Media, LLC*, 376

F. Supp. 3d 1257, 1269 (S.D. Fla. 2019) (finding a common enterprise among companies that

"maintained an unholy alliance" evidenced by shared resources and complete reliance on each other).

## IV.     Dorfman Is Individually Liable for the Defendants' Violations

Individuals are liable for a corporate entity's FTC Act violations if they (1) "participated directly in the practices or acts or had authority to control them" and (2) "had some knowledge of the practices." *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996). Here, the undisputed facts overwhelmingly support a finding that Dorfman is individually liable for the Corporate Defendants' unlawful practices.

First, the record clearly reflects Dorfman's control over the Corporate Defendants and his participation in the fraud. As detailed above, Dorfman is the CEO and 99% owner of each of the Corporate Defendants. *See Transnet*, 506 F. Supp. 2d at 1270 (holding that "status as a corporate officer gives rise to a presumption of ability to control a small closely-held corporation"). Moreover, Dorfman was involved in virtually every aspect of the operation. He had the authority to made businesses decisions ranging from dress codes to the sales script. Indeed, Dorfman not only wrote, reviewed, and approved the deceptive sales scripts, he trained employees on how to use them. He supervised company executives, had the authority to hire and fire employees, controlled the payroll, and used corporate funds. There can be no doubt that Dorfman both participated in and had control over Defendants' deceptive scheme. *See FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1233 (11th Cir. 2014) (holding that control can be established where the individual is "active[ly] involve[d] in business affairs and the making for corporate policy."); *Partners in Health Care Ass'n*, 189 F. Supp. 3d at 1367 ("Awareness of fraudulent practices and failure to act within one's authority to control such practices is sufficient to establish liability.").

The undisputed facts also establish that Dorfman had knowledge of the unlawful practices. The "knowledge" element is satisfied if an individual (1) had "actual knowledge of material misrepresentations" or other unlawful conduct, (2) was "reckless[ly] indifferen[t] to the truth or falsity of such misrepresentations," or (3) had an "awareness of a high probability of fraud" and intentionally avoided knowing the truth. *FTC v. Wilcox*, 926 F. Supp. 1091, 1104 (S.D. Fla. 1995). "An individual's degree of participation in the business is probative of knowledge." *Partners in Health Care Ass'n*, 189 F. Supp. 3d at 1367. The evidence reveals that Dorfman was the mastermind of the fraudulent scheme. Indeed, he was clearly aware of the deception in the scripts because he drafted them. He also was fully aware of consumer complaints, listened to sales calls recordings, directed his employees to lie, and made efforts to hide Defendants' deceptive conduct. At a minimum, Dorfman had a reckless disregard for the deceptive scheme. As a result, the Court finds that Dorfman is individually liable on Counts I and II.

## V.   Requested Relief

The FTC seeks both injunctive and monetary relief. The Court finds that both are appropriate here. Section 13(b) of the FTC Act permits the Court to enter a permanent injunction for violations of "any provision of law enforced by the FTC." 15 U.S.C. § 53(b). In addition, based on Defendants' violation of the TSR, Section 19b of the FTC Act provides a basis for awarding equitable monetary relief. 15 U.S.C. §57b (giving the FTC the authority to obtain relief "as the court finds necessary to redress injury to consumers or other persons."). *See also Simple Health*, 58 F.4th at 1331; *FTC v. Washington Data Res., Inc.,* 704 F.3d 1323, 1326 (11th Cir. 2013) (holding that where liability is established for "violation[s] of section 5(a) and the TSR, the FTC [is] entitled to seek relief under both section 13(b), 15 U.S.C. § 53(b), and section 19(b), 15 U.S.C. § 57b, of the FTC Act.").

## **CONCLUSION**

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff Federal Trade Commission's Motion for Summary Judgment, [ECF No. 374], is **GRANTED**, and Defendant Steven Dorfman's Motion for Summary Judgment, [ECF No. 379], is **DENIED**.

2. Final Judgment, including a permanent injunction and monetary relief, shall be entered separately pursuant to Federal Rule of Civil Procedure 58.

3. All pending motions, including Plaintiff Federal Trade Commission's Rule 12(c) Motion for Judgment on the Pleadings with Respect to Dorfman's Defenses, [ECF No. 378], Plaintiff Federal Trade Commission's Motion to Strike Defendant Steven Dorfman's Jury Demand, [ECF No. 408], and Plaintiff Federal Trade Commission's Motion *In Limine* to Admit Evidence at Trial, [ECF No. 438], are **DENIED as MOOT.**

**DONE AND ORDERED** in Chambers at Miami, Florida, this 7th day of February, 2024.

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE